WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11** |
| **FAIRWAY GROUP HOLDINGS** | : | |
| **CORP.**, *et al.*, | : | **Case No. 20-[_____] (___)** |
| | : | |
| **Debtors.**[1] | : | **(Joint Administration Pending)** |

---------------------------------------------------------------x

## MOTION OF DEBTORS FOR (I) AUTHORITY TO (A) OBTAIN POSTPETITION FINANCING, (B) USE CASH COLLATERAL, (C) GRANT LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (D) GRANT ADEQUATE PROTECTION, (E) MODIFY THE AUTOMATIC STAY, AND (F) SCHEDULE A FINAL HEARING AND (II) RELATED RELIEF

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Fairway Group Holdings Corp. (2788); Fairway Group Acquisition Company (2860); Fairway Bakery LLC (4129); Fairway Broadway LLC (8591); Fairway Chelsea LLC (0288); Fairway Construction Group, LLC (2741); Fairway Douglaston LLC (2650); Fairway East 86th Street LLC (3822); Fairway eCommerce LLC (3081); Fairway Georgetowne LLC (9609); Fairway Greenwich Street LLC (6422); Fairway Group Central Services LLC (7843); Fairway Group Plainview LLC (8643); Fairway Hudson Yards LLC (9331); Fairway Kips Bay LLC (0791); FN Store LLC (9240); Fairway Paramus LLC (3338); Fairway Pelham LLC (3119); Fairway Pelham Wines & Spirits LLC (3141); Fairway Red Hook LLC (8813); Fairway Stamford LLC (0738); Fairway Stamford Wines & Spirits LLC (3021); Fairway Staten Island LLC (1732); Fairway Uptown LLC (8719); Fairway Westbury LLC (6240); and Fairway Woodland Park LLC (9544). The location of the Debtors' corporate headquarters is 2284 12th Avenue, New York, New York 10027. Fairway Community Foundation Inc., a charitable organization, owned by Fairway Group Holdings Corp., is not a debtor in these proceedings.

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Fairway Group Holdings Corp. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

### Preliminary Statement

1.     By this Motion, the Debtors seek authorization to obtain postpetition financing (the "**DIP Financing**") and approval of their entry into a superpriority senior secured debtor-in-possession credit facility in an aggregate principal amount of up to $25.0 million (the "**DIP Facility**"), provided by certain of the Debtors' prepetition secured lenders (solely in such capacity, the "**DIP Lenders**") and agented by Ankura Trust Company, LLC (solely in such capacity, the "**DIP Agent**"), with an interim draw of $15.0 million under the proposed DIP Financing, subject to entry of the Interim Order (as defined herein).

2.     As described herein, the DIP Financing provides the Debtors with necessary liquidity, on reasonable terms and customary budget covenants.  The relief sought in this Motion is critical for the Debtors to pay their ordinary-course operating expenses, finance these chapter 11 cases, pursue the Sale Process (as defined herein), and, ultimately, to consummate the transactions contemplated by the Restructuring Support Agreement.  In support of this Motion, the Debtors filed the following declarations with the Court:

- the declarations of Michael Nowlan and Abel Porter pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York, each sworn to on the date hereof (the "**First Day Declarations**"); and

- the *Declaration of Mark Hootnick in Support of Motion of Debtors for (I) Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Liens and Provide Superpriority Administrative Expense Status, (D) Grant Adequate Protection, (E) Modify the Automatic Stay, and (F) Schedule a Final Hearing and (II) Related Relief*, sworn to the date hereof (the "**Hootnick Declaration**") and annexed hereto as **Exhibit B**.

2

3.      The Debtors' initial budget (the "**Initial DIP Budget**" and, any budget thereafter, a "**Budget**") reflecting the anticipated cash receipts and anticipated disbursements for each calendar week during the period from the Commencement Date (as defined herein) through and including the end of the thirteenth week following the Commencement Date is annexed hereto as **Exhibit C**.

4.      As described in the First Day Declarations, the Debtors commenced these chapter 11 cases with the support of an ad hoc group of lenders (the "**Ad Hoc Group**") holding over 91% of all outstanding obligations of the Debtors (and in excess of 66.67% of each tranche) under the Prepetition Credit Agreement (as defined herein).  On January 22, 2020, the Debtors executed a restructuring support agreement (the "**RSA**") with members of the Ad Hoc Group, pursuant to which the members of the Ad Hoc Group agreed to support a chapter 11 plan, as well as the Debtors' marketing and sale process for all or substantially all of their assets (the "**Sale Process**").  As of the Commencement Date, the Debtors have less than $1 million in cash on hand and thus require immediate access to the DIP Financing and authority to use Cash Collateral (as defined herein) to ensure that they have sufficient liquidity to operate their business and pursue the Sale Process, as contemplated by RSA.  The members of the Ad Hoc Group have committed to provide the Debtors with DIP Financing in an aggregate amount of up to $25 million to finance these chapter 11 cases and support the Sale Process.

5.      Several reasons justify the relief requested herein:

- The Debtors are entering chapter 11 with limited cash on hand.  Immediate access to DIP Financing is therefore critical to ensure the Debtors' smooth entry into chapter 11 and their ability to prudently operate their business during the pendency of these chapter 11 cases.

- The Debtors, with assistance from experienced financial and legal advisors, engaged with their prepetition secured lenders—who have substantial

experience with the Debtors and familiarity with their business—to solicit an initial proposal to provide debtor-in-possession financing.

- Negotiations with the proposed DIP Lenders were conducted at arm's length and were rigorous. The robust nature of this negotiation process is demonstrated by the terms of the DIP Facility. The Debtors believe the DIP Facility provides sufficient liquidity with customary budget restrictions, all at reasonable rates and market fees. As confirmed by the Debtors' prepetition marketing process, there is no alternative financing available to the Debtors in the marketplace on superior terms.

- The Debtors propose a limited, initial draw of $15.0 million on the terms set forth herein.

- Although the Debtors propose a "roll-up" of the Debtors' outstanding obligations under the Super Senior Credit Facilities (as defined herein) held by the DIP Lenders (the "**DIP Roll Up**"), the DIP Roll Up is subject to approval of the Final Order (as defined herein), and the DIP Roll Up will be subject to an interest rate that is less than the interest rate that would otherwise be applicable under the Super Senior Credit Facilities, thereby providing the Debtors with an economic benefit. Moreover, the senior prepetition obligations proposed to be rolled-up upon entry of the Final Order are very likely oversecured.

- The Debtors expect that vendors, customers, and their employees will be highly focused on whether these chapter 11 cases are appropriately funded to maximize the greatest possibility of success.

## Background

6. On the date hereof (the "**Commencement Date**"), the Debtors each commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Court**"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

7.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

8.      Information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the First Day Declarations,[2] which has been filed with the Court contemporaneously herewith and is incorporated by reference herein.

## Jurisdiction

9.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

10.      By this Motion, pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003(b), 6004(a), and 6004(h), and 9014, and Rule 4001-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "**Local Rules**"), the Debtors request (i) entry of an interim order, substantially in the form annexed hereto as **Exhibit A** (the "**Interim Order**") and, (ii) following the Final Hearing (as defined herein), entry of a final order granting the relief requested herein (the "**Final Order**" and, together with the Interim DIP Order, the "**DIP Orders**") and the relief as provided therein:

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the First Day Declarations.

- authority to enter into the DIP Credit Agreement (as defined herein) and related documents (collectively, the "**DIP Documents**"), the terms of which shall substantially conform to the terms included in the term sheet (the "**DIP Term Sheet**") annexed hereto as **Exhibit D**, providing for a DIP Facility that will be drawn up to $15.0 million on an interim basis (the "**Initial Draw**"), up to an additional $5.0 million on a final basis (together with the Initial Draw, the "**New Money DIP Loans**"), and up to an additional $5.0 million under a delayed-draw facility (the "**Delayed Draw DIP Facility**" and, the loans issued thereunder, the "**Delayed Draw DIP Loans**") and for the "roll-up" of amounts on account of the Debtors' outstanding obligations under the Super Senior Credit Facilities held by the DIP Lenders (the "**Roll-Up DIP Loans**");

- authority to pay the following interest and fees: (a) cash interest at a rate of 10.00% *per annum* and (b) certain fees, including (i) a commitment fee of 4.00%, which shall be payable on the aggregate amount of available New Money DIP Loans and, only to the extent such loans are funded, the Delayed Draw DIP Loans (but not, for the avoidance of doubt, payable on the Roll-Up DIP Loans); (ii) a structuring fee of 3.00%, which shall be payable on the aggregate amount of available New Money DIP Loans and, only to the extent such loans are funded, the Delayed Draw DIP Loans (but not, for the avoidance of doubt, payable on the Roll-Up DIP Loans); and (iii) agency fees, as described in that certain *Fee Letter* by and among the Debtors and the DIP Agent (the "**Fee Letter**");[3]

- grant, in each case subject to the Carve Out and certain other exceptions set forth in the Interim Order, a first priority, perfected, priming security interest and lien on all prepetition and postpetition assets of each Debtors' estate and all proceeds thereof (other than avoidance actions, but including, subject to and effective upon entry of the Final Order, any proceeds of such avoidance actions), not including any Excluded Collateral (as defined in the DIP Credit Agreement) (the "**DIP Collateral**"), and superpriority claims over all other administrative expenses;

- authority to use Cash Collateral within the meaning of section 363(a) and 363(c) of the Bankruptcy Code;

- approval of the form and manner of adequate protection to be provided to the Prepetition Secured Parties (as defined below), including (a) cash payment of interest at the non-default rate on account of obligations outstanding under the Super Senior Credit Facilities (as defined herein), *provided* that if the DIP Roll Up is approved by the Court pursuant to the

---

[3] The Fee Letter will be provided to the Court, the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**"), and any professionals retained by an official committee appointed in these chapter 11 cases, subject to the confidentiality provisions set forth therein.

Final Order, such interest payments shall cease and shall no longer be provided as adequate protection; (b) cash payment of the reasonable and documented costs and expenses of the Prepetition Secured Parties; (c) adequate protection liens and superpriority claims; (d) 506(c) and 552(b) waivers (in each case subject to entry of the Final Order); (e) stipulations as to the liens and claims held by such parties; and (f) certain financial reporting requirements;

- modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the DIP Orders, subject to the Remedies Notice Period (as defined herein), as applicable;

- waiver of any applicable stay, including (to the extent applicable) under Bankruptcy Rule 6004, to provide for immediate effectiveness of the Interim Order; and

- scheduling a date for a hearing on this Motion to consider entry of the Final Order (the "**Final Hearing**") no later than thirty-five (35) days after entry of the Interim Order.

## Concise Statements Regarding DIP Facility
## Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2[4]

11.     The following chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rule 4001(b)(1)(B) and 4001(c)(1)(B) and Local Bankruptcy Rule 4001-2:

---

[4]     The following summary of the DIP Facility is qualified in its entirety by reference to the applicable provisions of the DIP Term Sheet, the relevant DIP Documents, and/or the Interim DIP Order, as applicable. To the extent there are any inconsistencies between this summary and the provisions of the DIP Term Sheet, the DIP Documents, or the Interim DIP Order, the provisions of the Interim DIP Order or the DIP Documents, as applicable, shall control. Any capitalized terms used but not otherwise defined in this summary shall have the respective meanings ascribed to such terms in the DIP Term Sheet, the DIP Documents, and/or the Interim DIP Order, as applicable. The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Bankruptcy Rule 4001–2 herein.

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Borrowers** Bankruptcy Rule 4001(c)(1)(B) | Fairway Group Acquisition Company ("Borrower") | DIP Term Sheet p. 1 |
| **Guarantors** Bankruptcy Rule 4001(c)(1)(B) | Fairway Group Holdings Corp. ("Holdings") and each of the Borrower's existing and future direct and indirect subsidiaries | DIP Term Sheet p. 2 |
| **DIP Lenders** Bankruptcy Rule 4001(c)(1)(B) | Certain of the Super Senior Lenders | DIP Term Sheet p. 2 |
| **Administrative Agent** Bankruptcy Rule 4001(c)(1)(B) | Ankura Trust Company, LLC | DIP Term Sheet p. 2 |
| **Borrowing Limits** Bankruptcy Rule 4001(c)(1)(B), Local Bankruptcy Rule 4001-2(a)(ii) | Up to $20.0 million (up to $15.0 million available on an interim basis), with up to $5.0 million of additional funds potentially available under the Delayed Draw DIP Facility | DIP Term Sheet pp. 2–3 |
| **Interest Rate** Bankruptcy Rule 4001(c)(1)(B), Local Bankruptcy Rule 4001-2(a)(ii) | 10.00%, calculated on the basis of the actual number of days elapsed in a 360 day year | DIP Term Sheet p. 6 |
| **Expenses and Fees** Bankruptcy Rule 4001(c)(1)(B) | Commitment fee of 400 bps on the aggregate principal amount of the New Money DIP Loans and, only to the extent such loans are funded, the Delayed Draw DIP Loans (but not, for the avoidance of doubt, on the Roll-Up DIP Loans)<br><br>Structuring fee of 300 bps on the aggregate principal amount of the New Money DIP Loans and, only to the extent such loans are funded, the Delayed Draw DIP Loans (but not, for the avoidance of doubt, on the Roll-Up DIP Loans)<br><br>Certain agency fees (as described in that certain Fee Letter) | DIP Term Sheet pp. 6–7 |
| **Superpriority Claim** Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | The granting to the DIP Secured Parties of allowed superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code payable from and having recourse to all prepetition and post-petition property of the Debtors' estates and all proceeds thereof (other than avoidance actions, but, upon entry of the Final Order, including the proceeds of such avoidance actions) | Interim DIP Order ¶ 7 |

| | | |
|---|---|---|
| **Use of DIP Proceeds** Bankruptcy Rule 4001(c)(1)(B), Local Bankruptcy Rule 4001-2(a)(6)-(a)(7) | To (i) provide working capital and for other general corporate purposes of the Debtors, (ii) fund the costs of the administration of the chapter 11 cases (including professional fees and expenses) and the consummation of a chapter 11 plan, and (iii) fund interest, fees, and other payments contemplated in respect of the DIP Facility, in each case subject to the Budget (including Permitted Variances). | DIP Term Sheet pp. 5–6 |
| **Maturity Date** Bankruptcy Rule 4001(c)(1)(B), Local Bankruptcy Rule 4001-2(a)(ii) | The earliest of (i) the date that is nine (9) months after the Commencement Date; (ii) the consummation of any sale of all or substantially all of the assets pursuant to section 363 of the Bankruptcy Code; (iii) if the Final Order has not been entered, the date that is thirty-five (35) calendar days after the Commencement Date; (iv) the acceleration of the DIP Loans and the termination of the commitments of the DIP Lenders to provide DIP Loans pursuant to an Event of Default; and (v) the effective date of a chapter 11 plan. | DIP Term Sheet p. 4 |
| **Financial Covenants** Bankruptcy Rule 4001(c)(1)(B) | Compliance with the Budget, subject to permitted variances as set forth in the DIP Documents. | DIP Term Sheet p. 18 |
| **Budget** Bankruptcy Rule 4001(c)(1)(B) | The Initial DIP Budget is attached as **Exhibit C**. | Interim DIP Order ¶ 9 |
| **Events of Default** Bankruptcy Rule 4001(c)(1)(B), Local Bankruptcy Rule 4001-2(a)(ii) | Usual and customary events of default for financings of this type, including, among other things: (i) failure to make payments when due; (ii) noncompliance with covenants (subject to customary cure periods as may be agreed with respect to certain covenants); (iii) breaches of representations and warranties in any material respect; (iv) defaults on postpetition Indebtedness in excess of specified amounts; (v) failure to satisfy or stay execution of judgments in excess of specified amounts; (vi) the existence of certain materially adverse employee benefit or environmental liabilities, except for such liabilities as are in existence as of the Closing Date and are set forth on a schedule to the DIP Credit Agreement, and customary ERISA and similar foreign plan events; (vii) occurrence of a Material Adverse Change; (viii) impairment of DIP Loan Documents; | DIP Term Sheet pp. 23–25 |

(ix)    change in ownership or control, except as contemplated by the Chapter 11 Plan;

(x)     filing of a plan of reorganization under Chapter 11 of the Bankruptcy Code by the Debtors (other than the Chapter 11 Plan) that has not been consented to by the Requisite DIP Lenders;

(xi)    filing of a plan of reorganization by the Debtors (other than the Chapter 11 Plan) that does not propose to indefeasibly repay the DIP Obligations in full in cash, unless otherwise consented to by the DIP Agent and the Requisite DIP Lenders;

(xii)   any of the Debtors shall file a pleading seeking to vacate or modify any of the DIP Orders over the objection of the DIP Agent or the DIP Lenders constituting the Requisite DIP Lenders;

(xiii)  entry of an order without the prior written consent of the Requisite DIP Lenders amending, supplementing or otherwise modifying the Order;

(xiv)   reversal, vacatur or stay of the effectiveness of the DIP Orders except to the extent stayed or reversed within five (5) Business Days (and, other than, in respect of the Interim DIP Order, the entry of the Final DIP Order);

(xv)    any violation of the terms of the DIP Orders by the Debtors that are not cured within 3 calendar days (to the extent any such violation is curable);

(xvi)   dismissal of the Chapter 11 Case of a Debtor with material assets or conversion of the Chapter 11 Case of a Debtor with material assets to a case under Chapter 7 of the Bankruptcy Code;

(xvii)  appointment of a Chapter 11 trustee or examiner with enlarged powers relating to the operation of the business of the Borrower or any Guarantor;

(xviii) any sale of all or substantially all assets of the Debtors pursuant to section 363 of the Bankruptcy Code, unless (a) such sale is conducted in accordance with the Bid Procedures and (b) the proceeds of such sale will indefeasibly satisfy the DIP Obligations in full in cash;

(xix)   failure to meet a Milestone, unless extended or waived by the prior written consent of the DIP Agent at the direction of the Requisite DIP Lenders;

(xx)    granting of relief from the automatic stay in the Chapter 11 Cases to permit foreclosure or enforcement on assets of the Borrower or any

Guarantor, in each case, with a fair market value in excess of $100,000;

(xxi) the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order by the Bankruptcy Court, granting any superpriority claim or lien (except as contemplated herein) which is senior to or *pari passu* with the DIP Claims;

(xxii) the Debtors' filing of a motion seeking entry of an order approving any key employee incentive plan, employee retention plan, or comparable plan, except as provided in the Chapter 11 Plan, without the prior written consent of the Requisite DIP Lenders;

(xxiii) the Debtors shall seek, or shall support  any other person's motion seeking (in any such case, verbally in any court of competent jurisdiction or by way of any motion or pleading filed with the Bankruptcy Court, or any other writing to another party in interest by the Debtors), to challenge the validity or enforceability of any of the obligations of the parties under the Prepetition Loan Documents;

(xxiv) payment of or granting adequate protection with respect to prepetition debt, other than as expressly provided herein or in the DIP Orders or consented to by the DIP Agent at the direction of the Requisite DIP Lenders;

(xxv) expiration or termination of the period provided by section 1121 of the Bankruptcy Code for the exclusive right to file a plan with respect to a Debtor with material assets;

(xxvi) cessation of the DIP Liens or the DIP Claims to be valid, perfected and enforceable in all respects;

(xxvii) Permitted Variances under the Budget are exceeded for any Test Period without consent of or waiver by the DIP Agent at the direction of the Requisite DIP Lenders;

(xxviii) any uninsured judgments are entered with respect to any post-petition non-ordinary course claims against any of the Debtors or any of their respective affiliates in a combined aggregate amount in excess of $250,000 unless stayed;

(xxix) the termination of the RSA and revocation of the votes to accept the Chapter 11 Plan by Prepetition Lenders that has the effect of causing the percentage of funded debt owned by the Consenting Creditors to fall below $66 \, ^2/_3\%$ of the total amount of Senior First Out Term

11

| | | |
|---|---|---|
| | Loans, it being understood and agreed that the Consenting Creditors shall have the right to revoke their votes to accept the Chapter 11 Plan as provided in the RSA;<br><br>(xxx) any Debtor asserting any right of subrogation or contribution against any other Debtor until all borrowings under the DIP Facility are paid in full and the commitments are terminated; and<br><br>(xxxi) additional events of default as set forth in the DIP Credit Agreement. | |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi) | <u>Chapter 11 Milestones</u><br><br>• No later than three calendar days after the Commencement Date, the Bankruptcy Court shall have entered the Interim DIP Order.<br><br>• No later than 30 calendar days after the Commencement Date, the Debtors shall have filed a plan of reorganization, in form and substance satisfactory to the DIP Agent and the Requisite DIP Lenders.<br><br>• No later than 30 calendar days after the Commencement Date, the Debtors shall have filed disclosure statement motion and disclosure statement in form and substance satisfactory to the DIP Agent and the Requisite DIP Lenders.<br><br>• No later than 30 calendar days after the Commencement Date, the Bankruptcy Court shall have entered an order setting the date (the "<u>Bar Date</u>") by which proofs of claim for general unsecured creditors must be filed.<br><br>• No later than 35 calendar days following the Commencement Date, the Bankruptcy Court shall have entered the Final DIP Order.<br><br>• No later than 60 calendar days following the Commencement Date, the Bar Date shall have occurred.<br><br>• No later than 65 calendar days following the Commencement Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably satisfactory to the DIP Agent (with respect to matters relevant to or affecting the DIP Agent) and the Requisite DIP Lenders, approving the Disclosure Statement (the "<u>Disclosure Statement Order</u>"). | DIP Term Sheet pp. 21–23 |

- No later than 70 calendar days after the Commencement Date, the Debtors shall have commenced solicitation on the Chapter Plan.

- No later than 120 calendar days following the Commencement Date the Bankruptcy Court shall have entered an order, in form and substance reasonably satisfactory to the DIP Agent (with respect to matters relevant to or affecting the DIP Agent) and the Requisite DIP Lenders, confirming the Chapter 11 Plan (the "Plan Confirmation Order").

- No later than 125 calendar days following the Commencement Date the effective date (the "Effective Date") of the Chapter 11 Plan shall have occurred.

Sale Milestones

- Prior to the Commencement Date, the Debtors shall have entered into a stalking horse purchase agreement (the "Staking Horse Agreement") (in form and substance acceptable to the Requisite DIP Lenders) with Village Supermarket, Inc. (the "Stalking Horse Bidder") for a substantial portion of the Debtors' assets (the "Stalking Horse Package" and, the Stalking Horse Bidder's bid for such Stalking Horse Package, the "Stalking Horse Bid"), and such Stalking Horse Agreement shall not have been terminated by the Stalking Horse Bidder.

- No later than 2 calendar days after the Commencement Date, the Debtors shall file a motion (the "Sale Motion"), in form and substance acceptable to the DIP Agent and the Requisite DIP Lenders, requesting (x) an order from the Bankruptcy Court (the "Bid Procedures Order") (i) approving the proposed bid procedures attached to the Sale Motion related to the sale of substantially all of the assets of the Debtors, including the Stalking Horse Package (the "Bid Procedures"), and (ii) authorizing the Debtors to provide the Stalking Horse Bidder with the bid protections set forth in the Stalking Horse Agreement, and (y) an order from the Bankruptcy Court (the "Sale Order") approving the sale of the Debtors' assets to the highest and best bidder for such assets pursuant to Section 363 of the Bankruptcy Code, including the sale of the Stalking Horse Package to the Stalking Horse Bidder or such other higher or better bidder determined in accordance with the Bid Procedures.

|  | <ul><li>No later than 25 calendar days after the Commencement Date, the Debtors shall have obtained the Bid Procedures Order, in form and substance reasonably satisfactory to the DIP Agent and the Requisite DIP Lenders.</li><li>No later than 50 calendar days after the Commencement Date, the Debtors shall have commenced an auction, if applicable, for the Stalking Horse Package.</li><li>No later than 55 calendar days after the Commencement Date, the Debtors shall have commenced an auction, if applicable, for the Other Assets (as such term is defined in the Bid Procedures).</li><li>No later than 65 calendar days after the Commencement Date, the Bankruptcy Court shall have entered an order (the "<u>Stalking Horse Sale Order</u>"), in form and substance reasonably acceptable to the DIP Agent (acting at the direction of the Requisite DIP Lenders), approving the sale of the Stalking Horse Package; *provided* that if there is no overbid for the Stalking Horse Package, then the Stalking Horse Sale Order shall be entered no later than 50 calendar days after the Commencement Date.</li><li>No later than 65 calendar days after the Commencement Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the DIP Agent (acting at the direction of the Requisite DIP Lenders), approving the sale of the Other Assets.</li><li>No later than calendar 68 days after the Commencement Date, the Debtors shall have consummated the sale(s) of the Stalking Horse Package to the winning bidder(s) at the applicable Auction, *provided* if there is no overbid for the Stalking Horse Package, then the Debtors shall have consummated the sale(s) of the Stalking Horse Package no later than 55 days from the Commencement Date.</li><li>No later than calendar 70 days after the Commencement Date, the Debtors shall have consummated the sale(s) of the Other Assets to the winning bidder(s) at the applicable Auction.</li></ul> |  |

| | | |
|---|---|---|
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(1)(B)(i) | The DIP Financing shall be secured by:<br><br>• subject to the Carve Out and subject only to existing liens that under applicable law, are senior to, and have not been subordinated to, the liens of the DIP Agent under the DIP Loan Documents, but only to the extent that such liens are valid, enforceable and non-avoidable liens as of the Commencement Date (the "<u>Permitted Liens</u>"), pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority perfected senior priming lien on, and security interest in the Collateral (as defined in the Prepetition Loan Documents) securing the Prepetition Obligations, wherever located, that may be subject to a validly perfected security interest in existence on the Commencement Date securing the Prepetition Obligations under the Prepetition Loan Documents (the "<u>Prepetition Liens</u>"), which Prepetition Liens shall be primed by, and made subject and subordinate to, the perfected first priority senior priming liens and security interests to be granted to the DIP Agent for the benefit of the DIP Lenders, which senior priming liens and security interests in favor of the DIP Agent for the benefit of the DIP Lenders shall also be senior to the Prepetition Lender Adequate Protection Liens (as defined herein);<br><br>• subject to the Carve Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority perfected lien on, and security interest in, all present and after acquired property of the Debtors, wherever located, not subject to a lien or security interest on the date of commencement of the Chapter 11 Cases (collectively, the "<u>Unencumbered Property</u>")<br><br>• subject to the Carve Out, pursuant to section 364(c)(3) of the Bankruptcy Code, a junior perfected lien on, and security interest in, all present and after-acquired property of the Debtors, wherever located, that is subject to a perfected lien or security interest on the Commencement Date or subject to a lien or security interest in existence on the Commencement Date that is perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code; and<br><br>• subject to the Carve Out, a first priority perfected lien on, and security interest in, all funds on deposit in the Controlled Accounts. | DIP Term Sheet p. 8–9<br><br>Interim DIP Order ¶¶ 5–6 |

| | | |
|---|---|---|
| **Carve-Out**<br>Bankruptcy Rule<br>4001(b)(1)(B)(iii) | (i) <u>Clerk and U.S. Trustee Fees</u>: all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, without regard to the notice set forth in (iii) below, and which shall not be subject to any budget;<br><br>(ii) <u>Chapter 7 Trustee Fee</u>: all reasonable fees and expenses up to $25,000 incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below);<br><br>(iii) <u>Allowed Professional Fees</u>:  to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order, final order or otherwise, all accrued and unpaid fees, disbursements, costs and expenses incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and all budgeted and accrued unpaid fees, disbursements, costs and expenses incurred by the Committee (if any) pursuant to section 328 and 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>," together with the Debtor Professionals, the "<u>Estate Professionals</u>," and such Estate Professional fees, the "<u>Allowed Professional Fees</u>") at any time before or on the first business day following delivery by the DIP Agent at the direction of the Requisite DIP Lenders of a Carve Out Trigger Notice (as defined herein), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice;<br><br>(iv) <u>Stalking Horse Termination Fee</u>:  subject to entry of the Bid Procedures Order, amounts used to pay the Termination Payment and any of Buyer's Damages, as each of those terms are defined in and pursuant to the Asset Purchase Agreement, dated January 22, 2020, by and among Holdings and Village Super Market, Inc. (the "<u>Village APA</u>"), provided that such amounts, in the aggregate, shall not exceed three percent (3%) of the Cash Purchase Price, as that term is defined in and in accordance with the Village APA; and<br><br>(v) <u>Post-Carve-Out Trigger Notice Cap</u>: Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $500,000 incurred after the first business day following delivery by the DIP Agent at the direction of the Requisite DIP Lenders of a Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, final order, or otherwise. | Interim DIP Order ¶ 35 |

| | | |
|---|---|---|
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(1)(B), 4001(c)(1)(B)(viii) | The Committee (to the extent one is appointed) shall have a maximum of sixty (60) calendar days from entry of the Final DIP Order and, to the extent a Committee is not appointed, any party in interest (other than the Debtors) shall have a maximum of seventy-five (75) calendar days from entry of the Final DIP Order to investigate and commence an adversary proceeding or contested matter, as required by the applicable Federal Rules of Bankruptcy Procedure, and challenge the findings, the Debtors' stipulations, or any other stipulations contained in the DIP Orders | Interim DIP Order ¶ 38 |
| **Effect of Debtors' Stipulations on Third Parties**<br>Bankruptcy Rule 4001(c)(1)(B)(iii), (viii) | The stipulations and admissions contained in the Interim Order shall be binding upon each Debtor, each party to the DIP Documents, and other parties in interest, subject to the Challenge Period. | DIP Term Sheet p. 12–13<br><br>Interim DIP Order ¶ 38 |
| **Waivers/ Modification of Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay imposed under Section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, and Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Agent, DIP Lenders, or the Prepetition Agent each may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Agent, DIP Lenders, and Prepetition Secured Parties under the DIP Documents, the DIP Facility, and this Interim Order; and (d) authorize the Debtors to make, and the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Interim Order, the DIP Documents, and the Prepetition Documents, as applicable. | Interim DIP Order ¶ 20 |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors shall indemnify and hold harmless (a) the DIP Agent and the DIP Lenders in accordance with the terms and conditions of the DIP Credit Agreement and (b) the Prepetition Secured Parties in accordance with the terms and conditions of the Prepetition Documents. | Interim DIP Order ¶ 33 |
| **Cross-Collateralization**<br>Local Bankruptcy Rule 4001-2(a)(i)(A) | None, other than adequate protection. | Interim DIP Order ¶¶ 11–12 |

| | | |
|---|---|---|
| **Provisions Deeming Prepetition Debt to be Postposition Debt**<br>Local Bankruptcy Rule 4001-2(a)(i)(E) | Upon entry of the Final Order, each DIP Lender shall have the entire amount of the Debtors' obligations owed to it (or its designated affiliates') under the Super Senior Credit Facilities "rolled-up" into Roll Up DIP Loans, which Roll-Up DIP Loans shall be deemed used to satisfy and discharge the obligations under the Super Senior Credit Facilities held by such DIP Lenders (or their designated affiliates). | DIP Term Sheet pp. 2–3 |
| **Non-Consensual Priming Liens**<br>Local Bankruptcy Rule 4001-2(a)(i)(G) | None. | None. |
| **Section 506(c) Waiver**<br>Bankruptcy Rule 4001(c)(1)(B)(x);<br>Local Bankruptcy Rule 4001-2(a)(i)(C) | Subject to the entry of a Final Order, except to the extent of the Carve Out, no costs or expenses of administration that have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the DIP Agent, DIP Lenders, or the Prepetition Secured Parties or any of their respective claims, the DIP Collateral, or the Prepetition Collateral pursuant to Sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent, as applicable, of the DIP Agent (acting at the direction of the Requisite DIP Lenders) or the Prepetition Agent (acting at the direction of the Required Lenders), as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders. | Interim DIP Order ¶ 40 |
| **Section 552(b)(1) Waiver**<br>Local Bankruptcy Rule 4001-2(a)(i)(H) | Subject to the entry of a Final Order, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties, with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral. | Interim DIP Order ¶ 42 |
| **Conditions to Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Bankruptcy Rule 4001-2(a)(2) | The DIP Documents include conditions to closing, as well as conditions for subsequent draws under the DIP Credit Agreement, that are customary and appropriate for similar debtor-in-possession financings of this type. | DIP Term Sheet pp. 13–16 |

**Prepetition Indebtedness**

12.     As of the Commencement Date, the Debtors' have outstanding funded debt obligations in the amount of approximately $227.1 million in the aggregate under the Prepetition Credit Agreement, consisting of (i) approximately $16.0 million outstanding under the Super Senior Term Loan Facility; (ii) approximately $26.8 million outstanding under the Super Senior L/C Facility, (iii)  approximately $76.5 million outstanding under the Senior First Out Term Loan; (iv) approximately $56.8 million outstanding under the Senior Last Out Term Loan, and (v) approximately $51.0 million outstanding under the Holdco Loan (each as defined below).  The Debtors' secured financing obligations are described in greater detail below.

13.     *Super Senior Term Loan Facility*.  Pursuant to that certain Super Senior Credit Agreement, dated as of August 28, 2018 (as amended or modified by that certain First Amendment to Super Senior Credit Agreement, dated as of July 29, 2019, that certain Second Amendment to and Extension under Super Senior Credit Agreement, dated as of August 28, 2019, that certain Third Amendment and Limited Waiver to Super Senior Credit Agreement, dated as of October 7, 2019, and that certain Limited Waiver to Super Senior Credit Agreement, dated as of January 8, 2020, and as may be further amended, supplemented, or modified from time to time, the "**Prepetition Credit Agreement**"), among Fairway Acquisition, Holdings, the lenders from time to time party thereto (each, a "**Prepetition Lender**," and, collectively, the "**Prepetition Lenders**" or "**Prepetition Secured Parties**") and Ankura Trust Company, LLC, as administrative agent and collateral agent for the Prepetition Lenders (in its capacity as collateral agent, the "**Prepetition Agent**"), certain Prepetition Lenders (the "**Super Senior Term Lenders**") provided Fairway Acquisition with a super senior secured delayed draw first out term loan in the aggregate principal amount of $14.5 million (the "**Super Senior Term Loan Facility**").  The Super Senior Term Loan Facility matures on August 28, 2023.  The Super Senior Term Loan Facility is *pari*

*passu* in priority with the Super Senior L/C Facility and represents (together with the Super Senior L/C Facility) the Debtors' senior-most tranche of prepetition funded debt. As of the date hereof, the aggregate amount outstanding under the Super Senior Term Loan Facility is approximately $16 million in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

14.    *Super Senior L/C Facility*. The Prepetition Credit Agreement also provided for a super senior secured credit facility in the aggregate principal amount of $22.66 million (the "**Super Senior L/C Facility**" and, together with the Super Senior Term Loan Facility, the "**Super Senior Credit Facilities**") provided by certain of the Prepetition Lenders (the "**Super Senior L/C Lenders**" and, together with the Super Senior Term Lenders, the "**Super Senior Lenders**") to Fairway Acquisition for the purpose of cash collateralizing letters of credit issued by third-party issuers (i.e., entities that are not lenders under the Prepetition Credit Agreement) for the benefit of certain landlords, vendors, and other creditors of the Debtors. The Super Senior L/C Facility matures on August 28, 2023. As set forth above, the Super Senior L/C Facility is *pari passu* in priority with the Super Senior Term Loan Facility and represents (together with the Super Senior Term Loan Facility) the Debtors' senior-most tranche of prepetition funded debt. As of the date hereof, the aggregate amount outstanding under the Super Senior L/C Facility is approximately $26.8 million in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

15.     _Senior First Out Term Loan_.   The Prepetition Credit Agreement also provided for secured first out term loans in the aggregate principal amount of approximately $65.1 million (the "**Senior First Out Term Loan**") provided by certain of the Prepetition Lenders to Fairway Acquisition.  The Senior First Out Term Loan matures on November 28, 2023.  The Senior First Out Term Loan is junior in priority to the Super Senior Term Loan Facility and the Super Senior L/C Facility (but is senior in priority to the Senior Last Out Term Loan (as defined herein)).  As of the date hereof, the aggregate amount outstanding under the Senior First Out Term Loan is approximately $76.5 million in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

16.     _Senior Last Out Term Loan_.   The Prepetition Credit Agreement also provided for secured last out term loans in the aggregate principal amount of approximately $49.7 million (the "**Senior Last Out Term Loan**") provided by certain of the Prepetition Lenders to Fairway Acquisition.  The Senior Last Out Term Loan matures on November 28, 2023.  The Senior Last Out Term Loan is junior in priority to the Super Senior Term Loan Facility, the Super Senior L/C Facility, and the Senior First Out Term Loan.  As of the date hereof, the aggregate amount outstanding under the Senior Last Out Term Loan is approximately $56.8 million in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.

17.    *Holdco Loan*.  Lastly, the Prepetition Credit Agreement also provided for secured term loans in the aggregate principal amount of approximately $44.0 million (the "**Holdco Loan**," and together with the Super Senior Term Loans, Super Senior L/C Loans, Senior First Out Term Loans, and the Senior Last Out Term Loans, the "**Prepetition Secured Loans**") provided by certain of the Prepetition Lenders to Holdings, which Fairway Acquisition is also obligated to repay.  The Holdco Loan matures on February 24, 2024.  The Holdco Loan is junior in priority to the Super Senior Term Loan Facility, the Super Senior L/C Facility, the Senior First Out Term Loan, and the Senior Last Out Term Loan.  As of the date hereof, the aggregate amount outstanding under the Holdco Loan is approximately $51.0 million in unpaid principal, plus accrued and unpaid interest, fees, and other expenses].

18.    *Prepetition Security Agreement*.  The obligations under the Prepetition Credit Agreement are guaranteed by Holdings and certain subsidiaries of Holdings and are secured, in each case, in accordance with the terms of a Super Senior Guarantee and Collateral Agreement, dated as of August 28, 2018 (as amended, supplemented, or modified from time to time, the "**Prepetition Security Agreement**").  Pursuant to the terms of the Prepetition Security Agreement, each Debtor granted liens on substantially all of its assets (with certain specified exceptions) including, but not limited to, all accounts, chattel paper, cash and deposit accounts, documents, equipment, general intangibles, instruments, inventory, investment property, letter of credit rights, commercial tort claims, and certain other personal property and real estate (the "**Prepetition Collateral**").

### Debtors' Immediate Need for DIP Financing and Access to Cash Collateral

19.     As stated in the First Day Declarations, the Debtors require immediate access to debtor-in-possession financing to ensure (i) sufficient working capital to operate their business and to administer their estates, (ii) the timely payment of administrative expenses to be incurred, and (iii) a positive message to the Debtors' vendors, suppliers, and customers that these chapter 11 cases are sufficiently funded.   The Debtors are entering chapter 11 with limited available liquidity, which is significantly below the optimal level required to preserve the value of the Debtors' business operations in the ordinary course.   Prior to the Commencement Date, the Debtors, in consultation with their advisors, reviewed and analyzed the Debtors' projected cash needs and prepared an Initial DIP Budget outlining the Debtors' postpetition cash need in the initial thirteen weeks of the chapter 11 cases.   The DIP Financing will provide the Debtors with the liquidity necessary to, among other things, make payroll and satisfy their other working capital and general corporate purposes, including essential payments to vendors and service providers.

20.     In addition, the Debtors will require access to the Prepetition Collateral, including cash collateral (the "**Cash Collateral**") currently subject to the liens of the Prepetition Secured Parties.   As discussed in greater detail in the First Day Declarations and the Cash Management Motion, the Debtors operate a centralized cash management system.   Without the ability to access such cash, the Debtors will not be able to continue operations in the ordinary course of business, which cessation would detrimentally impact the value of the enterprise, including critical relationships with vendors and the Debtors' customers.

## **Debtors' Efforts to Obtain Postpetition Financing**

21.     As further detailed in the First Day Declarations, in large part due to underperformance compared to business projections, by late 2019, the Debtors had limited liquidity and were at risk of defaulting under their prepetition debt.  More recently, news of the Debtors' continued financial challenges permeated throughout the market, and, as a result, the Company has faced vendor terminations and the contraction of trade terms, with some suppliers and vendors demanding that the Debtors pay cash in advance as a condition for further deliveries. Accordingly, the Debtors began a formal review of strategic alternatives and engaged in constructive dialogue and communications with their key constituents, including the members of the Ad Hoc Group.

22.     As further discussed in the Hootnick Declaration, Solomon, the Debtors' proposed investment banker, approached twelve (12) potential third-party financing sources, including traditional bank DIP lenders and other firms experienced in direct non-bank lending in similar circumstances.  Due to the Debtors' financial position and existing capital structure, as well as the expedited timeline leading up to the Commencement Date, the Debtors found limited options to secure an adequate amount of financing, and, ultimately, the Debtors did not receive any financing proposals from the third-party financing sources it contacted.  In light of the Company's financial position and leveraged capital structure, unsecured financing would not have been a viable option.  Further, any senior financing that does involve the Prepetition Secured Parties would require non-consensual priming liens.  Commencing these chapter 11 cases with a priming dispute and litigation over adequate protection (with the attendant destruction of value) was not a risk the Debtors, in their business judgment, were willing to take.

**Relief Requested Should Be Granted**

A.      **Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business
Judgment**

23.      The Court should authorize the Debtors, as an exercise of their sound

business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and

continue using the Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to

obtain secured or superpriority financing under certain circumstances discussed in detail below.

Courts grant debtors considerable deference in acting in accordance with their business judgment

in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not

run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re L.A.

Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the

business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No.

08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that

courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage

the bankruptcy process' and unfairly cede control of the reorganization to one party in interest.");

*In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of

postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business

judgment."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving

a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent

business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)

("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy

Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be

exercised so long as the financing agreement does not contain terms that leverage the bankruptcy

process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

24.    Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-514 (Bankr. D. Utah.  Oct 8, 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").  To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'"  *In re Dura Auto.  Sys.  Inc*., No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).

25.    In determining whether the Debtors have exercised sound business judgment in entering into the DIP Documents, the Court should consider the economic terms of the DIP Financing under the totality of circumstances.  *See* Hr'g Tr. at 734-35:24, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. February 27, 2009) (recognizing that "the terms that are now available for DIP financing in the current economic environment aren't as desirable" as otherwise); *In re Elingsen McLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).  Moreover, the Court may appropriately take into consideration noneconomic benefits to the Debtors offered under the proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are
> naturally motivated to obtain financing on the best possible terms, a

> business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

26.     The Debtors' decision to enter into the DIP Facility is an exercise of their sound business judgment. As further discussed in the Hootnick Declaration, the DIP Financing was market tested and was the product of arm's-length negotiations. Keeping in mind the advantages and disadvantages of the proposed DIP Financing, the Debtors ultimately decided that moving forward with the proposed DIP Financing was appropriate and in the Debtors' best interests. Put simply, the DIP Financing represents the only financing available to the Debtors, and given the Debtors' current cash position, absent access to the proceeds of the DIP Financing, the only alternative path available to the Debtors is liquidation, which would be detrimental to all stakeholders. Thus, in light of the above, the Debtors and their advisors determined that the DIP Financing was the best path forward under the totality of circumstances, and the Debtors believe that they have obtained the best financing available. Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of their business judgment.

### B.     Debtors Should Be Authorized to Grant Liens and Superpriority Claims

27.     The Debtors propose to obtain DIP Financing by providing security interests and liens as set forth in the DIP Documents and described above. The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to

incur secured or superpriority debt under certain circumstances.  Specifically, section 364(c) of the

Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under
> section 503(b)(1) of this title as an administrative expense, the court,
> after notice and a hearing, may authorize the obtaining of credit or
> the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind
> specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise
> subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject
> to a lien . . . .

11 U.S.C. § 364(c).

28.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a

debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor

on an unsecured or administrative expense basis.  *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr.

E.D. Pa. 1987) (finding that secured credit under section 364(c) of the Bankruptcy Code is

authorized, after notice and hearing, upon a showing that unsecured credit cannot be obtained).

"The statute imposes no duty to seek credit from every possible lender before concluding that such

credit is unavailable."  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789

F.2d 1085, 1088 (4th Cir. 1986); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266

B.R. 575, 584 (S.D.N.Y. 2001) (finding that superpriority administrative expenses should be

authorized where debtor could not obtain credit as an administrative expense).  When few lenders

are likely to be willing to extend the necessary credit to a debtor, "it would be unrealistic and

unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky

Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988); *see also In re Snowshoe Co.*, 789 F.2d at

1088 (finding that credit was unavailable absent a senior priming lien because the debtor had made

28

unsuccessful contact with other financial institutions in the relevant geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (finding that the fact that two national banks refused to grant unsecured loans was sufficient to support the conclusion that the requirements of section 364 were met); *In re Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and finding that debtor made reasonable efforts to satisfy the requirements of section 364(c) by approaching four lending institutions, two of which refused to provide financing, and selecting the most favorable of the two offers it received).

29.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

- the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code (i.e., by allowing a lender only an administrative claim);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); *In re Ames Dep't Stores*, 115 B.R. at 37–40; *In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

30.     Furthermore, in the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." As described above, the Debtors are unable to obtain unsecured credit.    Thus, the Debtors

determined that the DIP Facility provided the best opportunity available to the Debtors under the circumstances to fund these chapter 11 cases. Therefore, approving superpriority claims in favor of the DIP Lenders is reasonable and appropriate.

31.    Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Consent by the secured creditors to priming obviates the need to show adequate protection. See *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Secured Parties support the priming or (b) the Prepetition Secured Parties' interests in collateral are adequately protected.

32.    Most importantly, here, the priming is consensual. Pursuant to the RSA, which over 66.67% of the prepetition lenders under each tranche of the Prepetition Credit Agreement have executed, the Prepetition Secured Parties support the priming of their prepetition liens in exchange for an adequate protection package. Further, the Debtors are not aware of any available financing on equal or better terms from the DIP Lenders absent the granting of first priority liens on the Prepetition Collateral. Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code—that alternative credit on more favorable terms be unavailable to the Debtors—is satisfied.

### C.      Interests of Prepetition Secured Parties Are Adequately Protected

33.      Parties with an interest in cash collateral are entitled to adequate protection. *See* 11 U.S.C. § 363(e).  Adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.  Thus, what constitutes adequate protection is decided on a case-by-case basis.  *See, e.g.*, *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact specific inquiry . . . left to the vagaries of each case."); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (finding that the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process" (citation omitted)).  The critical purpose of adequate protection is to guard against the diminution of a secured creditor's collateral during the period when such collateral is being used by the debtor in possession.  *See 495 Cent. Park*, 136 B.R. at 631 ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the chapter 11 reorganization."); *accord In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

34.      The adequate protection package provided to the Prepetition Secured Parties, as described above, is consensual and appropriately safeguards the Prepetition Secured Parties from the diminution in the value of their interests in the Prepetition Collateral, if any.  The Debtors submit that their provision of adequate protection to the Prepetition Secured Parties is fair and reasonable and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

31

### D.      Debtors Should Be Authorized to Use Cash Collateral

35.      For the reasons set forth herein, the Debtors require use of the Cash Collateral for working capital and to fund their chapter 11 cases.  Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).

36.      Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  Section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See, e.g., In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993)

(explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

37.     As noted above, the Prepetition Secured Parties have or are deemed to have consented to the use of Cash Collateral, and the Debtors are providing the Prepetition Secured Parties with adequate protection that (i) is fair and reasonable and (ii) adequately protects the Prepetition Secured Parties' interests in the Prepetition Collateral.  Accordingly, the Court should authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

### E.     Debtors' Proposed Repayment of Prepetition Indebtedness Should Be Approved Upon Entry of Final Order

38.     As set forth above, the DIP Agreement provides that upon entry of the Final DIP Order, the Debtors shall be authorized to "roll-up" all prepetition amounts outstanding under the Super Senior Credit Facilities, with such amounts deemed to have been converted into an equal aggregate principal amount of New Money DIP Loans.  The DIP Roll Up is a material component of the structure of the DIP Facility and was a condition precedent to the DIP Lenders' commitment to provide the DIP Financing.  The Debtors were unable to obtain an offer for debtor-in-possession financing on similar terms from the DIP Lenders that did not provide for the refinancing of certain amounts outstanding under the Super Senior Credit Facilities.

39.     The Debtors have determined that refinancing these prepetition claims as part of the DIP Facility is necessary to obtain access to the liquidity necessary to preserve the value of their business for the benefit of the Debtors' estates.  Moreover, refinancing this oversecured obligation benefits the estates, allowing the Debtors to access the liquidity necessary to successfully transition into chapter 11 and successfully reorganize, as well as reducing the interest rate that would otherwise be applicable to such obligations.  The refinance of the rolled-up obligations merely affects the timing, not the amount or certainty, of the Super Senior Lenders'

recovery.  In addition, the Debtors anticipate that all, not just some, of the amounts outstanding under the Super Senior Credit Facilities will be "rolled up" because 100% of the Super Senior Lenders are DIP Lenders, and thus the Debtors anticipate that all Super Senior Lenders will receive the same treatment in connection with the DIP Roll Up and that no Super Senior Lender will be adversely affected.  Additionally, the DIP Roll Up does not adversely affect junior creditors because the DIP Roll Up does not increase the amount of senior secured debt.  Indeed, only the Super Senior Credit Facilities are part of the DIP Roll Up, and the Super Senior Credit Facilities are the Debtors' senior-most tranches of prepetition funded debt and are already entitled to priority over all other prepetition funded debt.  Importantly, because the Debtors are seeking the approval of the DIP Roll Up on a *final* basis only, the DIP Roll Up remains subject to review by a creditors' committee or another party in interest with requisite standing.  Accordingly, the Debtors submit that the Court should approve the Debtors' decision to enter into the DIP Facility, including the DIP Roll Up.

40.     Recognizing exigent circumstances like those described above, courts in this district, as well as elsewhere, have approved repayments of prepetition debt ("roll-ups") funded by the proceeds of debtor-in-possession financing in recent chapter 11 cases.  *See, e.g.*, *In re Avaya Inc.*, No. 17-10089 (SMB) (Bankr. S.D.N.Y. Jan. 23, 2017) (approving roll up of $50 million); *In re Aéropostale, Inc.*, No. 16-11275 (Bankr. S.D.N.Y. May 6, 2016) (approving roll up of $78 million); *In re Chassix Holdings, Inc.*, No. 15-10578 (MEW) (Bankr. S.D.N.Y. Mar. 13, 2015) (approving roll up of $135 million); *In re United Retail Grp, Inc.*, No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 3, 2012) (approving roll up of $11.5 million); *In re Uno Rest. Holdings Corp.*, No. 10-10209 (MG) (Bankr. S.D.N.Y. Feb. 18, 2010) (approving roll up of $33.9 million);

*In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 6, 2009) (approving roll up of $2.1 billion).

### F.    <u>Carve Out Is Appropriate</u>

41.    The liens granted pursuant to the DIP Facility, replacement liens, and the superpriority claims of all secured lenders are subject and subordinate to the Carve Out.  The Carve Out contains similar terms to others that have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.  *See In re Avaya,* Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. Jan. 23, 2017) [Docket No. 61]; *In re Ames Dep't Stores*, 115 B.R. at 40–41; *In re Halcón Res. Corp.*, No. 16-11724 (BLS) (Bankr.  D. Del. Aug. 19, 2016) [Docket No. 130]; *In re Aéropostale, Inc.*, No. 16-11275 (SHL) (Bankr. S.D.N.Y. May 6, 2016) [Docket No. 99]; *In re American Apparel, Inc.*, No. 15-12055 (BLS) (Bankr.  D. Del. Nov. 2, 2015) [Docket No. 248]; *In re Reichold Holdings US, Inc.*, No. 14-12237 (MFW) (Bankr. D. Del. Oct. 2, 2014) [Docket No. 54]; *In re Bear Island Paper Co., LLC*, No. 10-31202 (DOT) (Bankr.  E.D. Va. Feb. 26, 2010) [Docket No. 66]; *In re The Great Atl. & Pac. Tea Co., Inc.*, No. 10-24549 (RDD) (Bankr.  S.D.N.Y. Dec. 13, 2010) [Docket No. 43].

42.    Without the Carve Out, the Debtors' estates may be deprived of possible rights and powers because the services for which professionals may be paid in these cases is restricted.  *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve Out protects against administrative insolvency during the course of these cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees, as well as potential administrative expenses related to the Debtors' entry into a stalking horse purchase agreement for

the sale of certain of its assets, notwithstanding the grant of superpriority claims and replacement liens as part of the adequate protection of prepetition secured interests.

### G. Debtors Should Be Authorized to Pay the Fees Due Under the DIP Documents

43.     As described herein, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lenders and the DIP Agent (collectively, the "**DIP Fees**") in exchange for their providing, agenting, and/or arranging the DIP Facility.  As set forth in the Hootnick Declaration, the terms of the DIP Documents, including the fees imposed thereunder, constitute the best terms on which the Debtors could obtain the postpetition financing necessary to maintain their ongoing business operations and fund their chapter 11 cases.  Moreover, the DIP Fees are customary and usual and in line with DIP Financings of this kind.  The Debtors considered the DIP Fees when determining in their sound business judgment whether the DIP Documents constituted the best terms on which the Debtors could obtain sufficient DIP Financing.  The Debtors believe paying these fees in order to obtain the DIP Financing is in the best interests of the Debtors' estates.  Accordingly, the Court should authorize the Debtors to pay the DIP Fees.

### H. DIP Lenders Should Be Deemed Good Faith Lenders Under Section 364(e)

44.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or the grant of such liens is later reversed or modified on appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

36

11 U.S.C. § 364(e).

45.      Here, the Debtors believe the DIP Financing embodies the most favorable terms on which the Debtors could obtain postpetition financing.  As described in the Hootnick Declaration, all negotiations of the DIP Documents with the DIP Lenders were conducted in good faith and at arms' length.  The terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the DIP Orders and the DIP Documents and in accordance with the Budget (subject to permitted variances).  Further, no consideration is being provided to any party to the DIP Documents other than as described herein and in the Hootnick Declaration.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and that the DIP Lenders thus are entitled to all of the protections afforded by that section.

## I.      **Modification of Automatic Stay Is Warranted**

46.      The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to, among other things, (a) grant the security interests, liens, and superpriority claims described above with respect to the Prepetition Secured Parties, as applicable, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (b) upon the occurrence of an Event of Default (as defined in the DIP Documents), subject to the "Remedies Notice Period" as set forth in the proposed DIP Orders, for the DIP Agent and/or DIP Lenders to exercise any remedies available to them; and (c) implement the terms of the proposed DIP Orders, including payment of all amounts referred to in the DIP Documents.

47.      Stay modifications of this kind are ordinary and standard features of postpetition financing facilities and, in the Debtors' business judgment, are appropriate under the

present circumstances.  *See, e.g., In re The Great Atl. & Pac. Tea Co., Inc.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. July 21, 2015) [Docket No. 88]; *In re Chassix Holdings, Inc.*, Case No. 15-10578 (MEW) (Bankr. S.D.N.Y. Mar. 13, 2015) [Docket No. 67]; *In re The Reader's Digest Assoc.*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2009) [Docket No. 26]; *In re Lear Corp.*, Case No. 09-14326 (ALG) (Bankr. S.D.N.Y. July 7, 2009) [Docket No. 59].

### Request for a Final Hearing

48.     The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2), (c)(2).  In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions.  *See In re Ames Dep't Stores*, 115 B.R. at 36.  The Debtors request a date which is no later than thirty-five (35) days after entry of the Interim Order, to hold a hearing to consider entry of the Final Order and the final approval of the relief requested in this Motion.

### Bankruptcy Rule 4001(a)(3) Should Be Waived

49.     The Debtors request a waiver of the stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 4001(a)(3).  Bankruptcy Rule 4001(a)(3) provides that "[an] order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise."  As explained herein, access to the DIP Facilities is essential to prevent irreparable damage to the Debtors' estates.  Accordingly, ample cause exists to justify the waiver of the fourteen-day stay imposed by Bankruptcy Rule 4001(a)(3), to the extent such applies.

**Reservation of Rights**

50.     Nothing contained herein is intended or shall be construed as (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (iii) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**Debtors Have Satisfied Bankruptcy Rule 6003(b)**

51.     Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition.  Fed. R. Bankr. P. 6003(b).  The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2), (c)(2).  As described herein and in the First Day Declarations and in the Hootnick Declaration, the Debtors risk a significant disruption in business operations and substantial harm to their enterprise absent an immediate infusion of liquidity via the DIP Financing.  The Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their business, maintain important customer and vendor relationships, meet payroll, and satisfy working capital and operational needs, all of which are

required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest.

52.     The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district in similar circumstances.  *See, e.g., In re Avaya, Inc.*, Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. Jan. 23, 2017) (finding that relief was necessary to avoid immediate and irreparable harm); *In re SunEdison, Inc.,* Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. June 9, 2016) (same); *In re MPM Silicones, LLC*, Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. May 23, 2014) (same); *In re United Retail Grp., Inc*., No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 2, 2012) (same); *In re Sbarro, Inc.*, No. 11-11527 (SCC) (Bankr. S.D.N.Y. Apr. 5, 2011) (same); *In re MSR Resort Golf Course LLC*, No. 11-10372 (SHL) (Bankr. S.D.N.Y. Mar. 16, 2011) (same); *In re Insight Health Servs. Holdings Corp.*, No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011).  Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm and that, therefore, Bankruptcy Rule 6003(b) is satisfied.

### Bankruptcy Rules 6004(a) and (h)

53.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above and in the First Day Declarations and in the Hootnick Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the

fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

### Notice

54.     Notice of this Motion has been provided to (i) the Office of the United States Trustee for Region 2, 201 Varick Street, Suite 1006, New York, NY 10014 (Attn: Greg Zipes, Esq. and Paul Schwartzberg, Esq.); (ii) the holders of the forty (40) largest unsecured claims against the Debtors (on a consolidated basis); (iii) counsel to the Ad Hoc Group and DIP Lenders, King & Spalding LLP, 1185 Avenue of the Americas, New York, NY 10036 (Attn: W. Austin Jowers, Esq., Michael Rupe, Esq., and Michael R. Handler, Esq.); (iv) counsel to Ankura Trust Company, LLC, as the Prepetition Agent under the Prepetition Credit Agreement, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017 (Attn: Christian Fischer, Esq.); (v) the Unions; (vi) Citizens Bank, N.A., 437 Madison Avenue, 18th Floor, New York, NY 10022 (Attn: Jamie Salas); (vii) the Internal Revenue Service; (viii) and the United States Attorney's Office for the Southern District of New York (collectively, the "**Notice Parties**"). The Debtors respectfully submit that no further notice is required.

55.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of interim and final orders

granting the relief requested herein and such other and further relief as the Court may deem just

and appropriate.

Dated: January 23, 2020
      New York, New York

                  /s/  Sunny Singh
                  WEIL, GOTSHAL & MANGES LLP
                  767 Fifth Avenue
                  New York, New York  10153
                  Telephone:  (212) 310-8000
                  Facsimile:  (212) 310-8007
                  Ray C. Schrock, P.C.
                  Sunny Singh

                  *Proposed Attorneys for Debtors*
                  *and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>FAIRWAY GROUP HOLDINGS CORP.,<br>*et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 20-_____ (___)<br><br>Jointly Administered |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364
AND 507: (A) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING
AND USE CASH COLLATERAL; (B) GRANTING LIENS AND PROVIDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (C) GRANTING
ADEQUATE PROTECTION; (D) MODIFYING AUTOMATIC STAY;
(E) SCHEDULING A FINAL HEARING; AND (F) GRANTING RELATED RELIEF**

Upon the motion, dated January 23, 2020 (the "<u>DIP Motion</u>")[2] of Fairway Group Holdings

Corp. and its debtor affiliates, as debtors and debtors in possession (collectively, the "<u>Debtors</u>") in

the above-captioned chapter 11 cases (collectively, the "<u>Chapter 11 Cases</u>"), seeking entry of an

order (this "<u>Interim Order</u>") and a Final Order (as defined herein) pursuant to Sections 105, 361,

362, 363, 364(c)(l), 364(c)(2), 364(c)(3), 364(d), 364(e), and 507 of title 11 of the United States

Code (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 4001-2 of the Local Bankruptcy Rules

for the United States Bankruptcy Court for the Southern District of New York (the "<u>Local Rules</u>"),

among other things:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Fairway Group Holdings Corp. (2788); Fairway Group Acquisition Company (2860); Fairway Bakery LLC (4129); Fairway Broadway LLC (8591); Fairway Chelsea LLC (0288); Fairway Construction Group, LLC (2741); Fairway Douglaston LLC (2650); Fairway East 86th Street LLC (3822); Fairway eCommerce LLC (3081); Fairway Georgetowne LLC (9609); Fairway Greenwich Street LLC (6422); Fairway Group Central Services LLC (7843); Fairway Group Plainview LLC (8643); Fairway Hudson Yards LLC (9331); Fairway Kips Bay LLC (0791); FN Store LLC (9240); Fairway Paramus LLC (3338); Fairway Pelham LLC (3119); Fairway Pelham Wines & Spirits LLC (3141); Fairway Red Hook LLC (8813); Fairway Stamford LLC (0738); Fairway Stamford Wines & Spirits LLC (3021); Fairway Staten Island LLC (1732); Fairway Uptown LLC (8719); Fairway Westbury LLC (6240); and Fairway Woodland Park LLC (9544).  The location of the Debtors' corporate headquarters is 2284 12th Avenue, New York, New York 10027.  Fairway Community Foundation Inc., a charitable organization, owned by Fairway Group Holdings Corp., is not a debtor in these proceedings.

[2] Capitalized terms used but not defined herein have the meanings given to them in the DIP Motion or the DIP Credit Agreement (as defined herein), as applicable.

(i)       authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis consisting of a senior secured superpriority term credit facility (the "DIP Facility" and, the financial institutions party thereto from time to time as lenders, as provided in the DIP Credit Agreement, the "DIP Lenders"), comprised of (a) a new money multiple draw term loan facility in an aggregate principal amount of $20.0 million (the "New Money DIP Facility" and, the new money loans made thereunder, the "New Money DIP Loans"); (b) a new money delayed draw credit facility in an aggregate principal amount of $5.0 million (the "New Money Delayed Draw DIP Facility," and, the loans available thereunder, the "New Money Delayed Draw DIP Loans"); and (c) subject to entry of a Final Order (as defined herein), in connection with the funding of any New Money DIP Loans, a roll up loan facility (the "Roll-Up DIP Facility"), pursuant to which the DIP Lenders shall be deemed to make loans under the Roll-Up DIP Facility (such loans, the "Roll-Up DIP Loans" and, together with the New Money DIP Loans and the New Money Delayed Draw DIP Loans, the "DIP Loans") in an aggregate principal amount equal to the Debtors' outstanding obligations under the Super Senior Credit Facilities held by the DIP Lenders, which Roll-Up DIP Loans shall be deemed used to satisfy and discharge such obligations, pursuant to the terms and conditions of that certain *Superpriority Secured Debtor-in-Possession Credit Agreement* (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement" and, together with the schedules and exhibits attached thereto and all agreements, documents, instruments, and amendments executed and delivered in connection therewith, the "DIP Documents"), by and among Fairway Group Acquisition Company ("Borrower") and the other "Loan Parties" party thereto (the Borrower and the other "Loan Parties," which are, in each case, the Debtors in these Chapter 11 Cases, collectively, the "DIP Parties"), the DIP Lenders, and Ankura Trust Company,

2

LLC ("Ankura"), as administrative agent and collateral agent (in such capacity, the "DIP Agent")

for and on behalf of itself and the DIP Lenders, substantially in the form annexed hereto as

**Exhibit 1**;

(ii)     authorizing the Debtors party thereto to execute and deliver the DIP Credit

Agreement and any other agreements and documents related thereto and to perform such other acts

as may be necessary or desirable in connection with the DIP Documents;

(iii)    authorizing the Debtors to enter into the DIP Facility and to incur all obligations

owing thereunder and under the DIP Documents to the DIP Agent and DIP Lenders (collectively,

including all "Obligations" as described in the DIP Credit Agreement, the "DIP Obligations") and

granting the DIP Agent and DIP Lenders allowed superpriority administrative expense claim status

in each of the Chapter 11 Cases and in any Successor Case (as defined herein), subject to the Carve

Out (as defined herein);

(iv)    granting to the DIP Agent, for the benefit of itself and the DIP Lenders,

automatically perfected security interests in and liens on all of the DIP Collateral (as defined

herein), including, without limitation, all property constituting "cash collateral" as defined in

Section 363(a) of the Bankruptcy Code ("Cash Collateral"), which liens shall have the priorities

set forth herein and shall be subject to the Carve Out;

(v)     authorizing the Debtors to use any Cash Collateral in which the Prepetition Secured

Parties have an interest, as well as the proceeds of the DIP Facility, in each case in accordance

with this Interim Order and the DIP Documents, including in accordance with the Budget (subject

to Permitted Variances) as required herein;

(vi)    authorizing and directing the Debtors to pay the principal, interest, fees, expenses

and other amounts payable under the DIP Documents as such become due, including, without

3

limitation, commitment fees, closing fees, structuring fees, administrative agent's fees, and the reasonable fees and disbursements of the DIP Agent's and the DIP Lenders' respective attorneys, advisors, accountants, and other consultants, in each case, as and to the extent provided in, and in accordance with, the applicable DIP Documents and this Interim Order;

(vii)    authorizing the Debtors to use the Prepetition Collateral (as defined herein), including the Cash Collateral of the Prepetition Secured Parties under the Prepetition Documents (each as defined herein) and providing adequate protection to the Prepetition Secured Parties solely to the extent of any Diminution in Value (as defined herein) of their respective interests in the Prepetition Collateral, including the Cash Collateral;

(viii)    modifying the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order and to provide for the immediate effectiveness of this Interim Order; and scheduling a final hearing (the "Final Hearing") to consider the relief requested in the DIP Motion and approving the form of notice with respect to the Final Hearing.

The Court having considered the DIP Motion, the exhibits attached thereto, the Declaration of Mark Hootnick pursuant to Rule 1007-2 of the Local Rules, the DIP Documents, the First Day Declarations, and the evidence submitted and arguments made at the interim hearing (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and

4

reasonable and in the best interests of the Debtors, their estates and all parties-in-interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Credit Agreement is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.    **Petition Date**.  On January 23, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court").

B.    **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

C.    **Jurisdiction and Venue**.  This Court has jurisdiction over the Chapter 11 Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2). This Court may enter a final order consistent with Article III of the United States Constitution. Venue for the Chapter 11 Cases and proceedings with respect to the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

5

**D.**     **Committee Formation**.  As of the date hereof, the United States Trustee for the Southern District of New York (the "U.S. Trustee") has not yet appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to Section 1102 of the Bankruptcy Code (any such committee subsequently appointed, a "Committee").

**E.**     **Notice**.  Proper, timely, adequate, and sufficient notice of the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or of the entry of this Interim Order shall be required.

**F.**     **Debtors' Stipulations**.    After consultation with their attorneys and financial advisors, and subject and without prejudice to the rights of parties in interest, including any Committee or any other statutory committee that may be appointed in the Chapter 11 Cases, as set forth in paragraph 38 herein, the Debtors, on their own behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows (paragraphs F(i) through F(iv) below are referred to herein, collectively, as the "Debtors' Stipulations"):

(i)     *Prepetition Credit Agreement*.  Pursuant to that certain Super Senior Credit Agreement, dated as of August 28, 2018 (as amended, restated, supplemented, or otherwise modified from time to time, including by that certain First Amendment to Super Senior Credit Agreement, dated as of July 29, 2019, by that certain Second Amendment to and Extension under Super Senior Credit Agreement, dated as of August 28, 2019, and by that certain Third Amendment and Limited Waiver to Super Senior Credit Agreement, dated as of October 7, 2019, and waived by that Limited Waiver to Super Senior Credit Agreement, dated as of January 8, 2020, the "Prepetition Credit Agreement," together with any Loan Document (as defined in the Prepetition Credit Agreement) and any other agreement or document related to or evidencing the loans and

6

obligations thereunder executed or delivered in connection therewith, each as amended, restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition Documents") among (a) Fairway Group Holdings Corp. ("Holdings"); (b) Borrower; (c) Ankura Trust Company, LLC, as administrative agent and collateral agent (the "Prepetition Agent"); and (e) the lenders from time to time party thereto (the "Prepetition Lenders" and, together with the Prepetition Agent, the "Prepetition Secured Parties"), the Prepetition Lenders provided term loans to the Borrower and Holdings pursuant to the Prepetition Documents;

(ii)     *Prepetition Obligations*.    Under the Prepetition Credit Agreement, the Prepetition Lenders provided to the Debtors party thereto commitments in respect of term loans in the aggregate principal amount of up to $227,100,000 (collectively, together with any accrued and unpaid interest, fees, expenses, and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, and financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' (as defined therein) obligations under the Prepetition Documents, including all "Obligations" as defined in the Prepetition Credit Agreement, the "Prepetition Obligations").

(iii)     *Prepetition Liens and Prepetition Collateral*.  As more fully set forth in the Prepetition Documents, prior to the Petition Date, pursuant to that certain Super Senior Guarantee and Collateral Agreement, dated as of August 28, 2018, as amended, restated, supplemented, or otherwise modified from time to time prior to the date hereof, Holdings and certain subsidiaries of Holdings (together with the Borrower and Holdings, collectively, the "Prepetition Loan Parties") jointly and severally guaranteed all of the Prepetition Obligations, and each Prepetition Loan Party

7

granted to the Prepetition Agent, for the benefit of itself and the other Prepetition Secured Parties, a lien on and security in all of its right, title, and interest in (collectively, the "Prepetition Liens") substantially all of its assets (the "Prepetition Collateral"), subject to certain customary exclusions;

(iv)    *Validity, Perfection, and Priority of Prepetition Liens and Prepetition Obligations*.  As of the Petition Date, (a) the Prepetition Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain liens otherwise permitted by the Prepetition Documents and any other lien arising as a matter of law (in each case, to the extent that such existing liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Liens as of the Petition Date or were valid non-avoidable senior liens that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, the "Permitted Liens");[4] (b) the Prepetition Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Secured Parties for fair consideration and reasonably equivalent value; (c) the Prepetition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Loan Parties enforceable in accordance with the terms of the respective Prepetition Documents; (d) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Obligations exist, and no portion of the Prepetition Liens or Prepetition Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or

---

[4] Nothing herein shall constitute a finding or ruling by this Court that any such Permitted Lien is valid, senior, enforceable, prior, perfected, or non-avoidable. Moreover, nothing shall prejudice the rights of any party in interest, including, but not limited to, the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, or a Committee (if appointed), to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any alleged Permitted Lien. The right of a seller of goods to reclaim such goods under Section 546(c) of the Bankruptcy Code is not a Permitted Lien and is expressly subject to the Prepetition Liens and DIP Liens.

choses in action, including, without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state-law equivalents or actions for recovery or disgorgement, against any of the Prepetition Secured Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, consultants, directors, and employees arising out of, based upon, or related to the Prepetition Credit Documents; (f) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Obligations; and (g) the Prepetition Obligations constitute allowed, secured claims within the meaning of Sections 502 and 506 of the Bankruptcy Code.

(a)     *Release*.   Subject to paragraph 38, the Debtors hereby stipulate and agree that they forever and irrevocably release, discharge, and acquit the DIP Agent, the Prepetition Secured Parties, all former, current, and future DIP Lenders, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, professionals, directors, employees, advisors, consultants, attorneys, and agents, past, present, and future, and their respective heirs, predecessors, successors, and assigns, each solely in their capacities as such (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever relating to, as applicable, the DIP Facility, the DIP Documents, the Prepetition Documents and/or the transactions contemplated hereunder or thereunder, including (x) any so-called "lender liability" or equitable subordination or recharacterization claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection, or avoidability of the liens or claims of the Prepetition Agent, the Prepetition

9

Secured Parties, the DIP Agent, and the DIP Lenders.  The Debtors further waive and release any

defense, right of counterclaim, right of set-off, or deduction to the payment of the Prepetition

Secured Obligations and the DIP Obligations that the Debtors may now have or may claim to have

against the Releasees, arising out of, connected with, or relating to any and all acts, omissions, or

events occurring prior to this Court entering this Interim Order.

> **G.**    **Cash Collateral**.  All of the Prepetition Loan Parties' cash, including any cash in

deposit accounts, wherever located, constitutes Cash Collateral of the Prepetition Secured Parties.

> **H.**    **Findings Regarding Postpetition Financing**

> (i)    *Request for Postpetition Financing*.  The Debtors seek authority to (a) enter

into the DIP Facility on the terms described herein and in the DIP Documents and (b) use Cash

Collateral on the terms described herein to administer their Chapter 11 Cases and fund their

operations.  At the Final Hearing, the Debtors will seek final approval of the proposed postpetition

financing and use of Cash Collateral arrangements pursuant to a proposed final order (the "Final

Order"), which shall be in form and substance reasonably acceptable to the DIP Agent (acting at

the direction of DIP Lenders holding more than fifty percent (50%) of the outstanding loans and

commitments under the DIP Facility, which shall include both Brigade Capital Management

("Brigade") and Special Situations Investing Group ("SSIG") for so long as such institutions

and/or their affiliates are DIP Lenders (the "Requisite DIP Lenders")).  Notice of the Final Hearing

and the proposed Final Order will be provided in accordance with this Interim Order.

> (ii)    *Priming of the Prepetition Liens*.  The priming of the Prepetition Liens of

the Prepetition Secured Parties on the Prepetition Collateral under Section 364(d) of the

Bankruptcy Code, as contemplated by the DIP Facility and as further described below, will enable

the Debtors to obtain the DIP Facility and to continue to operate their businesses to the benefit of

their estates and creditors. The Prepetition Secured Parties are each entitled to receive adequate protection as set forth in this Interim Order pursuant to Sections 361, 363, and 364 of the Bankruptcy Code ("Adequate Protection"), to the extent of any diminution in value resulting from, among other things, the Debtors' use, sale, or lease of Cash Collateral and other Prepetition Collateral, the subordination to the Carve Out (as defined herein), the priming (to the extent provided for herein) of the Prepetition Liens by the DIP Liens (as defined herein), and the imposition of the automatic stay ("Diminution in Value") of each of their respective interests in the Prepetition Collateral (including Cash Collateral).

(iii)    *Need for Postpetition Financing and Use of Cash Collateral*. The Debtors have an immediate and critical need to use Cash Collateral on an interim basis and to obtain credit on an interim basis pursuant to the DIP Facility in order to, among other things, enable the orderly continuation of their operations, to administer these Chapter 11 Cases, and to consummate the sale and the restructuring transactions contemplated by the Restructuring Support Agreement that will maximize recoveries to stakeholders. The ability of the Debtors to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, and to otherwise finance their operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral, the absence of either of which would immediately and irreparably harm the Debtors, their estates, and parties in interest. The Debtors do not have sufficient available sources of working capital and/or financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility and authorized use of Cash Collateral.

(iv)    *No Credit Available on More Favorable Terms*. The DIP Facility is the best source of debtor-in-possession financing available to the Debtors. Given their current financial condition, financing arrangements, and capital structure, the Debtors have been and continue to be

11

unable to obtain financing from sources other than the DIP Lenders on terms more favorable than

the DIP Facility.  The Debtors are unable to obtain unsecured credit allowable under Bankruptcy

Code Section 503(b)(1) as an administrative expense.  The Debtors have also been unable to obtain

(a) unsecured credit having priority over that of administrative expenses of the kind specified in

Sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on

property of the Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured

solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Financing

on a postpetition basis is not otherwise available without granting the DIP Agent, for the benefit

of itself and the DIP Lenders, (1) perfected security interests in and liens on (each as provided

herein) all of the Debtors' existing and after-acquired assets with the priorities set forth in

paragraph 5 hereof, (2) superpriority claims and liens, and (3) the other protections set forth in this

Interim Order.

(v)    *Use of Cash Collateral and Proceeds of the DIP Facility*.  As a condition to

the Debtors' entry into the DIP Documents, the extensions of credit under the DIP Facility, and the

authorization to use Prepetition Collateral, including Cash Collateral, the DIP Agent, the DIP

Lenders, and the Prepetition Secured Parties require, and the Debtors have agreed, that Cash

Collateral and the proceeds of the DIP Facility shall be used, in each case, in a manner consistent

with the terms and conditions of this Interim Order and the DIP Documents and in accordance with

the budget (as the same may be modified from time to time consistent with the terms of the DIP

Documents and subject to such variances as permitted in the DIP Credit Agreement, the "<u>Budget</u>")[5]

and as otherwise provided in this Interim Order and the DIP Documents, for (a) working capital;

(b) other general corporate purposes of the Debtors; (c) permitted payments of the costs of

---

[5] A copy of the initial Budget is attached hereto as **<u>Exhibit 2</u>**.

12

administration of the Chapter 11 Cases (including professional fees and expenses of the Debtors'
professionals and professionals retained by a Committee (if appointed)); (d) payment of such
prepetition expenses as consented to by the DIP Agent (acting at the direction of the Requisite DIP
Lenders) and as approved by the Court; (e) payment of interest, fees, and expenses (including,
without limitation, legal and other professionals' fees and expenses of the DIP Agent and the DIP
Lenders owed under the DIP Documents); (f) payment of certain adequate protection amounts to
the Prepetition Secured Parties, as set forth in paragraph 15 hereof; (g) payment of the Carve Out
(which shall be in accordance with paragraph 35 of this Interim Order); and (h) such other uses set
forth in the Budget and permitted by the DIP Credit Agreement.

(vi)     *Application of Proceeds of Collateral*.  As a condition to entry into the DIP
Credit Agreement, the extension of credit under the DIP Facility and authorization to use Cash
Collateral, the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agent, and the Prepetition
Lenders have agreed that, as of and commencing on the date of this Interim Order, the Debtors
shall apply the proceeds of DIP Collateral in accordance with this Interim Order and the DIP
Documents.

I.     **Adequate Protection**.  The Prepetition Agent and the Prepetition Secured Parties
are entitled to receive Adequate Protection to the extent of any aggregate Diminution in Value of
their respective interests in the Prepetition Collateral.  Pursuant to Sections 361, 363, and 507(b)
of the Bankruptcy Code, as Adequate Protection, subject in all respects to the Carve Out (as defined
herein), the Prepetition Secured Parties will receive (i) solely to the extent of any Diminution in
Value of their interests in the Prepetition Collateral, adequate protection liens and superpriority
claims, as more fully set forth in paragraphs 11–14 herein, and (ii) current payment of reasonable
and documented fees and expenses of the Prepetition Agent and the Ad Hoc Group (including

13

without limitation, legal and other professionals' fees and expenses of the Prepetition Agent and the Ad Hoc Group, whether arising before or after the Petition Date).

**J.**      __Sections 506(c) and 552(b)__.   In light of (i) the DIP Agent's and DIP Lenders' agreement that their liens and superpriority claims shall be subject to the Carve Out and (ii) the Prepetition Agent and Prepetition Lenders' agreement that their respective liens and claims, including any adequate protection liens and claims, shall be subject to the Carve Out and subordinate to the DIP Liens, subject to and effective only upon entry of a Final Order, (a) the Prepetition Secured Parties are entitled to a waiver of any "equities of the case" exception under Section 552(b) of the Bankruptcy Code and (b) the DIP Agent, DIP Lenders, and Prepetition Secured Parties are each entitled to a waiver of the provisions of Section 506(c) of the Bankruptcy Code.

**K.**      __Good Faith of the DIP Agent and DIP Lenders__.

(i)      *Willingness to Provide Financing*.   The DIP Lenders have indicated a willingness to provide the DIP Facility to the Debtors subject to (a) entry of this Interim Order and, subsequently, the Final Order; (b) approval of the terms and conditions of the DIP Facility and the DIP Documents; (c) satisfaction of the closing conditions set forth in the DIP Documents; and (d) findings by this Court that the DIP Facility is essential to the Debtors' estates, that the DIP Agent and DIP Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Agent's and DIP Lenders' DIP Superpriority Claims and DIP Liens, and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided by Section 364(e) of the Bankruptcy Code.

(ii)      *Business Judgment and Good Faith Pursuant to Section 364(e)*.   The terms and conditions of the DIP Facility and the DIP Documents, and the fees paid and to be paid

14

thereunder, (a) are fair, reasonable, and the best available to the Debtors under the circumstances; (b) are appropriate for secured financing to debtors in possession; (c) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties; and (d) are supported by reasonably equivalent value and consideration. The terms and conditions of the DIP Facility and the use of Cash Collateral were negotiated in good faith and at arms' length among the Debtors, DIP Agent, DIP Lenders, and the Prepetition Secured Parties, with the assistance and counsel of their respective advisors. Use of Cash Collateral and credit to be extended under the DIP Facility shall be deemed to have been allowed, advanced, made, or extended in good faith by the DIP Agent, DIP Lenders, and the Prepetition Secured Parties within the meaning of Section 364(e) of the Bankruptcy Code.

(iii)     *Consent to DIP Financing and Use of Cash Collateral*. Absent an order of this Court and the provision of Adequate Protection, consent of the Prepetition Secured Parties is required for the Debtors' use of Cash Collateral and other Prepetition Collateral. The Prepetition Secured Parties have consented, or are deemed pursuant to the Prepetition Documents to have consented, or have not objected to the Debtors' use of Cash Collateral and other Prepetition Collateral or to the Debtors' entry into the DIP Documents in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents.

L.     **Immediate Entry**. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

M.     **Interim Hearing**. Notice of the Interim Hearing and the relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier, or hand delivery, to certain parties in interest, including the Notice Parties. The Debtors have made

15

reasonable efforts to afford the best notice possible under the circumstances, and no other notice is required in connection with the relief set forth in this Interim Order.

Based upon the foregoing findings and conclusions, the DIP Motion, and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.     <u>Interim Financing Approved</u>.  The DIP Motion is granted on an interim basis.  The DIP Facility, in an amount up to the Interim Financing (as defined herein), is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case, subject to the terms and conditions set forth in the DIP Documents or this Interim Order, as applicable. All objections to this Interim Order, to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled.  This Interim Order shall become effective immediately upon its entry.

**<u>DIP Facility Authorization</u>**

2.     <u>Authorization of the DIP Facility</u>.  The DIP Facility, in an amount up to the Interim Financing (as defined herein), is hereby approved on an interim basis.  The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents and to deliver all instruments, certificates, agreements, and documents that may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens (as defined herein) described in and provided for by this Interim Order and the DIP Documents.  The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, any principal, interest, fees, expenses,

16

and other amounts described in the DIP Documents and this Interim Order, as such amounts become due and owing, without need to obtain further Court approval (except as otherwise provided herein or in the DIP Documents (including any related fee letters)), subject to and in accordance with the term hereof and thereof, respectively, including, without limitation, any closing fees, commitment fees, structuring fees, and administrative agent's fees, as well as any reasonable and documented fees and disbursements of the DIP Agent's and the DIP Lenders' professionals, as set forth herein and in the DIP Credit Agreement, whether or not such professional fees and disbursements arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, to implement all applicable reserves and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order and the DIP Documents.  All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise will be deposited and applied as required by this Interim Order and the DIP Documents.  Upon execution and delivery, the DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms.

3.      <u>Authorization to Borrow</u>.  In order to prevent immediate and irreparable harm to the Debtors' estates, from the entry of this Interim Order through and including the earliest to occur of (i) entry of the Final Order and (ii) the DIP Termination Date (as defined herein), and subject to the terms, conditions, limitations on availability, and reserves set forth in the DIP Documents and this Interim Order, the Debtors are hereby authorized to request extensions of credit (in the form of New Money DIP Loans) up to an aggregate outstanding principal amount of not greater than $15.0 million at any one time outstanding under the DIP Facility (the "<u>Interim Financing</u>").

17

4.      <u>DIP Obligations</u>.      The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations, which DIP Obligations shall be enforceable against the Debtors, their estates, and any successors thereto, including, without limitation, any trustee appointed in the Chapter 11 Cases or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>").  Upon entry of this Interim Order, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Agent or any of the DIP Lenders under the DIP Documents or this Interim Order, including, without limitation, all principal, accrued and unpaid interest, costs, fees, expenses, and other amounts under the DIP Documents.  The DIP Parties shall be jointly and severally liable for the DIP Obligations.  The DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease on the DIP Termination Date (as defined herein), except as provided in paragraphs 27 and 30 herein, and subject to the Carve Out requirements in paragraph 35 herein.  No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens (as defined herein) and including, in connection with any Adequate Protection provided to the Prepetition Secured Parties hereunder, subject to paragraph 38 herein) shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under Sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law) or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether

18

equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

5.      <u>DIP Liens</u>.  In order to secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to Sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "<u>DIP Liens</u>") all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of, with respect to the DIP Obligations, each of the DIP Parties (the "<u>DIP Collateral</u>"), including without limitation:  (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each of its subsidiaries), furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, and proceeds of the foregoing, wherever located, including insurance or other proceeds, (b) all owned real property interests and all proceeds of leasehold real property interests and proceeds thereof, (c) subject to, and upon entry of, the Final Order, the proceeds of all avoidance actions under Chapter 5 of the

Bankruptcy Code, (d) and all other property of the DIP Parties that was not otherwise subject to valid, perfected, enforceable and nonavoidable liens on the Petition Date. Notwithstanding the foregoing, the DIP Collateral shall not include (and the DIP Liens shall not extend to) assets held by the Debtors in trust and any "Excluded Collateral" (as defined in the DIP Credit Agreement). Nothing herein shall limit, subordinate, or constitute a waiver of any rights and priorities of claimants with statutory trust rights, including those afforded under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a et. seq or the Packers and Stockyards Act of 1921, as amended, 7 U.S.C. §§ 181 et. seq.

6.    DIP Lien Priority. The DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien, or claim to any of the DIP Collateral, except that the DIP Liens shall be subject to the Carve Out and shall otherwise be junior only to Permitted Liens. Other than as set forth in this Interim Order or in the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case) and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases. The DIP Liens shall not be subject to Section 510, 549, or 550 of the Bankruptcy Code, other than in respect of any Prepetition Obligations that have been satisfied and replaced by Roll-Up DIP Loans pursuant to a Final Order (subject in all respects to the Challenge Deadline and related provisions set forth in paragraph 38). No lien or interest avoided and preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

7.      <u>Superpriority Claims</u>.  Upon the entry of this Interim Order, the DIP Agent, on behalf of itself and the DIP Lenders, is hereby granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases and any Successor Cases (a "<u>DIP Superpriority Claim</u>") for all DIP Obligations (a) except as set forth herein, with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code, and (b) which shall at all times be senior to the rights of the Debtors and their estates and any successor trustee or other estate representative to the extent permitted by law. Notwithstanding anything to the contrary in this Interim Order, the DIP Superpriority Claim shall be subject in all respects to the Carve Out.

8.      <u>No Obligation to Extend Credit</u>.  Except as required to fund the Carve Out as set forth in paragraph 35, the DIP Agent and DIP Lenders shall have no obligation to make any loan under the DIP Documents, unless all of the conditions precedent to the making of such extension of credit under the DIP Documents and this Interim Order have been satisfied in full or waived by the DIP Agent (acting at the direction of the Requisite DIP Lenders, as applicable, and in accordance with the terms of the DIP Credit Agreement).

9.      <u>Use of Proceeds of DIP Facility</u>.  From and after the Petition Date, the Debtors shall use proceeds from borrowings under the DIP Facility in accordance with the Budget (subject to Permitted Variances), only for the purposes specifically set forth in this Interim Order

21

and the DIP Documents, and in compliance with the terms and conditions in this Interim Order and the DIP Documents.

**Authorization to Use Cash Collateral**

10.     <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Interim Order (including, without limitation, paragraphs 30 and 35 hereof), the DIP Facility, and the DIP Documents, and in accordance with the Budget (including Permitted Variances), the Debtors are authorized to use Cash Collateral until the DIP Termination Date.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order, the DIP Facility, the DIP Documents, the Restructuring Support Agreement (including, but not limited to, the sale transactions contemplated by the Bid Procedures), and in accordance with the Budget (including Permitted Variances).

11.     <u>Adequate Protection Liens</u>.

(i)     *Prepetition Adequate Protection Liens*.  Pursuant to Sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Secured Parties in the Prepetition Collateral, solely to the extent against any aggregate Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Loan Parties hereby grant to the Prepetition Agent, on behalf of itself and the Prepetition Secured Parties, continuing, valid, binding, enforceable and perfected postpetition security interests in and liens on the DIP Collateral (the "<u>Adequate Protection Liens</u>").

12.     Priority of Adequate Protection Liens.

(i)     The Adequate Protection Liens shall be subject to the Carve Out and shall otherwise be junior only to (1) Permitted Liens and (2) the DIP Liens, and the Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral.  For the avoidance of doubt, the Prepetition Agent shall hold the Adequate Protection Liens on behalf of the Prepetition Secured Parties and shall deliver the proceeds and/or other benefits of such Adequate Protection Liens to the Prepetition Secured Parties strictly in accordance with the Prepetition Documents (including any waterfall provision set forth therein).

(ii)     Except as provided herein, including, without limitation, with respect to the Carve Out, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, or upon the dismissal of any of the Chapter 11 Cases or Successor Cases.  Subject to the provisions of paragraph 38, the Adequate Protection Liens shall not be subject to Sections 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Prepetition Liens or the Adequate Protection Liens.

13.     Adequate Protection Superpriority Claims.

(i)     *Prepetition Superpriority Claims*.  As further adequate protection of the interests of the Prepetition Secured Parties in the Prepetition Collateral, solely to the extent of any Diminution in Value (if any) of their respective interests in the Prepetition Collateral, and subject in all respects to the Carve Out, the Prepetition Agent, on behalf of itself and the Prepetition

23

Secured Parties, is hereby granted as and to the extent provided by Section 507(b) of the Bankruptcy Code allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor Cases (the "Adequate Protection Superpriority Claims").

14.    Priority of the Adequate Protection Superpriority Claims.  Except as set forth herein, the Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code; *provided*, *however*, that the Adequate Protection Superpriority Claims shall be subject to the Carve Out and shall be junior to the DIP Superpriority Claim.  The Adequate Protection Superpriority Claims shall have the same priority between and among the Prepetition Parties as the claims such parties held prior to the Commencement Date.  For the avoidance of doubt, the Prepetition Agent shall hold the Adequate Protection Superpriority Claim on behalf of the Prepetition Secured Parties and shall deliver the proceeds and/or other benefits of such Adequate Protection Superpriority Claim to the Prepetition Secured Parties strictly in accordance with the Prepetition Documents (including any waterfall provision set forth therein).

15.    Adequate Protection Payments and Protections for Prepetition Secured Parties.  As further adequate protection (the "Adequate Protection Payments"), the Debtors are authorized and directed to pay in cash (i) current payment of interest in cash at the non-default rate on the outstanding obligations under the Super Senior Credit Facilities; provided that if the Roll-Up DIP Facility is approved by the court pursuant to the Final Order, such interest payments shall cease and shall no longer be required as adequate protection, (ii) current payment in cash of all

24

reasonable and documented (in summary form) prepetition and postpetition fees and expenses

payable to the Prepetition Agent under the Prepetition Documents (limited, in the case of counsel,

to all reasonable and documented out-of-pocket fees, costs, disbursements, and expenses payable

to outside counsel, Davis Polk & Wardwell LLP ("DPW")), and (iii) all reasonable and

documented (in summary form) prepetition and postpetition fees and expenses payable to the Ad

Hoc Group (limited, in the case of counsel, to all reasonable and documented out-of-pocket fees,

costs, disbursements, and expenses payable to outside counsel, King & Spalding LLP ("K&S")).

The payment of the professional fees and expenses set forth in this paragraph 15 shall be made

within ten (10) business days (which time period may be extended by the applicable professional)

following receipt by the Debtors, the Committee (if any), and the U.S. Trustee (the "Review

Period") of an invoice therefor (the "Invoiced Fees") and without the necessity of filing formal fee

applications, including as to any amounts arising before or after the Petition Date.  The invoices

for such Invoiced Fees shall include the number of hours billed (except for financial advisors or

other professionals that are not customarily compensated on an hourly basis), a summary

description of services provided, and the aggregate expenses incurred by the applicable

professional firm; *provided*, *however*, that any such invoice (i) may be limited and/or redacted to

protect privileged, confidential, or proprietary information, (ii) shall not be required to contain

individual time detail (*provided* that such invoice shall contain (except for financial advisors or

other professionals that are not customarily compensated on an hourly basis) summary data

regarding hours worked by each timekeeper for the applicable professional and such timekeepers'

hourly rates), and (iii) shall not be required to comply with the U.S. Trustee fee guidelines.  Any

objections raised by the Debtors, the U.S. Trustee, or the Committee (if appointed) with respect to

any portion of the Invoiced Fees (the "Disputed Invoiced Fees") must be in writing and state with

25

particularity the specific objections to the Disputed Invoiced Fees in reasonable narrative detail and the basis for such objections and must be submitted to the applicable professional within the Review Period.  If, after the Review Period, an objection remains unresolved, it may be submitted to the Court for resolution by the objecting party or the applicable professional.  Pending such resolution, the undisputed portion of any Invoiced Fees shall be paid promptly by the Debtors. Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to the Prepetition Secured Parties in connection or with respect to these matters, are hereby approved in full and shall not be subject to avoidance, disgorgement or any similar form of recovery by the Debtors or any other person.

16.    Adequate Protection Reservation.  Nothing herein shall impair or modify the application of Section 507(b) of the Bankruptcy Code in the event that the Adequate Protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution in Value of their respective interests in the Prepetition Collateral during the Chapter 11 Cases or any Successor Cases. The receipt by the Prepetition Secured Parties of the Adequate Protection herein shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected.  Further, this Interim Order shall not prejudice or limit the rights of the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection, subject, in all respects, to the terms and limitations of the Prepetition Documents.

17.    Effect of Order on Adequate Protection.  In the event that it is determined by a final order, which order shall not be subject to any appeal, stay, reversal, or vacatur, that (a) no Diminution in Value of any Prepetition Secured Party's respective interests has occurred or (ii) such Prepetition Secured Party is determined to be undersecured, then a party in interest shall

26

have the right to assert that payments of Adequate Protection shall be applied toward repayment of the principal amount due under the Prepetition Credit Agreement as is owing to such Prepetition Secured Party.

**Provisions Common to DIP Financing and Use of Cash Collateral**

18.     _Amendment of the DIP Documents_.  The DIP Documents may from time to time be amended, modified, or supplemented by the parties thereto without further order of the Court if (a) the amendment, modification, or supplement (i) is in accordance with the DIP Documents and (ii) does not prejudice the rights of the Debtors or their estates in any material respect; (b) a copy (which may be provided through electronic mail or facsimile) of the amendment, modification, or supplement is provided to counsel to the Committee (if appointed), any other statutory committee appointed in the Chapter 11 Cases, and the U.S. Trustee (collectively, the "_Notice Parties_"); and (c) notice of the amendment, modification or supplement is filed with the Court; _provided_, that neither consent of the Notice Parties nor approval of the Court will be necessary to effectuate any such amendment, modification, or supplement; and _provided_, _further_, that such amendment, modification, or supplement shall be without prejudice to the right of any party in interest to be heard regarding such proposed amendment.

19.     _Budget Maintenance and Compliance_.  The use of borrowings under the DIP Facility shall be in accordance with the Budget (subject to the Permitted Variances, and except as otherwise provided under this Interim Order) and the terms and conditions set forth in the DIP Documents and this Interim Order; _provided_, that, in the case of fees, costs, and expenses of the DIP Agent, the Prepetition Agent, the Ad Hoc Group, and the Debtors' Professionals, the Debtors shall pay such fees, costs, and expenses in accordance with the DIP Documents and this Interim Order without being limited by the Budget.  The Budget and any modification to, or amendment

27

or update of, the Budget shall be subject to the approval of, and in form and substance acceptable to, the DIP Agent (acting at the direction of the Requisite DIP Lenders).

20. <u>Modification of Automatic Stay</u>. The automatic stay imposed under Section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, and Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Agent, DIP Lenders, or the Prepetition Agent each may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Agent, DIP Lenders, and Prepetition Secured Parties under the DIP Documents, the DIP Facility, and this Interim Order; and (d) authorize the Debtors to make, and the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Interim Order, the DIP Documents, and the Prepetition Documents, as applicable.

21. <u>Perfection of DIP Liens and Adequate Protection Liens</u>. This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Prepetition Adequate Protection Liens or to entitle the DIP Agent, the DIP Lenders, the DIP Obligations, the Prepetition Secured Parties, and the Prepetition Obligations to

28

the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent and the Prepetition

Agent each are authorized, but not required, to file, subject to the terms and priorities of this Interim

Order, as they in their respective sole discretion deem necessary or advisable, such financing

statements, security agreements, mortgages, notices of liens, and other similar documents to

perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens

and the Prepetition Adequate Protection Liens, and all such financing statements, mortgages,

notices, and other documents shall be deemed to have been filed or recorded as of the Petition

Date; *provided*, *however*, that no such filing or recordation shall be necessary or required in order

to create or perfect the DIP Liens or the Adequate Protection Liens.  The Debtors, without further

consent of any party, are authorized to execute and deliver, upon request of the DIP Agent and/or

the Prepetition Agent, all such financing statements, mortgages, notices, and other documents as

the DIP Agent or the Prepetition Agent may reasonably request.  The DIP Agent and the Prepetition

Agent, each in its discretion, may file a photocopy of this Interim Order as a financing statement

with any filing or recording office or with any registry of deeds or similar office, in addition to or

in lieu of such financing statements, notices of lien, or similar instrument.  To the extent that the

Prepetition Agent is the secured party under any security agreement, mortgage, leasehold

mortgage, landlord waiver, credit card processor notices or agreements, bailee letters, custom

broker agreements, financing statement, account control agreements, or any other Prepetition

Documents or is listed as loss payee or additional insured under any of the Debtors' insurance

policies, the DIP Agent shall also be deemed to be the secured party or mortgagee, as applicable,

under such documents or to be the loss payee or additional insured, as applicable.  The Prepetition

Agent shall serve as agent for the DIP Agent for purposes of perfecting the DIP Agent's liens on

all DIP Collateral that, without giving effect to the Bankruptcy Code and this Interim Order, is of

29

a type such that perfection of a lien therein may be accomplished only by possession or control by a secured party.

22.     <u>Application of Proceeds of Collateral</u>.  As a condition to the entry of the DIP Documents, the extension of credit under the DIP Facility and the authorization to use Cash Collateral, the Debtors have agreed that as of and commencing on the date of the Interim Hearing, the Debtors shall apply all net proceeds of DIP Collateral in accordance with the DIP Credit Agreement; *provided* that, for the avoidance of doubt, the amount of net proceeds applied on account of the sale of assets in connection with the Stalking Horse Bid shall be limited in an amount determined by Requisite DIP Lenders in good faith and in consultation with the Debtors and their advisors, if necessary, to ensure sufficient liquidity to fund the remaining disbursements set forth in the Budget in effect at such time after taking into account the Debtors' (a) cash on hand and (b) anticipated receipts and disbursements; <u>provided</u>, <u>however</u>, that nothing in this Order shall be deemed (or otherwise interpreted as) a finding or ruling that any such items in the Budget (other than the Carve Out) have a priority senior to the DIP Superpriority Claims or the Adequate Protection Superpriority Claims.  The reduction of any Prepetition Obligations is subject to the preservation of rights provided in paragraph 38 herein.

23.     <u>Protections of Rights of DIP Agent, DIP Lenders and Prepetition Secured Parties</u>.

(a)     Unless the DIP Agent (acting at the direction of the Requisite DIP Lenders) and the Prepetition Agent (acting at the direction of the "Required Lenders" (as such term is defined in the Prepetition Credit Agreement, the "<u>Required Lenders</u>")) shall have provided their prior written consent, or all DIP Obligations have been paid in full in cash and all commitments thereunder are terminated, there shall not be entered in any of these Chapter 11 Cases or any

30

Successor Cases any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following (unless such order provides for the simultaneous satisfaction of such obligations):  (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral or Prepetition Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claim, the Prepetition Liens, the Prepetition Adequate Protection Liens, and/or the Adequate Protection Superpriority Claims; (ii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Interim Order; or (iii) any modification of any of the DIP Agent's, the DIP Lenders', or the Prepetition Secured Parties' rights under this Interim Order, the DIP Documents, or the Prepetition Documents with respect any DIP Obligations or Prepetition Obligations (except as expressly contemplated by the Restructuring Support Agreement).

(b)    The Debtors (and/or their legal and financial advisors in the case of clauses (ii) through (iv) below) will, until the DIP Termination Date, (i) maintain books, records, and accounts to the extent and as required by the DIP Documents; (ii) reasonably cooperate with, consult with, and provide to the DIP Agent and the DIP Lenders all such information and documents that any or all of the Debtors are obligated (including upon the request by the DIP Agent (acting at the direction of the Requisite DIP Lenders)) to provide under the DIP Documents or the provisions of this Interim Order; (iii) upon reasonable advance notice, permit consultants, advisors, and other representatives of each of the DIP Agent (acting at the direction of the Requisite DIP Lenders), the DIP Lenders, the Prepetition Agent (acting at the direction of the Required Lenders), and the Ad Hoc Group to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the

31

Debtors' business premises and other properties, and to discuss and provide advice with respect to their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants, and other professional advisors (other than legal counsel) as and to the extent required by the DIP Documents and/or the Prepetition Documents; (iv) permit the DIP Agent (acting at the direction of the Requisite DIP Lenders), the DIP Lenders, the Prepetition Agent (acting at the direction of the Required Lenders), and the Ad Hoc Group (without duplication), and their respective consultants, advisors and other representatives to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations and assets; and (v) upon reasonable advance notice, permit the DIP Agent (acting at the direction of the Requisite DIP Lenders), the DIP Lenders, the Prepetition Agent (acting at the direction of the Required Lenders), and the Ad Hoc Group (without duplication) to conduct, at their reasonable discretion and at the Debtors' cost and expense, field audits, collateral examinations, liquidation valuations, and inventory appraisals at reasonable times in respect of any or all of the DIP Collateral and Prepetition Collateral.

(c)     The DIP Agent (acting at the direction of the Requisite DIP Lenders) shall have the right to credit bid up to the full amount of the outstanding DIP Obligations including any accrued interest and expenses, in any sale of DIP Collateral, whether such sale is effectuated through Section 363 or 1129 of the Bankruptcy Code, by a Chapter 7 trustee under Section 725 of the Bankruptcy Code, or otherwise.  The Prepetition Agent (acting at the direction of the Required Lenders) shall have the right to credit bid up to the full amount of any remaining Prepetition Obligations in any sale of Prepetition Collateral, whether such sale is effectuated through Section 363 or 1129 of the Bankruptcy Code, by a Chapter 7 trustee under Section 725 of the

32

Bankruptcy Code, or otherwise, subject, in each case, to the satisfaction of the DIP Obligations, or

as otherwise consented to by the DIP Agent (at the direction of the Requisite DIP Lenders).

24.     <u>Proceeds of Subsequent Financing</u>.   If the Debtors, any trustee, any

examiner with expanded powers, or any responsible officer subsequently appointed in these

Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to Bankruptcy

Code Sections 364(b), 364(c), or 364(d) in violation of the DIP Documents at any time prior to the

indefeasible repayment in full of all DIP Obligations and the termination of the DIP Agent's and

DIP Lenders' obligation to extend credit under the DIP Facility, and such facilities are secured by

any DIP Collateral, then all the cash proceeds derived from such credit or debt shall immediately

be turned over to the DIP Agent to be applied in accordance with this Interim Order and the DIP

Documents.

25.     <u>Cash Collection</u>.   From and after the date of the entry of this Interim Order,

except as otherwise set forth in this Interim Order, the Debtors shall maintain a cash management

system consistent with prepetition practices and in accordance with the DIP Credit Agreement,

including, without limitation, Section 5.03(b) thereof.   Except as otherwise permitted under the

DIP Credit Agreement or otherwise agreed to in writing by the DIP Agent (acting at the direction

of the Requisite DIP Lenders) and the Prepetition Agent (acting at the direction of Required

Lenders), the Debtors shall maintain no accounts except those identified in the order granting the

Cash Management Motion (the "<u>Cash Management Order</u>").   The Debtors and the financial

institutions where the Debtors maintain deposit accounts (as identified in the Cash Management

Order) are authorized and directed to remit, without offset or deduction, funds in such deposit

accounts upon receipt of any direction to that effect from the DIP Agent (acting at the direction of

the Requisite DIP Lenders).   The Debtors shall use commercially reasonable efforts to enter into

33

one or more deposit account control agreements with respect to all accounts identified in the Cash Management Order (other than Excluded Accounts) in favor of the DIP Agent for the benefit of the DIP Lenders by no later than three (3) weeks after the Closing Date.

26.     <u>Maintenance of DIP Collateral</u>.  Until (x) the indefeasible payment in full of all DIP Obligations, all Prepetition Obligations, and the termination of the DIP Agent's and the DIP Lenders' obligation to extend credit under the DIP Facility or (y) consummation of a Chapter 11 Plan as contemplated under the Restructuring Support Agreement, the Debtors shall (a) insure the DIP Collateral as required under the DIP Facility or the Prepetition Documents, as applicable; (b) maintain the cash management system in effect as of the Petition Date, as modified by this Interim Order and the Cash Management Order; and (c) otherwise maintain the DIP Collateral in accordance with the terms of the DIP Documents.

27.     <u>Disposition of DIP Collateral</u>.  Except as contemplated by the Restructuring Support Agreement or the DIP Documents, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral or Prepetition Collateral other than in the ordinary course of business without the prior written consent of the DIP Agent (acting at the direction of the Requisite DIP Lenders) and/or the Prepetition Agent (acting at the direction of the Required Lenders) (and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, DIP Lenders, or Prepetition Secured Parties).

28.     <u>DIP Termination Date</u>.  On the DIP Termination Date, except as provided in paragraph 30 and subject to the Carve Out, (a) all DIP Obligations shall be immediately due and payable, (b) all commitments to extend credit under the applicable DIP Facility will terminate (other than as required in paragraph 35 with respect to the Carve Out), and (c) all authority to use

Cash Collateral shall cease.  For the purposes of this Interim Order, the "DIP Termination Date"

shall have the meaning provided in the DIP Credit Agreement.

29.    <u>Events of Default</u>.  Until the DIP Obligations are indefeasibly paid in full

(the "<u>DIP Repayment</u>"), the occurrence of any of the following events, unless waived by the DIP

Agent (acting at the direction of the Requisite DIP Lenders) in writing and in accordance with the

terms of the DIP Credit Agreement, shall constitute an event of default (collectively, the "<u>Events

of Default</u>") under this Interim Order:  (a) the failure of the Debtors to perform, in any respect, any

of the terms, provisions, conditions, covenants, or obligations under this Interim Order (except

where such failure would not adversely affect the DIP Agent and the DIP Lenders), subject to a

three (3) day cure period (if such failure is capable of being cured), or (b) the occurrence of any

other "Event of Default" under, and as defined in, the DIP Credit Agreement.  Upon the occurrence

of the DIP Repayment, the foregoing Events of Default may be waived by the Prepetition Agent

(acting at the direction of the Required Lenders).

30.    <u>Rights and Remedies Upon Event of Default</u>.  The automatic stay provisions

of Section 362 of the Bankruptcy Code are hereby modified to the extent necessary to permit the

DIP Agent (acting at the direction of the Requisite DIP Lenders) to enforce the DIP Agent's and

the DIP Lenders' rights under this Interim Order and the DIP Documents, and, immediately upon

the occurrence and during the continuation of an Event of Default and the giving by the DIP Agent

(acting at the direction of the Requisite DIP Lenders) of seven (7) calendar days' prior written

notice (the "<u>Termination Notice</u>" and, such notice period, the "<u>Remedies Notice Period</u>," provided

that such period may be extended by written agreement between the Debtors and the DIP Agent

(acting at the direction of the Requisite DIP Lenders) in their respective discretion), delivered to

counsel to the Debtors, with copies to the U.S. Trustee and counsel to the Committee (if appointed),

35

subject in all respects to the terms of this Interim Order, (a) the DIP Agent (acting at the direction

of the Requisite DIP Lenders) may declare (any such declaration, a "Termination Declaration")

(1) all DIP Obligations owing under the respective DIP Documents to be immediately due and

payable; (2) the termination, reduction or restriction of any further commitment to extend credit to

the Debtors to the extent any such commitment remains under the respective DIP Facility;

(3) termination of the DIP Credit Agreement and the DIP Documents as to any future liability or

obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the

DIP Obligations; and (4) that the application of the Carve Out has occurred through the delivery

of the Carve Out Trigger Notice to the Debtors; and (b) the DIP Agent (acting at the direction of

the Requisite DIP Lenders) may declare a termination, reduction, or restriction on the ability of

the Debtors to use Cash Collateral (the date which is the earliest to occur of any such date a

Termination Declaration is delivered and the DIP Termination Date, the "Termination Date").

Following the DIP Repayment, the Prepetition Agent (acting at the direction of the Required

Lenders) shall be entitled to make a Termination Declaration with respect to the foregoing clause

(a) subclause (4) and clause (b) in accordance with the same procedures set forth herein. The

Termination Declaration shall be given by electronic mail (or other electronic means) to counsel

to the Debtors, counsel to the Prepetition Agent, counsel to a Committee (if appointed), and the

U.S. Trustee. Upon termination of the Remedies Notice Period, unless the Court orders otherwise

during such period, the DIP Agent and the DIP Lenders shall be entitled to exercise their rights and

remedies in accordance with the respective DIP Documents and this Interim Order and shall be

permitted to satisfy the relevant DIP Obligations and DIP Superpriority Claims, subject to and

consistent with the Carve Out and this Interim Order. During the Remedies Notice Period, the

only basis on which the Debtors and/or a Committee (if any) shall be entitled to seek an emergency

hearing with respect to the DIP Obligations with the Court during the Remedies Notice Period

shall be to contest whether an Event of Default has occurred and/or is continuing, and, upon and

after delivery of the Termination Notice, the DIP Agent (on behalf of the Requisite DIP Lenders)

consent to such emergency hearing on an expedited basis to consider whether the automatic stay

may be lifted so that the DIP Agent and DIP Lenders may exercise all of their respective rights and

remedies in respect of the DIP Collateral in accordance with this Interim Order and the DIP

Documents.  The Debtors shall not be entitled to seek relief under Section 105 of the Bankruptcy

Code or otherwise in contravention of any express rights or remedies granted to the DIP Agent,

the DIP Lenders or the Prepetition Secured Parties under this Interim Order or the DIP Documents.

Unless the Court orders otherwise, the automatic stay, as to the DIP Agent and the DIP Lenders,

shall automatically be terminated at the end of the Remedies Notice Period without further notice

or order.  Upon expiration of the Remedies Notice Period, subject to the Carve Out in all respects,

including the requirements of paragraph 35 hereof, the DIP Agent and the DIP Lenders shall be

permitted to exercise all remedies set forth herein, in the DIP Documents and as otherwise

available at law without further order of or application or motion to the Court.

31.     Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification
or Stay of this Interim Order.  The DIP Agent, DIP Lenders, and the Prepetition Secured Parties

have acted in good faith in connection with this Interim Order and are entitled to rely upon the

protections granted herein and by Section 364(e) of the Bankruptcy Code.  Based on the findings

set forth in this Interim Order and the record made during the Interim Hearing, and in accordance

with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim

Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other

court, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties are entitled to the

protections provided in Section 364(e) of the Bankruptcy Code.   Any such modification, amendment, or vacatur shall not affect the validity and enforceability of any advances previously made hereunder or any lien, claim, or priority authorized or created hereby.

      32.    <u>DIP and Other Expenses</u>.   The Debtors are authorized to pay all (i) reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements, and expenses of (a) the DIP Agent (including (and limited, in the case of counsel, to)  all reasonable and documented out-of-pocket fees, costs, disbursements, and expenses of the DIP Agent's outside counsel, DPW) and any other professional advisors retained by the DIP Agent at the direction of the Requisite DIP Lenders in their reasonable discretion and (b) the Ad Hoc Group (including (and limited, in the case of counsel, to) all reasonable and documented out-of-pocket fees, costs, disbursements, and expenses of the Ad Hoc Group's outside counsel, K&S) and any other professional advisors retained by the Ad Hoc Group in their reasonable discretion, in the case of each of the foregoing clauses (a) and (b), in connection with the negotiations, preparation, execution, and delivery of the DIP Documents and the funding of all DIP Loans under the DIP Facility, including, without limitation, all due diligence, transportation, computer, duplication, messenger, audit, insurance, appraisal, valuation, and consultant costs and expenses, and all search, filing, and recording fees incurred or sustained by the DIP Agent and the Ad Hoc Group and their counsel and professional advisors in connection with the DIP Facility, the DIP Documents, and the transactions contemplated thereby, the administration of the DIP Facility, and any amendment or waiver of any provision of the DIP Documents, and (ii) without duplication, reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements, and expenses of the DIP Agent and the Ad Hoc Group (including (and limited, in the case of counsel, to) (x) all reasonable and documented out-of-pocket fees, costs, disbursements, and expenses of one firm of outside

counsel for the DIP Agent and, to the extent necessary, one firm of local counsel engaged by the DIP Agent in each relevant jurisdiction, and any successor counsel to such primary counsel and local counsel and (y) all reasonable and documented out-of-pocket fees, costs, disbursements, and expenses of one firm of outside counsel for the Ad Hoc Group and, to the extent necessary, one firm of local counsel engaged by the Ad Hoc Group (in connection with (A) the enforcement of any rights and remedies under the DIP Documents, (B) the Chapter 11 Cases, including attendance at all hearings in respect of the Chapter 11 Cases, and (C) defending and prosecuting any actions or proceedings arising out of or relating to the Prepetition Obligations, the DIP Obligations, the Liens securing the Prepetition Obligations and the DIP Obligations, or any transaction related to or arising in connection with the Prepetition Documents, the DIP Credit Agreement, or the other DIP Documents (in the case of the Prepetition Obligations and the Liens securing the Prepetition Obligations, to the extent provided in the Prepetition Documents).  For the avoidance of doubt, all fees, costs, and expenses paid pursuant to this paragraph 32 shall not be duplicative of any fees, costs, and expenses paid by the Debtors to the Prepetition Secured Parties as Adequate Protection pursuant to paragraph 15 of this Interim Order or the Restructuring Support Agreement.  Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to the DIP Agent and the Ad Hoc Group in connection with or with respect to the DIP Facilities are hereby approved in full and shall not be subject to avoidance, disgorgement or any similar form of recovery by the Debtors or any other person.

33.     <u>Indemnification</u>.  The Debtors shall indemnify and hold harmless (a) the DIP Agent and the DIP Lenders in accordance with the terms and conditions of the DIP Credit Agreement and (b) the Prepetition Secured Parties in accordance with the terms and conditions of the Prepetition Documents.

34.     <u>Proofs of Claim; Master Proof of Claim</u>.  The DIP Agent, the DIP Lenders,
and the Prepetition Secured Parties will not be required to file proofs of claim in any of the Chapter
11 Cases or Successor Cases for any claim allowed herein.  Notwithstanding any order entered by
the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or any
Successor Cases to the contrary, in order to facilitate the processing of claims, to ease the burden
upon the Court, and to reduce an unnecessary expense to the Debtors' estates,  the Prepetition
Agent is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend
and/or supplement, as it sees fit) in the Debtors' lead chapter 11 case *In re Fairway Group Holdings
Corp.*, Case No. [●], a master proof of claim on behalf of the Prepetition Secured Parties on
account of any and all of their respective claims arising under the applicable Prepetition
Documents and hereunder (a "**Master Proof of Claim**") against each of the Debtors.  Upon the
filing of a Master Proof of Claim by the Prepetition Agent, such entity shall be deemed to have
filed a proof of claim in the amount set forth opposite its name therein in respect of its claims
against each of the Debtors of any type or nature whatsoever with respect to the Prepetition
Documents, and the claim of each Prepetition Secured Party (and each of its respective successors
and assigns) named in a Master Proof of Claim shall be treated as if such entity had filed a separate
proof of claim in each of these Chapter 11 Cases.  The Master Proof of Claim shall not be required
to identify whether any Prepetition Secured Party acquired its claim from another party and the
identity of any such party or to be amended to reflect a change in the holders of the claims set forth
therein or a reallocation among such holders of the claims asserted therein resulting from the
transfer of all or any portion of such claims.  The provisions of this paragraph 34 and the Master
Proof of Claim are intended solely for the purpose of administrative convenience and shall not
affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately

on any plan proposed in these Chapter 11 Cases.  The Master Proof of Claim shall not be required

to attach any instruments, agreements, or other documents evidencing the obligations owing by

each of the Debtors to the Prepetition Secured Parties, which instruments, agreements, or other

documents will be provided upon written request to counsel to the Prepetition Agent.  Any proofs

of claim filed by the Prepetition Agent or any Prepetition Lender shall be deemed to be in addition

to and not in lieu of any other proof of claim that may be filed by the Prepetition Agent or any

Prepetition Lender.  Any order entered by the Court in relation to the establishment of a bar date

in any of the Chapter 11 Cases or Successor Cases shall not apply to any claim of the DIP Agent,

the DIP Lenders, and the Prepetition Secured Parties.

> 35.    <u>Carve Out</u>.

> (a)    <u>Carve Out</u>.  As used in this Interim Order, the "<u>Carve Out</u>" means the sum

of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States

Trustee under Section 1930(a) of title 28 of the United States Code plus interest at the statutory

rate (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and

expenses up to $25,000 incurred by a trustee under Section 726(b) of the Bankruptcy Code

(without regard to the notice set forth in clause (iii) below); (iii) to the extent allowed at any time,

whether by interim order, procedural order, or otherwise (and, solely in the case of Committee

Professionals (as defined herein), if any, subject to the Budget, including any Permitted Variance

thereto), all accrued and unpaid fees, disbursements, costs and expenses (the "<u>Allowed</u>

<u>Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to Section 327,

328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Committee (if any),

subject to the Budget, pursuant to Section 328 or 1103 of the Bankruptcy Code (the "<u>Committee</u>

<u>Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time

41

before or on the first business day following delivery by the DIP Agent (at the direction of the Requisite DIP Lenders) of a Carve Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; (iv) subject to entry of the Bid Procedures Order, amounts used to pay the Termination Payment and any of Buyer's Damages, as each of those terms are defined in and pursuant to the *Asset Purchase Agreement*, dated January 22, 2020, by and among Holdings and Village Super Market, Inc. (the "**Village APA**"), provided that such amounts, in the aggregate, shall not exceed three percent (3%) of the Cash Purchase Price, as that term is defined in and in accordance with the Village APA; and (v) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $500,000 incurred after the first business day following delivery by the DIP Agent (at the direction of the Requisite DIP Lenders) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the Requisite DIP Lenders to the Debtors), their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)    Starting with the first full calendar week following the Petition Date, each Estate Professional shall deliver to the Debtors a statement (each such statement, a "Weekly Statement") setting forth a good-faith estimate of the amount of unpaid fees and expenses incurred during the preceding week by such Estate Professional (through Saturday of such week, the "Calculation Date") (the "Estimated Fees and Expenses").  No later than one business day after

42

the delivery of a Carve-Out Trigger Notice, each Estate Professional shall deliver one additional statement to the Debtors setting forth a good-faith estimate of the amount of unpaid fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has already been delivered and concluding on the date of the Carve-Out Trigger Notice, and the Debtors shall transfer such amounts to the Professional Fees Escrow Account (as defined herein).  The Debtors shall on a weekly basis, transfer cash proceeds from the DIP Facility or cash on hand in an amount equal to the aggregate unpaid amount of Estimated Fees and Expenses included in all Weekly Statements timely received by the Debtors, which shall be reported to the DIP Agent, or if an estimate is not provided, the total budgeted weekly fees of Estate Professionals for the prior week set forth in the Budget, into a segregated account not subject to the control of the DIP Agent, any DIP Lender, or any Prepetition Secured Party (the "Professional Fees Escrow Account").  The Debtors shall use funds held in the Professional Fees Escrow Account exclusively to pay Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and any interim or final orders of the Court; *provided that* when all allowed Professional Fees have been paid in full (regardless of when such Professional Fees are allowed by the Court), any funds remaining in the Professional Fees Escrow Account shall revert to the Debtors for use in a manner consistent with the DIP Credit Agreement and this Interim Order; and *provided further that* the Debtors' obligations to pay allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fees Escrow Account.  Funds transferred to the Professional Fees Escrow Account shall be held in trust for and exclusively available for the payment of any fees and expenses of the Estate Professionals, including with respect to obligations arising out of the Carve-Out (with a reversionary interest to the Debtors of any amount remaining in the Professional

43

Fees Escrow Account after all allowed Professional Fees are satisfied in full).  Funds transferred

to the Professional Fees Escrow Account shall not be subject to any liens or claims granted to the

DIP Lenders herein or any liens or claims granted as Adequate Protection, shall not constitute DIP

Collateral, and shall not constitute Cash Collateral or assets of the Debtors' estates; *provided that*

the DIP Collateral shall include the Debtors' reversionary interest in funds held in the Professional

Fees Escrow Account, if any, after all allowed Professional Fees are satisfied in full.

(c)    <u>Professional Fees Escrow Account</u>.  On the day on which a Carve Out

Trigger Notice is given by the DIP Agent (at the direction of the Requisite DIP Lenders) to the

Debtors with a copy to counsel to the Committee (if any) (the "<u>Carve Out Trigger Notice Date</u>"),

the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand

as of such date and any available cash thereafter held by any Debtor (including any Cash

Collateral) to fund the Professional Fees Escrow Account in an amount equal to the then unpaid

amounts of Estimated Fees and Expenses to pay unpaid Allowed Professional Fees prior to any

and all other claims.  The Debtors also shall deposit and hold in trust in the Professional Fees

Escrow Account an amount equal to the Post-Carve Out Trigger Notice Cap, which shall

exclusively be used to pay such Allowed Professional Fees benefiting from the Post-Carve Out

Trigger Notice Cap.

(d)    <u>Application of Carve Out Reserves</u>.

(i)    Notwithstanding anything to the contrary in the DIP Documents or this

Interim Order, following delivery of a Carve Out Trigger Notice, if the DIP Agent (at the direction

of the Requisite DIP Lenders) sweeps or forecloses on cash (including cash received as a result of

the sale or other disposition of any assets) of the Debtors, the DIP Agent shall promptly deposit

any cash swept or foreclosed upon after delivery of the Carve Out Trigger Notice (including cash

44

received as a result of the sale or other disposition of assets) into the Professional Fees Escrow Account until it is fully funded.

(ii)    Notwithstanding anything to the contrary in this Interim Order, (i) the failure of the Professional Fees Escrow Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out and (ii) in no way shall the Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Professional Fees Escrow Account, or any of the foregoing be construed as a cap or limitation on the amount of Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Documents or the Prepetition Credit Documents, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the Adequate Protection Superpriority Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Obligations.

(e)    No Direct Obligation To Pay Allowed Professional Fees.  The DIP Agent and the DIP Lenders shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent or the DIP Lenders, in any way, to directly pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)    Payment of Allowed Professional Fees Prior to the Carve Out Trigger Notice Date.  Prior to the Carve Out Trigger Notice Date, the Debtors shall be permitted to pay compensation and reimbursement of all Allowed Professional Fees of Estate Professionals, as the same may be due and payable, and such payments shall not reduce the Carve Out.  Upon the receipt

45

of the Carve Out Trigger Notice, the right of the Debtors to pay professional fees using Cash Collateral outside the Carve Out shall terminate and the Debtors shall provide immediate notice to all Professional Persons informing them that such notice was delivered and further advising them that the Debtors' ability to pay such Professional Persons using Cash Collateral is subject to and limited by the Carve Out. Any payment or reimbursement made prior to the occurrence of the Carve Out Trigger Notice Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(g)    Payment of Carve Out On or After the Carve Out Trigger Notice Date. Any funding of the Carve Out from draws under the DIP Facility shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

36.    Limitations on Use of DIP Proceeds, Cash Collateral, and Carve Out. The DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, and the Carve Out may not be used in connection with (a) preventing, hindering, or delaying any of the DIP Agent's, the DIP Lenders', or the Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral or Prepetition Collateral in accordance with the Interim Order and the DIP Documents, to the extent that such enforcement or realization upon the DIP Collateral or Prepetition Collateral is expressly permitted by this Interim Order or the DIP Documents; (b) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral in a manner inconsistent with this Interim Order, the DIP Documents, or the Restructuring Support Agreement (including sales of assets pursuant to the Bid Procedures); (c) outside the ordinary course of business, using or seeking to use any insurance proceeds constituting DIP Collateral in a manner inconsistent with this Interim Order, the DIP Documents, or the Restructuring Support Agreement

46

(including sales of assets pursuant to the Bid Procedures); (d) incurring indebtedness without the prior consent of the DIP Agent (acting at the direction of the Requisite DIP Lenders), except to the extent permitted under the DIP Credit Agreement; (e) seeking to amend or modify any of the rights granted to the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties under this Interim Order, the DIP Documents, or the Prepetition Documents; (f) objecting to or challenging in any way the DIP Liens, DIP Obligations, Prepetition Liens, Prepetition Secured Obligations, DIP Collateral (including Cash Collateral), or, as the case may be, Prepetition Collateral, or any other claims or liens held by or on behalf of any of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, respectively; (g) asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code or applicable state-law equivalents, any so-called "lender liability" claims and causes of action, or actions to recover or disgorge payments, against any of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees, solely in their capacities as such; (h) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the Prepetition Liens, Prepetition Secured Obligations, or any rights or interests of any of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties granted under this Interim Order or the DIP Documents; or (i) seeking to subordinate, recharacterize, disallow, or avoid the DIP Obligations or the Prepetition Secured Obligations; *provided*, *however*, that the Carve Out and such collateral proceeds and loans under the DIP Documents may be used for allowed fees and expenses, in an amount not to exceed, $100,000 in the aggregate, incurred solely by a Committee (if appointed), in investigating (but not prosecuting or challenging) the validity, enforceability,

47

perfection, priority, or extent of the Prepetition Liens or Prepetition Claims (the "Investigation Budget").

37.     Payment of Compensation.  Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any Professional Person or shall affect the right of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties to object to the allowance and payment of such fees and expenses.  So long as an unwaived Event of Default has not occurred, the Debtors shall be permitted to pay fees and expenses allowed and payable by final order (that has not been vacated or stayed, unless the stay has been vacated) under Sections 328, 330, 331, and 363 of the Bankruptcy Code, as the same may be due and payable, in accordance with this Interim Order and the DIP Documents.

38.     Effect of Stipulations on Third Parties.

(a)     *Generally*.  The admissions, stipulations, agreements, releases, and waivers set forth in this Interim Order (collectively, the "Prepetition Lien and Claim Matters") are and shall be binding on the Debtors, any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties in interest and all of their successors in interest and assigns, including, without limitation, any Committee that may be appointed in these cases, unless, and solely to the extent that, a Committee (if any) or any other party in interest with standing and requisite authority (other than the Debtors, as to which any Challenge (as defined herein) shall be waived) (i) has timely filed the appropriate pleadings and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules challenging the Prepetition Lien and Claim Matters (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "Challenge") before

48

(A) for a Committee (to the extent one is appointed), sixty (60) calendar days from entry of the Final DIP Order and (B) to the extent a Committee is not appointed, any other party in interest with the requisite standing (other than the Debtors), seventy-five (75) calendar days from the entry of the Final DIP Order (the "Challenge Deadline"), as such applicable date may be extended in writing from time to time by the DIP Agent (acting at the direction of the Requisite DIP Lenders) and the Prepetition Agent (acting at the direction of the Required Lenders), and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any such judgment has become a final judgment that is not subject to any further review or appeal.

(b)    *Binding Effect*.    To the extent no Challenge is timely and properly commenced by the Challenge Deadline, or to the extent such Challenge does not result in a final and non-appealable judgment or order of this Court that is inconsistent with the Prepetition Lien and Claim Matters, then, without further notice, motion, application to, order of, or hearing before this Court, and without the need or requirement to file any proof of claim, the Prepetition Lien and Claim Matters shall, subject to a Final Order, become binding, conclusive, and final on any person, entity, or party in interest in the Chapter 11 Cases and their successors and assigns, as well as in any Successor Case for all purposes, and shall not be subject to challenge or objection by any party in interest, including, without limitation, a trustee, responsible individual, examiner with expanded powers, or other representative of the Debtors' estates.   Notwithstanding anything to the contrary herein, if any such proceeding is properly and timely commenced, the Prepetition Lien and Claim Matters shall nonetheless remain binding on all other parties in interest and preclusive as provided in subparagraph (a) above, except to the extent that any of such Prepetition Lien and Claim Matters is expressly the subject of a timely and properly filed Challenge that is successful as set forth in a

49

final judgment and only as to plaintiffs or movants that have complied with the terms hereof. To the extent any such Challenge proceeding is timely and properly commenced, the DIP Agent, Prepetition Agent, the Ad Hoc Group, and any other Prepetition Lender or DIP Lender shall be entitled to, as Adequate Protection, payment of the related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred under the Prepetition Documents in defending themselves and the other Prepetition Lenders in any such proceeding.

39.    <u>No Third Party Rights/No Superior Rights of Reclamation</u>.    Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary. In no event shall any alleged right of reclamation or return (whether asserted under Section 546(c) of the Bankruptcy Code or otherwise) be deemed to have priority over the DIP Liens or the Prepetition Liens.

40.    <u>Section 506(c) Claims</u>.    Subject to the entry of a Final Order, except to the extent of the Carve Out, no costs or expenses of administration that have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the DIP Agent, DIP Lenders, or the Prepetition Secured Parties or any of their respective claims, the DIP Collateral, or the Prepetition Collateral pursuant to Sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent, as applicable, of the DIP Agent (acting at the direction of the Requisite DIP Lenders) or the Prepetition Agent (acting at the direction of the Required Lenders), as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.

41.    <u>No Marshaling/Applications of Proceeds</u>.    Subject to the entry of a Final Order, the DIP Agent, DIP Lenders, and Prepetition Secured Parties shall not be subject to the

50

equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as the case may be, and proceeds shall be received and applied pursuant to this Interim Order and the DIP Documents notwithstanding any other agreement or provision to the contrary.

42.    Section 552(b).    Subject to the entry of a Final Order, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties, with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral.

43.    Access to DIP Collateral.    Upon expiration of the Remedies Notice Period, the DIP Agent and the DIP Lenders shall be permitted to (a) access and recover any and all Collateral and (b) enter onto any leased premises of any Debtor and exercise all of the Debtors' rights and privileges as lessee under such lease in connection with an orderly liquidation of the Collateral; *provided*, that in the case of clause (b), the DIP Agent and the DIP Lenders can only enter upon a leased premises after an Event of Default in accordance with (i) a separate written agreement by and between the DIP Agent and/or the DIP Lenders, as applicable, and any applicable landlord, (ii) pre-existing rights of the DIP Agent and/or the DIP Lenders and any applicable landlord under applicable non-bankruptcy law, (iii) consent of the applicable landlord, or (iv) entry of an order of this Court obtained by motion of the applicable DIP Agent or DIP Lender on such notice to the landlord as shall be required by this Court*; provided, however*, solely with respect to rent due to a landlord of any such leased premises, the DIP Agent and/or the DIP Lenders, as applicable, shall be obligated only to reimburse the Debtors for the payment of rent of the Debtors that first accrues after delivery of the Termination Declaration in accordance with paragraph 33

51

herein that that is payable during the period of such occupancy by the DIP Agent and/or the DIP

Lenders, as applicable, calculated on a daily per diem basis; *provided*, *further*, that nothing herein

shall relieve the Debtors of their obligations pursuant to Section 365(d)(3) of the Bankruptcy Code

for the payment of rent that accrues prior to delivery of the Termination Declaration through and

including any assumption and/or rejection of any lease.  Nothing herein shall require the DIP

Agent, the DIP Lenders, or the Prepetition Secured Parties to assume any lease as a condition to

the rights afforded in this paragraph.

   44. <u>Limits on Lender Liability</u>.  Subject to the entry of a Final Order, nothing in

this Interim Order or in any of the DIP Documents, Prepetition Documents, or any other documents

related thereto shall in any way be construed or interpreted to impose or allow the imposition upon

the DIP Agent, the DIP Lenders or the Prepetition Secured Parties of any liability for any claims

arising from any activities by the Debtors in the operation of their businesses or in connection with

the restructuring efforts and the administration of these Chapter 11 Cases.  The DIP Agent, the DIP

Lenders, and the Prepetition Secured Parties shall not be deemed in control of the operations of

the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the

operation or management of the Debtors (as such terms, or any similar terms, are used in the United

States Comprehensive Environmental Response, Compensation and Liability Act,

42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute).  Nothing in this

Interim Order, the DIP Documents, or the Prepetition Documents shall in any way be construed or

interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or any of the

Prepetition Secured Parties of any liability for any claims arising from the prepetition or

postpetition activities of any of the Debtors.

45.  <u>Insurance Proceeds and Policies</u>.  Upon the entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent (on behalf of the DIP Lenders), and the Prepetition Agent (on behalf of the Prepetition Lenders), shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral or the Prepetition Collateral.

46.  <u>Joint and Several Liability</u>.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and of the DIP Facility and the DIP Documents.

47.  <u>Rights Preserved</u>.  Except as provided in this Interim Order and the DIP Documents, and subject to the obligations and agreements of such parties under the Restructuring Support Agreement, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, (a) the DIP Agent's, DIP Lenders', and Prepetition Secured Parties' right to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of any of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of Section 362 of the Bankruptcy Code; (ii) request dismissal of any of the Chapter 11 Cases or Successor Cases, conversion of any of the Chapter 11 Cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers; or (iii) propose, subject to the provisions of Section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans; or (c) any rights, claims, or privileges (whether legal, equitable, or otherwise) of any

of the DIP Agent, DIP Lenders, or Prepetition Secured Parties.  Notwithstanding anything herein

to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a

waiver of, expressly or implicitly, the Debtors', a Committee's (if appointed), or any party in

interest's right to oppose any of the relief requested in accordance with the immediately preceding

sentence except as expressly set forth in this Interim Order.  Entry of this Interim Order is without

prejudice to any and all rights of any party in interest with respect to the terms and approval of the

Final Order and any other position which any party in interest deems appropriate to raise in the

Chapter 11 Cases.

48.    <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Agent, DIP

Lenders, or Prepetition Secured Parties to seek relief or otherwise exercise their rights and

remedies under this Interim Order, the DIP Documents, the Prepetition Documents, or applicable

law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or

otherwise of the DIP Agent, DIP Lenders, or Prepetition Secured Parties.

49.    <u>Binding Effect of Interim Order</u>.  Immediately upon the entry of the Interim

Order by this Court, the terms and provisions of this Interim Order shall become valid and binding

upon, and inure to the benefit of, the Debtors, DIP Agent, DIP Lenders, Prepetition Secured Parties,

all other creditors of any of the Debtors, any Committee (or any other court appointed committee)

appointed in the Chapter 11 Cases, and all other parties in interest and their respective successors

and assigns, including any trustee or other fiduciary hereafter appointed in any of the Chapter 11

Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case.

50.    <u>No Modification of Interim Order</u>.  Until and unless the DIP Obligations

and the Prepetition Secured Obligations have been indefeasibly paid in full in cash (such payment

being without prejudice to any terms or provisions contained in the DIP Facility which survive

54

such discharge by their terms) and all commitments to extend credit under the DIP Facility have been terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly, (a) without the prior written consent of the DIP Agent (acting at the direction of the Requisite DIP Lenders) or the Prepetition Agent (acting at the direction of the Required Lenders) (i) any modification, stay, vacatur, or amendment to this Interim Order or (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in Sections 503(b), 506(c), 507(a), or 507(b) of the Bankruptcy Code), in any of the Chapter 11 Cases or Successor Cases, equal or superior in priority to the DIP Superpriority Claim or Adequate Protection Superpriority Claims, other than the Carve Out; (b) without the prior written consent of the DIP Agent (acting at the direction of the Requisite DIP Lenders), any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as specifically provided in the DIP Documents; or (c) without the prior written consent of the Prepetition Agent (acting at the direction of the Required Lenders), any lien on any of the Prepetition Collateral with priority equal or superior to the Prepetition Liens or Adequate Protection Liens (other than the DIP Liens). No consent with respect to the foregoing shall be implied by any other action, inaction, or acquiescence of the DIP Agent or the Prepetition Agent, as applicable.

51.     <u>Interim Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the DIP Documents and this Interim Order, the provisions of this Interim Order shall govern and control.

52.     <u>Discharge</u>.    Except as contemplated by the Restructuring Support Agreement, pursuant to a Chapter 11 Plan, the DIP Obligations and the obligations of the Debtors

with respect to the Adequate Protection provided hereunder shall not be discharged by the entry of

an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding

the provisions of Section 1141(d) of the Bankruptcy Code, unless such obligations have been

indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of

reorganization or the DIP Agent (acting at the direction of the Requisite DIP Lenders) and/or the

Prepetition Agent (acting at the direction of the Required Lenders), as applicable, has otherwise

agreed in writing.

53.    <u>Survival</u>.  The provisions of this Interim Order and any actions taken

pursuant hereto shall survive entry of any order which may be entered (a) confirming any plan of

reorganization in any of the Chapter 11 Cases, (b) converting any of the Chapter 11 Cases to a case

under Chapter 7 of the Bankruptcy Code, (c) dismissing any of the Chapter 11 Cases or any

Successor Cases, or (d) pursuant to which this Court abstains from hearing any of the Chapter 11

Cases or Successor Cases.  The terms and provisions of this Interim Order, including the claims,

liens, security interests, and other protections granted to the DIP Agent, DIP Lenders, and

Prepetition Secured Parties pursuant to this Interim Order and/or the DIP Documents,

notwithstanding the entry of any such orders described in clauses (a) through (d) above, shall

continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter

11 Cases or any Successor Cases, and shall maintain their priority as provided by this Interim

Order until (i) in respect of the DIP Facility, all the DIP Obligations, pursuant to the DIP

Documents and this Interim Order, have been indefeasibly paid in full in cash and (ii) in respect

of the Prepetition Credit Agreement, all of the Prepetition Obligations pursuant to the Prepetition

Documents and this Interim Order have been indefeasibly paid in full in cash.  The terms and

provisions concerning the indemnification of the DIP Agent and DIP Lenders shall continue in the

Chapter 11 Cases, in any Successor Cases, following dismissal of the Chapter 11 Cases or any Successor Cases, following termination of the DIP Documents, and/or the indefeasible repayment of the DIP Obligations.

54.     <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order and final, approval of the DIP Facility is scheduled for **[                    ], 2020, at [   ] [a.m./p.m.] (Eastern Standard Time)**.  On or before [                    ], 2020, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>"), together with copies of this Interim Order, the proposed Final Order and the DIP Motion, on:  (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Committee (if appointed); (d) the Securities and Exchange Commission; and (e) the Internal Revenue Service.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on [                    **], 2020**, which objections shall be served so as to be received on or before such date by:  (i) counsel to the Debtors, Weil, Gotshal and Manges LLP, 767 Fifth Avenue, New York, NY 10153, Attn:  Ray C. Schrock, P.C. and Sunny Singh, Esq.; (ii) counsel to the DIP Agent and Prepetition Agent, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017, Attn: Mario Babić and Christian Fischer; and (iii) counsel to the Ad Hoc Group, King & Spalding LLP, 1185 Avenue of the Americas, New York, NY 10036, Attn: W. Austin Jowers, Michael Rupe, and Michael R. Handler.

55.     <u>Nunc Pro Tunc Effect of this Interim Order</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable nunc pro tunc to the Petition Date immediately upon execution thereof.

56.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

57.     No later than two (2) business days after the date of this Interim Order, the Debtors shall serve a copy of the Interim Order on the Notice Parties and shall file a certificate of service no later than 24 hours after service.


_____
[                                    ]
United States Bankruptcy Judge


DATED:  January [    ], 2020
New York, New York

58

**EXHIBIT 1**

DIP Credit Agreement

[to be provided]

**EXHIBIT 2**

Initial Budget

**Fairway Group Holdings Corp.**
Projected Results of Operations

1/23/20    thru    4/19/20

In $'s 000's

**13-WEEK CASH FLOW SUMMARY**

| | BK FILING | 2 | 3 | BID PROC. DEADLINE | 5 | BID DEADLINE | 7 | AUCTION | STALK HORSE CLS | 10 | 11 | AUCTION SALE CLS | 13 | 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| KEY DATES ---> | | | | | | | | | | | | | | |
| WEEK ---> | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| WEEK ENDING ---> | 1/26/20 | 2/2/20 | 2/9/20 | 2/16/20 | 2/23/20 | 3/1/20 | 3/8/20 | 3/15/20 | 3/22/20 | 3/29/20 | 4/5/20 | 4/12/20 | 4/19/20 | |
| **Net Sales** | 6,046 | 11,772 | 10,866 | 10,383 | 11,124 | 11,478 | 10,810 | 10,825 | 5,823 | 5,903 | 5,782 | - | | 100,812 |
| **Cash Receipts** | 8,689 | 11,006 | 11,558 | 10,748 | 10,600 | 11,181 | 11,187 | 10,730 | 9,236 | 5,802 | 5,821 | 3,998 | - | 110,554 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Merchandise | 624 | 6,131 | 8,833 | 6,183 | 5,931 | 7,224 | 7,136 | 7,134 | 6,697 | 5,821 | 3,893 | 3,318 | 2,167 | 71,092 |
| Store Related & Other | - | 400 | 620 | 820 | 820 | 820 | 820 | 820 | 820 | 820 | 474 | 474 | 474 | 8,186 |
| Payroll | 332 | 3,235 | 2,476 | 2,476 | 4,101 | 2,476 | 2,476 | 2,476 | 2,469 | 2,309 | 1,336 | 1,325 | 602 | 28,090 |
| Rent | - | - | 2,101 | 1,402 | - | - | 2,101 | 1,402 | - | - | 1,870 | 758 | - | 9,635 |
| Other Occupancy | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 144 | 144 | 144 | 3 | 3 | 2,438 |
| Taxes | 731 | - | - | - | 232 | 597 | - | - | 160 | 591 | - | - | - | 2,311 |
| Insurance | 770 | 24 | - | - | - | 24 | - | - | - | 24 | - | - | - | 841 |
| **Total    Operating Disbursements** | 2,707 | 10,040 | 14,281 | 11,132 | 11,334 | 11,390 | 12,783 | 12,083 | 10,290 | 9,710 | 7,716 | 5,878 | 3,246 | 122,592 |
| **Operating Cash Flow** | 5,982 | 966 | (2,723) | (384) | (735) | (210) | (1,596) | (1,354) | (1,054) | (3,909) | (1,896) | (1,880) | (3,246) | (12,037) |
| **Accumulated** | 5,982 | 6,947 | 4,224 | 3,841 | 3,106 | 2,897 | 1,300 | (54) | (1,107) | (5,016) | (6,912) | (8,791) | (12,037) | |
| **Other (Sources) / Uses** | | | | | | | | | | | | | | |
| Debt Service Fees | - | 1,025 | 65 | - | - | 238 | - | - | 1,301 | - | - | - | - | 2,629 |
| Capital Expenditures | - | 5 | 5 | 5 | 5 | 5 | 6 | 6 | 6 | 6 | - | - | - | 50 |
| **Total    Other (Sources) / Uses** | - | 1,030 | 70 | 5 | 5 | 243 | 6 | 6 | 1,308 | 6 | - | - | - | 2,679 |
| **Bankruptcy (Sources) / Uses** | | | | | | | | | | | | | | |
| Stalking Horse Sale Proceeds (1) | - | - | - | - | - | - | - | - | (82,144) | - | - | - | - | (82,144) |
| Debtor Professional Fee Carve-Out Funding | 511 | 511 | 511 | 511 | 511 | 511 | 511 | 511 | 511 | 511 | 511 | 511 | 511 | 6,639 |
| Lender Professional Fees | - | - | 105 | - | - | - | 185 | - | - | - | - | 185 | - | 475 |
| U.S. Trustee Fees | - | - | - | - | - | - | - | - | - | - | - | - | 250 | 250 |
| Critical Vendor Payments | - | 1,833 | 1,833 | 1,833 | 1,000 | - | - | - | - | - | - | - | - | 6,500 |
| PACA / PASA Payments | - | 1,700 | 1,700 | - | - | - | - | - | - | - | - | - | - | 3,400 |
| Required Bankruptcy Deposits | - | 450 | - | - | - | - | - | - | - | - | - | - | - | 450 |
| Stub Rent | - | - | 610 | 357 | - | - | - | - | - | - | - | - | - | 966 |
| Rent Cures | - | - | - | - | - | - | - | - | 1,142 | - | - | - | - | 1,142 |
| **Total    Bankruptcy (Sources) / Uses** | 511 | 4,494 | 4,759 | 2,701 | 1,511 | 511 | 696 | 511 | (80,492) | 511 | 511 | 696 | 761 | (62,322) |
| **Net Cash Flow** | 5,471 | (4,558) | (7,552) | (3,089) | (2,250) | (964) | (2,298) | (1,871) | 78,131 | (4,425) | (2,406) | (2,575) | (4,007) | 47,605 |
| **Accumulated** | 5,471 | 913 | (6,639) | (9,728) | (11,979) | (12,942) | (15,240) | (17,111) | 61,019 | 56,594 | 54,188 | 51,612 | 47,605 | |
| **Beginning Cash Balance** | 250 | 5,721 | 16,163 | 8,611 | 5,522 | 8,272 | 7,308 | 5,010 | 3,139 | 18,425 | 13,999 | 11,593 | 9,017 | 250 |
| DIP Facility Financing Advances / (Repayments) | - | 15,000 | - | - | 5,000 | - | - | - | (62,845) | - | - | - | - | (42,845) |
| Net Cash Flow | 5,471 | (4,558) | (7,552) | (3,089) | (2,250) | (964) | (2,298) | (1,871) | 78,131 | (4,425) | (2,406) | (2,575) | (4,007) | 47,605 |
| **Ending Cash Balance** | 5,721 | 16,163 | 8,611 | 5,522 | 8,272 | 7,308 | 5,010 | 3,139 | 18,425 | 13,999 | 11,593 | 9,017 | 5,010 | 5,010 |
| **Beginning DIP Facility Balance** | - | - | 15,000 | 15,000 | 15,000 | 62,845 | 62,845 | 62,845 | 62,845 | - | - | - | - | - |
| New Money DIP Facility Advances | - | 15,000 | - | - | 5,000 | - | - | - | - | - | - | - | - | 20,000 |
| DIP Facility Roll-Up Loans | - | - | - | - | 42,845 | - | - | - | - | - | - | - | - | 42,845 |
| Less: DIP Facility Repayments (2) | - | - | - | - | - | - | - | - | (62,845) | - | - | - | - | (62,845) |
| **Ending DIP Facility Balance** | - | 15,000 | 15,000 | 15,000 | 62,845 | 62,845 | 62,845 | 62,845 | - | - | - | - | - | - |

(1) Stalking Horse proceeds also includes release of $11.5M of Landlord Cash Collateralized Letters of Credit, estimate for 1-month of rent cures, and a pro-rata portion of March rent, based on acquisition date.
(2) Total repayment amount is subject to negotiation with lenders in order to ensure sufficient liquidity to fund remaining disbursements.

## Exhibit B

**Hootnick Declaration**

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **FAIRWAY GROUP HOLDINGS** | : | |
| **CORP.**, *et al.*, | : | **Case No. 20-[_____] (___)** |
| | : | |
| Debtors.[1] | : | **(Joint Administration Pending)** |

-------------------------------------------------------------x

## DECLARATION OF MARK HOOTNICK IN SUPPORT OF MOTION OF DEBTORS FOR (I) AUTHORITY TO (A) OBTAIN POSTPETITION FINANCING, (B) USE CASH COLLATERAL, (C) GRANT LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (D) GRANT ADEQUATE PROTECTION, (E) MODIFY THE AUTOMATIC STAY, AND (F) SCHEDULE A FINAL HEARING AND (II) RELATED RELIEF

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Fairway Group Holdings Corp. (2788); Fairway Group Acquisition Company (2860); Fairway Bakery LLC (4129); Fairway Broadway LLC (8591); Fairway Chelsea LLC (0288); Fairway Construction Group, LLC (2741); Fairway Douglaston LLC (2650); Fairway East 86th Street LLC (3822); Fairway eCommerce LLC (3081); Fairway Georgetowne LLC (9609); Fairway Greenwich Street LLC (6422); Fairway Group Central Services LLC (7843); Fairway Group Plainview LLC (8643); Fairway Hudson Yards LLC (9331); Fairway Kips Bay LLC (0791); FN Store LLC (9240); Fairway Paramus LLC (3338); Fairway Pelham LLC (3119); Fairway Pelham Wines & Spirits LLC (3141); Fairway Red Hook LLC (8813); Fairway Stamford LLC (0738); Fairway Stamford Wines & Spirits LLC (3021); Fairway Staten Island LLC (1732); Fairway Uptown LLC (8719); Fairway Westbury LLC (6240); and Fairway Woodland Park LLC (9544).  The location of the Debtors' corporate headquarters is 2284 12th Avenue, New York, New York 10027.  Fairway Community Foundation Inc., a charitable organization, owned by Fairway Group Holdings Corp., is not a debtor in these proceedings.

I, Mark Hootnick, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.     My name is Mark Hootnick.  I am over the age of 18 and competent to testify.

2.     I am a Managing Director in the Debt Advisory and Restructuring Practice at PJ Solomon, L.P. at ("**Solomon**"), the proposed investment banker to Fairway Group Holdings Corp. and its debtor affiliates, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**").

3.     I submit this declaration (this "**Declaration**") in support of the *Motion of Debtors for (I) Authorization (A) to Obtain Postpetition Financing, (B) to Use Cash Collateral, (C) to Grant Liens and Provide Superpriority Administrative Expense Status, (D) to Grant Adequate Protection, (E) to Modify the Automatic Stay and (F) to Schedule a Final Hearing and (II) Related Relief* (the "**Motion**").[2]  In particular, I submit this Declaration as evidence that the proposed $25 million debtor-in-possession superpriority financing facility (the "**DIP Financing**" and, the lenders thereunder, the "**DIP Lenders**") (a) is in the best interest of the Debtors, their estates, and all parties in interest in these chapter 11 cases and (b) will provide the Debtors with access to sufficient working capital and the necessary liquidity to operate during the chapter 11 cases.

4.     Except as otherwise indicated, all statements in this Declaration are based on (a) my personal knowledge of the Debtors' operations and finances, (b) my review of relevant

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or in the Interim DIP Order annexed as **Exhibit A** thereto.

documents, (c) information provided to me by Solomon employees working under my supervision, (d) information provided to me by, and discussions with, members of the Debtors' management team or their other advisors, and (e) my opinion based upon my experience as a restructuring professional. If called to testify, I could and would testify to each of the facts set forth herein on those bases.

### Qualifications

5.      As stated above, I am a Managing Director in the Debt Advisory and Restructuring Practice at Solomon, a global business advisory firm and one of the country's first independent investment banks. I have more than twenty-five (25) years of investment banking experience in restructuring, corporate finance, and mergers and acquisitions, during which I have advised debtors, creditors, investors, and acquirers across a diverse range of industries both domestically and internationally. My experience includes advising market participants in, among other industries, manufacturing, technology, telecommunications, distribution, grocery, real estate, and retail. Previously, I have advised various companies, in the chapter 11 context and otherwise, including American Airlines, AMF Bowling Worldwide Inc., Blockbuster, General Motors Company, ICO Global Communications, Indiana Toll Road, LightSquared Communications, Olympia & York, and SunCom Wireless Holdings, Inc.

6.      Prior to joining Solomon, I served in leadership positions at other investment banks that specialize in mergers, restructurings, and financings. With respect to my educational background, I earned a Juris Doctor from New York University School of Law and a Bachelor of Science in Finance from Lehigh University.

**Solomon's Retention**

7.      On May 15, 2019, Solomon was retained by Weil, Gotshal & Manges LLP ("**Weil**"), on behalf of the Debtors, to assist Weil in advising the Company in its negotiations with its creditors and to provide the Company with investment banking services in connection with the Company's evaluation and development of strategic alternatives to address its liquidity needs and capital structure.  The Debtors will seek authority to employ Solomon as their investment banker in these chapter 11 cases.

**Debtors' Capital Structure and the Immediate Need for DIP Financing**

8.      The Debtors' current capital structure is explained in declarations of Michael Nowlan and Abel Porter pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York, each sworn to on the date hereof (the "**First Day Declarations**"). To summarize, the Debtors have approximately $227 million in funded indebtedness and related obligations, consisting of a prepetition Super Senior Secured Facility, which includes a Super Senior Term Loan Facility, a Super Senior L/C Facility, a Senior First Out Term Loan, a Senior Last Out Term Loan, and a Holdco Loan (collectively, the "**Prepetition Debt**").

9.      I have reviewed the Motion, and it is my belief that the relief sought therein is (a) critical to ensure the uninterrupted operation of the Debtors' business and the success of the Debtors' chapter 11 cases and (b) necessary to avoid immediate and potentially irreparable harm to the Debtors' estates.

10.      As stated in the First Day Declarations, in large part due to underperformance compared to business projections, by late 2019, the Debtors had limited liquidity and were at risk of defaulting under their Prepetition Debt.  Accordingly, the Debtors began their formal review of strategic alternatives and engaged in constructive dialogue and

communications with their key constituents, including an ad hoc group of prepetition lenders that collectively hold over 91% of the Debtors' Prepetition Debt (the "**Ad Hoc Group**"), which lenders are also Fairway Group Holding Corp.'s majority shareholders.   The Debtors actively engaged with the Ad Hoc Group to negotiate and execute a restructuring support agreement (the "**RSA**"), which provides the Debtors with a viable path to a confirmable chapter 11 plan of reorganization. The Debtors are commencing these chapter 11 cases to implement the Sale Strategy (as defined below) for the benefit of all stakeholders.

11.   In an effort to address their deteriorating financial condition, the Debtors explored the sale of certain assets as part of either an in-court or out-of-court restructuring.   This process culminated in the execution of a "stalking horse" bid agreement (the "**Stalking Horse Bid**"), which provides for the sale of 5 of the Debtors' stores and the Debtors' Production and Distribution Center for an aggregate purchase price of approximately $70 million.   The Stalking Horse Bid is the cornerstone of the Debtors' strategic mergers and acquisition process, pursuant to which the Debtors will seek to consummate the going-concern sale of as many of their stores as possible (the "**Sale Strategy**").

12.   As detailed in the First Day Declarations, without additional financing, the Debtors will be in a negative cash position in the coming days.   To fund these chapter 11 cases and, by extension, to implement the Sale Strategy and the Debtors' other restructuring efforts, the Debtors engaged Solomon to assist them in obtaining debtor-in-possession ("**DIP**") financing on the best terms available in the market.

## **DIP Marketing Process**

13.     Due to the rapidly diminishing liquidity, the Debtors require immediate access to DIP financing to ensure (a) sufficient working capital to operate their business and to administer their estates; (b) an appropriate liquidity cushion for anticipated vendor contraction and tightening of trade terms, which began prior to the commencement of these chapter 11 cases; (c) the timely payment of administrative expenses to be incurred during these chapter 11 cases; and (d) a positive message to the grocery industry that these chapter 11 cases are sufficiently funded, which is critical to address the concerns of the Debtors' customers, employees, and vendors.  Put simply, due to its liquidity position, which is more fully described in the First Day Declarations, the Debtors require immediate access to debtor-in-possession financing and the authority to use Cash Collateral to continue to operate as a going concern.

14.     The Debtors, in consultation with Solomon and their other advisors, reviewed and analyzed their projected cash flows and prepared a preliminary budget outlining the Debtors' postpetition cash needs.  The Debtors and their advisors, in consultation with the Debtors' management team, determined the requisite amount of DIP financing based on management's cash-flow forecast.

15.     In my role as the Debtors' investment banker, I was actively involved in marking, soliciting, and reviewing proposals for DIP financing, as well as negotiating the terms of the DIP Financing with the DIP Lenders.  As part of the process of marketing the opportunity to provide DIP financing to the debtors, my team and I personally called approximately twelve (12) market participants in an effort to solicit proposals in the days leading up to the Commencement Date.  Despite my best efforts, however, the Debtors did not receive any offers from other potential DIP lenders.  Based on my professional experience and marketing feedback, I believe that the

Debtors failed to receive alternative proposals for DIP financing because, among other things, the relatively small size of the required funding, as compared with other opportunities to provide DIP financing in the market, acts as a limit on the return that potential lenders can expect to realize. Additionally, potential lenders could not get comfortable with the accelerated timeline leading up to the commencement of the Debtors' chapter 11 cases, and potential lenders were unsettled by the uncertainty surrounding the viability of the Debtors' business as a going concern, especially in light of the fact that the Debtors have previously sought chapter 11 protection. Further, in my professional opinion, all potential lenders would require priming liens as a condition to advancing DIP financing to the Debtors, and the Debtors' prepetition lenders would be very unlikely to consent to the assertion of such priming liens against their collateral. Thus, potential lenders were unwilling to submit proposals for alternative DIP financing because the process to approve such financing would likely be highly contested by the Debtors' prepetition lenders, notwithstanding the fact that the Debtors are not in a position in which they can afford to engage in such a contested process.

16.     The Debtors engaged in robust negotiations with the DIP Lenders and received concessions from the DIP Lenders. Thus, in my professional judgment, given the lack of alternatives and the successful arm's-length negotiations that took place between the Debtors and the DIP Lenders, the DIP Financing represents the best terms currently available to the Debtors in the marketplace. The proposed DIP Financing is fair, reasonable, and in the best interests of the Debtors' estates, providing the Debtors with the financing required for these chapter 11 cases on the best terms available.

17.     The proposed DIP Financing contemplates an interim draw of $15 million upon entry of the Interim Order and another draw of $5 million upon entry of the Final Order,

reflecting DIP New Money Loans up to $25 million in the aggregate, with an additional $5 million potentially available as New Money Delayed Draw DIP Loans. The DIP Financing also contemplates $42.8 million of the DIP Roll-Up Loans, which consist of deemed borrowings that, upon entry of the Final Order, will refinance the amounts outstanding under the Super Senior Credit Facility that are held by the DIP Lenders. Despite the Debtors' best efforts to negotiate with the DIP Lenders to eliminate the DIP Roll-Up Loans from the DIP Financing, the DIP Lenders were unwilling to provide the DIP Financing without the inclusion of the DIP Roll-Up Loans. Nevertheless, the DIP Roll-Up Loans do not prejudice unsecured creditors in these chapter 11 cases because the aggregate amount of senior secured debt will remain the same, and no intercreditor prejudice will result because all of the senior lenders will be eligible to participate in the DIP Financing, including the DIP Roll-Up Loans. Further, the applicable interest rate under the DIP Roll-Up Loans is lower than the prepetition interest rate that would otherwise be applicable, thereby benefiting the estate. The DIP Financing also contemplates various fees, including a 4% commitment fee, a 3% structuring fee, and certain agency fees. No fees are payable on account of the DIP Roll-Up Loans, and fees are only payable on account of the New Money Delayed Draw DIP Loans if and when such funds are drawn. Although the Debtors attempted to negotiate with the DIP Lenders to decrease the amount of such fees, the DIP Lenders insisted that the Debtors agree to pay the fees as a condition to extending the DIP Financing. Thus, regardless of the inclusion of the DIP Roll-Up Loans or the various fees, because of the lack of alternative sources of financing and the lack of prejudice to other creditors resulting from the DIP Roll-Up Loans, the DIP Financing nonetheless represents the best terms available to the Debtors in the market.

18.     The current initial budget and the projections reflected therein (the "**DIP Budget**") provide an accurate reflection of the Debtors' expected funding requirements over the identified period and are reasonable and appropriate under the circumstances.  Based on the DIP Budget and other information made available to me, the liquidity provided under the proposed DIP Financing will enable the Debtors to preserve their value as a going concern, providing the Debtors with sufficient liquidity to meet their ongoing day-to-day obligations, fund operational and administrative costs of these chapter 11 cases, and satisfy working capital requirements and other operational expenses, all of which will preserve the value of the Debtors' estates for the benefit of their stakeholders.

19.     Absent authority to enter into and access the DIP Financing, even for a limited period of time, the Debtors will be unable to continue operating their businesses, resulting in a deterioration of value and immediate and irreparable harm to the Debtors' estates.  Thus, the Debtors and their advisors, including Solomon, are in agreement that the Debtors require immediate access to the proceeds of the DIP Financing, as well as access to Cash Collateral, to finance their operations and continue operating as a going concern during the pendency of these chapter 11 cases, which will allow the Debtors to pursue certain value-maximizing transactions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  January 23, 2020
        New York, New York

/s/  Mark Hootnick
Mark Hootnick
Managing Director
PJ SOLOMON

*Proposed Investment Banker
to the Debtors*

## **Exhibit C**

**Initial DIP Budget**

**Fairway Group Holdings Corp.**
Projected Results of Operations

1/23/20    thru    4/19/20

**13-WEEK CASH FLOW SUMMARY**

In $'s 000's

| | BK FILING | | | BID PROC. DEADLINE | | BID DEADLINE | | | AUCTION | STALK HORSE CLS | | | | AUCTION SALE CLS | | | 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| KEY DATES ---> | | | | | | | | | | | | | | | | | |
| WEEK ---> | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | | | | |
| WEEK ENDING ---> | 1/26/20 | 2/2/20 | 2/9/20 | 2/16/20 | 2/23/20 | 3/1/20 | 3/8/20 | 3/15/20 | 3/22/20 | 3/29/20 | 4/5/20 | 4/12/20 | 4/19/20 | | | | |
| **Net Sales** | 6,046 | 11,772 | 10,866 | 10,383 | 11,124 | 11,478 | 10,810 | 10,825 | 5,823 | 5,903 | 5,782 | - | - | | | | 100,812 |
| **Cash Receipts** | 8,689 | 11,006 | 11,558 | 10,748 | 10,600 | 11,181 | 11,187 | 10,730 | 9,236 | 5,802 | 5,821 | 3,998 | - | | | | 110,554 |
| **Operating Disbursements** | | | | | | | | | | | | | | | | | |
| Merchandise | 624 | 6,131 | 8,833 | 6,183 | 5,931 | 7,224 | 7,136 | 7,134 | 6,697 | 5,821 | 3,893 | 3,318 | 2,167 | | | | 71,092 |
| Store Related & Other | - | 400 | 620 | 820 | 820 | 820 | 820 | 820 | 820 | 820 | 474 | 474 | 474 | | | | 8,186 |
| Payroll | 332 | 3,235 | 2,476 | 2,476 | 4,101 | 2,476 | 2,476 | 2,476 | 2,469 | 2,309 | 1,336 | 1,325 | 602 | | | | 28,090 |
| Rent | - | - | 2,101 | 1,402 | - | - | 2,101 | 1,402 | - | - | 1,870 | 758 | - | | | | 9,635 |
| Other Occupancy | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 144 | 144 | 144 | 3 | 3 | | | | 2,438 |
| Taxes | 731 | - | - | - | - | 232 | 597 | - | 160 | - | 591 | - | - | | | | 2,311 |
| Insurance | 770 | 24 | - | - | - | 24 | - | - | - | 24 | - | - | - | | | | 841 |
| Total   Operating Disbursements | 2,707 | 10,040 | 14,281 | 11,132 | 11,334 | 11,390 | 12,783 | 12,083 | 10,290 | 9,710 | 7,716 | 5,878 | 3,246 | | | | 122,592 |
| **Operating Cash Flow** | 5,982 | 966 | (2,723) | (384) | (735) | (210) | (1,596) | (1,354) | (1,054) | (3,909) | (1,896) | (1,880) | (3,246) | | | | (12,037) |
| Accumulated | 5,982 | 6,947 | 4,224 | 3,841 | 3,106 | 2,897 | 1,300 | (54) | (1,107) | (5,016) | (6,912) | (8,791) | (12,037) | | | | |
| **Other (Sources) / Uses** | | | | | | | | | | | | | | | | | |
| Debt Service Fees | - | 1,025 | 65 | - | - | 238 | - | - | 1,301 | - | - | - | - | | | | 2,629 |
| Capital Expenditures | - | 5 | 5 | 5 | 5 | 5 | 6 | 6 | 6 | 6 | - | - | - | | | | 50 |
| Total   Other (Sources) / Uses | - | 1,030 | 70 | 5 | 5 | 243 | 6 | 6 | 1,308 | 6 | - | - | - | | | | 2,679 |
| **Bankruptcy (Sources) / Uses** | | | | | | | | | | | | | | | | | |
| Stalking Horse Sale Proceeds (1) | - | - | - | - | - | - | - | - | (82,144) | - | - | - | - | | | | (82,144) |
| Debtor Professional Fee Carve-Out Funding | 511 | 511 | 511 | 511 | 511 | 511 | 511 | 511 | 511 | 511 | 511 | 511 | 511 | | | | 6,639 |
| Lender Professional Fees | - | - | 105 | - | - | - | 185 | - | - | - | - | 185 | - | | | | 475 |
| U.S. Trustee Fees | - | - | - | - | - | - | - | - | - | - | - | - | 250 | | | | 250 |
| Critical Vendor Payments | - | 1,833 | 1,833 | 1,833 | 1,000 | - | - | - | - | - | - | - | - | | | | 6,500 |
| PACA / PASA Payments | - | 1,700 | 1,700 | - | - | - | - | - | - | - | - | - | - | | | | 3,400 |
| Required Bankruptcy Deposits | - | 450 | - | - | - | - | - | - | - | - | - | - | - | | | | 450 |
| Stub Rent | - | - | 610 | 357 | - | - | - | - | - | - | - | - | - | | | | 966 |
| Rent Cures | - | - | - | - | - | - | - | - | 1,142 | - | - | - | - | | | | 1,142 |
| Total   Bankruptcy (Sources) / Uses | 511 | 4,494 | 4,759 | 2,701 | 1,511 | 511 | 696 | 511 | (80,492) | 511 | 511 | 696 | 761 | | | | (62,322) |
| **Net Cash Flow** | 5,471 | (4,558) | (7,552) | (3,089) | (2,250) | (964) | (2,298) | (1,871) | 78,131 | (4,425) | (2,406) | (2,575) | (4,007) | | | | 47,605 |
| Accumulated | 5,471 | 913 | (6,639) | (9,728) | (11,979) | (12,942) | (15,240) | (17,111) | 61,019 | 56,594 | 54,188 | 51,612 | 47,605 | | | | |
| **Beginning Cash Balance** | 250 | 5,721 | 16,163 | 8,611 | 5,522 | 8,272 | 7,308 | 5,010 | 3,139 | 18,425 | 13,999 | 11,593 | 9,017 | | | | 250 |
| DIP Facility Financing Advances / (Repayments) | - | 15,000 | - | - | 5,000 | - | - | - | (62,845) | - | - | - | - | | | | (42,845) |
| Net Cash Flow | 5,471 | (4,558) | (7,552) | (3,089) | (2,250) | (964) | (2,298) | (1,871) | 78,131 | (4,425) | (2,406) | (2,575) | (4,007) | | | | 47,605 |
| **Ending Cash Balance** | 5,721 | 16,163 | 8,611 | 5,522 | 8,272 | 7,308 | 5,010 | 3,139 | 18,425 | 13,999 | 11,593 | 9,017 | 5,010 | | | | 5,010 |
| **Beginning DIP Facility Balance** | - | - | 15,000 | 15,000 | 15,000 | 62,845 | 62,845 | 62,845 | 62,845 | - | - | - | - | | | | - |
| New Money DIP Facility Advances | - | 15,000 | - | - | 5,000 | - | - | - | - | - | - | - | - | | | | 20,000 |
| DIP Facility Roll-Up Loans | - | - | - | - | 42,845 | - | - | - | - | - | - | - | - | | | | 42,845 |
| Less: DIP Facility Repayments (2) | - | - | - | - | - | - | - | - | (62,845) | - | - | - | - | | | | (62,845) |
| **Ending DIP Facility Balance** | - | 15,000 | 15,000 | 15,000 | 62,845 | 62,845 | 62,845 | 62,845 | - | - | - | - | - | | | | - |

(1) Stalking Horse proceeds also includes release of $11.5M of Landlord Cash Collateralized Letters of Credit, estimate for 1-month of rent cures, and a pro-rata portion of March rent, based on acquisition date.
(2) Total repayment amount is subject to negotiation with lenders in order to ensure sufficient liquidity to fund remaining disbursements.

## **Exhibit D**

## **DIP Term Sheet**

**FAIRWAY GROUP HOLDINGS CORP.**
**FAIRWAY GROUP ACQUISITION COMPANY**

**SUPERPRIORITY SECURED**
**DEBTOR-IN-POSSESSION CREDIT FACILITY TERM SHEET**

**Summary of Proposed Terms and Conditions**

This Summary of Proposed Terms and Conditions (this "DIP Term Sheet") outlines certain terms of the DIP Facility (as defined herein) proposed to be provided by the DIP Lenders (as defined herein) subject to the conditions herein and as set forth more fully below. This DIP Term Sheet is preliminary, non-binding, and is subject to continued due diligence by the DIP Lenders, and remains subject to the execution of definitive documentation in form and substance reasonably acceptable to the DIP Lenders and the Loan Parties. This DIP Term Sheet is for discussion purposes only and does not constitute a commitment, a contract to provide a commitment, or any agreement by the DIP Lenders. This DIP Term Sheet does not attempt to describe all of the terms, conditions, and requirements that would pertain to the financing described herein, but rather is intended to outline certain basic items around which the DIP Lenders and the Loan Parties currently believe a financing could be structured. In addition, the pricing and terms included herein are based on market conditions on the date hereof and are subject to change. The Loan Parties are not authorized to disclose the terms contained herein to any person other than their professional advisors, who shall agree to maintain its confidentiality.

| | |
|---|---|
| **Borrower:** | Fairway Group Acquisition Company ("FGAC"), the borrower under the existing Prepetition Credit Agreement[1] (the "Borrower"), in its capacity as a debtor and debtor-in-possession in a case (together with the cases of its affiliated debtors and debtors-in-possession, the "Chapter 11 Cases") to be filed under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). This DIP Term Sheet assumes that the |

---

[1]    Reference is hereby made to that certain Super Senior Credit Agreement dated as of August 28, 2018 (as may be amended, restated, supplemented or otherwise modified from time to time, including by that certain First Amendment to Super Senior Credit Agreement, dated as of July 29, 2019 and that certain Second Amendment to and Extension under Super Senior Credit Agreement, dated as of August 28, 2019, and by that certain Third Amendment and Limited Waiver to Super Senior Credit Agreement, dated as of October 7, 2019, the "Prepetition Credit Agreement"; together with any Loan Document (as defined in the Prepetition Credit Agreement) and any other document related to or evidencing the loans and obligations thereunder (collectively, the "Prepetition Loan Documents")), among Holdings, Borrower, certain subsidiaries of Holdings (together with the Borrower and Holdings, collectively, the "Loan Parties" and each a "Loan Party"), Ankura Trust Company, LLC ("Ankura"), as administrative agent (in such capacity, the "Prepetition Agent") for the lenders from time to time party thereto (each, a "Prepetition Lender" and collectively, the "Prepetition Lenders"; each Prepetition Lender holding New Term Loans, a "Prepetition New Term Loan Lender"; and collectively, the "Prepetition New Term Loan Lenders"; each Prepetition Lender holding L/C Loans, a "Prepetition L/C Lender"; and collectively, the "Prepetition L/C Lenders"; each Prepetition Lender holding Senior First Out Loans, a "Prepetition Senior First Out Lender"; and collectively, the "Prepetition Senior First Out Lenders"; each Prepetition Lender holding Senior Last Out Loans, a "Prepetition Senior Last Out Lender and collectively, the "Prepetition Senior Last Out Lenders"; and each Prepetition Lender holding Holdco Loans, a "Prepetition Holdco Lender"; and collectively, the "Prepetition Holdco Lenders") and each of the other persons party thereto. Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Prepetition Credit Agreement, the RSA Term Sheet to which this term sheet is attached as Schedule 1 thereto, or the Restructuring Support Agreement (the "RSA"), to which the RSA Term Sheet is attached as Exhibit A thereto, as applicable.

Borrower, Fairway Group Holdings Corp. ("<u>Holdings</u>") and each of the other Guarantors (as defined herein) will file voluntary proceedings simultaneously under the Bankruptcy Code in the Bankruptcy Court and will request joint administration of the Chapter 11 Cases.

**Guarantors:**  Holdings and each of the Borrower's existing and future direct and indirect subsidiaries (collectively, the "<u>Guarantors</u>"), in their capacities as debtors and debtors-in-possession in the Chapter 11 Cases, on a joint and several basis (together with the Borrower, each individually a "<u>Debtor</u>", and collectively, the "<u>Debtors</u>").

**DIP Agent:**  Ankura (in such capacity, together with its successors and assigns, the "<u>DIP Agent</u>").

**DIP Lenders:**  Certain of the Prepetition New Term Loan Lenders and Prepetition L/C Lenders will, either directly or through one or more affiliated funds or financing vehicles (or funds or accounts advised or sub-advised by such person) (such participating funds, collectively, the "<u>DIP Lenders</u>"), finance the New Money DIP Facility (as defined herein) and participate in the New Money DIP Commitments (as defined herein) on a pro rata basis, determined based on the outstanding principal amount of New Term Loans and L/C Loans (collectively, the "<u>Prepetition Super Senior Loans</u>"), excluding any accrued interest and fees, under the Prepetition Credit Agreement (such Prepetition Super Senior Loans, together with accrued interest and fees, the "<u>Prepetition Super Senior Obligations</u>"), held by the DIP Lenders or their affiliated funds as of the date of the commencement of the Chapter 11 Cases (the "<u>Petition Date</u>").

**Type and Amount of the DIP Facility:**  A secured superpriority priming debtor-in-possession non-amortizing facility comprised of:

(i)  a new money credit facility in an aggregate principal amount of $20 million (the "<u>New Money DIP Facility</u>"; the DIP Lenders' commitments under the New Money DIP Facility, the "<u>New Money DIP Commitments</u>"; the loans under the New Money DIP Facility, the "<u>New Money DIP Loans</u>"; each DIP Lender's claim under the New Money DIP Facility, a "<u>New Money DIP Claim</u>"; and collectively, the "<u>New Money DIP Claims</u>"; and proceeds received by the Borrower from the New Money DIP Loans and the New Money Delayed Draw DIP Loans (as defined herein), the "<u>DIP Proceeds</u>");

(ii)  a roll up loan facility (the "<u>Roll-Up DIP Facility</u>"; together with the New Money DIP Facility, the "<u>DIP Facility</u>"; and the applicable DIP Lenders' commitments under the Roll-Up DIP Facility, the "<u>Roll-Up DIP Commitments</u>"; together with the New Money DIP Commitments, the "<u>DIP Commitments</u>") pursuant to which DIP Lenders shall be deemed to make loans under the Roll-Up DIP Facility (the loans under the Roll-Up DIP Facility, the "<u>Roll-Up DIP Loans</u>"; together with the New Money

2

DIP Loans, the "DIP Loans"; each DIP Lender's claim under the Roll-Up DIP Facility, a "Roll-Up DIP Claim"; and collectively, the "Roll-Up DIP Claims"; and together with the New Money DIP Claims and the New Money Delayed Draw DIP Loans (as defined herein), the "DIP Claims"). Each DIP Lender shall have the entire amount of its (or its designated affiliates') Prepetition Super Senior Obligations "rolled-up" into Roll-Up DIP Loans upon entry of the Final DIP Order and the Draw Date occurring thereafter and in connection therewith, which Roll-Up DIP Loans shall be deemed used to satisfy and discharge the Prepetition Super Senior Obligations held by such DIP Lenders (or their designated affiliates); and

(iii)    a new money delayed draw credit facility in an aggregate principal amount of $5 million (the "New Money Delayed Draw DIP Facility"; the DIP Lenders' commitments under the New Money Delayed DIP Facility, the "New Money Delayed Draw DIP Commitments"; the loans under the New Money Delayed Draw DIP Facility, the "New Money Delayed Draw DIP Loans"; each DIP Lender's claim under the New Money Delayed Draw DIP Facility, a "New Money Delayed Draw DIP Claim"; and collectively, the "New Money Delayed Draw DIP Claims"; provided that the New Money Delayed Draw DIP Loans shall only be funded (x) at the election of the Debtors and (y) with the consent of the Requisite DIP Lenders (which shall be in the sole and absolute discretion of the Requisite DIP Lenders) (the "New Money Delayed Draw Election"); and provided further that upon the New Money Delayed Draw Election, each DIP Lender shall be deemed to hold an New Money Delayed Draw DIP Commitment in an amount equal to (on a percentage basis) such DIP Lender's New Money DIP Commitment. For the avoidance of doubt, the disbursement of New Money Delayed Draw DIP Loans shall not result in any roll-up of Prepetition Obligations.

The New Money DIP Claims, Roll-Up DIP Claims, and New Money Delayed Draw DIP Claims shall be *pari passu* in right of payment and collateral priority, and shall be treated the same in all other respects unless expressly specified herein or in the DIP Documents.

Following the date (the "Closing Date") of the satisfaction or waiver by Requisite DIP Lenders (as defined herein) of the relevant "Conditions Precedent to the Closing of the DIP Facility," which shall include entry by the Bankruptcy Court of the Interim DIP Order authorizing and approving the DIP Facility, (1) the New Money DIP Loans may be incurred as follows: (x) up to $15 million under the DIP Facility to be drawn in one drawing on the Closing Date (the "Initial Funding Loan") and (y) a draw equal to the remaining undrawn New Money DIP Commitments upon entry of an order approving the DIP Facility on a final basis (the "Final DIP Order"; together with the Interim DIP Order, the "DIP Orders") and (2) following entry of the Final DIP Order and ending on the date prior to the date that is the earlier of the DIP Termination Date or effective date of the Chapter 11 Plan, a draw in

3

an amount not to exceed the New Money Delayed Draw DIP Commitments (as defined herein), in each case subject to the terms and conditions provided herein (the date of any draw under the DIP Facility pursuant to clause (1)(x), (1)(y) or (2), a "Draw Date").

Once repaid, the New Money DIP Loans and New Money Delayed Draw DIP Loans, if funded, incurred under the DIP Facility cannot be reborrowed. For the avoidance of doubt, the New Money DIP Commitments will be permanently reduced by the amount of New Money DIP Loans made on each Draw Date.

**Credit Bidding:**

The DIP Orders (as defined herein) and the DIP Loan Documents shall provide that, in connection with any sale of any of the Debtors' assets under section 363 of the Bankruptcy Code or under a plan of reorganization (i) the Prepetition Agent shall have the right to credit bid the full amount of all amounts due and outstanding under the Prepetition Loan Documents (the "Prepetition Obligations"), at the direction of the "Required Lenders" (as such term is defined in the Prepetition Credit Agreement), and (ii) the DIP Agent shall have the right to credit bid all amounts outstanding under the DIP Facility at the direction of the Requisite DIP Lenders (as defined herein), in each case, in accordance with section 363(k) of the Bankruptcy Code.

**Closing Date:**

The date of the satisfaction or waiver by the Requisite DIP Lenders of the relevant "Conditions Precedent to the Closing of the DIP Facility" set forth below (the "Closing Date").

**Maturity:**

All DIP Obligations (as defined herein) will be due and payable in full in cash unless otherwise agreed to by the DIP Lenders on the earliest of (i) the date that is nine months after the Petition Date, (ii) the consummation of any sale of all or substantially all of the assets of the Debtors pursuant to Section 363 of the Bankruptcy Code, (iii) if the Final Order has not been entered, the date that is 35 calendar days after the Petition Date, (iv) the acceleration of the DIP Loans and the termination of the New Money DIP Commitments upon the occurrence of an event referred to below under "Termination", and (v) the Effective Date (any such date, the "DIP Termination Date"). Principal of, and accrued interest on, the DIP Loans and all other amounts owing to the DIP Agent and/or the DIP Lenders under the DIP Facility shall be payable on the DIP Termination Date.

**Budget:**

The "Budget" shall consist of a 13-week operating budget setting forth all forecasted receipts and disbursements on a weekly basis for such 13-week period beginning as of the week of the Petition Date, broken down by week, including the anticipated weekly uses of the DIP Proceeds for such period, which shall include, among other things, available cash, cash flow, trade payables and ordinary course expenses, total expenses and incremental capital expenditures, fees and expenses relating to the DIP Facility, fees and expenses related to the Chapter 11 Cases (including professional fees), and working capital and other general corporate needs, which forecast shall be in form and substance reasonably satisfactory to the DIP Agent at the direction

4

of the Requisite DIP Lenders (such budget shall be supplemented in the manner required  pursuant to the Financial Reporting Requirements).

**Use of Proceeds:**

The New Money DIP Loans and New Money Delayed Draw DIP Loans, if funded, shall be used to provide working capital, for general corporate purposes and to fund the Chapter 11 Cases, in each case subject to the Budget (including Permitted Variances (as defined herein)) and the terms and conditions of the DIP Credit Agreement and the DIP Orders, including, without limitation, to (i) provide working capital and for other general corporate purposes of the Debtors, (ii) fund the costs of the administration of the Chapter 11 Cases (including professional fees and expenses) and the consummation of the Debtors' Chapter 11 Plan, and (iii) fund interest, fees, and other payments contemplated in respect of the DIP Facility.

Without in any way limiting the foregoing, no DIP Collateral (as defined herein), DIP Proceeds, any portion of the Carve-Out (as defined herein) or any other amounts may be used directly or indirectly by any of the Debtors, the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "Committee"), if any, or any trustee or other estate representative appointed in the Chapter 11 Cases (or any successor case) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (a) to seek authorization to obtain liens or security interests that are senior to, or *pari passu* with, the DIP Liens or the Prepetition Liens (as defined herein) (except to the extent expressly set forth herein); or (b) to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against any of the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing (all in their capacities as such) (collectively, the "Released Parties"), with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any claims or causes of action arising under chapter 5 of the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Claims, the DIP Liens, the DIP Loan Documents, the Prepetition Loan Documents or the Prepetition Obligations; (iv) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, the DIP Obligations or the Prepetition Obligations; (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either (A) the DIP Agent or the DIP Lenders hereunder or under any of the DIP Loan Documents, or (B) the Prepetition Agent or the Prepetition Lenders under any of the Prepetition Loan Documents (in each case, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of the DIP Agent's or the DIP Lenders' assertions, enforcements, realizations or remedies on or against the DIP

5

Collateral in accordance with the applicable DIP Loan Documents and the DIP Orders); or (vi) objecting to, contesting, or interfering with, in any way, the DIP Agent's and the DIP Lenders' enforcement or realization upon any of the DIP Collateral once an Event of Default (as defined herein) has occurred; provided, however, that no more than $100,000 in the aggregate of the DIP Collateral, the Carve Out, proceeds from the borrowings under the DIP Facility or any other amounts, may be used by the Committee, if any, to investigate claims and/or liens of the Prepetition Agent and Prepetition Lenders under the Prepetition Credit Agreement.

| | |
|---|---|
| **Documentation:** | The DIP Facility will be evidenced by a credit agreement (the "<u>DIP Credit Agreement</u>") to be in form consistent with the Prepetition Credit Agreement (with such modifications as are necessary to reflect the terms set forth in this DIP Term Sheet and to reflect administrative agency and operational matters reasonably acceptable to the DIP Agent and the Debtors and the nature of the DIP Facility as a debtor-in-possession facility and other modifications as may be reasonably agreed between DIP Agent (acting at the direction of the Requisite DIP Lenders) and the Debtors, the "<u>Documentation Principles</u>"), security documents, guarantees and other legal documentation (collectively, together with the DIP Credit Agreement, the "<u>DIP Loan Documents</u>"), which DIP Loan Documents shall be in form and substance consistent with the Documentation Principles, this DIP Term Sheet and otherwise satisfactory to the DIP Agent and the DIP Lenders. |
| **Controlled Accounts:** | The Debtors shall use commercially reasonable efforts to enter into one or more deposit account control agreements within three weeks of the Closing Date, with respect to all accounts holding the DIP Proceeds (collectively, the "<u>Controlled Accounts</u>"), which establish "control" (as defined in the Uniform Commercial Code as in effect from time to time in the State of New York) in favor of the DIP Agent for the benefit of the DIP Lenders, in form and substance reasonably satisfactory to the DIP Agent and the Requisite DIP Lenders. The DIP Credit Agreement shall require the Debtors to maintain the DIP Proceeds (including any intra-company transfers of DIP Proceeds) in the Controlled Accounts except as permitted to be used in accordance with the Budget (including Permitted Variances). From and after the Closing Date, all cash collateral (other than cash collateral held as security by issuers of letters of credit as of the Petition Date) must be held in Controlled Accounts. |
| **Interest:** | The DIP Loans will bear interest at 10.00% *per annum*. |
| | Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day year. |
| **Default Interest:** | Upon the occurrence of and during the continuance of an Event of Default under the DIP Loan Documents, the DIP Loans and all DIP Obligations will automatically bear interest at an additional 2.00% *per annum*. |

| | |
|---|---|
| **Fees:** | An administrative agency fee set forth in a separate fee letter payable in cash to the DIP Agent on the Closing Date.[2] |

A commitment fee equal to 4.00% (the "Commitment Fee") on the entire New Money DIP Commitments, which shall be earned upon entry of the Interim DIP Order, with such Commitment Fee to be shared on a pro rata basis by the DIP Lenders. The Commitment Fee shall be paid as follows: (i) 2.00% shall be paid on the Closing Date in the form of Original Issue Discount ("OID") and (ii) 2.00% shall be paid in cash to the DIP Agent (for distribution to the DIP Lenders) on the earlier of the DIP Termination Date or effective date of the Chapter 11 Plan. For the avoidance of doubt, no Commitment Fee shall be earned or payable on the Roll-Up DIP Commitments.

A structuring fee equal to 3.00% (the "Structuring Fee") on the entire New Money DIP Commitments, which shall be earned upon entry of the Interim DIP Order, with such Structuring Fee to be shared on a pro rata basis solely by DIP Lenders affiliated with Brigade Capital Management and Special Situations Investing Group based on their pro rata share of the New Money DIP Commitments. The Structuring Fee shall be paid in cash on the Closing Date. For the avoidance of doubt, no Structuring Fee shall be earned or payable on the Roll-Up DIP Commitments.

For the avoidance of doubt, the Commitment Fee and Structuring Fee shall also be paid on account of the New Money Delayed Draw DIP Commitments if funded; provided that the OID portion of the Commitment Fee shall be paid on the date the New Money Delayed Draw DIP Loans are disbursed.

| | |
|---|---|
| **Voluntary Prepayments:** | Voluntary prepayments of the DIP Loans shall be permitted at any time, without premium or penalty. |
| **Mandatory Prepayments:** | The DIP Credit Agreement will contain customary mandatory prepayment events for financings of this type consistent with the Documentation Principles and others agreed to by the DIP Lenders and the Borrower ("Mandatory Prepayments"), including, without limitation, prepayments from proceeds of (i) asset sales, (ii) insurance and condemnation proceeds, subject to reinvestment rights to be agreed upon by the Debtors and the Requisite DIP Lenders, (iii) equity or debt issuances, (iv) extraordinary receipts, (v) any cash or cash equivalents cash collateralizing any letter of that is returned to the Borrower or any Guarantor for its own account and (vi) any cash or cash equivalents returned to the Borrower or any Guarantor from rent reserves or security deposits returned to the Borrower or any Guarantor upon the assignment of a lease or otherwise, in each case, received by the Borrower or any of the Guarantors and subject to exceptions to be agreed; provided that the aggregate net cash proceeds utilized for a Mandatory Prepayment on account of the sale of the Stalking Horse Package (as defined below) shall be limited in an amount determined by Requisite DIP Lenders in good faith and in consultation with the Debtors and their advisors, if necessary, to ensure sufficient liquidity to fund the remaining disbursements set forth in the |

---

[2] Agency fee will be set forth in a separate fee letter.

Budget in effect at such time after taking into account the Debtors' (i) cash on hand and (ii) anticipated receipts and disbursements. Mandatory Prepayments will result in a permanent reduction of the DIP Facility.

**Amortization:** None.

**Priority and Security under DIP Facility:** All obligations of the Borrower and the Guarantors to the DIP Agent and the DIP Lenders under the DIP Facility, including, without limitation, all principal and accrued interest, premiums (if any), costs, fees and expenses or any other amounts due, or any exposure of each DIP Lender and its affiliates in respect of cash management incurred on behalf of the Borrower or any Guarantor under the DIP Facility (collectively, the "DIP Obligations"), shall be secured by the following liens and security interests (the "DIP Liens"):

(a)      subject to the Carve Out and subject only to existing liens that under applicable law, are senior to, and have not been subordinated to, the liens of the DIP Agent under the DIP Loan Documents, but only to the extent that such liens are valid, enforceable and non-avoidable liens as of the Petition Date (the "Permitted Liens"), pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority perfected senior priming lien on, and security interest in the Collateral (as defined in the Prepetition Loan Documents) securing the Prepetition Obligations, wherever located, that may be subject to a validly perfected security interest in existence on the Petition Date securing the Prepetition Obligations under the Prepetition Loan Documents (the "Prepetition Liens"), which Prepetition Liens shall be primed by, and made subject and subordinate to, the perfected first priority senior priming liens and security interests to be granted to the DIP Agent for the benefit of the DIP Lenders, which senior priming liens and security interests in favor of the DIP Agent for the benefit of the DIP Lenders shall also be senior to the Prepetition Lender Adequate Protection Liens (as defined herein);

(b)      subject to the Carve Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority perfected lien on, and security interest in, all present and after acquired property of the Debtors, wherever located, not subject to a lien or security interest on the date of commencement of the Chapter 11 Cases (collectively, the "Unencumbered Property");

(c)      subject to the Carve Out, pursuant to section 364(c)(3) of the Bankruptcy Code, a junior perfected lien on, and security interest in, all present and after-acquired property of the Debtors, wherever located, that is subject to a perfected lien or security interest on the Petition Date or subject to a lien or security interest in existence on the Petition Date that is perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code; and

(d)      subject to the Carve Out, a first priority perfected lien on, and security interest in, all funds on deposit in the Controlled Accounts.

The property referred to in the preceding clauses (a), (b), (c) and (d) is collectively referred to as the "DIP Collateral" and shall include, without limitation, all assets (whether tangible, intangible, personal or mixed) of the

8

Borrower and the Guarantors, whether now owned or hereafter acquired and wherever located, before or after the Petition Date, including, without limitation, all accounts, proceeds of leases, inventory, equipment, equity interests or capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, the proceeds of all claims or causes of action (including, subject to entry of the Final Order, proceeds of avoidance actions under chapter 5 of the Bankruptcy Code) and all products, offspring, profits and proceeds thereof.

The DIP Liens shall be effective and perfected as of the entry of the Interim DIP Order (as defined herein) and without necessity of the execution, filing or recording of security agreements, pledge agreements, control agreements, financing statements or other agreements.  However, the DIP Agent may, in its discretion, require the execution, filing or recording of any or all of the documents described in the preceding sentence.

Notwithstanding the foregoing, the DIP Collateral shall not include (and the DIP Liens shall not extend to) assets held by the Debtors in trust. Nothing herein shall limit, subordinate, or constitute a waiver of any rights and priorities of claimants with statutory trust rights, including those afforded under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a et. seq or the Packers and Stockyards Act of 1921, as amended, 7 U.S.C. § 181 et. seq.

| | |
|---|---|
| **Superpriority DIP Claims:** | All DIP Claims shall be entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having superpriority over any and all administrative expenses of the kind that are specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code, subject only to the Carve Out. |

The DIP Claims will, at all times during the period that the DIP Loans remain outstanding, remain, in right of payment, senior in priority to all other claims or administrative expenses, including (a) any claims allowed pursuant to the obligations under the Prepetition Loan Documents, and (b) the Prepetition Lender Superpriority Claims (as defined herein), subject only to the Carve Out.

| | |
|---|---|
| **Carve Out:** | "Carve Out" means an amount equal to the sum of the following (A) : (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $25,000 (without regard to the notice set forth in clause (iii) below); (iii) to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order, final order or otherwise, all accrued and unpaid fees, disbursements, costs and expenses incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (the |

9

"Debtor Professionals") and all budgeted and accrued unpaid fees, disbursements, costs and expenses incurred by the Committee (if any) pursuant to section 328 and 1103 of the Bankruptcy Code (the "Committee Professionals," together with the Debtor Professionals, the "Estate Professionals," and such Estate Professional fees, the "Allowed Professional Fees") at any time before or on the first business day following delivery by the DIP Agent at the direction of the Requisite DIP Lenders of a Carve Out Trigger Notice (as defined herein), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; (iv) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $500,000 incurred after the first business day following delivery by the DIP Agent at the direction of the Requisite DIP Lenders of a Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, final order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap") and (v) subject to entry of the Bid Procedures Order (as defined herein), amounts used to pay the Termination Payment and any of Buyer's Damages, as each of those terms are defined in and pursuant to the Stalking Horse Agreement (as defined herein), provided that such amounts, in the aggregate, shall not exceed three (3%) of the Cash Purchase Price (as such term is defined in and.in accordance with the Stalking Horse Agreement). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by e-mail (or other electronic means) by the DIP Agent at the direction of the Requisite DIP Lenders to the Debtors and their counsel, the United States Trustee, and lead counsel to any Committee appointed in the Chapter 11 Cases, which notice may be delivered following the occurrence of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

On the day on which a Carve Out Trigger Notice is given by the DIP Agent at the direction of the Requisite DIP Lenders to the Debtors with a copy to counsel to the Committee (if any) (the "Carve Out Trigger Notice Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor (including any cash collateral) to fund the Professional Fees Escrow Account (as defined herein) in an amount equal to the then unpaid amounts of Estimated Fees and Expenses (as defined herein) in an amount to pay unpaid Allowed Professional Fees prior to any and all other claims. The Debtors shall deposit and hold in trust in the Professional Fees Escrow Account an amount equal to the Post-Carve Out Trigger Notice Cap, which shall exclusively be used to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap Notwithstanding anything to the contrary herein, following delivery of a Carve Out Trigger Notice, if the DIP Agent (at the direction of the Requisite DIP Lenders) sweeps or forecloses on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors, the DIP Agent shall promptly deposit any cash swept or foreclosed upon after delivery of the Carve-Out Trigger Notice (including cash received as a result of the sale or other disposition of any assets) into the Professional Fees Escrow Account until it is fully funded. Further, notwithstanding anything to the contrary herein, (i) the failure of the Professional Fees Escrow Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out and (ii) in no way shall the

Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Professional Fees Escrow Account, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.

For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the adequate protection liens and claims, and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Obligations.

Prior to the occurrence of an Event of Default, the Debtors shall be permitted to pay compensation and reimbursement of all Allowed Professional Fees of Estate Professionals, as the same may be due and payable, and such payments shall not reduce the Carve Out.  Upon the receipt of the Carve Out Trigger Notice, the right of the Debtors to pay professional fees using Cash Collateral outside the Carve Out shall terminate and the Debtors shall provide immediate notice to all Estate Professionals informing them that such notice was delivered and further advising them that the Debtors' ability to pay professional fees to such Estate Professionals using Cash Collateral is subject to and limited by the Carve Out.  Any payment or reimbursement made prior to the occurrence of the Carve Out Trigger Notice Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

Starting with the first full calendar week following the Petition Date, each Estate Professional shall deliver to the Debtors a statement (each such statement, a "Weekly Statement") setting forth a good-faith estimate of the amount of unpaid fees and expenses incurred during the preceding week by such Estate Professional (through Saturday of such week, the "Calculation Date") (the "Estimated Fees and Expenses").  No later than one business day after the delivery of a Carve-Out Trigger Notice, each Estate Professional shall deliver one additional statement to the Debtors setting forth a good-faith estimate of the amount of unpaid fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has already been delivered and concluding on the date of the Carve-Out Trigger Notice, and the Debtors shall transfer such amounts to the Professional Fees Escrow Account (as defined herein).

The Debtors shall on a weekly basis, transfer cash proceeds from the DIP Facility or cash on hand in an amount equal to the aggregate unpaid amount of Estimated Fees and Expenses included in all Weekly Statements timely received by the Debtors which shall be reported to the DIP Agent, or if an estimate is not provided, the total budgeted weekly fees of Estate Professionals for the prior week set forth in the Budget, into a segregated account not subject to the control of the DIP Agent, any DIP Lender, or any Prepetition Secured Party (the "**Professional Fees Escrow Account**").  The Debtors shall use funds held in the Professional Fees Escrow Account exclusively to pay Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and any interim or final orders of the Court; provided that when all allowed Professional Fees have been paid in full (regardless of when such

Professional Fees are allowed by the Court), any funds remaining in the Professional Fees Escrow Account shall revert to the Debtors for use in a manner consistent with the DIP Credit Agreement and the DIP Orders; and provided further that the Debtors' obligations to pay allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fees Escrow Account. Funds transferred to the Professional Fees Escrow Account shall be held in trust for and exclusively available for the payment of any fees and expenses of the Estate Professionals, including with respect to obligations arising out of the Carve-Out (with a reversionary interest to the Debtors of any amount remaining in the Professional Fees Escrow Account after all allowed Professional Fees are satisfied in full). Funds transferred to the Professional Fees Escrow Account shall not be subject to any liens or claims granted to the DIP Lenders herein or any liens or claims granted as adequate protection, shall not constitute DIP Collateral, and shall not constitute Cash Collateral or assets of the Debtors' estates; provided that the DIP Collateral shall include the Debtors' reversionary interest in funds held in the Professional Fees Escrow Account, if any, after all allowed Professional Fees are satisfied in full.

Nothing herein shall be construed to impair the ability of any party to object to any fees, expenses, reimbursement or compensation sought by any Estate Professionals or any other person or entity.

**Investigation Rights:**

The Committee (to the extent one is appointed) shall have a maximum of sixty (60) calendar days from entry of the Final DIP Order, and, to the extent a Committee is not appointed, any party in interest (other than the Debtors) shall have a maximum of seventy-five (75) calendar days from entry of the Final DIP Order (the "Investigation Period") to investigate and commence an adversary proceeding or contested matter, as required by the applicable Federal Rules of Bankruptcy Procedure, and challenge (each, a "Challenge") the findings, the Debtors' stipulations, or any other stipulations contained in the DIP Orders, including, without limitation, any challenge to the validity, priority or enforceability of the liens securing the obligations under the Prepetition Loan Documents, or to assert any claim or cause of action against the Prepetition Agent or the Prepetition Lenders arising under or in connection with the Prepetition Loan Documents or the Prepetition Obligations, as the case may be, whether in the nature of a setoff, counterclaim or defense of Prepetition Obligations, or otherwise. The Investigation Period may only be extended with the prior written consent of the DIP Agent (acting at the direction of the Requisite DIP Lenders), or pursuant to an order of the Bankruptcy Court. Except to the extent asserted in an adversary proceeding or contested matter filed during the Investigation Period, upon the expiration of such applicable Investigation Period (to the extent not otherwise waived or barred), (i) any and all Challenges or potential challenges shall be deemed to be forever waived and barred; (ii) all of the agreements, waivers, releases, affirmations, acknowledgements and stipulations contained in the Interim DIP Order shall be irrevocably and forever binding on the Debtors, the Committee and all parties-in-interest and any and all successors-in-interest as to any of the foregoing, including any Chapter 7 Trustee, without further action by any party or the Bankruptcy Court; (iii) the Prepetition Obligations shall be deemed to be finally allowed

12

and the Prepetition Liens shall be deemed to constitute valid, binding and enforceable encumbrances, and not subject to avoidance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (iv) the Debtors shall be deemed to have released, waived and discharged the Released Parties from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Prepetition Obligations. Notwithstanding anything to the contrary herein: (x) if any Challenge is timely commenced, the stipulations contained in the DIP Orders shall nonetheless remain binding on all other parties-in-interest and preclusive except to the extent that such stipulations are expressly and successfully challenged in such Challenge; and (y) the Released Parties reserve all of their rights to contest on any grounds any Challenge. For the avoidance of doubt, the DIP Orders shall include language that the investigation rights afforded to the Committee will not constitute the Debtors' or DIP Lenders' recognition, consent, or agreement not to object to, the Committee's standing to assert any claim or cause of action. To the extent that there is a successful Challenge to any Prepetition Obligations that are converted into the Roll-Up DIP Facility, the Roll-Up DIP Facility shall be automatically unwound and deemed null and void in an equivalent amount.

| | |
|---|---|
| **Conditions Precedent to the Closing of the DIP Facility:** | The DIP Credit Agreement will contain customary conditions precedent to closing mutually acceptable to the Debtors, the DIP Agent and the DIP Lenders, including but not limited to the following conditions precedent, each of which shall be subject to waiver with the consent of the Debtors and the DIP Agent at the direction of the Requisite DIP Lenders: |

- All documentation relating to the DIP Facility shall be in form and substance reasonably satisfactory to the DIP Agent and the DIP Lenders, and shall have been duly executed and delivered by all parties thereto.

- All reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses, accrued and unpaid as of the Closing Date, of (i) the DIP Agent (limited, in the case of counsel, to all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of the DIP Agent's outside counsel, Davis Polk & Wardwell LLP ("DPW") and any successor counsel, and, to the extent necessary, one firm of local counsel engaged by the DIP Agent in connection with the Debtors' Chapter 11 Cases), (ii) the Prepetition Lenders and DIP Lenders represented by King & Spalding LLP ("K&S") (collectively, the "Ad Hoc Group") (limited, in the case of counsel, to all reasonable and documented fees, costs, disbursements and expenses of the Ad Hoc Group's outside counsel, K&S, and, to the extent necessary, one firm of local counsel engaged by the Ad Hoc Group in connection with the Debtors' Chapter 11 Cases), and (iii) any other professional advisors retained by the DIP Agent at the direction of the Requisite DIP Lenders in their reasonable discretion, or the Ad Hoc Group, in their reasonable discretion, shall have been paid in full in cash (which payment may be made from DIP Proceeds), in each case to the extent invoices for any such accrued and unpaid amounts are provided to the Debtors no later than three (3) Business Days prior to the Closing Date.

- The DIP Agent and the DIP Lenders shall have received a Budget in form and substance reasonably satisfactory to the DIP Agent at the direction of the Requisite DIP Lenders.

- All first day motions, including those related to the DIP Facility, filed by the Debtors and related orders entered by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance reasonably satisfactory to the DIP Agent (with respect to matters relevant to or affecting the DIP Agent) and the Requisite DIP Lenders.

- Other than the DIP Orders, there shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that prohibits, restricts or imposes a materially adverse condition on the DIP Facility or the exercise by the DIP Agent at the direction of the DIP Lenders of its rights as a secured party with respect to the DIP Collateral.

- Other than, in each case, as a result of the commencement and continuation of the Chapter 11 Cases, the events leading up to the Chapter 11 Cases, the effect of the bankruptcy, the conditions in the industry in which the Borrower operates in as existing on the Closing Date and/or the consummation of transactions contemplated by the Debtors' "first day" pleadings reviewed by the DIP Agent and the Requisite DIP Lenders, since the Petition Date there shall have occurred no event, circumstance or condition which has resulted, or could reasonably be expected to result, in a material adverse change in (i) the business, operations, properties or condition (financial or otherwise) of the Debtors and their subsidiaries, collectively, (ii) the legality, validity or enforceability of any DIP Loan Documents or the DIP Orders, (iii) the ability of the Borrower or the Guarantors, taken as a whole, to perform their payment obligations under the DIP Loan Documents, (iv) the perfection or priority of the DIP Liens granted pursuant to the DIP Loan Documents or the DIP Orders, or (v) the rights and remedies of the DIP Agent and the DIP Lenders under the DIP Loan Documents taken as a whole (any of the foregoing being a "Material Adverse Change").

- Other than the Chapter 11 Cases, as stayed upon the commencement of the Chapter 11 Cases, or as disclosed to the DIP Agent prior to the Petition Date, there shall exist no action, suit, investigation, litigation or proceeding pending or threatened in writing in any court or before any arbitrator or governmental authority that (i) would reasonably be expected to result in a Material Adverse Change or (ii) restrains, prevents or purports to affect materially adversely the legality, validity or enforceability of the DIP Facility or the consummation of the transactions contemplated thereby.

- Other than as a result of or in connection with the Chapter 11 Cases, all governmental and third party consents and approvals reasonably necessary to be obtained by the Borrower in connection with the DIP Facility, if any, shall have been obtained (without the imposition of any conditions that are not reasonably acceptable to the DIP Agent at the

14

direction of the Requisite DIP Lenders in their reasonable discretion) and shall remain in effect.

- Subject to the entry of the Interim DIP Order, the DIP Agent, for the benefit of the DIP Lenders, shall have a valid and perfected lien on and security interest in the DIP Collateral of the Debtors on the basis and with the priority set forth herein.

- The Bankruptcy Court shall have entered an interim order (the "Interim DIP Order") within three (3) calendar days following the Petition Date, in form and substance consistent with the terms and conditions set forth herein and otherwise satisfactory to the DIP Agent at the direction of the Requisite DIP Lenders, which Order shall include, without limitation, copies of the DIP Facility and the initial Budget as exhibits thereto, entered on notice to such parties as may be satisfactory to the DIP Agent acting at the direction of the Requisite DIP Lenders and otherwise as required by applicable Bankruptcy Law, (i) authorizing and approving the New Money DIP Facility and the transactions contemplated thereby, including, without limitation, the granting of the superpriority status, security interests and priming liens, and the payment of all fees, referred to herein; (ii) authorizing the lifting or modification of the automatic stay to permit the Borrower and the Guarantors to perform their obligations, and the DIP Lenders to exercise their rights and remedies, with respect to the DIP Facility; (iii) authorizing the use of cash collateral and providing for adequate protection in favor of the Prepetition Lenders as and to the extent provided herein; and (iv) reflecting such other terms and conditions that are mutually satisfactory to the DIP Agent (with respect to matters relevant to or affecting the DIP Agent), the Requisite DIP Lenders, and the Debtors, in their respective discretion, in each case, on the terms and conditions set forth herein; which Interim DIP Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Agent (at the direction of the Requisite DIP Lenders); provided that, for the avoidance of doubt, the Interim DIP Order need not include authorization and approval of the Roll-Up DIP Facility, which shall be deferred to and included in the Final DIP Order.

- The Debtors shall have entered into the RSA with the Requisite Consenting Lenders in form and substance reasonably satisfactory to the DIP Agent and the DIP Lenders.

- The DIP Agent shall have received, at least three (3) Business Days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act.

15

| | |
|---|---|
| **Conditions Precedent to Borrowing New Money DIP Loans and New Money Delayed Draw DIP Loans (if funded):** | In addition to the satisfaction of the conditions on the Closing Date, the DIP Credit Agreement will contain only the following conditions precedent to borrowings: |

- No Default or Event of Default shall have occurred, and shall be continuing, under the DIP Loan Documents immediately prior to the funding of the New Money DIP Loans or New Money Delayed Draw DIP Loans, if funded, or would result from such borrowing of the New Money DIP Loans or New Money Delayed Draw DIP Loans, if funded.

- The representations and warranties of each Borrower and each Guarantor set forth in the DIP Credit Agreement shall be true and correct in all material respects (without duplication of any materiality qualifier) on and as of the Closing Date or on and as of any Draw Date thereafter, as applicable, in each case immediately after giving effect to the funding of any New Money DIP Loans and New Money Delayed Draw DIP Loans, and to the application of the proceeds therefrom as though made on and as of such date (except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (without duplication of any materiality qualifier) as of such earlier date).

- The making of the New Money DIP Loans shall not violate any requirement of law and shall not be enjoined temporarily, preliminarily or permanently.

- The making of the New Money DIP Loans shall be authorized pursuant to the Interim DIP Order or the Final DIP Order, as applicable.

- The entry of the Interim DIP Order or the Final DIP Orders (as applicable).

The RSA shall remain in force and effect according to its terms as to the Debtors and the Requisite Consenting Creditors.

| | |
|---|---|
| **Representations and Warranties:** | The DIP Credit Agreement will contain the following representations and warranties (which will be applicable to each Debtor and its subsidiaries) consistent with the Documentation Principles and to be made as of (x) the date the Borrower and the Guarantors execute the DIP Loan Documents, (y) the Closing Date, and (z) any Draw Date thereafter: representations and warranties regarding valid existence, requisite power, due authorization, no conflict with the Interim DIP Order or the Final DIP Order (as applicable) or applicable law, governmental consent, enforceability of DIP Loan Documents, accuracy of financial statements, and all other non-forward looking information provided, compliance with law, absence of Material Adverse Change, no default under the DIP Loan Documents, taxes, subsidiaries, ERISA, pension and benefit plans, ownership of properties and necessary rights to intellectual property, insurance, inapplicability of Investment Company Act, compliance with OFAC, money laundering, PATRIOT Act and other anti-terrorism laws and anti-corruption laws, continued accuracy of representations and continued effectiveness of the applicable DIP Order and each other order of the Bankruptcy Court with respect to the DIP Facility. |
| **Affirmative and Negative Covenants:** | The DIP Credit Agreement will contain customary affirmative and negative covenants to be consistent with the Documentation Principles, including, the following: |

- Deliver to the DIP Agent and the DIP Lenders and their counsel for review and comment, as soon as commercially reasonable, and in any event not less than two (2) Business Days prior to filing (or as soon thereafter as is reasonably practicable under the circumstances), upon request, all pleadings, motions and other documents material to the DIP Agent or DIP Lenders (provided that any of the foregoing relating to the DIP Facility shall be deemed material) to be filed on behalf of the Debtors with the Bankruptcy Court.

- Promptly deliver, upon receipt of same, to the DIP Agent and the DIP Lenders copies of any term sheets, proposals, presentations or other documents, from any party, related to (i) the restructuring of the Debtors, or (ii) the sale of assets of one or more of the Debtors.

- Comply in all material respects with laws (including without limitation, the Bankruptcy Code, ERISA, environmental laws, OFAC, money laundering laws, PATRIOT Act and other anti-terrorism laws and anti-corruption laws), pay taxes, maintain all necessary licenses and permits and trade names, trademarks, patents, preserve corporate existence, maintain appropriate and adequate insurance coverage and permit inspection of properties, books and records.

- Conduct all transactions with affiliates of the Debtors on terms no less favorable to the Debtors than those obtainable in arm's length transactions, including, without limitation, restrictions on management fees paid to affiliates.

- Maintain a cash management system as required by the DIP Orders and

otherwise the Prepetition Credit Agreement.

- Not make or commit to make payments to critical vendors in respect of prepetition amounts in excess of $7.5 million in the aggregate (or as otherwise contemplated by the Chapter 11 Plan).

- Delivery of the Budget, updated on a weekly basis and adherence to the Budget, subject to Permitted Variances.

- (i) Actual aggregate disbursements shall not exceed the aggregate amount of disbursements in the Budget for the applicable period by more than the Permitted Variances, and (ii) actual aggregate cash receipts (excluding DIP Proceeds that may be deemed a receipt) during the applicable period shall not be less than the aggregate amount of such cash receipts in the Budget for such period by more than the Permitted Variances.

  For purposes hereof, the term "Permitted Variances" will mean, for the first two weeks after the Closing Date and on a rolling two-week basis thereafter, to be tested commencing on the third Friday following the Closing Date and every other Friday thereafter (each such period, the "Testing Periods"): (i) all favorable variances, (ii) (x) an unfavorable variance of no more than 10% for each of actual aggregate receipts and disbursements (excluding professional fees and expenses), (y) an unfavorable variance of no more than 10% for professional fee and expense disbursements, and (z) an unfavorable variance of no more than the greater of $500,000 and 10% of net cash flow (excluding professional fees and expenses), as compared to the budgeted aggregate receipts, disbursements (excluding professional fees and expenses), professional fee and expense disbursements, and net cash flow (excluding professional fees and expenses), respectively, set forth in the Budget with respect to the applicable Testing Period; provided, that any disbursements in such Testing Period made from proceeds of favorable variances with respect to receipts in such Testing Period shall not be counted as disbursements for purposes of calculating unfavorable variances. The Permitted Variances with respect to each Testing Period shall be determined and reported to the DIP Agent and the DIP Lenders not later than Friday immediately following each such Testing Period. Additional variances, if any, from the Budget, and any proposed changes to the Budget, shall be subject to the approval of the DIP Agent at the direction of the Requisite DIP Lenders.

- Consistent with the Documentation Principles and subject to the Budget, not incur or assume any additional debt or contingent obligations in respect of debt, give any guaranties in respect of debt, create any liens, charges or encumbrances or incur additional material lease obligations, in each case, beyond agreed upon limits; not merge or consolidate with any other person, change the nature of business or corporate structure or create or acquire new subsidiaries, in each case, beyond agreed upon limits; not amend its charter or by laws; not sell, lease or otherwise dispose of assets (including, without limitation, in connection with a sale

leaseback transaction) outside the ordinary course of business and beyond agreed upon limits; not give a negative pledge on any assets in favor of any person other than the DIP Agent for the benefit of the DIP Lenders; and not permit to exist any consensual encumbrance on the ability of any subsidiary to pay Borrowers or other distributions to the Borrower; in each case, subject to customary exceptions or baskets as may be agreed.

- Other than the DIP Obligations, not prepay, redeem, purchase, defease, exchange or repurchase any debt or amend or modify any of the terms of any such debt or other similar agreements entered into by any Debtor or its subsidiaries.

- Not make any loans, advances, capital contributions or acquisitions, form any joint ventures or partnerships or make any other investments in subsidiaries (other than among the Debtors) or any other person, subject to certain exceptions to be agreed.

- Not make or commit to make any payments in respect of warrants, options, repurchase of stock, dividends or any other distributions (other than among the Debtors, from Debtors to non-Debtor affiliates in the ordinary course, among non-Debtors, and from non-Debtors to Debtors).

- Not make, commit to make, or permit to be made any bonus payments to executive officers of the Debtors and their subsidiaries in excess of the amounts set forth in the Budget.

- Not permit any change in ownership or control of any Debtor or any subsidiary or any change in accounting treatment or reporting practices, except as required by GAAP or as permitted or contemplated by the RSA, the Chapter 11 Plan or the DIP Credit Agreement.

- Without the prior written consent of the Requisite DIP Lenders, not make or permit to be made any change to the DIP Orders or any other order of the Bankruptcy Court with respect to the DIP Facility.

- Not permit the Debtors to seek authorization for, and not permit the existence of, any claims other than that of the DIP Lenders entitled to a superpriority under section 364(c)(1) of the Bankruptcy Code that is senior or *pari passu* with the DIP Lenders' section 364(c)(1) claim, except for the Carve Out.

- The Debtors shall comply with the Milestones (as defined herein).

| | |
|---|---|
| **Financial Reporting Requirements:** | The Borrower shall provide to the DIP Agent for the benefit of the DIP Lenders (hereinafter the "Financial Reporting Requirements"): (i) monthly operating reports of the Debtors and their subsidiaries, within thirty (30) calendar days of month end, certified by the Debtors' chief financial officer; (ii) quarterly consolidated financial statements of the Debtors and their subsidiaries within sixty (60) calendar days of fiscal quarter end, certified by the Borrower's chief financial officer; (iii) annual audited consolidated financial statements of the Debtors and their subsidiaries within one-hundred |

twenty (120) calendar days of fiscal year end, certified with respect to such consolidated statements by independent certified public accountants acceptable to the DIP Lenders (provided that the Borrower's existing independent certified public accountants are acceptable) which shall not be qualified in any material respect as to scope but may contain a qualification with respect to the Chapter 11 Cases; (iv) following delivery of the Budget, on every Friday during the Chapter 11 Cases, an updated Budget, in each case, in form reasonably satisfactory to the DIP Agent at the direction of the Requisite DIP Lenders and substance satisfactory to the DIP Agent at the direction of the Requisite DIP Lenders for the subsequent 13 week period consistent with the form of the initial Budget and such updated Budget shall become the "Budget" for the purposes of the DIP Facility upon the DIP Agent's acknowledgement at the direction of the Requisite DIP Lenders that the proposed updated Budget is substantially in the form of the initial Budget and in substance satisfactory to the DIP Agent (provided, that, until a new Budget has been approved by the DIP Agent at the direction of the Requisite DIP Lenders, the most recently approved Budget shall govern); and (v) beginning on the third Friday following the Closing Date, and every other Friday thereafter, a variance report (the "<u>Variance Report</u>") setting forth actual cash receipts, disbursements (excluding professional fees and expenses), professional fee and expense disbursements and net cash flow (excluding professional fees and expenses) of the Debtors for the prior Testing Period and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such period as compared to the applicable Budget delivered by the Debtors, in each case, on a cumulative rolling 2-week basis (and each such Variance Report shall include explanations for all material variances and shall be certified by the Chief Financial Officer of the Debtors).  The Borrower will promptly provide notice to the DIP Agent, for distribution to the DIP Lenders, of any Material Adverse Change.

All deliveries required pursuant to this section shall be subject to the confidentiality provision to be negotiated in the DIP Credit Agreement.

**Other Reporting Requirements:**

The DIP Credit Agreement will contain other customary reporting requirements for similar financings and others determined by the DIP Lenders in their reasonable discretion to be appropriate to the transactions contemplated herein, including, without limitation, with respect to material adverse events, events and notices under other material debt instruments, litigation, contingent liabilities, ERISA or environmental events and consistent with the Documentation Principles (collectively with the financial reporting information described above, the "<u>Information</u>").

**Chapter 11 Cases Milestones:**

The DIP Credit Agreement will include the following milestones (the "Case Milestones") related to the Debtors' Chapter 11 Cases:

- No later than three calendar days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order.

- No later than 30 calendar days after the Petition Date, the Debtors shall have filed a plan of reorganization, in form and substance satisfactory to the DIP Agent and the Requisite DIP Lenders.

- No later than 30 calendar days after the Petition Date, the Debtors shall have filed disclosure statement motion and disclosure statement in form and substance satisfactory to the DIP Agent and the Requisite DIP Lenders.

- No later than 30 calendar days after the Petition Date, the Bankruptcy Court shall have entered an order setting the date (the "Bar Date") by which proofs of claim for general unsecured creditors must be filed.

- No later than 35 calendar days following the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order.

- No later than 65 calendar days following the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably satisfactory to the DIP Agent (with respect to matters relevant to or affecting the DIP Agent) and the Requisite DIP Lenders, approving the Disclosure Statement (the "Disclosure Statement Order").

- No later than 60 calendar days following the Petition Date, the Bar Date shall have occurred.

- No later than 70 calendar days after the Petition Date, the Debtors shall have commenced solicitation on the Chapter Plan.

- No later than 120 calendar days following the Petition Date the Bankruptcy Court shall have entered an order, in form and substance reasonably satisfactory to the DIP Agent (with respect to matters relevant to or affecting the DIP Agent) and the Requisite DIP Lenders, confirming the Chapter 11 Plan (the "Plan Confirmation Order").

- No later than 125 calendar days following the Petition Date the effective date (the "Effective Date") of the Chapter 11 Plan shall have occurred.

The DIP Credit Agreement will include the following sale milestones (the "Sale Milestones"; together with the Case Milestones, the "Milestones") related to the Debtors' 363 Sale (as defined herein):

- Prior to the Petition Date, the Debtors shall have entered into a stalking horse purchase agreement (the "Staking Horse Agreement") (in form and substance acceptable to the Requisite DIP Lenders) with Village Supermarket, Inc. (the "Stalking Horse Bidder") for a substantial portion of the Debtors' assets (the "Stalking Horse Package" and, the Stalking Horse Bidder's bid for such Stalking

21

Horse Package, the "<u>Stalking Horse Bid</u>"), and such Stalking Horse Agreement shall not have been terminated by the Stalking Horse Bidder.

- No later than 2 calendar days after the Petition Date, the Debtors shall file a motion (the "<u>Sale Motion</u>"), in form and substance acceptable to the DIP Agent and the Requisite DIP Lenders, requesting (x) an order from the Bankruptcy Court (the "<u>Bid Procedures Order</u>") (i) approving the proposed bid procedures attached to the Sale Motion related to the sale of substantially all of the assets of the Debtors, including the Stalking Horse Package (the "<u>Bid Procedures</u>"), and (ii) authorizing the Debtors to provide the Stalking Horse Bidder with the bid protections set forth in the Stalking Horse Agreement, and (y) an order from the Bankruptcy Court (the "<u>Sale Order</u>") approving the sale of the Debtors' assets to the highest and best bidder for such assets pursuant to Section 363 of the Bankruptcy Code, including the sale of the Stalking Horse Package to the Stalking Horse Bidder or such other higher or better bidder determined in accordance with the Bid Procedures.

- No later than 25 calendar days after the Petition Date, the Debtors shall have obtained the Bid Procedures Order, in form and substance reasonably satisfactory to the DIP Agent and the Requisite DIP Lenders.

- No later than 50 calendar days after the Petition Date, the Debtors shall have commenced an auction, if applicable, for the Stalking Horse Package.

- No later than 55 calendar days after the Petition Date, the Debtors shall have commenced an auction, if applicable, for the Other Assets (as such term is defined in the Bid Procedures).

- No later than 65 calendar days after the Petition Date, the Bankruptcy Court shall have entered an order (the "<u>Stalking Horse Sale Order</u>"), in form and substance reasonably acceptable to the DIP Agent (acting at the direction of the Requisite DIP Lenders), approving the sale of the Stalking Horse Package; provided that if there is no overbid for the Stalking Horse Package, then the Stalking Horse Sale Order shall be entered no later than 50 calendar days after the Petition Date.

- No later than 65 calendar days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the DIP Agent (acting at the direction of the Requisite DIP Lenders), approving the sale of the Other Assets.

- No later than calendar 68 days after the Petition Date, the Debtors shall have consummated the sale(s) of the Stalking Horse Package to the winning bidder(s) at the applicable Auction, provided if there is no overbid for the Stalking Horse Package, then the Debtors shall have consummated the sale(s) of the Stalking Horse Package no later than 55 days from the Petition Date.

- No later than calendar 70 days after the Petition Date, the Debtors

22

shall have consummated the sale(s) of the Other Assets to the winning bidder(s) at the applicable Auction.

**Events of Default:**   The DIP Credit Agreement will contain events of default customarily found in loan agreements for similar financings and other events of default deemed by the DIP Lenders appropriate to the transactions contemplated therein which will be applicable to the Debtors and their subsidiaries (each an "<u>Event of Default</u>"), including, without limitation:

- failure to make payments when due;

- noncompliance with covenants (subject to customary cure periods as may be agreed with respect to certain covenants);

- breaches of representations and warranties in any material respect;

- failure to satisfy or stay execution of judgments in excess of specified amounts;

- the existence of certain materially adverse employee benefit or environmental liabilities, except for such liabilities as are in existence as of the Closing Date and are set forth on a schedule to the DIP Credit Agreement, and customary ERISA and similar foreign plan events;

- impairment of DIP Loan Documents;

- change in ownership or control, except as contemplated by the Chapter 11 Plan;

- filing of a plan of reorganization under Chapter 11 of the Bankruptcy Code by the Debtors (other than the Chapter 11 Plan) that has not been consented to by the Requisite DIP Lenders;

- filing of a plan of reorganization by the Debtors (other than the Chapter 11 Plan) that does not propose to indefeasibly repay the DIP Obligations in full in cash, unless otherwise consented to by the DIP Agent and the Requisite DIP Lenders;

- any of the Debtors shall file a pleading seeking to vacate or modify any of the DIP Orders over the objection of the DIP Agent or the DIP Lenders constituting the Requisite DIP Lenders;

- entry of an order without the prior written consent of the Requisite DIP Lenders amending, supplementing or otherwise modifying the Order;

- reversal, vacatur or stay of the effectiveness of the DIP Orders except to the extent stayed or reversed within five (5) Business Days (and, other than, in respect of the Interim DIP Order, the entry of the Final DIP Order);

- any violation of the terms of the DIP Orders by the Debtors that are not cured within 3 calendar days (to the extent any such violation is curable);

- dismissal of the Chapter 11 Case of a Debtor with material assets or conversion of the Chapter 11 Case of a Debtor with material assets to a case under Chapter 7 of the Bankruptcy Code;

- appointment of a Chapter 11 trustee or examiner with enlarged powers

23

relating to the operation of the business of the Borrower or any Guarantor;

- any sale of all or substantially all assets of the Debtors pursuant to section 363 of the Bankruptcy Code, unless (a) such sale is conducted in accordance with the Bid Procedures and (b) the proceeds of such sale will indefeasibly satisfy the DIP Obligations in full in cash;

- failure to meet a Milestone, unless extended or waived by the prior written consent of the DIP Agent at the direction of the Requisite DIP Lenders;

- granting of relief from the automatic stay in the Chapter 11 Cases to permit foreclosure or enforcement on assets of the Borrower or any Guarantor, in each case, with a fair market value in excess of $100,000;

- the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order by the Bankruptcy Court, granting any superpriority claim or lien (except as contemplated herein) which is senior to or *pari passu* with the DIP Claims;

- the Debtors' filing of a motion seeking entry of an order approving any key employee incentive plan, employee retention plan, or comparable plan, except as provided in the Chapter 11 Plan, without the prior written consent of the Requisite DIP Lenders;

- the Debtors shall seek, or shall support  any other person's motion seeking (in any such case, verbally in any court of competent jurisdiction or by way of any motion or pleading filed with the Bankruptcy Court, or any other writing to another party in interest by the Debtors), to challenge the validity or enforceability of any of the obligations of the parties under the Prepetition Loan Documents;

- payment of or granting adequate protection with respect to prepetition debt, other than as expressly provided herein or in the DIP Orders or consented to by the DIP Agent at the direction of the Requisite DIP Lenders;

- expiration or termination of the period provided by section 1121 of the Bankruptcy Code for the exclusive right to file a plan with respect to a Debtor with material assets;

- cessation of the DIP Liens or the DIP Claims to be valid, perfected and enforceable in all respects;

- Permitted Variances under the Budget are exceeded for any Test Period without consent of or waiver by the DIP Agent at the direction of the Requisite DIP Lenders;

- any uninsured judgments are entered with respect to any post-petition non-ordinary course claims against any of the Debtors or any of their respective affiliates in a combined aggregate amount in excess of $250,000 unless stayed;

- the termination of the RSA and revocation of the votes to accept the Chapter 11 Plan by Prepetition Lenders that has the effect of causing the

24

percentage of funded debt owned by the Consenting Creditors to fall below 66 $2/3$% of the total amount of Senior First Out Term Loans, it being understood and agreed that the Consenting Creditors shall have the right to revoke their votes to accept the Chapter 11 Plan as provided in the RSA; and

- any Debtor asserting any right of subrogation or contribution against any other Debtor until all borrowings under the DIP Facility are paid in full and the commitments are terminated.

**Termination:**   Upon the occurrence and during the continuance of an Event of Default, the DIP Agent, at the direction of the Requisite DIP Lenders shall, by written notice to the Borrower, its counsel, the U.S. Trustee and counsel for any statutory committee, terminate the DIP Facility, declare the obligations in respect thereof to be immediately due and payable and, subject to the immediately following paragraph, exercise all rights and remedies under the DIP Loan Documents and the DIP Orders.

**Remedies:**   The DIP Agent and the DIP Lenders shall have customary remedies, including, without limitation, the following:

Without further order from the Bankruptcy Court, and subject to the terms of the DIP Orders, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise, upon the occurrence and during the continuance of any Event of Default under their respective DIP Loan Documents, all rights and remedies provided for in the DIP Loan Documents, and to take any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable): (a) immediately terminate the Debtors' limited use of any cash collateral; (b) cease making any DIP Loans under the DIP Facility to the Debtors; (c) declare all DIP Obligations to be immediately due and payable; (d) freeze monies or balances in the Debtors' accounts (and, with respect to the DIP Credit Agreement and the DIP Facility, sweep all funds contained in the Controlled Accounts); (e) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Agent or the DIP Lenders against the DIP Obligations, or otherwise enforce any and all rights against the DIP Collateral in the possession of any of the applicable DIP Lenders, including, without limitation, disposition of the DIP Collateral solely for application towards the DIP Obligations; and (f) take any other actions or exercise any other rights or remedies permitted under the DIP Orders, the DIP Loan Documents or applicable law to effect the repayment of the DIP Obligations; provided, however, that prior to the exercise of any right in clauses (a) or (f) of this paragraph, the DIP Agent shall be required to provide seven (7) calendar days written notice to the Debtors, the U.S. Trustee, and the Committee of the DIP Agent's intent to exercise its rights and remedies; provided, further, that neither the Debtors, the Committee nor any other party-in-interest shall have the right to contest the enforcement of the remedies set forth in the DIP Orders and the DIP Loan Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth in the applicable DIP Loan

25

Documents.  The Debtors shall cooperate fully with the DIP Agent and the DIP Lenders in their exercise of rights and remedies, whether against the DIP Collateral or otherwise.

The Debtors shall waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Agent and the DIP Lenders set forth in the DIP Orders and in the DIP Loan Documents.

**Adequate Protection:**   As adequate protection for the use of the collateral securing the Prepetition Obligations (the "Prepetition Collateral"), the Prepetition Agent, on behalf of and for the benefit of the Prepetition Lenders, and the Prepetition Lenders, shall receive, in each case subject to the Carve Out:

(i)   current payment of interest in cash at the non-default rate on the outstanding Prepetition Super Senior Obligations; provided that if the Roll-Up DIP Facility is approved by the court pursuant to the Final Order, such interest payments shall cease and shall no longer be required as adequate protection;

(ii)   current payment of all reasonable and documented (in summary form) out-of-pocket fees, costs and expenses of the Prepetition Agent (limited, in the case of counsel, to all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of its outside counsel, DPW, and one local counsel shared with the DIP Agent and any successor counsel);

(iii)   current payment of all reasonable and documented (in summary form) out-of-pocket fees, costs and expenses of the Ad Hoc Group (limited, in the case of counsel, financial advisors and other outside professionals, to all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of its outside counsel, K&S, and, to the extent necessary, one firm of local counsel engaged by the Ad Hoc Group in connection with the Debtors' Chapter 11 Cases);

(iv)   replacement liens to the extent of any postpetition diminution in value of the Prepetition Lenders' interest in the Collateral resulting from the use, sale or lease by the Debtors of such Prepetition Collateral and/or the imposition of the automatic stay, including replacement liens on all Unencumbered Property of the Debtors, which liens will be junior to DIP Liens (the "Prepetition Lender Adequate Protection Liens") and senior to the Prepetition Liens;

(v)   superpriority administrative expense claims to the extent of any postpetition diminution in value of the Prepetition Lenders' interest in the Collateral resulting from the use, sale or lease by the Debtors of such Prepetition Collateral and/or the imposition of the automatic stay (the "Prepetition Lender Superpriority Claims"), which claims will be junior to the DIP Obligations and be payable from and have recourse to all assets and property of

26

the Debtors; and

(vi)    reasonable access to the Debtors' books and records and such financial reports as are provided to the DIP Agent pursuant to provisions (i) through (iii) above of the Financial Reporting Requirements section.

(the foregoing clauses (i)-(v), the "Adequate Protection Package").

The DIP Orders shall provide that the Debtors' agreement to the Milestones and the Budget shall constitute a component of the Adequate Protection Package.

The Interim DIP Order shall include language providing for the payment of all outstanding fees and expenses referenced in the foregoing clauses (i) and (ii) through and including the Petition Date upon entry of the Interim DIP Order.

For the avoidance of doubt, any and all payments made on account of the Prepetition Obligations to the Prepetition Lenders in connection with the Adequate Protection Package shall be distributed in accordance with the waterfall set forth in the Prepetition Credit Agreement.

|  |  |
|---|---|
| **Marshalling and Waiver of 506(c) and 552(b) Claims:** | The Final DIP Order shall provide that in no event shall the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Lenders, the Prepetition Agent be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral, the Prepetition Collateral, as applicable, and all proceeds shall be received and applied pursuant to the Final DIP Order and the DIP Loan Documents notwithstanding any other agreement or provision to the contrary. |

Upon entry of the Final DIP Order, the Debtors (on behalf of themselves and their estates) shall waive, and shall not assert in the Chapter 11 Cases or any successor cases, (i) any surcharge claim under sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, upon the DIP Collateral, or the Prepetition Collateral and (ii) the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or DIP Collateral.

|  |  |
|---|---|
| **Indemnification:** | The Debtors shall jointly and severally indemnify and hold harmless the DIP Agent, each DIP Lender and each of their affiliates and each of the respective officers, directors, employees, controlling persons, agents, advisors, attorneys and representatives of each (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to any investigation, |

27

litigation or proceeding or the preparation of any defense with respect thereto, arising out of or in connection with or relating to the DIP Facility, the DIP Loan Documents or the transactions contemplated thereby, or any use made or proposed to be made with the DIP Proceeds, whether or not such investigation, litigation or proceeding is brought by any Debtor or any of its subsidiaries, any shareholders or creditors of the foregoing, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby or under the DIP Loan Documents are consummated, except, with respect to any Indemnified Party, to the extent such claim, damage, loss, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's gross negligence or willful misconduct or any of such Indemnified Party's affiliates or their respective principals, directors, officers, employees, representatives, agents, attorneys or third party advisors.  No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except, with respect to any Indemnified Party, to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's gross negligence or willful misconduct or any of such Indemnified Party's affiliates or their respective principals, directors, officers, employees, representatives, agents, attorneys or third party advisors.  In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages.

**Expenses**:

The Borrower and each Guarantor shall jointly and severally pay all (i) reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of (a) the DIP Agent (including (and limited, in the case of counsel, to) all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of the DIP Agent's outside counsel, DPW and, to the extent necessary, one firm of local counsel engaged by the DIP Agent in connection with the Debtors' Chapter 11 Cases, and any successor counsel to each) and any other professional advisors retained by the DIP Agent at the direction of the Requisite DIP Lenders in their reasonable discretion and (b) the Ad Hoc Group (including (and limited, in the case of counsel,) all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of the Ad Hoc Group's outside counsel, K&S, and, to the extent necessary, one firm of local counsel engaged by the Ad Hoc Group in connection with the Debtors' Chapter 11 Cases) and any other professional advisors retained by the Ad Hoc Group in their reasonable discretion, in the case of each of the foregoing clauses (a) and (b), in connection with the negotiations, preparation, execution and delivery of the DIP Loan Documents and the funding of all DIP Loans under the DIP Facility, including, without limitation, all due diligence, transportation, computer, duplication, messenger, audit, insurance, appraisal, valuation and consultant costs and expenses, and all search, filing and recording fees, incurred or sustained by the DIP Agent and the Ad Hoc Group, and their counsel and professional advisors in connection with the DIP Facility, the DIP Loan Documents or the transactions contemplated thereby, the

administration of the DIP Facility and any amendment or waiver of any provision of the DIP Loan Documents, and (ii) without duplication, reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of the DIP Agent and the Ad Hoc Group (including (and limited, in the case of counsel, to) (x) all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of one firm of outside counsel for the DIP Agent and, to the extent necessary, one firm of local counsel engaged by the DIP Agent in each relevant jurisdiction, and any successor counsel to such primary counsel and local counsel) and (y) all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of one firm of outside counsel for the Ad Hoc Group and, to the extent necessary, one firm of local counsel engaged by the Ad Hoc Group in connection therewith) in connection with (A) the enforcement of any rights and remedies under the DIP Loan Documents, (B) the Chapter 11 Cases, including attendance at all hearings in respect of the Chapter 11 Cases, and (C) defending and prosecuting any actions or proceedings arising out of or relating to the Prepetition Obligations, the DIP Obligations, the Liens securing the Prepetition Obligations and the DIP Obligations, or any transaction related to or arising in connection with the Prepetition Loan Documents, the DIP Credit Agreement or the other DIP Documents (in the case of the Prepetition Obligations and the Liens securing the Prepetition Obligations, to the extent provided in the Prepetition Loan Documents).

| | |
|---|---|
| **Assignments and Participations:** | Prior to the occurrence of an Event of Default, assignments (other than assignments to another DIP Lender or an affiliate of any DIP Lender or an Approved Fund (to be defined)) shall be subject to the consent of the Borrower, which consent shall not be unreasonably withheld, delayed or conditioned; provided, that the consent of the Borrower will be deemed to have been given if the Borrower has not responded within three Business Days of a request for such consent.  Following the occurrence of an Event of Default, no consent of the Borrower shall be required for any assignment. Each DIP Lender shall have the right to sell participations in its DIP Loans, subject to customary voting limitations.  Any assignment by a DIP Lender shall be subject to the terms and conditions of the RSA as long as the RSA is in effect. |
| **Removal of DIP Lenders:** | The Requisite DIP Lenders shall have the right to cause any DIP Lender (under certain situations to be specified in the DIP Credit Agreement) to assign its DIP Loans, DIP Commitment or any other obligations to one or more existing and consenting DIP Lenders. |

| | |
|---|---|
| **Requisite DIP Lenders:** | DIP Lenders holding more than 50.0% of the DIP Commitments, which shall include each of both Brigade and SSIG for so long as such institutions and/or their affiliates are DIP Lenders (the "Requisite DIP Lenders"), except as to matters requiring unanimity under the DIP Credit Agreement (*e.g.*, the reduction of interest rates, the extension of interest payment dates, the reduction of fees, the extension of the maturity of the Borrower's obligations, any change in the superpriority status of the Borrower's and Guarantors' obligations under the DIP Facility and the release of all or substantially all of the DIP Collateral). |
| **Miscellaneous:** | The DIP Credit Agreement will include standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs, payments free and clear of withholding taxes and customary EU bail-in provisions). |
| **Governing Law:** | Except as governed by the Bankruptcy Code, the law of the State of New York. |
| **Counsel to the DIP Agent:** | Davis Polk & Wardwell LLP |
| **Counsel to the Ad Hoc Group:** | King & Spalding LLP |
| **Counsel to the Debtors:** | Weil, Gotshal & Manges LLP |