WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11** |
| **FAIRWAY GROUP HOLDINGS** | : | |
| **CORP.**, *et al.*, | : | **Case No. 20-[_____] (___)** |
| | : | |
| **Debtors.**[1] | : | **(Joint Administration Pending)** |

---------------------------------------------------------------x

## MOTION OF DEBTORS FOR ENTRY OF ORDERS
### (I)(A) APPROVING BIDDING PROCEDURES FOR SALES OF DEBTORS' ASSETS, (B) APPROVING STALKING HORSE BID PROTECTIONS, (C) AUTHORIZING DESIGNATION OF ADDITIONAL STALKING HORSE BIDDERS, (D) SCHEDULING AUCTIONS FOR AND HEARINGS TO APPROVE SALES OF DEBTORS' ASSETS, (E) APPROVING FORM AND MANNER OF NOTICE OF SALES, AUCTIONS, AND SALE HEARINGS, (F) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES AND FORM AND MANNER OF NOTICE OF ASSUMPTION AND ASSIGNMENT, AND (G) GRANTING RELATED RELIEF; AND (II)(A) AUTHORIZING SALE OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Fairway Group Holdings Corp. (2788); Fairway Group Acquisition Company (2860); Fairway Bakery LLC (4129); Fairway Broadway LLC (8591); Fairway Chelsea LLC (0288); Fairway Construction Group, LLC (2741); Fairway Douglaston LLC (2650); Fairway East 86th Street LLC (3822); Fairway eCommerce LLC (3081); Fairway Georgetowne LLC (9609); Fairway Greenwich Street LLC (6422); Fairway Group Central Services LLC (7843); Fairway Group Plainview LLC (8643); Fairway Hudson Yards LLC (9331); Fairway Kips Bay LLC (0791); FN Store LLC (9240); Fairway Paramus LLC (3338); Fairway Pelham LLC (3119); Fairway Pelham Wines & Spirits LLC (3141); Fairway Red Hook LLC (8813); Fairway Stamford LLC (0738); Fairway Stamford Wines & Spirits LLC (3021); Fairway Staten Island LLC (1732); Fairway Uptown LLC (8719); Fairway Westbury LLC (6240); and Fairway Woodland Park LLC (9544). The location of the Debtors' corporate headquarters is 2284 12th Avenue, New York, New York 10027.

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Fairway Group Holdings Corp. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" or "**Fairway**"), respectfully represent as follows in support of this motion (the "**Motion**"):

### Preliminary Statement

1.     The consummation of sale transactions that will maximize value for the Debtors' estates and preserve as many jobs of the Debtors' employees as possible is the cornerstone of the Debtors' chapter 11 strategy.  The Debtors are seeking to sell substantially all of their assets (the "**Assets**"), which consist primarily of the grocery stores, cafes, and beer, wine, and liquor stores (collectively, the "**Stores**") and an approximately 240,000 square foot production and distribution facility (the "**PDC**"), and related leasehold interests, inventory, intellectual property, prepaid expenses, and other assets.  To that end, the Debtors have secured a stalking horse bid (the "**Stalking Horse Bid**") from Village Super Market, Inc. (the "**Stalking Horse Bidder**") for the sale of five (5) Stores, the PDC, and other assets for an aggregate purchase price of approximately $70 million in cash plus assumption of certain liabilities under the Stalking Horse Agreement.  The asset purchase agreement with the Stalking Horse Bidder is annexed hereto as **Exhibit C** (the "**Stalking Horse Agreement**").

2.     The Stalking Horse Agreement is the product of the Debtors' and their advisors' extensive prepetition marketing efforts.  Given the exigencies of the Debtors' financial condition, the milestones set forth under the Debtors' DIP Facility, and the conditions to closing the Sale Transaction contemplated by the Stalking Horse Agreement, the timely sale of substantially all of the Debtors' assets (collectively, the "**Assets**"), in accordance with the sale process outlined in this Motion, is the best way to avoid a fire-sale liquidation of the Debtors'

2

estates. Liquidation would be a worst-case scenario for all of the Debtors' economic stakeholders, including for thousands of Fairway employees.

3.     Accordingly, in consultation with the Ad Hoc Group (as defined herein), the Debtors have developed bidding and auction procedures to govern the sale of the Assets (the "**Bidding Procedures**"), attached as **Exhibit 1** to the Bidding Procedures Order (as defined herein). The Bidding Procedures allow interested parties to submit bids for (a) all of the Assets in the Stalking Horse Bid (such "**Acquired Assets**" together with the Transferred Contracts (as defined herein), the "**Stalking Horse Package**"); (b) certain individual Assets or combinations of Assets included in the Stalking Horse Package; or (c) Assets not included in the Stalking Horse Package (the "**Other Assets**"), in each case, subject to the terms and provisions of the Bidding Procedures.

4.     The Bidding Procedures were designed with the objective of generating the greatest level of interest in and best value for the Assets while affording the Debtors maximum flexibility to execute asset sales as quickly and efficiently as possible. The Debtors are confident that the Bidding Procedures and the other relief requested herein will facilitate the sale of the Assets for the highest or otherwise best value, preserve as many jobs as possible for their dedicated employees, and maximize recoveries.

**Background**

5.     On the date hereof (the "**Commencement Date**"), the Debtors each commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Court**"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

3

Code. No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

6.    Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

7.    The Debtors commenced these chapter 11 cases with the support of an ad hoc group of Prepetition Lenders (the "**Ad Hoc Group**") holding over 91% of all outstanding obligations of the Debtors under the Prepetition Credit Agreement (and in excess of 66.67% of each tranche of debt thereunder). On January 23, 2020, the Debtors executed a restructuring support agreement (the "**RSA**") with members of the Ad Hoc Group, pursuant to which the members of the Ad Hoc Group agreed to support a chapter 11 plan. The Ad Hoc Group also supports the Debtors' marketing and sale process for all or substantially all of their assets, and has committed to provide the Debtors with up to $25 million of debtor-in-possession financing to finance these chapter 11 cases and the sale process.

8.    Information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the declarations of Michael Nowlan and Abel Porter pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York, sworn to on the date hereof (together, the "**First Day Declarations**"), which have been filed with the Court contemporaneously herewith and are incorporated by reference herein.

## Jurisdiction

9.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012

4

(Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before

the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Relief Requested**

10.     By this Motion, pursuant to sections 105(a), 363, and 365 of the Bankruptcy

Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014, and Rules 6004-1, 6005-1, and

6006-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"),

and the *Amended Sale Guidelines for the Conduct of Assets Sales Established and Adopted by the*

*United States Bankruptcy Court for the Southern District of New York*, the Debtors request entry

of:

(a)     the "**Bidding Procedures Order**," substantially in the form annexed hereto as
**Exhibit A**,[2]

   (i)     authorizing and approving the Bidding Procedures attached to the Bidding
Procedures Order as **Exhibit 1**, in connection with the sale of the Assets
(each transaction, a "**Sale Transaction**");

   (ii)    approving Stalking Horse Bid Protections (as defined below) for the
Stalking Horse Bidder in accordance with the terms and conditions set forth
in the Stalking Horse Agreement and the Bidding Procedures;

   (iii)   authorizing the Debtors to designate one or more additional stalking horse
bidders (each, an "**Additional Stalking Horse Bidder**" and, each such
bidder's bid, an "**Additional Stalking Horse Bid**") for one or more of the
Other Assets (each such group of Other Assets, an "**Additional Stalking
Horse Package**") and offer each such Additional Stalking Horse Bidder
certain bid protections (collectively, the "**Additional Stalking Horse Bid
Protections**");

   (iv)    scheduling auctions of the Assets (each, an "**Auction**");

   (v)     scheduling hearings (each, a "**Sale Hearing**") to consider approval of the
proposed Sale Transactions;

   (vi)    authorizing and approving (1) notice of the sale of Assets, the Auctions, and
the Sale Hearings, substantially in the form attached to the Bidding

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms
in the Bidding Procedures Order, the Bidding Procedures, and/or the First Day Declarations, as applicable.

5

Procedures Order as **Exhibit 2** (the "**Sale Notice**"); and (2) notice to each relevant non-Debtor counterparty (each, a "**Counterparty**") to an executory contract or unexpired non-residential real property lease (collectively, the "**Contracts**" and **Leases**," respectively) regarding the Debtors' potential assumption and assignment of their Contracts or Leases and of the Debtors' calculation of the amount necessary to cure any defaults thereunder (the "**Cure Costs**"), substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "**Assumption and Assignment Notice**");

(vii)   authorizing and approving procedures for the assumption and assignment of Contracts and Leases and determination of Cure Costs with respect thereto (collectively, the "**Assumption and Assignment Procedures**"); and

(viii)   granting related relief; and

(b)   one or more orders (each, a "**Sale Order**") authorizing and approving the following:

(i)   the sale of Assets free and clear of all liens, claims, interests, and encumbrances, except certain permitted encumbrances as determined by the Debtors and any purchaser of the Assets, with liens to attach to the proceeds of the applicable Sale Transactions;[3]

(ii)   the assumption and assignment of proposed assumed Contracts and Leases (collectively, the "**Proposed Assumed Contracts**") in connection with the Sale Transactions; and

(iii)   granting related relief;

in each case subject to the Debtors' debtor-in-possession financing facility and the interim and final orders with respect thereto (the "**DIP Orders**").

### Prepetition Marketing and Sale Process[4]

11.   In May 2019, the Debtors initiated a comprehensive marketing process to sell the Company's Stores and related assets as going concerns or to consummate another strategic,

---

[3] A proposed form of Sale Order authorizing and approving, among other things, the sale of the Stalking Horse Package to the Stalking Horse Bidder, should the Stalking Horse Bidder be declared the Successful Bidder (as defined herein) for the Stalking Horse Package in accordance with the Bidding Procedures, is annexed hereto as **Exhibit B**.

[4] A more detailed description of the Debtors' and Solomon's prepetition marketing and sale efforts is set forth in a declaration of Scott Moses, a Managing Director of Solomon, annexed hereto as **Exhibit D** (the "**Moses Declaration**").

value-maximizing transaction that would resolve the Company's operational and financial challenges. To that end, the Company retained PJ Solomon, L.P. ("**Solomon**") to serve as its investment banker and to design and execute an "M&A" process. Solomon solicited interest from parties in consummating a strategic transaction with the Company through a sale. Solomon contacted eighty-two (82) entities, including twenty-six (26) potential strategic buyers. Based on responses from those entities, Solomon provided forty (40) parties with a confidential information memorandum containing confidential information regarding the Company's businesses. Of those parties, five (5), including the Stalking Horse Bidder, expressed serious interest in consummating a transaction with the Company and were granted access to a data room containing additional confidential information regarding the Assets.

12.    By the end of December 16, 2019, the Company had received two (2) bids for overlapping and non-overlapping Assets, including certain of the Core and Non-Core Stores, the PDC, related inventory, and other real and personal property.

13.    After extensive deliberations with its advisors and members of the Ad Hoc Group and several rounds of negotiations with bidders, the Company elected to pursue the Stalking Horse Bid for the sale of the Stalking Horse Package. In reaching the decision to proceed with the Stalking Horse Bid, the Company determined that, of all the bids received by the Company before it became necessary to execute a binding asset purchase agreement, the Stalking Horse Bid offered a combination of the best value for the Stalking Horse Package and the greatest level of deal certainty.

14.    Based on the value already conferred on the Debtors' estates by the Stalking Horse Bid, and the continued interest expressed by other prospective bidders in participating in the Auction, the Debtors believe that the sale process will allow them to maximize value for their

estates for the benefit of their stakeholders.  Additionally, the marketing process for the Debtors'

Assets has been, and is expected to remain, comprehensive and vibrant.  The Debtors are

continuing their discussions with certain bidders who have expressed interest in the Assets,

including the leasehold interests and all other related assets for the Stores not included in the

Stalking Horse Bid.

### Need for a Timely Sale Process

15.     Appreciating their challenging financial condition and the tight timeline that

likely would govern the postpetition sale process under the Debtors' DIP Financing, the Debtors

accomplished as much as possible prior to the commencement of these cases.  With the Stalking

Horse Bid in place, the Debtors are prepared to execute the last leg of their sale process, which

will include a postpetition marketing campaign, consistent with the terms of the Stalking Horse

Agreement and the Bidding Procedures.

16.     Contemporaneously herewith, the Debtors have filed a motion seeking

approval of a DIP Facility provided by the Ad Hoc Group.  Although the Debtors expect that

access to the DIP Financing, together with the use of cash collateral, will provide them with

sufficient runway to consummate value-maximizing Sale Transactions for substantially all of their

Assets, it cannot be overemphasized that time is of the essence.  Given the significant costs

associated with the ongoing operations of the Debtors' businesses and the Debtors' current

financial condition, the Ad Hoc Group has established strict milestones (the "**Milestones**")[5] for

the Debtors' sale process.  Specifically, the Debtors and the DIP Lenders have agreed to the

following Milestones:

---

[5] In the event of any inconsistencies between the provisions of the DIP Documents and the general description of the Milestones in this Motion, the DIP Documents shall control.

8

| | |
|---|---|
| **Prior to Commencement Date** | Debtors shall have entered into a Stalking Horse Agreement for sale of substantial portion of Debtors' assets |
| **No later than two (2) days after Commencement Date** | Debtors shall file Motion requesting (i) order approving Bidding Procedures and authorizing Stalking Horse Bid Protections, and (ii) order approving sale of Debtors' assets to highest and best bidder for Debtors' assets, including through Stalking Horse Agreement |
| **No later than twenty-five (25) days after Commencement Date** | Debtors shall have obtained entry of Bidding Procedures Order |
| **No later than fifty (50) days after Commencement Date** | Bankruptcy Court shall have entered Sale Order approving winning bid to Stalking Horse Bid (if no Auction held); or |
| **No later than fifty-five (55) days after Commencement Date** | Debtors shall complete Auction for substantially all assets in accordance with Bidding Procedures (other than Stalking Horse Package if no other Qualified Bids received) |
| **No later than sixty-five (65) days after the Commencement Date** | Debtors shall have consummated sale to Stalking Horse Bidder (if no Auction held) |
| **No later than sixty-eight (68) days after Commencement Date** | Bankruptcy Court shall have entered Sale Order(s) approving winning bid(s) resulting from Auction(s) |
| **No Later than seventy (70) days after Commencement Date** | Debtors shall have consummated sale(s) of Stalking Horse Package to winning bidder(s) at Auction(s) |

17.     Access to the DIP Facility and cash collateral is critical to the Debtors' ability to continue their operations and manage their bankruptcy estates through the conclusion of the sale process.  Failure to adhere to the Milestones could jeopardize the Debtors' access to cash under the DIP Facility and, in turn, compromise the Debtors' chapter 11 strategy and ability to maximize recoveries for creditors.  In light of the foregoing, the Debtors believe that the proposed timeline is both reasonable and necessary under the circumstances of these chapter 11 cases.

WEIL:\97276692\10\44444.0008

### Stalking Horse Agreement

18.     The Stalking Horse Agreement represents a binding bid for five (5) Stores,[6] the PDC, prepaid expenses, related inventory, furniture, fixtures, and equipment, intellectual property, and other assets for a total consideration of (a) cash in the amount of approximately $70 million, plus the costs to cure prepetition defaults under the Contracts and Leases assumed and assigned to the Stalking Horse Bidder (the "**Transferred Contracts**"), subject to certain adjustments and prorations under the Stalking Horse Agreement, and (b) the Stalking Horse Bidder's assumption of certain liabilities under the Stalking Horse Agreement.

19.     The assets proposed to be purchased include the Transferred Contracts.  In the event that the sale to the Stalking Horse Bidder is consummated, the Debtors would assume and assign the Transferred Contracts to the Stalking Horse Bidder.  The Stalking Horse Bidder is responsible for paying any Cure Costs related to the assumption and assignment of the Transferred Contracts (limited to one month of prepetition rent with respect to Leases).

20.     By this Motion, the Debtors request authority to provide the Stalking Horse Bidder with standard Stalking Horse Bid Protections.  In particular, the Stalking Horse Agreement provides for the payment of a break-up fee in an amount equal to three percent (3%) of the Cash Purchase Price (the "**Termination Payment**") as an administrative expense that will be included in the "Carve-Out" (as defined in the DIP Orders) in the event that the Stalking Horse Bid is not selected or the Debtors consummate one or more Sale Transactions for the Assets in the Stalking Horse Package with one or more other bidders.  The Bidding Procedures also establish bidding requirements and provide that if the Stalking Horse Bidder bids on the Stalking Horse Package at

---

[6] The Stores included in the Stalking Horse Package include the Upper West Side, Upper East Side, Kips Bay, Chelsea, and Harlem, New York Stores (each reflected on **Schedule 1** to the Bidding Procedures).

WEIL:\97276692\10\44444.0008

the Auction, the Stalking Horse Bidder will be entitled to a credit in the amount of its Termination

Payment against the increased purchase price for the Stalking Horse Package (the Termination

Payment and the other bid protections described in this paragraph collectively are referred to as

the "**Stalking Horse Bid Protections**").

21.      In the event it is not the winning bidder at the Auction, as described in more

detail below, the Stalking Horse Bidder has agreed to act as a "Back-up Bidder" and, as such, hold

open its binding offer to purchase the Acquired Assets for forty-five (45) days after the Auction in

case the winning bid at the Auction is not consummated.

22.      The Stalking Horse Agreement includes various customary representations,

warranties, and covenants by and from the Debtors and the Stalking Horse Bidder (together, the

"**Parties**"), as well as certain conditions to closing the contemplated Sale Transaction and rights

of termination related to the Debtors' chapter 11 cases.  The transactions contemplated by the

Stalking Horse Agreement are subject to approval by the Court and entry of the Bidding

Procedures Order and the Sale Order.

23.      The following chart describes certain and material terms in the Stalking

Horse Agreement:

| **MATERIAL TERMS OF THE STALKING HORSE AGREEMENT**[7] |
|---|
| **Acquired Assets; Excluded Assets; Transferred Contracts** | Acquired Assets is defined in <u>Section 1.1</u> of the Stalking Horse Agreement and includes, among other things, all Inventory, Furnishings and Equipment, Assumed Leases, rights under the Transferred Contracts, Sellers' security deposits (excluding adequate assurance deposits), Modified Labor Agreement(s) (to the extent an agreement is reach with the Unions), Permits, and intellectual property, including the Fairway and Fairway Markets trademarks.<br><br>Buyer may remove the Leases for the Harlem Store, the Chelsea Store, and/or the PDC from the list of Assumed Leases at any time prior to the later of the date that |

---

[7] In the event of any inconsistencies between the provisions of the Stalking Horse Agreement and the general description of such agreement in this Motion, the Stalking Horse Agreement shall control.

11

| | |
|---|---|
| | is (i) forty-five (45) days from the date of execution of the Stalking Horse Agreement and (ii) two (2) days prior to the date of the Auction, if any. |
| | Buyer may add or remove Contracts from the list of Transferred Contracts under the Stalking Horse Agreement at any time prior to five (5) days prior to the Auction, if any, or ten (10) days prior to the Sale Hearing, if no Auction is held. |
| | In the event Buyer elects to remove the Leases for the Chelsea Store, the Harlem Store, and/or the PDC from the list of Assumed Leases in accordance with the Stalking Horse Agreement, the Sellers may elect to deem the related assets attributable to such removed Location(s) as Excluded Assets and decrease the Cash Purchase Price accordingly. |
| **Closing and Other Deadlines** | As set forth in <u>Section 2.4</u> of the Stalking Horse Agreement, the Closing shall take place as soon as reasonably practicable, and in no event later than three (3) Business Days following the date upon which the last to be satisfied or waived of each of the conditions set forth in <u>Article VII</u> of the Stalking Horse Agreement (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions) shall have been satisfied or waived in accordance with the Stalking Horse Agreement. |
| **Termination** | <u>Section 8.1(b)</u> of the Stalking Horse Agreement provides that the Parties may terminate the Stalking Horse Agreement at any time prior to the Closing under the following conditions:

(i) by the mutual written consent of the Parties;

(ii) by any Party giving written notice to the other Parties if:

     (a) any court or other governmental authority has taken action to permanently prohibit the consummation of the Sale Transaction contemplated by the Stalking Horse Agreement (unless caused by the Buyer's failure to fulfill its obligations thereunder); or

     (b) the Closing shall not have occurred prior to April 30, 2020 (the "Outside Date"); provided that if the Closing shall not have occurred on or before the Outside Date due to a material breach of the Stalking Horse Agreement by Buyer or Sellers, then the breaching Party may not terminate for such reason;

(iii) by Buyer giving written notice to each Seller that there has been a breach by any Seller of the Stalking Horse Agreement that has prevented the satisfaction of specified closing conditions;

(iv) by any Seller by giving written notice to Buyer and the other Sellers if there has been a breach by Buyer of the Stalking Horse Agreement that has prevented the satisfaction of the specified closing conditions; and

(v) by either party if (1) (x) Sellers enter into a definitive agreement with respect to a Competing Bid, (y) the Bankruptcy Court enters an order approving a Competing Bid, and (z) the Person making the Competing Bid consummates the Competing Bid, or (2) the Bankruptcy Court enters an order that precludes the |

12

| | consummation of the Sale Transaction, subject to Buyer's right to payment of the Termination Payment, if applicable. |
|---|---|
| | If any Party validly terminates the Stalking Horse Agreement, subject to certain exceptions, all rights and obligations of the Parties shall terminate upon such termination and shall become null and void, and no Party shall have any Liability (except as set forth in <u>Section 8.3</u> of the Stalking Horse Agreement) to the other Party thereunder, except for any breach occurring prior to any such termination (but solely to the extent such breach was willful, or intentionally fraudulent); provided, further, that the maximum Liability of Sellers under the Stalking Horse Agreement shall not exceed the amount of the Termination Payment. |
| **Casualty and Condemnation** | If prior to the Closing any Acquired Assets (excluding inventory), any Store or the PDC is damaged or destroyed, and the amount required to repair, restore or reconstruct such damage is greater than $750,000, the Cash Purchase Price will be reduced by amount of damages and Buyer will retain the damaged asset (with Sellers retaining the right to any insurance proceeds).

If any property on which a Store (except for the Broadway Store and the 86th Street Stores) is located is subject to a taking or condemnation which materially interferes with Buyer's ability to operate the applicable Store or the PDC, Buyer may elect to not purchase such Store or the PDC and the Cash Purchase Price will be reduced by the amount allocated to the PDC or the Store, as applicable.

If (a) the Broadway Store or the 86th Street Store is damaged or destroyed and the amount required to repair, restore, or reconstruct such Store is greater than $4,000,000 or (b) the property which such Store is located is condemned and such condemnation is reasonably expected to have a material adverse impact on Buyer's ability to operate the Store, then Buyer will have the right to terminate the Stalking Horse Agreement with no penalty. |
| **Back-Up Bidder** | In the event that the Buyer is not the winning bidder at Auction, if and only if (i) Buyer submits the second highest or best bid at the Auction for the Acquired Assets which is memorialized by an acceptable agreement incorporating terms established at the Auction, or the terms of the Stalking Horse Agreement constitute the second highest or best bid for the Stalking Horse Package and (ii) the Seller provides written notice to Buyer on or before the Back-Up Termination Date that Sellers (A) failed to consummate the sale of the Acquired Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder, Buyer shall promptly consummate the transactions contemplated by the Stalking Horse Agreement upon the terms and conditions as set forth therein, including the Purchase Price, as the same may be increased by Buyer at the Auction. |
| **Treatment of Labor Agreements** | With respect to Covered Employees under an Affected Labor Agreement, Buyer shall engage in good faith negotiations, in coordination with Sellers, to reach mutually satisfactory modifications to the relevant Affected Labor Agreement with each of the Affected Unions and to enter into a Modified Labor Agreement with each of the Affected Unions. Under the Stalking Horse Agreement, Sellers consent to Buyer having direct conversations and negotiations, not including Sellers, with each of the Affected Unions concerning the terms and conditions of a Modified Labor Agreement; <u>provided that</u> Buyer shall provide reasonably |

13

|  | advance notice to Sellers in advance of any direct conversations and negotiations with the Affected Unions and Buyer shall keep Sellers apprised of the status of such negotiations and developments as promptly as practicable. Such Modified Labor Agreement shall constitute a Transferred Contract. Buyer, in coordination with Sellers, shall propose a Modified Labor Agreement to each Affected Union (each, a "<u>Proposal</u>"), which Proposal may be modified as a result of Buyer's and/or Sellers' good faith negotiations with the Affected Unions. Buyer agrees to cooperate with Sellers in providing each Affected Union with complete and reliable information to allow the Affected Unions to evaluate the Proposal. For all purposes under <u>Section 6.3</u> of the Stalking Horse Agreement, Buyer acknowledges the requirements of sections 1113 and 1114 of the Bankruptcy Code and agrees to use good faith reasonable best efforts to cooperate with Sellers in ensuring compliance with any applicable provisions thereof. |
|---|---|

24.     Importantly, the Stalking Horse Bidder has agreed to interview and extend offers of employment to substantially all of the Covered Employees (as defined in the Stalking Horse Agreement) employed at the Stores and at least fifty percent (50%) of the Covered Employees employed at the PDC (over 400 employees), at the same location of employment as the Covered Employees' location of employment and on the same terms and conditions of employment (as modified by a Modified Labor Agreement) as those immediately prior to Closing.

## **Designation of Additional Stalking Horse Bidders**

25.     Based on the progress achieved thus far in the Debtors' marketing process, and on the advice and counsel of Solomon and the Debtors' other advisors, the Debtors have determined, in their reasonable business judgment, that having the flexibility to designate Additional Stalking Horse Bidders for certain of the Other Assets will enhance the Debtors' ability to maximize value of the Debtors' Assets and is in the best interests of their estates.

26.     Accordingly, as set forth in further detail in the Bidding Procedures, the Debtors request authority to enter into asset purchase agreements with Additional Stalking Horse Bidders (each such agreement, an "**Additional Stalking Horse Agreement**"), pursuant to which the Debtors would provide Additional Stalking Horse Bidders with Additional Stalking Horse Bid Protections where the Debtors determine, in the exercise of their reasonable business judgment,

14

that setting a floor for certain Other Assets is in the best interests of their estates and creditors. Specifically, the Debtors propose to offer each Additional Stalking Horse Bidder a break-up fee in an amount that shall not exceed three percent (3%) of the cash portion of the purchase price in the applicable Additional Stalking Horse Bid (an "**Additional Termination Payment**"), subject to notice and an opportunity for parties in interest to object.   In accordance with the noticing procedures outlined below (the "**Noticing Procedures**"), upon the designation of an Additional Stalking Horse Bidder, the Debtors either will include in the Sale Notice the material terms of the applicable Additional Stalking Horse Agreement, or shall file with the Court, serve on the Sale Notice Parties (as identified and defined herein), and cause to be published on the website maintained by Omni Agent Solutions, the Debtors' claims and noticing agent in these chapter 11 cases, located at www.omniagentsolutions.com/Fairway (the "**Omni Website**"), an addendum to the Sale Notice containing such information (each, a "**Additional Stalking Horse Notice**").

27.    Parties in interest who wish to object to the provision of an Additional Termination Payment will be afforded an opportunity to file with the Court and serve on the applicable Objection Recipients (as identified and defined in the Bidding Procedures), an objection (each, a "**Bid Protection Objection**") within seven (7) calendar days after service of the Sale Notice or relevant Additional Stalking Horse Notice, as applicable.  If a timely Bid Protection Objection is filed, the Proposed Additional Termination Payment will not be approved until either the Bid Protection Objection is resolved or it has been approved upon further order of the Court. Under the Bidding Procedures, in the absence of a Bid Protection Objection, the Debtors' entry into the applicable Additional Stalking Horse Agreement and provision of the Additional Stalking Horse Bid Protections, including the Additional Termination Payment, will be made effective through entry of a Court order, which the Debtors may obtain upon notice of presentment.

WEIL:\97276692\10\44444.0008

28.    Given the urgency of the Debtors' need to maximize value for creditors through timely and efficient Sale Transactions, the ability to designate Additional Stalking Horse Bidders and offer such bidders Additional Stalking Horse Bid Protections is justified and appropriate.

**Bidding Procedures**

**A.    Overview**

29.    The Bidding Procedures are designed to promote a competitive and expedient sale process.  The Bidding Procedures describe, among other things, procedures for parties to access due diligence, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of the Auction (if any), the selection and approval of the ultimately successful bidder, and the deadlines with respect to the foregoing Bidding Procedures.  If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest or best offer for the Assets on a schedule consistent with the Milestones, the deadlines under the Stalking Horse Agreement, and the Debtors' chapter 11 strategy.

30.    As the Bidding Procedures are attached to the Bidding Procedures Order, they are not herein restated in their entirety.  The Debtors will have the ability to alter the Bidding Procedures based on the exigencies of a given situation if the Debtors determine, in their business judgment, in a manner consistent with their fiduciary duties and applicable law, and in consultation with the Consultation Parties (as defined in the Bidding Procedures), that it is reasonable to do so.

**B.    Key Dates and Deadlines**

31.    Consistent with the Milestones and the Debtors' need to consummate a sales of their Assets as quickly and efficiently as possible, the Debtors propose the following key dates and deadlines for the sale process:

16

| **February 13, 2020** | Hearing to consider approval of Bidding Procedures and entry of Bidding Procedures Order |
|---|---|
| **February 28, 2020 at 4:00 p.m. (Eastern Time)** | Sale Objection Deadline for (i) sale of Stalking Horse Package to Stalking Horse Bidder pursuant to Stalking Horse Agreement and (ii) assumption and assignment of Initial Transferred Contracts to Stalking Horse Bidder |
| **February 28, 2020 at 4:00 p.m. (Eastern Time)** | Global Bid Deadline |
| **March 6, 2020 at 11:59 p.m. (Eastern Time)** | Qualified Bid and Baseline Bid Designation Date for Stalking Horse Package |
| **March 9, 2020 at 11:59 p.m. (Eastern Time)** | Qualified Bid and Baseline Bid Designation Date for Other Assets |
| **March 10, 2020** | (i) Auction for Stalking Horse Package (if other Qualified Bids received for Stalking Horse Package); or

(ii) Sale Hearing for sale of Stalking Horse Package to Stalking Horse Bidder (if no other Qualified Bids received for Stalking Horse Package) |
| **March 11, 2020** | Auction for Other Assets |
| **March 19, 2020 at 4:00 p.m. (Eastern Time)** | Sale Objection Deadline for sale of Stalking Horse Package if Auction held (if Successful Bidder is not Stalking Horse Bidder or additional Proposed Assumed Contracts added at Auction); and

Sale Objection Deadline for sale of Other Assets to Successful Bidder |
| **March 26, 2020** | Sale Hearing for (i) Stalking Horse Package, if Auction held, and (ii) Other Assets |

32.     The time periods set forth in the Bidding Procedures are reasonable.  Under the proposed timeline, there will be thirty-six (36) days between the filing of this Motion and the Sale Objection Deadline (with respect to the sale of the Stalking Horse Package to the Stalking Horse Bidder with no Auction) and the deadline for the submission of any and all bids, February 28, 2020 at 4:00 p.m. (the "**Global Bid Deadline**").  This period will provide parties with sufficient time to formulate bids to purchase any Locations.  The Debtors' businesses have been extensively

17

marketed, and information regarding the Debtors' business has been made available in an electronic data room during the process. As such, many parties that may have an interest in bidding at the Auction likely have already conducted diligence and evaluated the Debtors' businesses and will not be bidding in a vacuum. In addition, potential bidders who have not previously conducted diligence on the Debtors' businesses will have immediate access to, subject to the execution of an appropriate confidentiality agreement, a substantial body of information regarding the Locations, including information gathered based upon specific due diligence requests of the Stalking Horse Bidder and other bidders.

### C.    Noticing Procedures

33.    The Bidding Procedures provide for the following Noticing Procedures:

(a)    <u>Sale Notice</u>. Within two (2) business days after entry of the Bidding Procedures Order, the Debtors will file with the Bankruptcy Court, serve on the Sale Notice Parties, and cause to be published on the Omni Website the Sale Notice, which will set forth (i) a complete list and general description of the Assets for sale; (ii) the date, time, and place of (1) the Auctions and (2) the Sale Hearings; (iii) the Sale Objection Deadlines; and (iv) the procedures for filing Sale Objections (as defined herein).

(b)    <u>Sale Notice Parties</u>. The "**Sale Notice Parties**" shall include the following parties:

(i)    counsel to the Stalking Horse Bidder;

(ii)    the Consultation Parties (as applicable);

(iii)    all persons and entities, known by the Debtors and their advisors, to have expressed an interest in a transaction with respect to any of the Debtors' Assets during the past twelve (12) months;

(iv)    all persons and entities known by the Debtors to have asserted any lien, claim, encumbrance, or other interest in any Asset (for whom identifying information and addresses are available to the Debtors);

(v)    all Counterparties to Proposed Assumed Contracts under the applicable proposed Sale Transaction(s);

(vi)    any Governmental Authority known to have a claim in these chapter 11 cases;

18

(vii)    the United States Attorney for the Southern District of New York;

(viii)   the Office of the Attorney General in each state which the Debtors operate;

(ix)     the Office of the Secretary of State in each state in which the Debtors operate or are organized;

(x)      all of the multiemployer pension plans to which any of the Debtors is a contributing employer and all of the single employer defined benefit plans to which any Debtor is a contributor;

(xi)     the Unions;

(xii)    the Federal Trade Commission;

(xiii)   the United States Attorney General/Antitrust Division of Department of Justice;

(xiv)    all of the Debtors' known creditors (for whom identifying information and addresses are available to the Debtors);

(xv)     all applicable local environmental enforcement agencies;

(xvi)    the United States Environmental Protection Agency; and

(xvii)   all other Persons directed by the Court (for whom identifying information and addresses are available to the Debtors).

(c)   <u>Designation of Additional Stalking Horse Bidders</u>.  In the event that the Debtors determine to designate an Additional Stalking Horse Bidder, the Debtors either shall include in the Sale Notice the material terms of the applicable Additional Stalking Horse Agreement, including the terms and conditions regarding any Additional Stalking Horse Bid Protections, or shall file with the Bankruptcy Court, serve on the Sale Notice Parties, and cause to be published on the Omni Website an Additional Stalking Horse Notice containing such information, including whether bidders may submit Partial Bids on any Other Assets included in an Additional Stalking Horse Package.

(d)   <u>Publication Notice</u>.  Within five (5) business days after entry of the Bidding Procedures Order, the Debtors will cause the information contained in the Sale Notice to be published once in the national edition of *USA Today* and once in the *New York Times*.

(e)   <u>Selection of Qualified Bids</u>.  The Debtors will make a determination regarding which bids qualify as a Qualified Bid, and will notify Prospective Bidders whether they have been selected as Qualified Bidders by no later than the applicable Qualified Bid Designation Date.

19

(f)     Notice of Hearing if Auction Not Held.

(i)     Stalking Horse Package and Additional Stalking Horse Packages.  With respect to the Stalking Horse Package, if no Qualified Bid other than the Stalking Horse Bid is received by the Global Bid Deadline, the Debtors will not conduct the Auction for the Stalking Horse Package, and will file with the Bankruptcy Court, serve on the Sale Notice Parties, and cause to be published on the Omni Website a notice (1) indicating that the Auction for the Stalking Horse Package has been canceled, (2) indicating that the Stalking Horse Bidder is the Successful Bidder with respect to the Stalking Horse Package, and (3) setting forth the date and time of the applicable Sale Hearing.  The same procedures shall apply with respect to any Additional Stalking Horse Package for which the Debtors do not receive a timely Qualified Bid other than the applicable Additional Stalking Horse Bid.

(ii)    Other Assets Not Included in an Additional Stalking Horse Bid.  With respect to Other Assets not included in an Additional Stalking Horse Package, if only one Qualified Bid is received in respect of such assets by the Global Bid Deadline, the Debtors may, but shall not be required to, after consulting with the Consultation Parties, determine to consummate a Sale Transaction with the applicable Qualified Bidder, and shall file with the Bankruptcy Court, serve on the Sale Notice Parties, and cause to be published on the Omni Website a notice (1) identifying the Qualified Bidder, (2) setting forth the terms of the Qualified Bid, and (3) setting forth the date and time of the applicable Sale Hearing.

(g)     Notice of Auction Results.  The Debtors will use commercially reasonable efforts to, within two (2) business days after the conclusion of the Auction, or as soon as reasonably practicable thereafter, file with the Court, serve on the Sale Notice Parties (including each Counterparty to a Proposed Assumed Contract in a Successful Bid), and cause to be published on the Omni Website, a notice of the results of the Auction (the "**Notice of Auction Results**"), which shall (1) identify the Successful Bidders and Back-Up Bidders; (2) list all Proposed Assumed Contracts in the Successful Bids and Back-Up Bids; (3) identify any known proposed assignee(s) of Proposed Assumed Contracts (if different from the applicable Successful Bidder); and (4) set forth the deadline and procedures for filing Adequate Assurance Objections (as defined herein) and other Sale Objections in response to the Notice of Auction Results.

(h)     Objection Deadline for Sale Transactions.  The Bidding Procedures Order establishes the deadline (the "**Sale Objection Deadline**") to file and serve objections to the sale of Assets and the assumption and assignment of Contracts and Leases (including Cure Objections and Adequate Assurance Objections) to a Successful Bidder as (i) **February 28, 2020 at 4:00 p.m. (Eastern Time)** with respect to the sale of any of the Acquired Assets, and assumption and assignment of any of the Initial Transferred Contracts (as defined herein), to the Stalking Horse Bidder pursuant to the Stalking Horse Agreement; or (ii) **seven (7) calendar days**

20

**after the service of the Additional Stalking Horse Notice, Notice of Auction Results, or Supplemental Assumption and Assignment Notice, as applicable**, providing notice of the proposed sale or assumption or assignment to which the Sale Objection relates (or with respect to Cure Objections related to the proposed Cure Cost of a Proposed Assumed Contract, seven (7) calendar days after the service of the first notice including such Cure Cost for such Contract) with respect to any other Sale Transaction or assumption and assignment.

34.     The Noticing Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including, among other things, the Sale Objection Deadlines, the Global Bid Deadline, and the time and location of the Auctions and the Sale Hearings.  Accordingly, the Debtors request that the Court find that the Noticing Procedures are adequate and appropriate under the circumstances, and comply with the requirements of Bankruptcy Rule 2002.

<u>**Assumption and Assignment Procedures**</u>

35.     In connection with a Sale Transaction, the Debtors may seek to assume and assign to the Successful Bidders (or their designated assignee(s)) certain Contracts and Leases. The Assumption and Assignment Procedures set forth herein are designed to, among other things, govern the Debtors' provision of Adequate Assurance Information (as defined herein) and notice of Cure Costs to relevant Counterparties.   Specifically, the Assumption and Assignment Procedures are as follows:

(a)     <u>Assumption and Assignment Notice</u>.  As soon as practicable, but not later than three (3) calendar days after the entry of this Order, the Debtors shall file with the Court, serve on the Sale Notice Parties, including each applicable Contract Counterparty, and cause to be published on the Omni Website, an initial Assumption and Assignment Notice which shall (a) identify the Transferred Contracts initially designated by the Stalking Horse Bidder for assumption and assignment to the Stalking Horse Bidder (the "**Initial Transferred Contracts**"); (b) list the Debtors' good faith calculation of the Cure Costs with respect to each Initial Transferred Contract; (c) expressly state that assumption or assignment of any Transferred Contact is not guaranteed and is subject to Court approval; (d) direct the non-Debtor Counterparty to relevant publicly available financial information regarding the Stalking Horse Bidder for purposes of demonstrating adequate assurance of future performance by the Stalking Horse Bidder; (e) prominently display the deadline to

21

file a Cure Objection and an Adequate Assurance Objection (each as hereinafter defined); and (f) prominently display the dates, times, and location of the Sale Hearings.

(b)   <u>Designation of Contracts and Leases</u>.

(i)   <u>Stalking Horse Bidder Designation Rights</u>.  Pursuant to the terms of the Stalking Horse Agreement, the Stalking Horse Bidder shall have the right, at any time prior to five (5) calendar days prior to the Auction on the Stalking Horse Package, if any, or ten (10) calendar days prior to the Sale Hearing if no Auction is held, to designate additional Transferred Contracts for proposed assumption and assignment to the Stalking Horse Bidder (each, a "**Supplemental Contract**") or to remove Contracts from the list of Transferred Contracts from proposed assumption and assignment (each, a "**Removed Contract**").  The Debtors shall use commercially reasonable efforts to, as soon as reasonably practicable after the Buyer's designation of any Supplemental Contracts or any Removed Contracts (1) file with the Court, serve by overnight delivery on all applicable Counterparties, and cause to be published on the Omni Website, a notice of proposed assumption and assignment of the Supplemental Contracts (a "**Supplemental Assumption and Assignment Notice**") and/or removal of the Removed Contracts, which shall (A) expressly state that assumption or assignment of the Supplemental Contracts is not guaranteed and subject to Court approval and removal of the Removed Contracts does not constitute a rejection by the Debtors of such Contract, and (B) direct the non-Debtor Counterparty to a Supplemental Contract to relevant publicly available financial information regarding the Stalking Horse Bidder for purposes of demonstrating adequate assurance of future performance by the Stalking Horse Bidder; and (C) prominently display the deadline to file an Adequate Assurance Objection with respect to a Supplemental Contract.

(ii)   <u>Designation Rights of Additional Stalking Horse Bidders and Successful Bidders</u>.  The Debtors will provide Counterparties whose Contracts or Leases may be designated for assumption and assignment by any Additional Stalking Horse Bidder, pursuant to the terms of an applicable Additional Stalking Horse Agreement in a manner consistent with these Assumption and Assignment Procedures, the Bidding Procedures Order, and all applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules. The same procedures will apply with respect to any designation rights of a Successful Bidder pursuant to the terms of an asset purchase agreement executed by the Debtors.

(c)   <u>Auction Results</u>.  The Debtors will use commercially reasonable efforts to, within one (1) calendar day after the conclusion of the Auction, or as soon as reasonably practicable thereafter, file with the Court, serve on the Sale Notice Parties (including each Counterparty to a Proposed Assumed Contract in a Successful Bid), a Notice of Auction Results, which shall (1) identify the Successful Bidders and

22

Back-Up Bidders; (2) list all Proposed Assumed Contracts in the Successful Bids and Back-Up Bids; (3) identify any known proposed assignee(s) of Proposed Assumed Contracts (if different from the applicable Successful Bidder); and (4) set forth the deadlines and procedures for filing Adequate Assurance Objections in response to the Notice of Auction Results.

(d)    Cure Objections.

(i)    Cure Objection Deadlines.  Any Counterparty who wishes to object to the proposed assumption, assignment, or potential designation of their Contract or Lease, the subject of which objection is the Debtors' proposed Cure Costs to cure any outstanding defaults then existing under such contract or lease (a "**Cure Objection**") shall  file with the Court and serve on the Objection Recipients its Cure Objection, which must (1) be in writing; (2) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules; (3) state, with specificity, the legal and factual bases thereof, including the cure amount the Counterparty believes is required to cure defaults under the relevant Contract or Lease; and (4) include any appropriate documentation in support thereof, by no later than the applicable Sale Objection Deadline, which shall be at least seven (7) calendar days after service of such notice, or less in the case of a Supplemental Assumption and Assignment Notice to the extent necessary, but in each case no less than three (3) calendar days before the applicable Sale Hearing.

(ii)    Resolution of Cure Objections.  If a timely Cure Objection cannot otherwise be resolved by the parties prior to the commencement of the applicable Sale Hearing, such objection and all issues of adequate assurance of future performance shall be determined by the Court at the Sale Hearing or at a later hearing on a date to be scheduled.

(iii)    Adjourned Cure Objections.  If a timely Cure Objection is received and such objection cannot otherwise be resolved by the parties, such objection shall be heard at the applicable Sale Hearing; provided that a Cure Objection may, at the Debtors' discretion (after consultation with the Stalking Horse Bidder, an Additional Stalking Horse Bidder (if applicable), or, if an Auction is held, the Successful Bidder), be adjourned to a subsequent hearing if, pending resolution of such Cure Objection (an "**Adjourned Cure Objection**"), the Debtors maintain a cash reserve (a "**Cure Cost Reserve**") equal to the lesser of (1) the amount the objecting Counterparty has asserted to be required to cure the asserted defaults under the applicable Proposed Assumed Contract and (2) such other cash reserve amount as may be ordered by the Court, until a Cure Cost amount is agreed to by the parties or determined by the Court; provided that if the Debtors maintain a letter of credit or similar security deposit for the Debtors' obligations under a Proposed Assumed Contract to a Counterparty asserting a Cure Objection, the Debtors shall not be required to fund a Cure Cost Reserve to the extent of the existing amounts available under such letter of credit or other security

23

deposit maintained by such Counterparty. Notwithstanding the existence of an Adjourned Cure Objection, the Proposed Assumed Contract may be deemed assumed and assigned to the Stalking Horse Bidder, the Additional Stalking Horse Bidder (if applicable), or, if an Auction is held, the Successful Bidder, as of the applicable Closing Date if the Debtors maintain a Cure Cost Reserve.

(iv)    <u>Failure to File Timely Cure Objection</u>. If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Cure Objection, the Counterparty shall be forever barred from asserting any objection with regard to the cost to cure any defaults under the applicable Contract or Lease. The Cure Costs set forth in each Assumption and Assignment Notice shall be controlling and will be the only amount necessary to cure outstanding defaults under the applicable Contract or Lease under Bankruptcy Code section 365(b), notwithstanding anything to the contrary in the Contract or Lease, or any other document, and the Counterparty shall be forever barred from asserting any additional cure or other amounts with respect  to such Contract or Lease against the Debtors, the Successful Bidder, or the property of any of them.

(e)    <u>Adequate Assurance Information</u>. Each Bid (other than the Stalking Horse Bid) must contain such financial and other information that allows the Debtors, after consultation with the Consultation Parties, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the applicable Sale Transaction, including, without limitation, such financial and other information setting forth adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code, and the Potential Bidder's willingness to perform under any contracts that are assumed and assigned to the Potential Bidder (the "**Adequate Assurance Information**").

(i)    <u>Additional Stalking Horse Bidders</u>. If the Debtors designate an Additional Stalking Horse Bidder, the Debtors shall use commercially reasonable efforts to, on the date of service of the Sale Notice or applicable Additional Stalking Horse Notice, as the case may be, or as soon as reasonably practicable thereafter, provide or cause to be provided to Counterparties to any known Proposed Assumed Contracts in the applicable Additional Stalking Horse Bid Adequate Assurance Information for such Additional Stalking Horse Bidder.

If an Additional Stalking Horse Bidder is named a Successful Bidder at the applicable Auction, the Debtors shall, within one (1) calendar day after the conclusion of the Auction (or as soon as reasonably practicable thereafter), provide or cause to be provided to Counterparties to any additional Proposed Assumed Contracts added to the Additional Stalking Horse Bid at the applicable Auction Adequate Assurance Information for the Additional Stalking Horse Bidder.

24

(ii)     <u>Other Successful Bidders</u>.  The Debtors shall, within one (1) calendar day after the conclusion of each Auction (or as soon as reasonably practicable thereafter), provide or cause to be provided to Counterparties to the Proposed Assumed Contracts included in each Successful Bid (other than the Stalking Horse Bid) Adequate Assurance Information for such Successful Bidder.

(iii)    <u>Confidentiality</u>.  Adequate Assurance Information will be provided to affected Counterparties on a strictly confidential basis.  Counterparties shall not use any Adequate Assurance Information for any purpose other than to (1) evaluate whether adequate assurance requirements under Bankruptcy Code section 365(f)(2) and, if applicable, Bankruptcy Code section 365(b)(3), have been satisfied; and (2) to support any Adequate Assurance Objection filed by the Counterparty; <u>provided</u> <u>that</u> any Adequate Assurance Objection that discloses confidential, non-public information included in the Adequate Assurance Information must be filed with the Court under seal unless disclosure of such confidential, non-public information is authorized by the Debtors, the Successful Bidder, and any known proposed assignee(s) of the relevant Contract or Lease (if different from the Successful Bidder), or ordered by the Court.

(f)     <u>Adequate Assurance Objections</u>.

(i)     <u>Adequate Assurance Objection Deadline</u>.  Any Counterparty who wishes to object to the proposed assumption, assignment, or potential designation of their Contract or Lease, the subject of which objection is a Successful Bidder's (including the Stalking Horse Bidder's and any Additional Stalking Horse Bidder's) and/or any of their known proposed assignees' (if different from the Successful Bidder) proposed form of adequate assurance of future performance with respect to such Contract or Lease (an "**Adequate Assurance Objection**"), shall file with the Court and serve on the Objection Notice Parties, including the applicable Successful Bidder and any known proposed assignee of such contract or lease (if different from the Successful Bidder), its Adequate Assurance Objection, which must (1) be in writing; (2) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules; (3) state, with specificity, the legal and factual bases thereof; (4)  include any appropriate documentation in support thereof, by no later than the applicable deadline set forth in the applicable notice, which shall be at least seven (7) calendar days after the filing of such notice, or less in the case of a Supplemental Assumption and Assignment Notice to the extent necessary, but in each case no less than three (3) calendar days before the Sale Hearing.

(ii)    <u>Resolution of Adequate Assurance Objections</u>.  If a timely Adequate Assurance Objection cannot otherwise be resolved by the parties prior to the commencement of the applicable Sale Hearing, such objection and all issues of adequate assurance of future performance shall be determined by the Court at the Sale Hearing or at a later hearing on a date to be scheduled.

25

(iii) <u>Failure to File Timely Adequate Assurance Objection</u>. If a Counterparty fails to file with the Court and serve on the Objection Recipients, including the applicable Successful Bidder and any known proposed assignee of the Contract or Lease (if different from the Successful Bidder), a timely Adequate Assurance Objection, the Counterparty shall be forever barred from asserting any such objection with regard to the relevant Contract or Lease. The Successful Bidder and/or its known proposed assignee of the Contract or Lease shall be deemed to have provided adequate assurance of future performance with respect to the applicable Contract or Lease in accordance with Bankruptcy Code section 365(f)(2)(B) and, if applicable, Bankruptcy Code section 365(b)(3), notwithstanding anything to the contrary in the Contract or Lease or any other document.

(g) <u>Reservation of Rights</u>. The inclusion of a Contract or Lease or Cure Costs with respect thereto on an Assumption and Assignment Notice or the Notice of Auction Results shall not constitute or be deemed a determination or admission by the Debtors, the Successful Bidders, or any other party in interest that such Contract or Lease is an executory contract or unexpired lease within the meaning of the Bankruptcy Code. The Debtors reserve all of their rights, claims, and causes of action with respect to each Contract and Lease listed on an Assumption and Assignment Notice and Notice of Auction Results. The Debtors' inclusion of any Contract or Lease on the Assumption and Assignment Notice or the Notice of Auction Results shall not be a guarantee that such Contract or Lease ultimately will be assumed or assumed and assigned.

## **Extraordinary Provisions Under Local Guidelines**

36. Collectively, the Bidding Procedures and the Stalking Horse Bid contain the following provisions, which the Guidelines for the Conduct of Asset Sales, adopted by General Order M-331, require to be separately disclosed:

(a) <u>Use of Proceeds</u>. Other than payment of a Termination Payment from the proceeds of a Competing Transaction, the Stalking Horse Agreement does not contemplate an allocation of sale proceeds.

(b) <u>Records Retention</u>. As noted above, the Stalking Horse Agreement provides that the Stalking Horse Bidder will acquire the books and records related to the Stalking Horse Package. The Stalking Horse Agreement grants the Debtors reasonable access to such records, and the Debtors will be able to administer their bankruptcy cases, notwithstanding the sale of any books and records.

(c) <u>Requested Findings as to Successor Liability</u>. The Stalking Horse Agreement requires that the Sale Order contain findings of fact and conclusions of law limiting the Stalking Horse Bidder's successor liability.

26

(d)     Requested Findings as to Fraudulent Conveyance or Transfers.  The proposed Sale Orders for the Stalking Horse Bidder contains finding of fact and conclusions of law with respect to the consideration paid and the elements of a fraudulent transfer.

(e)     No Sale Free and Clear of Leases.  The proposed Sale Orders provide that the sales of the Locations will be free and clear of all liens, claims, encumbrances, and other interests except for those Permitted Liens, including leases and subleases, and Assumed Liabilities, as specified in the Stalking Horse Agreement.

(f)     Relief from Bankruptcy Rules 6004(h) and 6006(d).  The Debtors seek relief from the fourteen (14) day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

**Relief Requested Is Warranted
And In Best Interests of Debtors and Economic Stakeholders**

**A.     The Bidding Procedures are Fair and Reasonable**

37.     The Bidding Procedures are designed to promote the paramount goal of any proposed sale of property of a debtor's estate:  maximizing the value of sale proceeds received by the estate.  *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures and bid protections "are important tools to encourage bidding and to maximize the value of the debtor's assets"), *appeal dismissed* 3 F. 3d 49 (2d Cir. 1993); *see also In re Metaldyne Corp.,* 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) ("[b]idder protections are granted when a bidder provides a floor for bidding by expending resources to conduct due diligence and allowing its bid to be shopped around for a higher offer").  Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing value of a debtor's estate.  *See In re Integrated Res. Inc.*, 147 B.R. at 659 (observing that sale procedures "encourage bidding" and "maximize the value of the debtor's assets").

38.     The Bidding Procedures provide for an orderly, uniform, and competitive process through which interested parties may submit offers to purchase the Debtors' Assets.  The Debtors, with the assistance of their advisors, have structured the Bidding Procedures to promote

27

active bidding by interested parties and to reach the highest or otherwise best offer reasonably available for the Debtors' Assets. Additionally, the Bidding Procedures will allow the Debtors to conduct the Auction, if necessary, in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to timely consummate a Sale Transaction. The Bidding Procedures provide the Debtors with an adequate opportunity to consider competing bids and to select the highest or otherwise best offers for the potential completion of a Sale Transaction, while comparing such competing bids against the value of a Reorganization Transaction.

39.     Moreover, an orderly and expeditious sale process is critical to preserve and realize the Debtors' going concern value and maximize recoveries for the Debtors' stakeholders. In formulating the Bidding Procedures, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest and potential bidders with the need to quickly and efficiently run a sale process in parallel with a solicitation process. The Bidding Procedures provide for the marketing of the Debtors' Assets and for the consummation of a Sale Transaction, to the extent such Sale Transaction represents a higher or better value than the Reorganization Transaction.

40.     Courts in this and other districts have approved procedures substantially similar to the proposed Bidding Procedures. *See, e.g., In re Fusion Connect, Inc.*, Case No. 19-11811 (SMB) (Bankr. S.D.N.Y. July 3, 2019) (ECF No. 164); *In re Ditech Holding Corp.,* Case No. 19-10412 (JLG) (Bankr. S.D.N.Y. Apr. 23, 2019) (ECF No. 456); *In re Waypoint Leasing Holdings Ltd.*, Case No. 18-13648 (SMB) (Bankr. S.D.N.Y. Dec. 21, 2018) (ECF No. 159); *In re Sears Holdings Corp.,* Case No. 18-23538 (RDD) (Bankr. S.D.N.Y. Nov. 19, 2018) (ECF No. 816); *In re Cent. Grocers, Inc.* Case No. 17-10993 (LSS) (Bankr. D. Del. June 2, 2017) (ECF No.

28

338); *In re Angelica Corp.*, Case No. 17-10870 (JLG) (Bankr. S.D.N.Y. Apr. 28, 2017) (ECF No.

137); and *In re Aéropostale, Inc.*, Case No. 16-11275 (SHL) (Bankr. S.D.N.Y. Jul. 29, 2016) (ECF

No. 527); *In re The Great Atl. & Pac. Tea Co., Inc.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y.

Aug. 11, 2015) (ECF No. 495).  Accordingly, the Bidding Procedures should be approved.

### B.    The Stalking Horse Bid Protections are Reasonable and Appropriate

41.    The Bidding Procedures allow the Debtors to provide certain Stalking Horse

Bid Protections for the Stalking Horse Bidder, such as the initial minimum overbid requirement,

the subsequent bidding increments, and the Termination Payment.  Bidding incentives such as

these Stalking Horse Bid Protections have become commonplace in connection with sales under

chapter 11.  Moreover, approval of break-up fees as administrative expense claims as a form of

bidder protections in connection with a sale has become a recognized practice in chapter 11 cases

because it enables a debtor to ensure a sale to a contractually committed buyer at a price the debtor

believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery

through an auction process.[8]

42.    Bankruptcy courts in this District analyze the appropriateness of bidding

incentives such as the Stalking Horse Bid Protections under the "business judgment rule."

Specifically, courts in this District consider whether: (a) the relationship of the parties who

---

[8] *See, e.g.*, *In re Barneys New York, Inc.*, Case No. 19-36300 (CGM) (Bankr. S.D.N.Y. Oct. 30, 2019) (ECF No. 491) (approving break-up fee and expense reimbursement); *In re Ditech Holding Corp.*, Case No. 19-10412 (JLG) (Bankr. S.D.N.Y. Apr. 23, 2019) (ECF No. 456) (same); *In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC) (Bankr. S.D.N.Y. May 7, 2018) (ECF No. 223) (same); *In re SunEdison, Inc.*, Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. Aug. 19, 2016) (ECF No. 1033); *In re Lehman Bros. Holdings Inc., et al.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Oct. 22, 2008) (same); *In re Steve & Barry's Manhattan LLC, et al.*, Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 5, 2008) (same); *In re Bally Total Fitness of Greater New York, Inc.*, Case No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) (same); *In re G+G Retail, Inc.*, Case No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30, 2006) (same); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc., (In re Integrated Res., Inc.)*, 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (same); *In re Twinlab Corp., et al.*, Case No. 03-15564 (CB) (Bankr. S.D.N.Y. 2003) (same); *In re Adelphia Business Solutions, Inc., et al.*, Case No. 02-11389 (REG) (Bankr. S.D.N.Y. 2002) (same).

WEIL:\97276692\10\44444.0008

negotiated the break-up fee was tainted by self-dealing or manipulation, (b) the fee encourages, rather than hampers, bidding, and (c) the amount of the fee is unreasonable relative to the proposed purchase price. *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 465 (Bankr. S.D.N.Y 2014) (citing *In re Metaldyne Corp.,* 409 B.R. at 670); *see also In re Integrated Res., Inc.*, 147 B.R. at 657–58 (holding that in evaluating bid protections, courts should employ the business judgment rule, which proscribes judicial second-guessing of the corporate debtor's actions taken in good faith absent self-dealing and in the exercise of honest judgment).

43.    The Bid Protections provided in the Bidding Procedures and the Stalking Horse Agreement meets the "business judgment rule" standard.  First, the Stalking Horse Bid Protections were only offered after good faith, arm's length negotiations with the Debtors who were acting in the interest of their estates, consistent with their fiduciary duties.  These protections, individually and collectively, were a material inducement for, and condition of, the Stalking Horse Bidder's entry into the Stalking Horse Agreement.  The Stalking Horse Bidder was unwilling to hold open its offer without assurance of payment of the Break-Up Fee under the conditions set forth in the Stalking Horse Agreement.  Parties in interest will be given notice and an opportunity to object if they do not believe that the Stalking Horse Bid Protections are in the best interests of the Debtors' estates.

44.    Second, the Stalking Horse Bid Protections will promote the interests of the Debtors' estates to maximize value.  The Termination Payment will promote more competitive bidding for the Debtors' Assets by inducing the Stalking Horse Bidder to hold its offer open as a minimum bid on which other bidders and the Debtors can rely.  In doing so, the Stalking Horse Bidder will help lay the foundation for the Debtors' sale process and will serve as a catalyst for other Qualified Bids.  Executing the Stalking Horse Agreement has put the Debtors in a

30

comfortable position to solicit competing bids that may be materially higher or of otherwise better value to the Debtors' estates than the Stalking Horse Bid.  The Stalking Horse Bid also increases the likelihood that the price at which the Assets in the Stalking Horse Package are sold will reflect their true worth.  Accordingly, the Termination Payment is appropriate and any Stalking Horse Bidder is entitled to be compensated for the risk it is assuming and the substantial value it is conferring on the Debtors' estates.

45.     Third, the Stalking Horse Bid Protections are reasonable in view of the substantial benefits the Debtors would receive from having the Stalking Horse Bid serve as a floor for potential bidders, which would confirm that the Debtors receive the highest and best offer for their business.  Moreover, the Stalking Horse Bid will provide the Debtors with an opportunity to move forward with a Sale Transaction that has a high likelihood of consummation with a contractually committed party at a fair and reasonable purchase price.  Accordingly, the Stalking Horse Bid Protections will not deter bidding and are reasonable, and their availability to the Debtors will enable the Debtors to maximize the value of their estates.

46.     The Termination Payment is fair and reasonable in amount under the circumstances, particularly because the Termination Payment will be paid out of the proceeds of any Competing Transaction.  Further, there is ample precedent for approving a break-up fee of three percent (3%).  *See, e.g.*, *In re Hostess Brands, Inc.*, Case No. 12-22052 (Bankr. S.D.N.Y. 2013) (break-up fee equal to 3.5%); *In re Global Crossing Ltd.*, Case No. 02-40187 (Bankr. S.D.N.Y. 2002) (break-up fee equal to 4%); *In re LTV Steel Company, Inc.*, Case No. 00-43866 (Bankr. N.D. Ohio 2000) (break-up fee equal to 7.5%); *In re Fruit of the Loom, Inc.*, Case No. 99-4497 (Bankr. D. Del. 1999) (break-up fee equal to 3.59%); *In re Graham-Field Health Products, Inc.*, Case No. 99-4457 (Bankr. D. Del. 1999) (break-up fee equal to 4.65%).

31

47.     Similarly, any Additional Termination Payment will be fair and reasonable in amount and under the circumstances.  Additional Termination Payments, if any, will be paid out of the proceeds of alternative transactions that generated higher or better value for the applicable Additional Stalking Horse Packages.  As with the Termination Payment and the Stalking Horse Package, Additional Termination Payments would promote more competitive bidding for Additional Stalking Horse Packages.  The Debtors will, in consultation with the Consultation Parties, carefully negotiate the terms of any Additional Termination Payment to ensure that the amount of such payment is commensurate with the benefit provided to the Debtors' estates by the applicable Additional Stalking Horse Bid, subject to a cap of three percent (3%) of the purchase price of such bid.  Finally, no Additional Termination Payment will be offered unless such payment is a condition to the execution of an applicable Additional Stalking Horse Agreement.

48.     The foregoing bid protections will not deter or chill bidding, are reasonable, and their availability to the Debtors will enable the Debtors to maximize the value of their estates.

## C.     Proposed Sale Transaction

49.     Ample authority exists for approval of the sale envisioned by this Motion. Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts in the Second Circuit and others, in applying this section, have required that the sale of a debtor's assets be based upon the sound business judgment of the debtor.  *See In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); *Committee of Equity Security Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722

32

F.2d 1063, 1071 (2d Cir. 1983) (same); *In re Gen. Motors Corp.*, 407 B.R. 463, 493-94 (Bankr.

S.D.N.Y. 2009).

50.    Once a court is satisfied that there is a sound business justification for the

proposed sale, the court must then determine whether (a) the debtor has provided the interested

parties with adequate and reasonable notice, (b) the sale price is fair and reasonable, and (c) the

purchaser is proceeding in good faith. *Gen. Motors*, 407 B.R. at 493–94; *In re Betty Owens Sch.*,

1997 U.S. Dist. Lexis 5877 (S.D.N.Y. 1997); *accord In re Delaware and Hudson Ry. Co.*, 124

B.R. at 166; *In re Decora Indus., Inc.*, Case No. 00-4459, 2002 WL 32332749 at *3 (Bankr. D.

Del. May 20, 2002).  Where a debtor demonstrates a valid business justification for a decision, it

is presumed that "in making a business decision the directors of a corporation acted on an informed

basis, in good faith and in the honest belief that the action taken was in the best interests of the

company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated

Res., Inc.)*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

### 1.    *The Debtors Have Demonstrated a Sound Business Justification for the Proposed Sale Transactions*

51.    A sound business purpose for the sale of a debtor's assets outside the

ordinary course of business exists where such sale is necessary to preserve the value of the estate

for the benefit of creditors and interest holders.  *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788

F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1063; *see also In re Food Barn Stores,

Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (recognizing that paramount goal of any proposed sale

of property of estate is to maximize value).

52.    As set forth above and in described in the Moses Declaration, a strong

business justification exists for the sale of the Debtors' Assets as described herein.  An orderly but

expeditious sale of the Acquired Assets is critical to preserving and realizing their going concern

33

value and, in turn, to maximizing recoveries for the Debtors' economic stakeholders and preserving jobs. *See* Moses Decl. ¶¶ 16–19. A prompt sale is also required by the express terms of the DIP Credit Agreement, the Milestones, and the Stalking Horse Agreement. Pursuing entry into and performance under the Stalking Horse Agreement represents a reasonable exercise of the Debtors' business judgment and is in the best interests of all parties.

### 2. *The Noticing Procedures Are Reasonable and Appropriate*

53.    The notice to third parties that the Debtors propose to provide, as set forth in the Bidding Procedures Order and Bidding Procedures, is more than adequate and reasonable. Such notice will ensure that actual notice of the Auction, Sale Hearing, and Sale Transaction will be provided to all known creditors of the Debtors, in addition to notice by publication. Such notice, together with the authority pursuant to sections 363 and 365 of the Bankruptcy Code, will enable the Court to make findings at the Sale Hearing and in the Sale Order that the ultimate purchaser of the Acquired Assets, whether it be the Stalking Horse Bidder or, if an Auction is held, the Successful Bidder, shall not be liable under theories of successor liability in connection with such Acquired Assets.

### 3. *The Proposed Sale Transaction Will Produce a Fair and Reasonable Purchase Price for the Assets*

54.    The Purchase Price under the Stalking Horse Agreement is fair and reasonable for the Acquired Assets. The Stalking Horse Bid is an offer to purchase the Stalking Horse Package for a price that the Debtors, with the advice of their advisors, already have determined to be fair and reasonable. Given that the Stalking Horse Bid, together with the Stalking Horse Bid Protections, will serve as a floor for Qualified Bids for the Stalking Horse Package, the Debtors are confident that the sale process will culminate in the Debtors' obtaining the highest or

WEIL:\97276692\10\44444.0008

best value for the applicable Assets.   The Debtors also believe that any Additional Stalking Horse

Bid, together with an applicable Additional Termination Payment, will achieve the same results.

55.     In addition, the Bidding Procedures were carefully designed to facilitate a

robust and competitive bidding process. The Debtors are poised to capitalize on the momentum

from the prepetition phase of their sale process to maximize the value of Other Assets sold at the

Auction. The Bidding Procedures provide an appropriate framework for the Debtors to review,

analyze, and compare all bids received to determine which bids are in the best interests of the

Debtors' estates and their economic stakeholders.   Sale Transactions governed by the Bidding

Procedures undoubtedly will serve the important objectives of obtaining not only a fair and

reasonable purchase price for the Assets, but also the highest or best value for the Assets, which

will inure to the benefit of all parties in interest in these chapter 11 cases.  The Debtors' compliance

with the Bidding Procedures Order and the Bidding Procedures will provide the basis to find that

any sale of the Acquired Assets does not constitute a fraudulent transfer because the purchase price

represents reasonably equivalent value and is fair and reasonable.

56.     Based on the foregoing, the Debtors have demonstrated that the proposed

Sale Transaction is a sound exercise of the Debtors' business judgment and should be approved.

**D.     Sale Free and Clear of Liens, Claims, Encumbrances, and Interests**

57.     In the interest of attracting the best offers, the Assets should be sold free

and clear of any and all liens, claims, interests, and other encumbrances, in accordance with section

363(f) of the Bankruptcy Code, with any such liens, claims, interests, and encumbrances to attach

to the proceeds of the applicable sale.  Section 363(f) of the Bankruptcy Code authorizes a debtor

to sell assets free and clear of liens, claims, interests, and encumbrances if any one of the following

conditions is satisfied:

35

(a)    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(b)    such entity consents;

(c)    such interest is a lien and the price at which property is to be sold is greater than the value of all liens on such property;

(d)    such interest is in bona fide dispute; or

(e)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.");

*Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

58.    With respect to any party asserting a lien, claim, encumbrance or other interest against the Stores, the Debtors will be able to satisfy one or more of the conditions set forth in section 363(f).

**E.    Protections as Good Faith Purchaser**

59.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) states the following:

> The reversal or modification on appeal of an authorization under [section 363(b)] … does not affect the validity of a sale … to an entity that purchased … such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) fosters the "'policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and

36

judgments upon which third parties rely.'" *Reloeb Co. v. LTV Corp* (*In re Chateaugay Corp*., No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Pa., Inc*., 788 F.2d 143, 147 3d Cir. 1986). *See also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"). *In re Stein & Day, Inc*., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

60.    The Debtors and the Stalking Horse Bidder have entered into the Stalking Horse Agreement without collusion, in good faith, and through extensive arm's-length negotiations. To that end, the Stalking Horse Bidder and the Debtors have engaged separate counsel and other professional advisors to represent their respective interests in the negotiation of the Stalking Horse Agreement and in the sale process generally. To the best of the Debtors' knowledge, information, and belief, no party has engaged in any conduct that would cause or permit the Stalking Horse Agreement to be set aside under section 363(m) of the Bankruptcy Code.

61.    Further, and as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process. Any Additional Stalking Horse Agreement or asset purchase agreement with a Successful Bidder executed by the Debtors will be negotiated at arm's-length and in good faith. Accordingly, the Debtors seek a finding that any Successful Bidder (including the Stalking Horse Bidder and any Additional Stalking Horse Bidder if named a Successful Bidder) is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

### F.    Assumption and Assignment of Transferred Contracts Should Be Approved

62.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code.  *See Nostas Assocs. v. Costich* (*In re Klein Sleep Prods.*, *Inc*.), 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp*.), 4 F.3d 1095, 1099 (2d Cir. 1993).

63.    The assumption of the Transferred Contracts in connection with a Sale Transaction is an exercise of the Debtors' sound business judgment because the Transferred Contracts are necessary to operate the Debtors' business and, as such, are essential to obtaining the highest or otherwise best offer for the Debtors' business.  The assumption and assignment of additional Proposed Assumed Contracts may be required by Successful Bidders.  Moreover, the Transferred Contracts will be assumed and assigned in accordance with the Assumption and Assignment Procedures approved by the Court pursuant to the Bidding Procedures Order, which will be reviewed by the Debtors' key stakeholders.  Given that consummation of one or more going-concern Sale Transactions for the Debtors' Locations is critical to the Debtors' efforts to maximize value for their estates and creditors, and to preserve jobs for their employees, the Debtors' assumption of Proposed Assumed Contracts is an exercise of sound business judgment and should be approved.

64.    The consummation of a Sale Transaction, which will involve the assignment of the Transferred Contracts, will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code.  Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Transferred Contracts must be

38

cured or that adequate assurance be provided that such defaults will be promptly cured.  As set forth above, the Debtors propose to file with the Court and serve on each Contract Counterparty, the Assumption and Assignment indicating the Debtors' calculation of the Cure Cost for each such Contract.  The Contract Counterparties will have the opportunity to file objections to the proposed assumption and assignment of the Transferred Contracts to the Successful Bidder, including the proposed Cure Costs, in advance of the applicable Sale Hearing.  The Debtors' assumption and assignment of Transferred Contracts and other Proposed Assumed Contracts will be contingent upon payment or reserve of Cure Costs and effective only upon the closing of an applicable Sale Transaction.

65.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."   11 U.S.C. § 365(f)(2)(B).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.,* 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective

39

assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

66.    As set forth in the Bidding Procedures, for a bid to qualify as a "Qualified Bid," a Potential Bidder (other than the Stalking Horse Bidder) must include with its bid Adequate Assurance Information regarding its ability (and the ability of its designated assignee, if applicable) to perform under the applicable Proposed Assumed Contracts. The Debtors will provide Adequate Assurance Information to all Counterparties to any Proposed Assumed Contracts, or with respect to Transferred Contracts designated to assumption and assignment to the Stalking Horse Bidder, direct the non-Debtor Counterparty to relevant publicly available financial information regarding the Stalking Horse Bidder for purposes of demonstrating adequate assurance of future performance by the Stalking Horse Bidder, and, upon reasonable request, the Debtors will furnish additional Adequate Assurance Information to Counterparties. Counterparties will have an opportunity to file with the Court and serve on the Objection Notice Parties Adequate Assurance Objections in advance of the applicable Sale Hearing. Based on the foregoing, the Debtors' assumption and assignment of the Proposed Assumed Contracts, including the Transferred Contracts, satisfy the requirements under section 365 of the Bankruptcy Code and should be approved.

67.    In addition, to facilitate the assumption and assignment of the Transferred Contracts, the Debtors further request that the Court find that all anti-assignment provisions in the Transferred Contracts, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such contract or lease, to be unenforceable under section 365(f) of the Bankruptcy Code.[9]

---

[9] Section 365(f)(1) provides, in part, that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the

WEIL:\97276692\10\44444.0008

### G.    Request for Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d)

68.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property…is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of fourteen (14) days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

69.    In light of the current circumstances and financial condition of the Debtors, the Debtors believe that in order to maximize value and preserve jobs, the sale of the Acquired Assets pursuant to the Sale Transaction must be consummated as soon as practicable. Accordingly, the Debtors request that the Bidding Procedures Order and the Sale Order be effective immediately upon entry of each such order and that the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d) be waived.

### Notice

70.    Notice of this Motion has been provided to (i) the Office of the United States Trustee for Region 2, 201 Varick Street, Suite 1006, New York, NY 10014 (Attn:  Greg Zipes, Esq. and Paul Schwartzberg, Esq.); (ii) the holders of the forty (40) largest unsecured claims against the Debtors (on a consolidated basis); (iii) counsel to the Ad Hoc Group and DIP Lenders, King & Spalding LLP, 1185 Avenue of the Americas, New York, NY 10036 (Attn:  W. Austin Jowers, Esq., Michael Rupe, Esq., and Michael R. Handler, Esq.); (iv) counsel to Ankura Trust

---

trustee may assign such contract or lease[.]" 11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that, "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

WEIL:\97276692\10\44444.0008

Company, LLC, as the Prepetition Agent under the Prepetition Credit Agreement, Davis Polk &

Wardwell LLP, 450 Lexington Avenue, New York, NY 10017 (Attn:  Christian Fischer, Esq.);

(v) the Unions; (vi) the Internal Revenue Service; (vii) the United States Attorney's Office for the

Southern District of New York; (viii) all entities known or reasonably believed to have asserted

any lien, claim, encumbrance, or other interest in the Acquired Assets; and (ix) all parties to the

Transferred Contracts (collectively, the "**Notice Parties**").  The Debtors respectfully submit that

no further notice is required.

71.    No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WEIL:\97276692\10\44444.0008

WHEREFORE the Debtors respectfully request entry of a final order granting the

relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: January 23, 2020
New York, New York

/s/ Sunny Singh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

43

## **Exhibit A**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

In re                                           :
                                                :    **Chapter 11**
**FAIRWAY GROUP HOLDINGS**                       :
**CORP.**, ***et al.***,                         :    **Case No. 20-[_____] (___)**
                                                :
         **Debtors.**[1]                         :    **(Jointly Administered)**

----------------------------------------------------------------x

### ORDER (I) APPROVING (A) BIDDING PROCEDURES FOR SALES OF DEBTORS' ASSETS, (B) STALKING HORSE BID PROTECTIONS, (C) FORM AND MANNER OF NOTICE OF SALES, AUCTIONS, AND SALE HEARINGS, AND (D) ASSUMPTION AND ASSIGNMENT PROCEDURES AND FORM AND MANNER OF NOTICE OF ASSUMPTION AND ASSIGNMENT; (II) AUTHORIZING DESIGNATION OF ADDITIONAL STALKING HORSE BIDDERS; (III) SCHEDULING AUCTIONS AND SALE HEARINGS; AND (IV) GRANTING RELATED RELIEF

Upon the motion, dated January 23, 2020 (ECF No. [__]) (the "**Motion**"),[2] of

Fairway Group Holdings Corp. and its debtor affiliates, as debtors and debtors in possession in the

above-captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant to sections 105, 363, 365,

503, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002,

6004, 6006, and 9014, for entry of orders (i)(a) approving the bidding procedures attached hereto

as **Exhibit 1** (the "**Bidding Procedures**"), in connection with the sale of substantially all of the

Debtors' assets (the "**Assets**"), (b) approving the Stalking Horse Bid Protections proposed to be

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Fairway Group Holdings Corp. (2788); Fairway Group Acquisition Company (2860); Fairway Bakery LLC (4129); Fairway Broadway LLC (8591); Fairway Chelsea LLC (0288); Fairway Construction Group, LLC (2741); Fairway Douglaston LLC (2650); Fairway East 86th Street LLC (3822); Fairway eCommerce LLC (3081); Fairway Georgetowne LLC (9609); Fairway Greenwich Street LLC (6422); Fairway Group Central Services LLC (7843); Fairway Group Plainview LLC (8643); Fairway Hudson Yards LLC (9331); Fairway Kips Bay LLC (0791); FN Store LLC (9240); Fairway Paramus LLC (3338); Fairway Pelham LLC (3119); Fairway Pelham Wines & Spirits LLC (3141); Fairway Red Hook LLC (8813); Fairway Stamford LLC (0738); Fairway Stamford Wines & Spirits LLC (3021); Fairway Staten Island LLC (1732); Fairway Uptown LLC (8719); Fairway Westbury LLC (6240); and Fairway Woodland Park LLC (9544).  The location of the Debtors' corporate headquarters is 2284 12th Avenue, New York, New York 10027.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

granted to the Stalking Horse Bidder (as defined herein) in accordance with the terms and conditions set forth in the Bidding Procedures and the Stalking Horse Agreement (as defined herein), (c) authorizing the Debtors to designate one or more Additional Stalking Horse Bidders and offer each such Bidder certain Additional Stalking Horse Bid Protections (each as defined herein), (d) scheduling one or more auctions for the Assets (each, an "**Auction**") and one or more hearings for the approval of proposed Sale Transactions (as defined below) (each, a "**Sale Hearing**"), (e) approving form and manner of (1) notice of Auctions, sales of the Assets (each, a "**Sale Transaction**"), and Sale Hearings substantially in the form annexed hereto as **<u>Exhibit 2</u>** (the "**Sale Notice**") and (2) notice to each non-Debtor counterparty (each, a "**Counterparty**") to an executory contract or unexpired non-residential real property lease of the Debtors (each, a "**Proposed Assumed Contract**") that the Debtors propose to assume and assign to a particular Successful Bidder (including the Stalking Horse Bidder or any Additional Stalking Horse Bidder) setting forth the Debtors' calculation of the amount necessary to cure any monetary defaults under such Proposed Assumed Contract (the "**Cure Costs**") and the applicable proposed assignee, substantially in the form attached hereto as **<u>Exhibit 3</u>** (the "**Assumption and Assignment Notice**"), (f) approving the procedures for the assumption and assignment of Contracts and Leases as set forth herein (the "**Assumption and Assignment Procedures**"), including the procedures for determining Cure Costs; and (g) granting related relief; (ii)(a) authorizing the sale of the Assets (the "**Acquired Assets**") in the Stalking Horse Package (as defined herein) free and clear of all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code, (b) authorizing the assumption and assignment of the Transferred Contracts (as defined herein); and (c) granting related relief, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157

2

and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b) as to which the Bankruptcy Court has the power to enter a final judgment; and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice Parties (as defined in the Motion), and such notice having been adequate and appropriate under the circumstances, and it appearing that no other notice need be provided; and the Court having reviewed the Motion; and the Court having held a hearing to consider the relief requested in the Motion (the "**Hearing**"); and upon the Moses Declaration, filed contemporaneously with the Motion, and the record of the Hearing; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

## IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.      This Court has jurisdiction to hear and determine the Motion and to grant the relief requested herein with respect to the Bidding and Auction Process (as defined in the Bidding Procedures) pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      The statutory and legal predicates for the relief requested in the Motion are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014.

C.      Good and sufficient notice of the Motion, the Bidding and Auction Process, and the relief sought in the Motion has been given under the circumstances, and no other or further notice is required except as set forth herein and in the Bidding Procedures.  A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to parties in interest.

D.      The Debtors and their advisors, including PJ Solomon, L.P., engaged in a robust and extensive marketing and sale process before and after the Commencement Date, over a period of more than eight (8) months, to solicit and develop the highest or best offer for all of their store locations, production and distribution center, inventory, intellectual property, and other assets.

E.      The Bidding Procedures are fair, reasonable, and appropriate, and are designed to maximize the value of the Assets.

F.      The Assumption and Assignment Procedures are fair, reasonable, and appropriate, and comply with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

G.      The Stalking Horse Bid as reflected in the Stalking Horse Agreement represents the highest or best offer the Debtors have received to purchase the Acquired Assets included in the Stalking Horse Bid (the "**Stalking Horse Package**"), in accordance with the Bidding Procedures, and the holders of secured claims against the Stalking Horse Package have consented to the sale to the Stalking Horse pursuant to the Stalking Horse Agreement.

4

H.      Village Super Market, Inc. shall act as the stalking horse bidder (the "**Stalking Horse Bidder**" and, its bid, the "**Stalking Horse Bid**") pursuant to that certain Asset Purchase Agreement, dated as of January 22, 2020, by and between certain of the Debtors, as Sellers, and the Stalking Horse Bidder, as Buyer, substantially in the form attached to the Motion as **<u>Exhibit C</u>** (as may be amended, supplemented, or otherwise modified by the parties thereto, the "**Stalking Horse Agreement**"), and the Stalking Horse Bid shall be subject to higher or better offers in accordance with the Bidding Procedures.

I.      Pursuit of the Stalking Horse Bidder as a "stalking-horse" and its Stalking Horse Agreement as a "stalking-horse" sale agreement is in the best interests of the Debtors and the Debtors' estates and creditors, and it reflects a sound exercise of the Debtors' business judgment.  The Stalking Horse Agreement provides the Debtors with the opportunity to sell the Acquired Assets in order to preserve and realize their going concern value.  The Stalking Horse Agreement will enable the Debtors to continue their operations, preserve jobs, minimize disruption to the Debtors' business, and secure a fair and adequate baseline price for the Acquired Assets at the Auctions, if any, for the Stalking Horse Package and, accordingly, will provide a clear benefit to the Debtors' estates, their creditors, and all other parties in interest.

J.      The Stalking Horse Bid Protections, including, but not limited to, the Termination Payment (as defined in the Stalking Horse Agreement), (i) have been negotiated by the Stalking Horse Bidder and the Debtors and their respective advisors at arm's-length and in good faith and (ii) are necessary to ensure that the Stalking Horse Bidder will continue to pursue its Stalking Horse Agreement and the Sale Transaction contemplated thereby.  The Termination Payment, to the extent payable under the Stalking Horse Agreement, (a)(x) is an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of section 503(b)

5

of the Bankruptcy Code, (y) shall be treated as an allowed administrative expense claim against the Debtors' estates pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code, and (z) shall be included in the Carve-Out (as defined in the DIP Orders); (b) is commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Bidder; and (c) is fair, reasonable, and appropriate, including in light of the size and nature of the Sale Transaction, the necessity to announce a sale transaction for the Acquired Assets, and the efforts that have been and will be expended by the Stalking Horse Bidder.  The Stalking Horse Bid Protections are a material inducement for, and condition of, the Stalking Horse Bidder's execution of the Stalking Horse Agreement.  Unless it is assured that the Bid Protections will be available, the Stalking Horse Bidder is unwilling to remain obligated to consummate the Sale Transaction or otherwise be bound under the Stalking Horse Agreement (including the obligations to maintain its committed offer while such offer is subject to higher or better offers as contemplated by the Bidding Procedures).

K.      The Debtors have articulated good and sufficient business reasons for the Court to approve (i) the Bidding Procedures, (ii) the Assumption and Assignment Procedures, (iii) the Stalking Horse Bid Protections, and (iv) the form and manner of notice of the Auctions and the Sale Hearings for the Sale Transactions.

L.      The Stalking Horse Bidder is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders exists between the Stalking Horse Bidder and the Debtors.  The Stalking Horse Bidder and its counsel and advisors have acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code in connection with the Stalking Horse Bidder's negotiation of the Stalking Horse Bid Protections and the Bidding

6

Procedures and the Stalking Horse Bidder's negotiation and entry into the Stalking Horse Agreement.

M.      Good and sufficient business reasons exist for the Court to authorize the Debtors to designate Additional Stalking Horse Bidders and enter into Additional Stalking Horse Agreements, in each case, in accordance with the terms of this Order and the Bidding Procedures.

N.      The Assumption and Assignment Procedures, including notice of proposed Cure Costs, are reasonable and appropriate and consistent with section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.  The Assumption and Assignment Procedures have been tailored to provide adequate opportunity for all non-Debtor Counterparties to the Transferred Contracts and other Proposed Assumed Contracts to raise any objections to the proposed assumption and assignment or to the Cure Costs.

O.      The Sale Notice is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Bidding Procedures, the Assumption and Assignment Procedures, the Auctions, the Sale Hearings, and the Sale Transactions (including the sale of the Acquired Assets as set forth under the Stalking Horse Agreement) free and clear of any liens, claims, encumbrances, or interests pursuant to section 363(f) of the Bankruptcy Code) (with such liens, claims, encumbrances, or interests attaching to the proceeds of any such sale), and any and all objection deadlines related thereto, and no other or further notice shall be required for the Motion, the Sale Transactions, or the assumption and assignment of the Transferred Contracts except as expressly required herein.

P.      Nothing contained herein shall prejudice or impair the right to Credit Bid, as set forth in the Bidding Procedures (and subject to the terms of the Prepetition Credit Agreement (and any other "Loan Documents" as such term is defined therein)), of (i) Ankura Trust Company,

7

LLC, as administrative agent and collateral agent under the Prepetition Credit Agreement, (ii) the

Prepetition Secured Lenders under the Prepetition Credit Agreement, and (iii) the DIP Lenders, on

such assets that are subject to their respective liens in their respective priorities.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND
DECREED THAT:**

1.      The Motion is granted to the extent set forth herein.

2.      All objections to the relief granted herein that have not been withdrawn with

prejudice, waived, or settled, and all reservations of rights included in such objections, hereby are

overruled and denied on the merits with prejudice.

3.      The Bidding Procedures are hereby approved in their entirety, are

incorporated herein by reference, and shall govern the bids and proceedings related to the sale of

the Assets and the Auctions.   The failure to specifically include or reference any particular

provision of the Bidding Procedures in the Motion or this Order shall not diminish or otherwise

impair the effectiveness of such procedures, it being the Court's intent that the Bidding Procedures

are approved in their entirety, as if fully set forth in this Order.  The Debtors are authorized to take

all actions necessary or appropriate to implement the Bidding Procedures.

**Stalking Horse Bid Protections**

4.      The Debtors are authorized to enter into the Stalking Horse Agreement, and

the Stalking Horse Bid shall be subject to higher or better Qualified Bids, in accordance with the

terms and procedures of the Bidding Procedures.

5.      The Stalking Horse Bid Protections are approved in their entirety, including,

without limitation, the Termination Payment payable in accordance with, and subject to the terms

of, the Stalking Horse Agreement and the Bidding Procedures.  In accordance with the Stalking

Horse Agreement, the Stalking Horse Bidder shall be granted the right to a Termination Payment

8

comprised of a break-up fee in an amount equal to three percent (3%) of the Cash Purchase Price (as such term is defined in the Stalking Horse Agreement). Except as expressly provided for herein, no other termination payments are authorized or permitted under this Order.

6.    The Debtors are authorized to pay the Termination Payment, to the extent payable under the Stalking Horse Agreement, without further order of the Court.

7.    The Termination Payment, to the extent payable under the Stalking Horse Agreement, shall (a) constitute an allowed administrative expense claim against the Debtors' estates pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code and (b) be included in the Carve-Out (as defined in the DIP Orders). Subject to the foregoing, the Termination Payment shall be (i) paid in cash from the proceeds of any approved sale or (ii) credited against the purchase price if, after an Auction, the Stalking Horse Bid, as enhanced at the Auction, is the Successful Bid and the sale contemplated by the Stalking Horse Agreement (as enhanced at the Auction) is consummated.

**Designation of Additional Stalking Horse Bidders**

8.    The Debtors are authorized to, in the exercise of their reasonable business judgment, in consultation with the Consultation Parties, designate one or more Additional Stalking Horse Bidders for one or more of the Assets not included in the Stalking Horse Package and enter into asset purchase agreements with Additional Stalking Horse Bidders (each such agreement, an "**Additional Stalking Horse Agreement**") for the sale of such Assets (each such group of Assets, an "**Additional Stalking Horse Package**"), in each case, in accordance with the terms of this Order and the Bidding Procedures.

9.    Subject to the terms of this Order and the Bidding Procedures, the Debtors are authorized to offer each Additional Stalking Horse Bidder Additional Stalking Horse Bid Protections, including a break-up fee (an "**Additional Termination Payment**"); provided that all

9

Additional Termination Payments must be negotiated by the Debtors, in consultation with the Consultation Parties (as defined in the Bidding Procedures), and no Additional Termination Payment shall exceed three percent (3%) of the Cash Purchase Price in the applicable Additional Stalking Horse Bid, as set forth in the applicable Additional Stalking Horse Agreement executed by the Debtors.

10.     The Debtors shall include in the Sale Notice the material terms of any Additional Stalking Horse Agreement, including the terms of any Additional Stalking Horse Bid Protections; provided that if the Debtors already have filed with the Court and served on the Sale Notice Parties (as defined in the Motion) the Sale Notice prior to the execution of an Additional Stalking Horse Agreement, the Debtors shall file with the Court, serve on the Sale Notice Parties, and cause to be published on the website maintained by Omni Agent Solutions, the Debtors' claims and noticing agent in these chapter 11 cases, located at www.omniagentsolutions.com/Fairway (the "**Omni Website**"), an addendum to the Sale Notice setting forth the identity of the Additional Stalking Horse Bidder and the material terms of such Additional Stalking Horse Agreement, including the terms of the applicable Additional Stalking Horse Bid Protections and the Proposed Assumed Contracts in the Additional Stalking Horse Package (each, an "**Additional Stalking Horse Notice**").

11.     Objections to the provision of an Additional Termination Payment (each, a "**Bid Protection Objection**") shall (a) be in writing; (b) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules; (c) state, with specificity, the legal and factual bases thereof; and (d) be filed with the Court and served on the Objection Notice Parties (as defined herein) within seven (7) calendar days after service of the Sale Notice or the applicable Additional Stalking Horse Notice.

10

12.     If a timely Bid Protection Objection is filed and served with respect to an Additional Stalking Horse Agreement in accordance with the Bidding Procedures, any Additional Termination Payment provided for under such agreement shall not be deemed approved until the Bid Protection Objection is resolved, either by agreement of the objecting party and the Debtors, or by order of the Court resolving such objection and approving the provision of the Additional Termination Payment.

13.     If no timely Bid Protection Objection is filed and served with respect to an Additional Stalking Horse Agreement in accordance with the Bidding Procedures, the Debtors may file with the Court, upon certification of counsel, a proposed order authorizing and approving the Debtors' provision of Additional Stalking Horse Bid Protections, including an Additional Termination Payment, pursuant to the terms and provisions of the applicable Additional Stalking Horse Agreement and the Bidding Procedures, which may be entered without further notice or hearing.

14.     Absent further order of the Court, no person or entity (other than the Stalking Horse Bidder and any applicable Additional Stalking Horse Bidder) shall be entitled to any expense reimbursement or break-up, "topping," termination, or other similar fee or payment by the Debtors for submitting a bid for the Assets, or in any way participating in an Auction or the Debtors' sale process.  The Stalking Horse Bidder is a party in interest in these chapter 11 cases.

**Bidding Procedures and Auction**

15.     The Bidding Procedures, attached hereto as **Exhibit 1**, are incorporated herein and approved, and shall apply with respect to any bids for, and the auction and sale of, all of the Debtors' Locations and other assets, including the Acquired Assets in the Stalking Horse Package.  The Debtors are authorized to take all actions necessary or appropriate to implement the Bidding Procedures.

11

16.     The deadline for submitting Qualified Bids (the "**Global Bid Deadline**") is

**February 28, 2020 at 4:00 p.m. (Eastern Time)**; provided that the Debtors shall have the right,

after consulting with the Consultation Parties, to extend the Global Bid Deadline for any reason

whatsoever, in their reasonable business judgment, for all or certain Potential Bidders, without

further order of the Court, subject to providing notice to the Stalking Horse, all Potential Bidders,

and the Consultation Parties.  The Debtors shall promptly provide copies of all bids to each of the

Consultation Parties, but in no event later than the next calendar day.  Any party that does not

submit a Qualified Bid by the Global Bid Deadline in accordance with the Bidding Procedures will

not be allowed to (a) submit any offer after the Global Bid Deadline or (b) participate in the

Auction; provided that the foregoing shall not preclude the Debtors after the Global Bid Deadline

from marketing to any person, or auctioning, or any parties from bidding on, any Locations or

other assets not included in an Auction, including pursuant to the Store Closing Procedures;[4]

provided, further, that to the extent there is no Auction for the Acquired Assets in the Stalking

Horse Bid, the prior proviso shall not be applicable to such Acquired Assets.

17.     The Stalking Horse Bidder and any Additional Stalking Horse Bidder shall

be considered a Qualified Bidder, and the Stalking Horse Bid and any Additional Stalking Horse

Bid, as reflected in the Stalking Horse Agreement or an Additional Stalking Horse Agreement, as

applicable, is a Qualified Bid for all purposes and requirements pursuant to the Bidding

Procedures.  If the Stalking Horse Bid, as reflected in the Stalking Horse Agreement, is the only

Qualified Bid in respect of the Stalking Horse Package that is received by the Debtors by the

Global Bid Deadline, the Debtors shall not conduct an Auction for the Stalking Horse Package,

---

[4] As used herein, "**Store Closing Procedures**" shall have the meaning ascribed to such term in the *Motion of Debtors for (I) Approval of Procedures for Store Closing Sales and (II) Related Relief*, filed on the Commencement Date.

WEIL:\95670212\13\44444.0005

and the Stalking Horse Bidder will be the Successful Bidder for the Stalking Horse Package.  If an Additional Stalking Horse Bid is the only Qualified Bid received by the Debtors in respect of an Additional Stalking Horse Package by the Global Bid Deadline, the Debtors shall not conduct an Auction for such Additional Stalking Horse Package, and the Additional Stalking Horse Bidder shall be deemed the Successful Bidder with respect to the assets included in the Additional Stalking Horse Package.

18.    If, in addition to the Stalking Horse Bid, the Debtors receive at least one Qualified Bid in respect of the Stalking Horse Package by the Global Bid Deadline, the Debtors shall conduct an Auction of the Acquired Assets in accordance with the Bidding Procedures.

19.    If, in addition to an Additional Stalking Horse Bid, the Debtors receive at least one Qualified Bid in respect of the applicable Additional Stalking Horse Package by the Global Bid Deadline, the Debtors shall conduct an Auction of the assets in the Additional Stalking Horse Package in accordance with the Bidding Procedures.

20.    The Debtors, after consultation with the Consultation Parties, may also include Assets not included in the Stalking Horse Bid or any Additional Stalking Horse Bid for bidding and sale at an Auction pursuant to the Bidding Procedures.

21.    The Auctions will take place at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 on (a) **March 10, 2020**, with respect to the Stalking Horse Package, if a Qualified Bid for the Stalking Horse Package other than the Stalking Horse Bid is received, and (b) **March 11, 2020**, with respect to any other Auction Package, or at such other time and location as the Debtors, after consulting with the Consultation Parties and providing notice to the Sale Notice Parties, may determine in their reasonable business judgment.

13

22.    All proceedings of the Auctions shall be conducted openly, and all creditors and other parties in interest shall be permitted to attend; provided that the Debtors may, in their reasonable business judgment, and in consultation with the Consultation Parties, establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of or accompany Qualified Bidders or other parties in interest at the Auctions.  The proceedings of the Auctions shall be transcribed.

23.    Subject to Paragraph 47 below, each Qualified Bidder (other than the Stalking Horse Bidder) must provide with its bid financial and other information that allows the Debtors, after consultation with the Consultation Parties, to make a reasonable determination as to the Bidder's financial and other capabilities to consummate the Sale Transaction, including, without limitation (and in each case after consultation with the Consultation Parties), such financial and other information setting forth adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code and the Bidder's willingness to perform under any Contracts or Leases that are assumed and assigned to the Bidder (the "**Adequate Assurance Information**").

24.    Each Qualified Bidder participating in an Auction shall confirm in writing that (a) it has not engaged in any collusion with respect to the submission of any bid, the bidding, or the Auction and (b) its Qualified Bid is a good faith bona fide offer that it intends to consummate if selected as a Successful Bidder.

25.    Subject to the rights of the Stalking Horse Bidder under the Stalking Horse Agreement and the rights of any Additional Stalking Horse Bidder under an applicable Additional Stalking Horse Agreement, the Bidding Procedures (including the consultation rights of the Consultation Parties described therein) and this Order, the Debtors shall have the right, as they may reasonably determine to be in the best interests of their estates, to carry out the Bidding

14

Procedures (in consultation with the Consultation Parties), including, without limitation, to: (a) determine which bidders are Qualified Bidders; (b) determine which bids are Qualified Bids; (c) determine which Qualified Bid is a Baseline Bid (as such terms are defined in the Bidding Procedures); (d) determine which bids are the Successful Bid and Back-Up Bid (as such terms are defined in the Bidding Procedures), each as it relates to the Auction; (e) reject any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (iii) contrary to the best interests of the Debtors and their estates; (f) adjourn or cancel the Auctions and/or the Sale Hearings in open court without further notice or as provided in the Bidding Procedures; (g) modify the Bidding Procedures consistent with their fiduciary duties and bankruptcy law; and (h) withdraw the Motion at any time with or without prejudice.

26.     The Debtors shall have the right, in their reasonable business judgment, after consulting with the Consultation Parties, in a manner consistent with their fiduciary duties and applicable law, to modify the Bidding Procedures, including (a) waive terms and conditions with respect to any Prospective Bidder; (b) extend the deadlines set forth in the Bidding Procedures; (c) announce at the Auctions modified or additional procedures for conducting the Auction; and (d) provide reasonable accommodations to the Stalking Horse Bidder and any Additional Stalking Horse Bidder with respect to such terms, conditions, and deadlines of the Bidding and Auction process to promote further bids by such bidders on any Assets (including extending deadlines as may be required for the Stalking Horse Bidder and any applicable Additional Stalking Horse Bidder to comply with any additional filing and review procedures with the Federal Trade Commission in connection with any previous filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976), in each case, to the extent not materially inconsistent

15

with the Bidding Procedures and this Order.  Except as provided in the Stalking Horse Agreement and any Additional Stalking Horse Agreement, nothing in this Order or the Bidding Procedures shall obligate the Debtors to consummate or pursue any transaction with respect to any Asset with a Qualified Bidder.

### Sale Hearings and Sale Objection Deadlines

27.     In accordance with the Bidding Procedures, if: (a) the Stalking Horse Bid is the only Qualified Bid received by the Debtors in respect of the Stalking Horse Package by the Global Bid Deadline, the Sale Hearing for the Stalking Horse Package shall be held before the Court on [**March 10, 2020**]; or (b) if a Qualified Bid other than the Stalking Horse Bid is received by the Debtors in respect of the Stalking Horse Package or a Qualified Bid for Other Assets is received by the Debtors by the Global Bid Deadline, the Sale Hearing for the Stalking Horse Package and/or such Other Assets, as applicable, shall be held on [**March 26, 2020**].[5]

28.     Notwithstanding the foregoing paragraph, the Debtors may (after consultation with the Consultation Parties and the Successful Bidders) seek an adjournment of the Sale Hearings, as the Debtors deem appropriate in the exercise of their reasonable business judgment.

29.     Objections to a proposed Sale Transaction, including any objection to the sale of any Assets free and clear of liens, claims, encumbrances, and interests pursuant to section 363(f) of the Bankruptcy Code and entry of a Sale Order (each, a "**Sale Objection**") shall (a) be in writing; (b) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules; (c) state, with specificity, the legal and factual bases thereof; and (d) be filed with the Court and served on (i) counsel to the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York

---

[5] All hearing dates included in this Order are subject to the Court's availability.

16

10153 (Attn: Ray C. Schrock, P.C. and Sunny Singh, Esq.); (ii) counsel to any statutory committee

of unsecured creditors; (iii) counsel to the Stalking Horse Bidder, Wollmuth Maher & Deutsch

LLP, 500 Fifth Avenue, New York, NY 10110 (Attn:  Paul R. DeFilippo, Esq.); (iv) counsel to the

Ad Hoc Group and DIP Lenders, King & Spalding LLP, 1185 Avenue of the Americas, New York,

NY 10036 (Attn:  W. Austin Jowers, Esq., Michael Rupe, Esq., and Michael R. Handler, Esq.);

(v) counsel to Ankura Trust Company, LLC, as the Prepetition Agent under the Prepetition Credit

Agreement, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017 (Attn:

Christian Fischer, Esq.); and (vi) the Unions, including: (a) United Food and Commercial Workers

Local 371, 290 Post Road West, Westport, CT 06881 (Attn:  Thomas Wilkinson), (b) United Food

and Commercial Workers Local 1262, 1389 Broad Street, Clifton, NJ 07013 (Attn:  Harvey

Whille), and (c) United Food and Commercial Workers Local 1500, 425 Merrick Avenue,

Westbury, NY 11590 (Attn:  Robert Newell) (collectively, the "**Objection Notice Parties**") by no

later than (x) **February 28, 2020 at 4:00 p.m. (Eastern Time)**, if the Sale Objection is with

respect to the sale of the Stalking Horse Package, or the assumption or assignment of an Initial

Transferred Contract, to the Stalking Horse Bidder pursuant to the Stalking Horse Agreement; or

(y) **seven (7) days after the service of the Additional Stalking Horse Notice, Notice of Auction**

**Results, or Supplemental Assumption and Assignment Notice, as applicable**, providing notice

of the proposed sale or assumption and assignment to which the Sale Objection relates (or with

respect to Cure Objections related to the proposed Cure Cost of a Proposed Assumed Contract,

seven (7) days after the service of the first notice including such Cure Cost for such Contract).  If

a timely Sale Objection cannot otherwise be resolved by the parties, such objection shall be heard

at the applicable Sale Hearing.

17

**Noticing Procedures**

30.    The Sale Notice, substantially in the forms annexed hereto as **Exhibit 2**, are approved, and no other or further notice of the sale of the Assets, the Auctions, the Sale Hearings, or the deadlines for Sale Objections shall be required if the Debtors serve and publish such notice, including any Additional Stalking Horse Notice, in the manner provided in the Bidding Procedures and this Order.  The Sale Notice contains the type of information required under Bankruptcy Rule 2002 and Local Rule 2002-1, and complies in all respects with applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

31.    Within two (2) business days after entry of this Order, the Debtors shall file with the Court, serve on the Sale Notice Parties, and cause to be published on the Omni Website the Sale Notice, which shall set forth (a) a complete list and general description of the Assets for sale; (b) the date, time, and place of (i) the Auctions and (ii) the Sale Hearings; (c) the deadlines for Sale Objections; and (d) the procedures for filing Sale Objections.

32.    Within five (5) business days after entry of this Order, the Debtors shall cause the contents of the Sale Notice to be published once in the national edition of *USA Today* and once in the *New York Times*.

33.    Within one (1) calendar day after the conclusion of an Auction (or as soon as reasonably practicable thereafter), the Debtors shall file with the Court, serve on the Sale Notice Parties (including each Counterparty to a Proposed Assumed Contract (as defined below) in a Successful Bid and Back-Up Bid), and cause to be published on the Omni Website, a notice containing the results of the Auction (the "**Notice of Auction Results**"), which shall (a) identify the Successful Bidder(s) and Back-Up Bidder(s); (b) list all Proposed Assumed Contracts in the Successful Bid(s) and Back-Up Bid(s), if known; (c) identify any known proposed assignees of Proposed Assumed Contracts (if different from the applicable Successful Bidder); and (d) set forth

18

the deadlines and procedures for filing Sale Objections in response to the Notice of Auction Results.

## Assumption and Assignment Procedures

34.    The Assumption and Assignment Notice is reasonable, fair, and appropriate, and contains the type of information required under Bankruptcy Rule 2002, Local Rule 2002-1, and complies in all respects with applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules, and no other or further notice to each Counterparty to all known Contracts and Leases of the Debtors' proposed Cure Costs and, with respect to the Contracts proposed to be assumed and assigned under the Stalking Horse Bid and any other Contracts and Leases proposed to be assigned to any Additional Stalking Horse Bidder or any other Successful Bidder, the proposed assumption and assignment of Contracts and Leases (all such Contracts and Leases, collectively, the "**Proposed Assumed Contracts**"), shall be required if the Debtors file and serve such notice (and the Notice of Auction Results) in accordance with the Assumption and Assignment Procedures and this Order.

35.    The following Assumption and Assignment Procedures are reasonable and appropriate under the circumstances, fair to all non-Debtor counterparties, comply in all respects with the Bankruptcy Code, and are approved.

36.    As soon as practicable, but not later than three (3) days after the entry of this Order, the Debtors shall file with the Court, serve on the Sale Notice Parties, including each applicable Contract Counterparty, and cause to be published on the Omni Website, an initial Assumption and Assignment Notice (the "**Initial Assumption and Assignment Notice**") which shall (a) identify the Transferred Contracts initially designated by the Stalking Horse Bidder for assumption and assignment to the Stalking Horse Bidder (the "**Initial Transferred Contracts**"); (b) list the Debtors' good faith calculation of the Cure Costs with respect to each Initial Transferred

19

Contract; (c) expressly state that assumption or assignment of any Transferred Contact is not guaranteed and is subject to Court approval; (d) direct the non-Debtor Counterparty to relevant publicly available financial information regarding the Stalking Horse Bidder for purposes of demonstrating adequate assurance of future performance by the Stalking Horse Bidder; (e) prominently display the deadline to file a Cure Objection and an Adequate Assurance Objection (each as hereinafter defined); and (f) prominently display the dates, times, and location of the Sale Hearings.

37.    Pursuant to the terms of the Stalking Horse Agreement, the Stalking Horse Bidder shall have the right, at any time prior to five (5) days prior to the Auction on the Stalking Horse Package, if any, or ten (10) days prior to the Sale Hearing if no Auction is held, to designate additional Transferred Contracts for proposed assumption and assignment to the Stalking Horse Bidder (each, a "**Supplemental Contract**") or to remove Contracts from the list of Transferred Contracts from proposed assumption and assignment (each, a "**Removed Contract**").    The Debtors shall use commercially reasonable efforts to, as soon as reasonably practicable after the Buyer's designation of any Supplemental Contracts or any Removed Contracts file with the Court, serve by overnight delivery on all applicable Counterparties, and cause to be published on the Omni Website, a notice of proposed assumption and assignment of the Supplemental Contracts (a "**Supplemental Assumption and Assignment Notice**") and/or removal of the Removed Contracts, which shall (a) expressly state that assumption or assignment of the Supplemental Contracts is not guaranteed and subject to Court approval and removal of the Removed Contracts does not constitute a rejection by the Debtors of such Contract, (b) direct each non-Debtor Counterparty to a Supplemental Contract to relevant publicly available financial information regarding the Stalking Horse Bidder for purposes of demonstrating adequate assurance of future

20

performance by the Stalking Horse Bidder, and (c) prominently display the deadline to file an Adequate Assurance Objection with respect to a Supplemental Contract.

38.     The Debtors shall provide notice to Counterparties whose Contracts or Leases are designated for assumption and assignment by any Additional Stalking Horse Bidder, pursuant to the terms of an applicable Additional Stalking Horse Agreement, or by any Successful Bidder, pursuant to the terms of an asset purchase agreement executed by the Debtors and the applicable Successful Bidder, in a manner consistent with the Assumption and Assignment Procedures, this Order, and all applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules, by no later than five (5) days prior to the applicable Auction, if held, and to the extent known, or otherwise ten (10) days prior to the applicable Sale Hearing.

39.     All objections to any proposed Cure Costs (a "**Cure Objection**") shall (a) be in writing; (b) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules; (c) state, with specificity, the legal and factual bases thereof, including the cure amount the objecting Counterparty believes is required to cure defaults under the relevant Contract or Lease; (d) include any appropriate documentation in support thereof; and (e) be filed with the Court and served on the Objection Notice Parties by the applicable deadline set forth in the applicable notice, which shall be at least seven (7) days after service of such notice, or less in the case of a Supplemental Assumption and Assignment Notice to the extent necessary, but in each case no less than three (3) calendar days before the applicable Sale Hearing.

40.     If a timely Cure Objection is received and such objection cannot otherwise be resolved by the parties, such objection shall be heard at the applicable Sale Hearing; provided that a Cure Objection may, at the Debtors' discretion (after consultation with the Stalking Horse Bidder, an Additional Stalking Horse Bidder (if applicable), or, if an Auction is held, the

21

Successful Bidder), be adjourned to a subsequent hearing if, pending resolution of such Cure

Objection (an "**Adjourned Cure Objection**"), the Debtors maintain a cash reserve (a "**Cure Cost**

**Reserve**") equal to the lesser of (a) the amount the objecting Counterparty has asserted to be

required to cure the asserted defaults under the applicable Proposed Assumed Contract and

(b) such other cash reserve amount as may be ordered by the Court, until a Cure Cost amount is

agreed to by the parties or determined by the Court; provided that if the Debtors maintain a letter

of credit or similar security deposit for the Debtors' obligations under a Proposed Assumed

Contract to a Counterparty asserting a Cure Objection, the Debtors shall not be required to fund a

Cure Cost Reserve to the extent of the existing amounts available under such letter of credit or

other security deposit maintained by such Counterparty.   Notwithstanding the existence of an

Adjourned Cure Objection, the Proposed Assumed Contract may be deemed assumed and assigned

to the Stalking Horse Bidder, the Additional Stalking Horse Bidder (if applicable), or, if an Auction

is held, the Successful Bidder, as of the applicable Closing Date if the Debtors maintain a Cure

Cost Reserve.   Upon resolution of a Cure Objection, the Cure Cost Reserve shall be reduced as

appropriate, and such available cash shall be applied to the Obligations in accordance with the

terms of the DIP Orders.

41.     If a Counterparty fails to file with the Court and serve on the Objection

Notice Parties a timely Cure Objection, the Counterparty shall be forever barred from asserting

any objection with regard to the cost to cure any defaults under the applicable Contract or Lease.

The Cure Costs set forth in each Assumption and Assignment Notice shall be controlling and will

be the only amount necessary to cure outstanding defaults under the applicable Contract or Lease

under Bankruptcy Code section 365(b), notwithstanding anything to the contrary in the Contract

or Lease, or any other document, and the Counterparty shall be forever barred from asserting any

22

additional cure or other amounts with respect to such Contract or Lease against the Debtors, the Successful Bidder, or the property of any of them.

42.     If the Stalking Horse Bidder is named a Successful Bidder at the applicable Auction, the Notice of Auction of Results served by the Debtors upon Counterparties to any Supplemental Contracts added to the Stalking Horse Bid at such Auction shall direct the non-Debtor Counterparty to relevant publicly available financial information regarding the Stalking Horse Bidder for purposes of demonstrating adequate assurance of future performance by the Stalking Horse Bidder.

43.     In the event the Debtors designate an Additional Stalking Horse Bidder, the Debtors shall use commercially reasonable efforts to, on the date of service of the Sale Notice or applicable Additional Stalking Horse Notice, as the case may be, or as soon as reasonably practicable thereafter, provide or cause to be provided to Counterparties to any known Proposed Assumed Contracts in the applicable Additional Stalking Horse Bid Adequate Assurance Information for the Additional Stalking Horse Bidder.

44.     If an Additional Stalking Horse Bidder is named a Successful Bidder at the applicable Auction, the Debtors shall, within one (1) calendar day after the conclusion of the Auction (or as soon as reasonably practicable thereafter), provide or cause to be provided to Counterparties to any additional Proposed Assumed Contracts added to the Additional Stalking Horse Bid at the applicable Auction Adequate Assurance Information for the Additional Stalking Horse Bidder.

45.     The Debtors shall, within one (1) calendar day after the conclusion of each Auction (or as soon as reasonably practicable thereafter), provide or cause to be provided to

23

Counterparties to the Proposed Assumed Contracts included in each Successful Bid (other than the Stalking Horse Bid) Adequate Assurance Information for such Successful Bidder.

46.     The Debtors shall provide or cause to be provided to applicable Counterparties Adequate Assurance Information on a strictly confidential basis.  Counterparties shall not use any Adequate Assurance Information for any purpose other than to (a) evaluate whether adequate assurance requirements under Bankruptcy Code section 365(f)(2) have been satisfied, and (b) to support any Adequate Assurance Objection filed by the Counterparty; provided that any Adequate Assurance Objection that discloses confidential, non-public information included in the Adequate Assurance Information, which shall be expressly identified as non-public and confidential therein, must be filed with the Court with such confidential, non-public information redacted, unless disclosure of such confidential, non-public information is authorized by the Debtors, the Successful Bidder, and any known proposed assignee(s) of the relevant Contract or Lease (if different from the Successful Bidder), or ordered by the Court.

47.     Any objection to the assumption and assignment of a Proposed Assumed Contract, including the Transferred Contracts, the subject of which objection is a Successful Bidder's (including the Stalking Horse Bidder and any Additional Stalking Horse Bidder if selected as a Successful Bidder) and/or its known proposed assignee's (if different from the Successful Bidder) proposed form of adequate assurance of future performance with respect to such Proposed Assumed Contract (an "**Adequate Assurance Objection**"), shall (a) be in writing; (b) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules; (c) state, with specificity, the legal and factual bases thereof; (d) include any appropriate documentation in support thereof; and (e) be filed with the Court and served on the Objection Notice Parties, including the applicable Successful Bidder and any known proposed assignee of such Proposed

24

Assumed Contract (if different from the Successful Bidder) by the applicable deadline set forth in the applicable notice, which shall be at least seven (7) days after the filing of such notice, or less in the case of a Supplemental Assumption and Assignment Notice to the extent necessary, but in each case no less than three (3) calendar days before the Sale Hearing.

48.     If a timely Adequate Assurance Objection cannot otherwise be resolved by the parties prior to the commencement of the applicable Sale Hearing, such objection and all issues of adequate assurance of future performance with respect to the applicable Proposed Assumed Contract shall be determined by the Court at the Sale Hearing or at a later hearing on a date to be scheduled by the Debtors.

49.     If a Counterparty fails to file with the Court and serve on the Objection Notice Parties, including the applicable Successful Bidder and any known proposed assignee (if different from the Successful Bidder) of the relevant Proposed Assumed Contract, a timely Adequate Assurance Objection, the Counterparty shall be forever barred from asserting any such Adequate Assurance Objection with regard to the Proposed Assumed Contract.  The Successful Bidder and/or its known proposed assignee of the Proposed Assumed Contract or Lease shall be deemed to have provided adequate assurance of future performance with respect to the Proposed Assumed Contract in accordance with Bankruptcy Code section 365(f)(2)(B) notwithstanding anything to the contrary in the contract or lease or any other document, and the Debtors shall be authorized to assume and assign the applicable Proposed Assumed Contract to the applicable Successful Bidder (or its known proposed assignee) without further notice to any Counterparty or any other party in interest, and without need for further order of the Court, with such assumption and assignment being subject to the terms of the applicable Sale Order.

WEIL:\95670212\13\44444.0005

50.    The Debtors' assumption and assignment of a Proposed Assumed Contract to a Successful Bidder (or to a designee of the Successful Bidder) is subject to Court approval and consummation of a Sale Transaction with the applicable Successful Bidder.  Accordingly, absent the closing of a Sale Transaction, the Proposed Assumed Contract shall not be deemed either assumed or assumed and assigned and shall, in all respects, be subject to further administration under the Bankruptcy Code.

51.    The inclusion of a Contract, Lease, or Cure Costs with respect thereto on an Assumption and Assignment Notice or the Notice of Auction Results shall not constitute or be deemed a determination or admission by the Debtors, the Successful Bidders, or any other party in interest that such Contract or Lease is an executory contract or an unexpired lease within the meaning of the Bankruptcy Code.  The Debtors reserve all of their rights, claims, and causes of action with respect to each Contract and Lease listed on any Assumption and Assignment Notice and Notice of Auction Results.  The Debtors' inclusion of any Contract or Lease on an Assumption and Assignment Notice or Notice of Auction Results shall not be a guarantee that such Contract or Lease ultimately will be assumed or assumed and assigned.  The Initial Assumption and Assignment Notice and any Supplemental Assumption and Assignment Notice or Additional Stalking Horse Sale Notice shall be without prejudice to the Stalking Horse Bidder's or any Additional Stalking Horse Bidder's rights under the Stalking Horse Agreement or the applicable Additional Stalking Horse Agreement to subsequently (a) exclude a Contract from the list of Proposed Assumed Contracts previously included on such Notice or (b) include additional Proposed Assumed Contracts for assumption and assignment in accordance with the applicable Stalking Horse Agreement.

26

52.     For the avoidance of doubt, nothing herein shall modify, alter, impair, or otherwise affect any of the provisions of the DIP Order or the DIP Documents, or the rights or remedies of the DIP Agent or the DIP Lenders under the DIP Documents (each as defined in the DIP Order) except with respect to the Acquired Assets.

## **Related Relief**

53.     All persons and entities (whether or not selected as a Qualified Bidder) that submit a bid for any of the Debtors' Assets during the sale process, including at the Auctions, shall be deemed to have knowingly and voluntarily (a) submitted to the exclusive jurisdiction of this Court with respect to all matters related to the terms and conditions of the transfer of Assets, the Auctions, and any Sale Transaction; (b) consented to the entry of a final order by the Court in connection with the Motion or this Order (including any disputes relating to the Bidding and Auction Process, the Auctions, and/or any Sale Transaction) to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution; and (c) waived any right to jury trial in connection with any disputes relating to the any of the foregoing matters.

54.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014, or any applicable provisions of the Bankruptcy Rules or the Local Rules or otherwise stating the contrary, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and any applicable stay of the effectiveness and enforceability of this Order is hereby waived.

55.     Prior to mailing and publishing the Sale Notice and the Global Cure Notice, as applicable, the Debtors may fill in any missing dates and other information, conform the provisions thereof to the provisions of this Order, and make such other, non-material changes as the Debtors deem necessary or appropriate.

27

56.     The Debtors are authorized to take all action necessary to effectuate the

relief granted in this Order.

57.     The Court shall retain jurisdiction to hear and determine all matters arising

from or related to the implementation, interpretation, and/or enforcement of this Order.


Dated: _____, 2020
       New York, New York

                                    _____

                                    UNITED STATES BANKRUPTCY JUDGE

28

**<u>Exhibit 1</u>**

**Bidding Procedures**

WEIL:\97276692\10\44444.0008

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re                                      :
                                           :     **Chapter 11**
**FAIRWAY GROUP HOLDINGS**                  :
**CORP.**, *et al.*,                        :     **Case No. 20-[_____] (___)**
                                           :
            **Debtors.**[1]                 :     **(Jointly Administered)**
-------------------------------------------------------------x

## BIDDING PROCEDURES

### Overview

On January 23, 2020, Fairway Group Holdings Corp. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtors are seeking to sell their fourteen (14) operating grocery stores, bakeries, and beer, wine, and liquor stores (each, a "**Store**"), their production and distribution center (the "**PDC**" and, together with the Stores, the "**Locations**"), and all related assets (collectively with the Locations, the "**Assets**") for the highest or best offers. On [__], 2020, the United States Bankruptcy Court for the Southern District of New York entered an order (ECF No. [__]) (the "**Bidding Procedures Order**"),[2] which, among other things, authorized the Debtors to solicit bids and approved these procedures (the "**Bidding Procedures**") for the consideration of the highest or otherwise best price for **all** of the Assets, on the terms and conditions set forth herein.

A stalking horse bid has been submitted for certain of the Assets by Village Super Market, Inc. (the "**Stalking Horse Bidder**" and its bid, the "**Stalking Horse Bid**"). The Stalking Horse Bidder has executed an agreement (the "**Stalking Horse Agreement**") for the purchase of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Fairway Group Holdings Corp. (2788); Fairway Group Acquisition Company (2860); Fairway Bakery LLC (4129); Fairway Broadway LLC (8591); Fairway Chelsea LLC (0288); Fairway Construction Group, LLC (2741); Fairway Douglaston LLC (2650); Fairway East 86th Street LLC (3822); Fairway eCommerce LLC (3081); Fairway Georgetowne LLC (9609); Fairway Greenwich Street LLC (6422); Fairway Group Central Services LLC (7843); Fairway Group Plainview LLC (8643); Fairway Hudson Yards LLC (9331); Fairway Kips Bay LLC (0791); FN Store LLC (9240); Fairway Paramus LLC (3338); Fairway Pelham LLC (3119); Fairway Pelham Wines & Spirits LLC (3141); Fairway Red Hook LLC (8813); Fairway Stamford LLC (0738); Fairway Stamford Wines & Spirits LLC (3021); Fairway Staten Island LLC (1732); Fairway Uptown LLC (8719); Fairway Westbury LLC (6240); and Fairway Woodland Park LLC (9544). The location of the Debtors' corporate headquarters is 2284 12th Avenue, New York, New York 10027.

[2] Capitalized terms used but not otherwise shall have the respective meanings ascribed to such terms in the Bidding Procedures Order or the Motion requesting the relief granted therein, as applicable.

Assets associated with six (6) Locations (five (5) Stores and the PDC) identified on **Schedule 1** annexed hereto, including the leasehold interests, inventory, Transferred Contracts, and furniture, fixtures, and equipment, and other related assets at such Locations (collectively, the "**Stalking Horse Package**").[3]

The Stalking Horse Bid is subject to higher or better offers submitted in accordance with the terms and conditions of these Bidding Procedures.  These Bidding Procedures describe, among other things: (i) the procedures for bidders to submit bids for one or more Locations, including those included in the Stalking Horse Package; (ii) the manner in which bidders and bids become Qualified Bidders and Qualified Bids (each as defined herein); (iii) the negotiation of bids received; (iv) the conduct of one or more subsequent auctions (an "**Auction**"); and (v) the ultimate selection of the Successful Bidder(s) (as defined herein) and Court approval thereof (collectively, the "**Bidding and Auction Process**").

The Debtors reserve the right to extend any of the bidding deadlines or other dates set forth in these Bidding Procedures, after consultation with the Consultation Parties (as defined herein) without further order of the Bankruptcy Court subject to providing notice as described below.

### Summary of Important Dates

| Stalking Horse Package Sale Timeline | |
| --- | --- |
| **February 13, 2020** | Hearing to consider approval of Bidding Procedures and entry of Bidding Procedures Order |
| **February 28, 2020 at 4:00 p.m. (Eastern Time)** | Objection deadline for (i) sale of Stalking Horse Package to Stalking Horse Bidder pursuant to Stalking Horse Agreement and (ii) assumption and assignment of Initial Transferred Contracts to Stalking Horse Bidder |
| **February 28, 2020 at 4:00 p.m. (Eastern Time)** | Global Bid Deadline |
| **March 6, 2020 at 11:59 p.m. (Eastern Time)** | Qualified Bid and Baseline Bid Designation Date for Stalking Horse Package |

---

[3] Pursuant to the Stalking Horse Agreement, the Stalking Horse Bidder may remove the Leases for (a) the Chelsea Store, (b) the Harlem Store, and/or (c) the PDC from the Stalking Horse Package at any time prior to the later of the date that is (i) forty-five (45) days from the date of execution of the Stalking Horse Agreement and (ii) two (2) days prior to the date of the Auction, if any.  In addition, the Stalking Horse Bidder may add or remove Contracts from the list of Transferred Contracts at any time prior to five (5) days prior to the Auction, if any, or ten (10) days prior to the Sale Hearing if no Auction is held.  Any such Location or Contract removed from the Stalking Horse Package shall, upon removal, no longer be deemed to be part of the Stalking Horse Package for purposes of these Bidding Procedures, and any such Contract added to the Stalking Horse Package shall be deemed included therein for all purposes hereof.

2

| | |
|---|---|
| **March 10, 2020** | (i) Auction for Stalking Horse Package (if other Qualified Bids received for Stalking Horse Package) to be held at offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153; or |
| | (ii) Sale Hearing (if no other Qualified Bids received for Stalking Horse Package) |
| **March 11, 2020 at 11:59 p.m. (Eastern Time)** | Date for Debtors to file and serve Notice of Auction Results, and provide applicable Counterparties with Adequate Assurance Information, with respect to Successful Bidder (if applicable, and if Auction held) |
| **March 19, 2020 at 4:00 p.m. (Eastern Time)** | Objection deadline for sale of Stalking Horse Package if Auction held (if Successful Bidder is not Stalking Horse Bidder or additional Proposed Assumed Contracts added at Auction) |
| **March 26, 2020** | Sale Hearing if Auction held |
| **Other Asset Sale Timeline** ||
| **February 13, 2020** | Hearing to consider approval of Bidding Procedures and entry of Bidding Procedures Order |
| **February 28, 2020 at 4:00 p.m. (Eastern Time)** | Global Bid Deadline |
| **March 9, 2020 at 11:59 p.m. (Eastern Time)** | Qualified Bid and Baseline Bid Designation Date for Other Assets |
| **March 11, 2020** | Auction for Other Assets, to be held at offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153 |
| **March 12, 2020 at 11:59 p.m. (Eastern Time)** | Date for Debtors to file and serve Notice of Auction Results, and provide applicable Counterparties with Adequate Assurance Information for Successful Bidder |
| **March 19, 2020 at 4:00 p.m. (Eastern Time )** | Objection deadline for sale of Auction Package to Successful Bidder |
| **March 26, 2020** | Sale Hearing for Other Assets |

3

## **Marketing Process**

Assets to be Sold

        All of the Debtors' Assets are available for sale.  A party who is interested in purchasing any of the Assets may submit one or more bids to purchase the following, in addition to related Assets:

      (A)     the Stalking Horse Package;

      (B)     the Locations not included in the Stalking Horse Package; and/or

      (C)     one or more Locations, whether or not such Location is included in the Stalking Horse Package.

        Stores not included in the Stalking Horse Package are referred to herein as the "**Other Locations**" (together with any other Assets not included in the Stalking Horse Package, the "**Other Assets**").  A complete list of the Other Locations available for sale pursuant to these Bidding Procedures is annexed hereto as **Schedule 2**.[4]

Access to Diligence

        To participate in the diligence process and receive access to due diligence information with respect to any of the Locations, a party must submit to the Debtors or their advisors:

      (A)     an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors; and

      (B)     sufficient information, as reasonably determined by the Debtors, to allow the Debtors, after consultation with the Consultation Parties, to reasonably determine that the interested party has, or can obtain, the financial wherewithal and any required internal corporate, legal, or other authorizations to close a Sale Transaction, including, but not limited to, current audited financial statements of the interested party (or such other form of financial disclosure reasonably acceptable to the Debtors in their discretion).

        An interested party shall be a "**Potential Bidder**" if the Debtors determine in their reasonable discretion, after consultation with the Consultation Parties, that an interested party has satisfied the above requirements.  As soon as practicable, the Debtors will deliver to such Potential Bidder (i) an information package containing information and financial data with respect to the

---

[4] Pursuant to the Stalking Horse Agreement, the Leases (and other related Assets) for (a) the Chelsea Store, (b) the Harlem Store, and/or (c) the PDC from the Stalking Horse Package may be removed from the Stalking Horse Package at any time prior to the later of the date that is (i) forty-five (45) days from the date of execution of the Stalking Horse Agreement and (ii) two (2) days prior to the date of the Auction, if any.  Any such Locations and other Assets removed from the Stalking Horse Package shall, upon removal, be deemed Other Assets for purposes of these Bidding Procedures.

WEIL:\97323793\7\44444.0008

Assets in which such Potential Bidder has expressed an interest and (ii) access to the Debtors' confidential electronic data room concerning the Locations (the "**Data Room**").

Once an interested party is deemed a Potential Bidder, its identity may, in the Debtors' discretion, be disclosed to the Stalking Horse Bidder and any Additional Stalking Horse Bidder (as defined below).

Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder, as applicable, to consummate its contemplated transaction.

<u>Due Diligence</u>

Until the Global Bid Deadline (as defined below), the Debtors will provide any Potential Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances. The Debtors will work to accommodate all reasonable requests for additional information and due diligence access from Prospective Bidders. All due diligence requests shall be directed to Scott Moses (smoses@pjsolomon.com) and Josh Heft (jheft@pjsolomon.com) of the Debtors' advisors, PJ Solomon, L.P. ("**Solomon**").

Unless otherwise determined by the Debtors, the availability of additional due diligence to a Potential Bidder will cease if (i) the Potential Bidder does not become a Qualified Bidder or (ii) these Bidding Procedures are terminated.

Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Locations to any person or entity who is not a Potential Bidder or a Consultation Party or who does not comply with the participation requirements set forth above.

## **Designation of Additional Stalking Horse Bidders**

<u>Designation of Additional Stalking Horse Bidders</u>

In connection with the sale of the Other Assets, the Debtors may, but are not obligated to, after consulting with the Consultation Parties, designate one or more stalking horse bidders (each, an "**Additional Stalking Horse Bidder**," and each such bidder's bid, an "**Additional Stalking Horse Bid**") for one or more of the Other Assets (each such group of Other Assets, an "**Additional Stalking Horse Package**") and offer each such Additional Stalking Horse Bidder certain bid protections, including a break-up fee (an "**Additional Termination Payment**" and, together with other bid protections provided to an Additional Stalking Horse Bidder, the "**Additional Stalking Horse Bid Protections**"); <u>provided</u> <u>that</u> the Additional Termination Payment provided to an Additional Stalking Horse Bidder shall be negotiated by Debtors, in consultation with the Consultation Parties, and may not exceed three percent (3%) of the cash portion of the purchase price in the Additional Stalking Horse Bid, as set forth in an asset purchase agreement executed by the Debtors and the applicable Additional Stalking Horse Bidder (each, an "**Additional Stalking Horse Agreement**").

5

In the event that the Debtors determine to designate an Additional Stalking Horse Bidder, the Debtors shall promptly upon execution of an Additional Stalking Horse Agreement, and in no event more than one (1) calendar day following such execution, file with the Bankruptcy Court, serve on the Sale Notice Parties (as defined in the Motion), and cause to be published on the website maintained by Omni Agent Solutions, the Debtors' claims and noticing agent in these chapter 11 cases, located at www.omniagentsolutions.com/Fairway (the "**Omni Website**"), a notice that contains information about the Additional Stalking Horse Bidder and the Additional Stalking Horse Bid, including the proposed Additional Stalking Horse Bid Protections, and attaches the proposed Additional Stalking Horse Agreement (the "**Notice of Additional Stalking Horse Bidder**").

<u>Objections to and Approval of Designation of Additional Stalking Horse Bidder</u>

Any objections (each, an "**Additional Stalking Horse Objection**") to the designation of an Additional Stalking Horse Bidder, including any Additional Stalking Horse Bid Protections pursuant to the terms and provisions of an Additional Stalking Horse Agreement, must (i) be in writing; (ii) state the name and address of the objecting party (unless such party is the U.S. Trustee or a Consultation Party) and the amount and nature of the Claim or Interest of such party; (iii) state with particularity the basis and nature of any objection; (iv) conform to the Bankruptcy Rules and the Local Rules; (v) be filed with the Court (a) by registered users of the Court's case filing system, electronically in accordance with General Order M-399 (which can be found at http://www.nysb.uscourts.gov) and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Court and General Order M-399, as applicable; and (vi) be served upon the Objection Notice Parties (as defined herein) within seven (7) calendar days after the filing of the Notice of Additional Stalking Horse Bidder.

If a timely Additional Stalking Horse Objection is filed and served in accordance with the preceding paragraph, the proposed designation of an Additional Stalking Horse Bidder and Additional Stalking Horse Bid Protections will not be approved until either the Additional Stalking Horse Objection is resolved by agreement of the objecting party and the Debtors or by order of the Bankruptcy Court.

If no timely Additional Stalking Horse Objection is filed and served with respect to an Additional Stalking Horse Agreement in accordance with these Bidding Procedures, the Debtors shall file a Certificate of No Objection and submit a proposed order approving the Additional Stalking Horse Bid Protections to the Court.

For all purposes under these Bidding Procedures, an Additional Stalking Horse Bidder approved as such in accordance with the Bidding Procedures Order shall be a Qualified Bidder, and its Additional Stalking Horse Bid shall be considered a Qualified Bid. Subject to the other provisions of these Bidding Procedures, in the event that an Additional Stalking Horse Bid is the only Qualified Bid received by the Debtors by the Global Bid Deadline, the Additional Stalking Horse Bidder may be declared the Successful Bidder.

6

## Auction Qualification Procedures

Global Bid Deadline

A Potential Bidder that desires to make a bid on one or more of the Locations shall deliver written and electronic copies of its bid in both PDF and MS-WORD format to the Bid Notice Parties (as defined herein) so as to be received no later than **February 28, 2020 at 4:00 p.m. (Eastern Time)** (the "**Global Bid Deadline**"); provided that the Debtors may, in consultation with the Consultation Parties, extend the Global Bid Deadline for any reason whatsoever, in their reasonable business judgment, for all or certain Potential Bidders, without further order of the Bankruptcy Court, subject to providing notice to the Stalking Horse Bidder, all Potential Bidders, and the Consultation Parties.

**Any party that does not submit a bid by the Global Bid Deadline will not be allowed to (i) submit any offer after the Global Bid Deadline or (ii) participate in any Auction;** provided that the foregoing shall not preclude the Debtors from marketing to any person or auctioning, or any parties from bidding on, any Locations not included in an Auction after the Global Bid Deadline.

Communications with Potential Bidders

There must be no communications between and amongst Potential Bidders unless the Debtors have previously authorized such communication in writing. The Debtors reserve the right, in their reasonable business judgment, in consultation with the Consultation Parties, to disqualify any Potential Bidder(s) that have communications between and amongst themselves.

Form and Content of Qualified Bids

A "**Bid**" as used herein is a signed document from a Potential Bidder received by the Global Bid Deadline that identifies the purchaser by its legal name (including any equity holders or other financial backers, if the Potential Bidder is an entity formed for the purpose of submitting bids or consummating a Sale Transaction), and any other party that will be participating in connection with the bid or the Sale Transaction, and includes, at a minimum, the following information:

(A)   Proposed Locations and Valuation. Each Bid must clearly identify and list the particular Locations and Other Assets (such as inventory) and liabilities that the Potential Bidder seeks to acquire, whether individually or in combination. The Bid must identify, on a per Location basis, the valuations, in U.S. dollars, that the Potential Bidder associates with each of those Locations, and a description of any significant assumptions on which such valuations are based (including a separate identification of the cash and non-cash components of the valuation). To the extent the Bid proposes to purchase particular Assets associated with the Locations, such as inventory, the Bid shall clearly identify the value, in U.S. dollars, associated with such Assets.

(B)   Proposed APA. Each Bid must include a copy of an asset purchase agreement reflecting the terms and conditions of the Bid, which agreement must be marked to

7

show any proposed amendments and modifications to the form of purchase agreement posted by the Debtors in the Data Room (the "**Proposed APA**").

(C)   <u>Unconditional Offer; No Financial Contingency</u>.   A statement that the Bid is formal, binding, and unconditional (except for those conditions expressly set forth in the applicable Proposed APA), is not subject to any due diligence or financing contingency, and is irrevocable until the first business day following the closing of the proposed Sale Transaction, except as otherwise provided in these Bidding Procedures.   To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the Sale Transaction set forth in its Bid with cash on hand (or other immediately available cash), each Bid must include committed financing documented to the Debtors' satisfaction, in consultation with the Consultation Parties, that demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's purchase price and other obligations under its Bid.

(D)   <u>Form of Consideration</u>.

    (i)   <u>All-Cash Offer</u>.   Unless the Bid includes a Credit Bid or a Landlord Bid (as described below), a statement confirming that the Bid is based on an all-cash offer, including, in the case of a bid for all or any part of the Stalking Horse Package or any Additional Stalking Horse Package, sufficient cash consideration to pay the Termination Payment (as such term is defined in the Stalking Horse Agreement) or any Additional Termination Payment and to meet the Minimum Overbid Amount (as defined herein); <u>provided</u> <u>that</u> any bid that includes a Credit Bid shall also include a cash component sufficient to pay, and earmarked exclusively for the payment of, any applicable Termination Payment or Additional Termination Payment and all obligations secured by senior liens on the applicable Assets.

    (ii)   <u>Credit Bidding</u>.   In connection with the sale of all or a portion of the Assets, a person or entity may seek to credit bid all or a portion of their secured claims for their respective collateral (each such bid, a "**Credit Bid**") pursuant to section 363(k) of the Bankruptcy Code; <u>provided</u> <u>that</u> the Credit Bid shall include cash consideration sufficient to pay in full all claims for which there are valid, perfected, and unavoidable liens on any Assets included in such Bid that are senior in priority to those of the party seeking to Credit Bid (unless such senior lien holder consents to alternative treatment) and complies with any orders of the Bankruptcy Court approving debtor-in-possession financing or use of cash collateral, and if for any portion of the Stalking Horse Package, an amount sufficient to pay the Termination Payment.   A Credit Bid shall not require a Deposit (as defined herein).

    (iii)   <u>Landlord Bid</u>.   Subject to the Debtors' discretion to consider such bids (in consultation with the Consultation Parties), any bid submitted by a landlord for the purchase of one or more of such landlord's own Locations (each

8

such bid, a "**Landlord Bid**") may include a purchase price composed of a (i) cash component, and (ii) a non-cash component that represents a valid and undisputed "credit" for any unpaid amounts validly due under the lease for such Location (a "**Landlord Credit**"). A Landlord Credit will be applied to reduce the cash consideration for the applicable Location. Landlord Bids must be accompanied by a Deposit in an amount equal to ten percent (10%) of only the cash component of such Bid.

(E)   Purchase Price; Minimum Bid.

(i)   Stalking Horse Package. Except as otherwise provided herein, each Bid submitted in connection with the Stalking Horse Package must (a) be a Bid for all of the Locations and the related Assets contained in the Stalking Horse Package, (b) exceed the Cash Purchase Price, the Termination Payment, and any Minimum Overbid Amount set by the Debtors, and (c) propose an alternative transaction that provides substantially similar or better terms than the Stalking Horse Bid (as determined by the Debtors in consultation with the Consultation Parties).

(ii)   Bids for Individual Locations or Combination of Locations. Bidders may also submit Bids for individual Locations or combinations of Locations that do not comprise the entire Stalking Horse Package, whether or not any such Locations are included in the Stalking Horse Package or any Additional Stalking Horse Package (each, a "**Partial Bid**"). The Debtors will determine, after consultation with the Consultation Parties, whether such Bids qualify as Qualified Bids. Generally, to be considered a Qualified Bid, the Debtors, in consultation with the Consultation Parties, must conclude that a Partial Bid, when taken together with other Partial Bids, satisfies the criteria for being a Qualified Bid with respect to the Stalking Horse Package.

If a Bid includes one or more Locations and/or other Assets currently included in the Stalking Horse Package or any Additional Stalking Horse Package, but does not include all of the Locations and other Assets included in such Stalking Horse Package, such Bid will not be considered to be a "Qualified Bid" unless (a) the Debtors receive one or more Bids for the remaining Locations in such Stalking Horse Package that, in combination with one or more other Bids for other Acquired Assets in the Stalking Horse Package, constitute a higher or better bid than the applicable Stalking Horse Bid; or (b) the Partial Bid includes less than all of the Locations and related Assets in such Stalking Horse Package but proposes a purchase price allocable to such Locations and related Assets that, together with the liquidation or alternative value of any Locations and related Assets in such Stalking Horse Package not included in the Partial Bid, exceeds the aggregate purchase price in the applicable Stalking Horse Bid.

9

(iii) <u>Additional Stalking Horse Packages</u>. Each bid submitted in connection with an Additional Stalking Horse Package must exceed the cash purchase price in the applicable Additional Stalking Horse Bid, plus any applicable Additional Termination Payment and Minimum Overbid Amount, or propose an alternative transaction that provides better terms than the Additional Stalking Horse Bid, taking into account any allocable Additional Termination Payment.

(F) <u>Employee and Labor Terms</u>. A statement of proposed terms for unionized and non-unionized employees, which shall include, alternatively: (i) a statement that the Potential Bidder will assume the Debtors' affected collective bargaining agreements (the "**Affected Labor Agreements**") without modification; (ii) if the Potential Bidder will not assume the Affected Labor Agreements without modification, a statement that the Potential Bidder will enter into good faith negotiations with each affected labor union (the "**Affected Unions**") to enter into modified labor agreements (each, a "**Modified Labor Agreement**"), including a term sheet, which shall be attached to the Potential Bidder's Proposed APA, proposing post-closing work rules and conditions to be offered to unionized employees; or (iii) a statement that the Potential Bidder does not intend to assume any Affected Labor Agreements; <u>provided</u> <u>that</u> such statement shall include whether or not the Potential Bidder intends to offer employment to any of the Debtors' employees following a closing of an applicable Sale Transaction. Such statement shall also include an acknowledgment of the requirements of sections 1113 and 1114 of the Bankruptcy Code and an agreement to use good faith reasonable best efforts to cooperate with the Debtors in ensuring compliance with any applicable provisions thereof in the event that mutually satisfactory Modified Labor Agreements have not been entered into between the Potential Bidder and the Affected Unions prior to the closing of a sale contemplated by these Bidding Procedures.

(G) <u>Pension Plans</u>. Each Bid must state whether or not the Potential Bidder intends to assume (i) sponsorship of all or any part of or (ii) any of the potential liabilities associated with the Debtors' multi-employer pension plan (the "**Pension Plan**"). If the Potential Bidder does not intend to assume sponsorship or liabilities of the Pension Plan in full, each Bid must state whether the Potential Bidder intends to assume the assets and liabilities of the Pension Plan relating to plan participants associated with the Locations in the Bid.

(H) <u>Required Approvals</u>. A statement or evidence (i) that the Potential Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable ("**HSR Filings**"), and any other Antitrust Law (as defined in the Stalking Horse Agreement), and pay the fees associated with such filings and (ii) of the Potential Bidder's plan and ability to obtain all governmental and regulatory approvals to operate the business and the Locations included in its Bid from and after closing the applicable Sale Transaction and the proposed timing for the Potential Bidder to undertake the actions required to obtain such approvals. A Potential Bidder further agrees that its

10

legal counsel will coordinate in good faith with Debtor's legal counsel to discuss and explain Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Proposed APA.

(I)    <u>No Entitlement to Expense Reimbursement or Other Amounts</u>.  Except as provided with respect to the Stalking Horse Bidder or any Additional Stalking Horse Bidder in the Stalking Horse Agreement or any Additional Stalking Horse Agreement, a statement that the Bid does not entitle the Potential Bidder to any breakup fee, termination fee, expense reimbursement, or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the Assets.

(J)    <u>Adequate Assurance Information</u>.  Each Bid must contain such financial and other information that allows the Debtors, after consultation with the Consultation Parties, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the applicable Sale Transaction, including, without limitation, such financial and other information setting forth adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code, and the Potential Bidder's willingness to perform under any contracts that are assumed and assigned to the Potential Bidder (the "**Adequate Assurance Information**").

(K)    <u>Designation of Contracts and Leases</u>.  Each Bid must identify with particularity each and every executory contract and unexpired lease, the assumption and, as applicable, assignment of which is a condition to closing the applicable Sale Transaction.

(L)    <u>Representations and Warranties</u>.   Each Bid must include the following representations and warranties:

(i)    a statement that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the applicable Assets prior to submitting its Bid;

(ii)    a statement that the Potential Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the assets in making its Bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Potential Bidder's Proposed APA ultimately accepted and executed by the Debtors;

11

(iii)    a statement that the Potential Bidder agrees to serve as Back-Up Bidder (as defined herein), if its Bid is selected as the next highest or next best bid after the Successful Bid with respect to the applicable Assets, until the Back-Up Termination Date (as defined herein);

(iv)    a statement that the Potential Bidder has not engaged in any collusion with respect to the submission of its Bid;

(v)     a statement that all proof of financial ability to consummate a Sale Transaction in a timely manner and all information provided to support adequate assurance of future performance is true and correct; and

(vi)    A statement that the Potential Bidder agrees to be bound by the terms of these Bidding Procedures.

A Potential Bidder must also accompany its Bid with:

(M)    a Deposit (as defined herein);

(N)    the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the bid submitted by the Potential Bidder;

(O)    written evidence of available cash, a commitment for financing (not subject to any conditions), and such other evidence of ability to consummate the transaction contemplated by the applicable Proposed APA, as acceptable in the Debtors' business judgment and following consultation with the Consultation Parties, including a description of each investor and any additional party or parties investing in the transaction included in the applicable bid and such party's financial position;

(P)    a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed and to consummate the transaction contemplated by the Proposed APA;

(Q)    a covenant to cooperate with the Debtors to provide pertinent factual information regarding the Potential Bidder's operations reasonably required to analyze issues arising with respect to any applicable Antitrust Laws and other applicable regulatory requirements;

(R)    in the case of a Bid for the Stalking Horse Package or any Additional Stalking Horse Package, if the value of the Bid relative to the applicable Stalking Horse Agreement includes additional non-cash components (such as fewer contingencies than are in the applicable Stalking Horse Agreement), a detailed analysis of the value of any additional non-cash component of the Bid and back-up documentation to support such value; and

(S)    if the Bid includes an asset purchase agreement that is not executed, a signed statement that such Bid is irrevocable until the first business day following the

12

closing or closings of the applicable Sale Transaction, and to serve as a Back-Up Bidder.

The submission of a Bid by the Global Bid Deadline shall constitute a binding and irrevocable offer to acquire the Locations and/or other Assets reflected in such Bid.

Deposit

To qualify as a Qualified Bid (as defined herein), each Bid (other than any Credit Bid) must be accompanied by a good faith cash deposit in the amount of ten percent (10%) of the proposed purchase price (the "**Deposit**"), to be deposited, prior to the Global Bid Deadline, with an escrow agent selected by the Debtors (the "**Escrow Agent**") pursuant to the escrow agreement to be provided by the Debtors to the Potential Bidders (the "**Escrow Agreement**"); provided that with respect to a Landlord Bid, the landlord may deduct from its Deposit the amount of any undisputed monetary obligations that constitute the Cure Costs for the applicable real property lease.

To the extent the Locations included in a Qualified Bid are modified at or prior to the Auction, the Qualified Bidder must adjust its Deposit so that it equals ten percent (10%) of the purchase price proposed to be paid for each Location and related Assets.

Review of Bids and Designation of Qualified Bidders

The Debtors will deliver, within one (1) business day after receipt thereof, copies of all Bids to the Consultation Parties. A bid received for the Assets that is determined by the Debtors, in consultation with the Consultation Parties, to meet the requirements set forth in the preceding section will be considered a "**Qualified Bid**," and the Stalking Horse Bidder, any Additional Stalking Horse Bidder, and any bidder that submits a Qualified Bid (including the Stalking Horse Bid and any Additional Stalking Horse Bid) will be considered a "**Qualified Bidder**."

The Debtors may, after consulting with the Consultation Parties, amend or waive the conditions precedent to being a Qualified Bidder at any time, in their reasonable business judgment, in a manner consistent with their fiduciary duties and applicable law, and may engage in negotiations with Potential Bidders who submitted Bids complying with the preceding section as the Debtors deem appropriate in the exercise of their business judgment, based upon the Debtors' evaluation of the content of each Bid.

The Debtors will evaluate timely submitted bids, in consultation with the Consultation Parties, and may take into consideration the following non-binding factors:

(A)     the amount of the purchase price and Credit Bid, Landlord Credit, and/or other non-cash consideration, as applicable, set forth in the Bid;

(B)     the Assets included in or excluded from the Bid;

13

(C)      the value to be provided to the Debtors under the Bid for the Locations included therein (individually and in the aggregate), including the net economic effect upon the Debtors' estates after the payment of any applicable Termination Payment;

(D)      any benefit to the Debtors' bankruptcy estates from any assumption or waiver of liabilities, including through a Credit Bid or a Landlord Credit, and any liabilities under the Pension Plans, the assumption of the sponsorship of all, any, or a portion of the Pension Plans;

(E)      the transaction structure and execution risk, including conditions to, timing of, and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, cost to the Debtors' bankruptcy estates to pursue such transaction, and required governmental or other approvals;

(F)      the impact on employees, employee claims against the Debtors, Affected Labor Agreements, and whether the Potential Bidder has reached an agreement with the Affected Unions;

(G)      the impact on trade creditors and landlords; and

(H)      any other factors the Debtors may reasonably deem relevant, in consultation with the Consultation Parties.

The Debtors, in consultation with the Consultation Parties, will make a determination regarding which bids qualify as Qualified Bids, and will notify Potential Bidders whether they have been selected as Qualified Bidders by no later than (i) **March 6, 2020**, with respect to each bid or combination of bids for the Stalking Horse Package, or (ii) **March 9, 2020**, with respect to all other bids (the applicable date, the "**Qualified Bid Designation Date**").

The Debtors reserve the right to work with any Bidder in advance of the Auctions to cure any deficiencies in a Bid that is not initially deemed a Qualified Bid. The Debtors may accept a single Bid or multiple Bids for non-overlapping Locations such that, if taken together, would otherwise meet the standards for a single Qualified Bid as to the Stalking Horse Package, any Additional Stalking Horse Package, or any Other Locations, Other Assets, or combination of Locations and Assets that the Debtors determine to auction (in which event those multiple bidders shall be treated as a single Qualified Bidder for purposes of the applicable Auction). If a Bid is received and, in the Debtors' judgment, after consultation with the Consultation Parties, it is not clear whether the Bid is a Qualified Bid, the Debtors may consult with the Potential Bidder and seek additional information in an effort to establish whether or not the Bid is a Qualified Bid.

The Debtors, after consultation with the Consultation Parties, will have the right to determine that a Bid is not a Qualified Bid if any of the following conditions are satisfied:

(A)      A Potential Bidder has failed to comply with reasonable requests for additional information from the Debtors; or

(B)      The terms of the Bid are burdensome or conditional in view of the proposed purchase price or, in the case of a Bid or combination of Bids for the Stalking Horse

14

Package or any Additional Stalking Horse Package, are materially more burdensome or conditional than the terms of the applicable Stalking Horse Agreement, and are not offset by a material increase in purchase price, which determination (as made by the Debtors in consultation with the Consultation Parties) may take into consideration, among other things:

(i)     whether the Bid does not provide sufficient cash consideration to pay transfer taxes, Cure Costs, or other cash costs of the transaction (including, if applicable, the applicable Termination Payment); and

(ii)    whether the Bid includes a non-cash instrument or similar consideration that is not freely marketable.

The Stalking Horse Bidder and any Additional Stalking Horse Bidder are each a Qualified Bidder and the Stalking Horse Bid and any Additional Stalking Horse Bid are each a Qualified Bid as to the applicable Stalking Horse Package.

Should it decide to Credit Bid, each of (i) Ankura Trust Company, LLC, as administrative agent and collateral agent under the Prepetition Credit Agreement, (ii) the Prepetition Secured Lenders under the Prepetition Credit Agreement, and (iii) the DIP Lenders is a Qualified Bidder and any such Credit Bid will be considered a Qualified Bid to the extent such bid is received by the Global Bid Deadline, complies with (a) the above requirements set forth under the heading "Designation of Qualified Bidders," (b) section 363(k) of the Bankruptcy Code, and (c) the terms and conditions of the Prepetition Credit Agreement (and any other "Loan Documents" (as such term is defined therein)), and includes, to the extent the Credit Bid is for a Stalking Horse Package or any Additional Stalking Horse Package, a cash component sufficient to pay, and earmarked exclusively for payment of, the applicable Termination Payment and all obligations secured by senior liens (if any) on the Assets to be purchased.

Notwithstanding the foregoing or anything contained in these Bidding Procedures to the contrary, the Debtors reserve the right to, in consultation with the Consultation Parties, consider Landlord Bids (and Partial Bids that include Landlord Bids). A Landlord Bid may qualify as a Qualified Bid if such bid complies with the Qualified Bid requirements set forth under the heading "Form and Content of Qualified Bids," as applicable; provided that the bidding landlord shall not be required to include in its Bid the regulatory approvals set forth in subsection (H) under such heading or include any Adequate Assurance Information of the type set forth in subjection (J) under such heading with respect to its ability to perform under its own lease. In addition, for a Landlord Bid for a Location included in the Stalking Horse Package to be considered a Qualified Bid, the Debtors, in consultation with the Consultation Parties, must conclude that the Landlord Bid, when taken together with other Partial Bids and/or Landlord Bids received in respect of the remaining Locations in the Stalking Horse Package, satisfies the criteria for being a Qualified Bid for the Stalking Horse Package.

15

**Pre-Auction Procedures**

Determination and Announcement of Baseline Bids

In consultation with the Consultation Parties, the Debtors shall make a determination regarding:

(A)    the Assets to be auctioned by the Debtors, including the Stalking Horse Package and any Additional Stalking Horse Package (each, an "**Auction Package**");

(B)    the highest or best Qualified Bid (or collection of Qualified Bids) determined for each Auction Package (each, a "**Baseline Bid**," and such bidder or group of bidders, a "**Baseline Bidder**") to serve as the starting point at the Auction for such Auction Package;

(C)    which Bids have been determined to be Qualified Bids and the Auction Package applicable to such Qualified Bid; provided that the Debtors may permit a Qualified Bidder to bid on any other Auction Package; and

(D)    the time and place for the Auction of each Auction Package.

By the applicable Qualified Bid Designation Date, the Debtors shall file notice of the foregoing on the Court's docket and publish such notice on the Omni Website and in the Data Room.  As soon as practicable, but no later than two (2) days prior to the Auction, the Debtors will provide copies of each Baseline Bid to the Consultation Parties.

Between the date the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the written consent of the Debtors (in consultation with the Consultation Parties), a Qualified Bidder may not modify, amend or withdraw its Qualified Bid, except for proposed amendments to increase the purchase price or otherwise improve the terms of its Qualified Bid, during the period that such Qualified Bid remains binding as specified herein; provided that any Qualified Bid may be improved at the Auction as set forth herein.

Except as provided in the Stalking Horse Agreement, the Debtors are under no obligation to (i) select any Baseline Bid or (ii) conduct separate Auctions for any Locations, whether before or after selecting a Baseline Bid.  Notwithstanding anything to the contrary contained herein, the Debtors may elect, in their reasonable discretion, and after consultation with the Consultation Parties, to adjourn any Auction.

Failure to Receive Two or More Qualified Bids

If no Qualified Bid for the Stalking Horse Package and/or any Additional Stalking Horse Package other than the applicable Stalking Horse Bid is received by the applicable bid deadline, the Debtors will not conduct the Auction for such Stalking Horse Package, and shall file and serve a notice indicating that the Auction has been cancelled with respect to such Stalking Horse Package, that the applicable Stalking Horse Bidder is the Successful Bidder as to such Stalking Horse Package, and setting forth the date and time of the Sale Hearing.

16

With respect to Locations not included in the Stalking Horse Package or any Additional Stalking Horse Package, if only one Qualified Bid is received by the Global Bid Deadline, the Debtors may, after consultation with the Consultation Parties, determine to consummate a Sale Transaction with the Qualified Bidder that submitted such Qualified Bid (to the extent one is received) and shall file and serve a notice identifying such Qualified Bidder, the terms of such Qualified Bid, and notice of the Sale Hearing applicable to such Qualified Bid.

Except as provided in the Stalking Horse Agreement, nothing herein shall obligate the Debtors to consummate or pursue any transaction with a Qualified Bidder.

### Auction Procedures

If there are two or more Qualified Bids for an Auction Package, the Debtors may conduct one or more Auctions for such Auction Package on dates to be announced at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153, or such other time and place as the Debtors, after consultation with the Baseline Bidder and the Consultation Parties, may notify Qualified Bidders who have submitted Qualified Bids. Only a Qualified Bidder will be eligible to participate at an Auction, subject to such limitations as the Debtors may impose in good faith. Professionals and/or other representatives of the Consultation Parties will be permitted to attend and observe an Auction.

At any Auction, Qualified Bidders (including the Stalking Horse Bidder and any Additional Stalking Horse Bidder) will be permitted to increase their bids. For each Baseline Bid, bidding will start at the purchase price and terms proposed in the applicable Baseline Bid, and will proceed thereafter in increments to be announced (a "**Minimum Overbid Amount**"). The Minimum Overbid Amount for the Stalking Horse Package, whether in one or a combination of Qualified Bids, shall be the amount of the Termination Payment plus $1 million. The Debtors reserve the right to and may, after consultation with the Consultation Parties, increase or decrease the Minimum Overbid Amount at any time during the Auction for any assets other than the Stalking Horse Package. The Stalking Horse Bidder and any Additional Stalking Horse Bidder are each authorized to increase their respective bids at the Auction. If the Stalking Horse Bidder or any Additional Stalking Horse Bidder bids at an Auction for the applicable Stalking Horse Package that is the subject of its Stalking Horse Bid or Additional Stalking Horse Bid, as applicable, such Stalking Horse Bidder will also be entitled to a "credit" in the amount of the applicable Termination Payment to be counted towards its bid such that the cash and other consideration proposed by the applicable Stalking Horse Bidder plus the applicable Termination Payment "credit" must exceed the most recent bid by at least the Minimum Overbid Amount.

The Debtors may adopt rules, after consultation with the Consultation Parties, for an Auction at any time that the Debtors reasonably determine to be appropriate to promote the goals of the Bidding and Auction Process and are not inconsistent with these Bidding Procedures. At the start of an Auction, the Debtors shall describe the terms of the applicable Baseline Bid. Any rules adopted by the Debtors will not unilaterally modify any of the terms of the Stalking Horse Agreement or any Additional Stalking Horse Agreement (as each may be consensually modified at any Auction) without the consent of the Stalking Horse Bidder or the Additional Stalking Horse Bidder, as applicable. Any rules developed by the Debtors will provide that all bids in a particular Auction will be made and received in one room, on an open basis, and all other bidders

17

participating in that Auction will be entitled to be present for all bidding with the understanding that the true identity of each bidder will be fully disclosed to all other bidders participating in that Auction and that all material terms of each Qualified Bid submitted in response to the Baseline Bid or to any successive bids made at the Auction will be fully disclosed to all other bidders throughout the entire Auction. Each Qualified Bidder will be permitted what the Debtors reasonably determine, in consultation with the Consultation Parties, to be an appropriate amount of time to respond to the previous bid at the Auction.

The Debtors reserve the right to and may, after consultation with the Consultation Parties, reject at any time before entry of the relevant Sale Order any bid that, in the Debtors' judgment, is (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, these Bidding Procedures, or the terms and conditions of the applicable Sale Transaction; or (iii) contrary to the best interests of the Debtors and their estates, except that if the Stalking Horse Bid and/or any Additional Stalking Horse Bid as reflected in the applicable Stalking Horse Agreement is the only Qualified Bid for the applicable Stalking Horse Package, the foregoing provisions of this sentence will be inoperative. In doing so, the Debtors may take into account the factors set forth above regarding the form and content of Qualified Bids and the Debtors' review of bids. No attempt by the Debtors to reject a bid under this paragraph will modify any rights of the Debtors or the Stalking Horse Bidder or any Additional Stalking Horse Bidder under applicable Stalking Horse Agreement (as may be consensually modified at any Auction).

Prior to the conclusion of an Auction, the Debtors, after consultation with the Consultation Parties, will (i) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating a Sale Transaction; (ii) determine the highest or best offer or collection of offers for an Auction Package (as applicable to each Auction Package, a "**Successful Bid**"); (iii) except as provided in the applicable Stalking Horse Agreement, determine which Qualified Bid is the next highest or best bid for such Auction Package (as applicable to each Auction Package, the "**Back-Up Bid**"); and (iv) notify all Qualified Bidders participating in an Auction, prior to its conclusion, the successful bidder for such Auction Package (the "**Successful Bidder**"), the amount and other material terms of the Successful Bid, and the identity of the party that submitted the Back-Up Bid for such Auction Package (the "**Back-Up Bidder**").

Each Qualified Bidder shall be required to confirm, both before and after the Auction, that it has not engaged in any collusion with respect to the submission of any bid, the bidding, or the Auction.

## Post-Auction Process

A Successful Bidder shall, within one (1) business day after the close of the Auction, submit to the Debtors fully executed revised documentation memorializing the terms of the Successful Bid, which shall be in form and substance acceptable to the Debtors, in consultation with the Consultation Parties. Promptly following the submission of such documentation, the Debtors shall file with the Bankruptcy Court notice of the Successful Bid, the Successful Bidder, and, if applicable, the Back-Up Bid and the Back-Up Bidder. The Successful Bid may not be

18

assigned to any party without the consent of the Debtors after consultation with the Consultation Parties.

Except to the extent otherwise provided in the Stalking Horse Agreement or any Additional Stalking Horse Agreement, the Back-Up Bid shall remain open and irrevocable until the earliest to occur of (i) forty-five (45) days after the completion of the Auction, or such other date as may be provided for in an applicable Stalking Horse Agreement, (ii) the consummation of the transaction with the Successful Bidder, and (iii) the release of such bid by the Debtors (such date, the "**Back-Up Termination Date**").  If the transaction with a Successful Bidder is terminated prior to the Back-Up Termination Date, the Back-Up Bidder shall be deemed the Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were the Successful Bid.

## Notices Regarding Assumption and Assignment

The Debtors shall provide all notices regarding the proposed assumption and assignment of contracts and leases in connection with the Assumption and Assignment Procedures set forth in the Bidding Procedures Order.

## Treatment and Return of Deposits

<u>Potential Bidders</u>

Within three (3) business days after the Designation Deadline, the Escrow Agent shall return to each Potential Bidder that was determined not to be a Qualified Bidder, as confirmed by the Debtors, such Potential Bidder's Deposit, plus any interest accrued thereon.  Upon the authorized return of such Potential Bidder's Deposit, the bid of such Potential Bidder shall be deemed revoked and no longer enforceable.

<u>Qualified Bidders</u>

The Deposit of a Qualified Bidder will be forfeited to the Debtors if (i) the applicable Qualified Bidder attempts to modify, amend, or withdraw its Qualified Bid, except as permitted by these Bidding Procedures, during the time the Qualified Bid remains binding and irrevocable under these Bidding Procedures, or (ii) the Qualified Bidder is selected as the Successful Bidder and fails to enter into the required definitive documentation or to consummate the transaction according to these Bidding Procedures and the terms of the applicable transaction documents with respect to the Successful Bid.  The Escrow Agent shall release the Deposit by wire transfer of immediately available funds to an account designated by the Debtors two (2) business days after the receipt by the Escrow Agent of a joint written notice by an authorized officer of the Debtors stating that the Qualified Bidder has breached or failed to satisfy its obligations or undertakings.

With the exception of the Deposit of a Successful Bidder and a Back-Up Bidder, the Escrow Agent shall return to any other Qualified Bidder any Deposit, plus any interest accrued thereon, three (3) business days after the execution by the Successful Bidder and the Debtors of the documentation memorializing the Successful Bid, but in no event later than seven (7) business days after the conclusion of a Sale Hearing.

19

Notwithstanding anything to the contrary herein, the good faith deposit provided by the Stalking Horse Bidder pursuant to the Stalking Horse Agreement (including any required return of such deposit) and any good faith deposit provided by an Additional Stalking Horse Bidder pursuant to an Additional Stalking Horse Agreement (including any required return of such deposit) shall be governed by the terms and conditions of the applicable Stalking Horse Agreement.

Back-Up Bidder

The Escrow Agent shall return a Back-Up Bidder's Deposit, plus any interest accrued thereon, within three (3) business days after the occurrence of the applicable Back-Up Bid Expiration Date.

The Successful Bidder

The Deposit of a Successful Bidder shall be applied against the cash portion of the Purchase Price of such Successful Bidder upon the consummation of the transaction proposed in the applicable Successful Bid.

Joint Notice to Escrow Agent

The Debtors and, as applicable, the Potential Bidder, Qualified Bidder, and/or Back-Up Bidder agree to execute an appropriate joint notice to the Escrow Agent for the return of any Deposit to the extent such return is required by these Bidding Procedures. If either party fails to execute such written notice, the Deposit may be released by an order of the Bankruptcy Court.

## **Notice and Consultation Parties**

Bid Notice Parties

Information that must be provided to the "**Bid Notice Parties**" under these Bidding Procedures must be provided to the following parties:

(i)     Fairway Group Holdings Corp., 2284 12th Avenue, New York, New York 10027 (Attn: Abel Porter and Nathalie Augustin, Esq.);

(ii)    counsel to the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C., Gavin Westerman, and Sunny Singh, Esq.);

(iii)   Solomon, 1345 6th Avenue, New York, NY 10105 (Attn: Scott Moses and Josh Heft); and

(iv)    Mackinac Partners, 180 N. Lasalle Street, Suite 3020, Chicago, IL 60601 (Attn: Michael Nowlan).

20

Objection Notice Parties

Information that must be provided to the "**Objection Notice Parties**" under these Bidding Procedures must be provided to each of the Bid Notices Parties and the following parties:

(i)     counsel to any official committee of unsecured creditors appointed in the Debtors' chapter 11 cases;

(ii)    counsel to the Stalking Horse Bidder, Wollmuth Maher & Deutsch LLP, 500 Fifth Avenue, New York, NY 10110 (Attn:  Paul R. DeFilippo, Esq.);

(iii)   counsel to the Ad Hoc Group and DIP Lenders, King & Spalding LLP, 1185 Avenue of the Americas, New York, NY 10036 (Attn:  W. Austin Jowers, Esq., Michael Rupe, Esq., and Michael R. Handler, Esq.);

(iv)    counsel to Ankura Trust Company, LLC, as the Prepetition Agent under the Prepetition Credit Agreement, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017 (Attn:  Christian Fischer, Esq.); and

(v)     the Unions, including (a) United Food and Commercial Workers Local 371, 290 Post Road West, Westport, CT 06881 (Attn:  Thomas Wilkinson), (b) United Food and Commercial Workers Local 1262, 1389 Broad Street, Clifton, NJ 07013 (Attn:  Harvey Whille), and (c) United Food and Commercial Workers Local 1500, 425 Merrick Avenue, Westbury, NY 11590 (Attn:  Robert Newell).

Consultation Parties

The term "**Consultation Parties**" as used in these Bidding Procedures shall mean:

(i)     any official committee of unsecured creditors appointed in the Debtors' chapter 11 cases;

(ii)    the Ad Hoc Group and DIP Lenders; and

(iii)   designated representatives of each of the Unions.

For the avoidance of doubt, any consultation rights provided to the Consultation Parties by these Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their business judgment.

In the event that any Consultation Party or any member of the Creditors' Committee, or an affiliate of any of the foregoing, submits a bid that is a Qualified Bid, any obligation of the Debtors to consult with the bidding party established under these Bidding Procedures will be waived, discharged, and released without further action; provided that the bidding party will have the same rights as any other Potential Bidder set forth above, and will

21

retain any rights it has under existing orders regarding debtor in possession financing and/or use of cash collateral (to the extent applicable).

If a member of the Creditors' Committee submits a Qualified Bid, the Creditors' Committee will continue to have Consultation Rights; provided that the Creditors' Committee shall exclude such member from any discussions or deliberations regarding the sale of the Assets and shall not provide any confidential information regarding the sale of the Assets to such member.

## Consent to Jurisdiction and Authority to Condition to Bidding

All Potential Bidders (including the Stalking Horse Bidder and any Additional Stalking Horse Bidder) shall be deemed to have (i) consented to the core jurisdiction of the Bankruptcy Court to enter any order or orders, which shall be binding in all respects, in any way related to the Bidding Procedures, an Auction, or the construction and enforcement of any agreement or any other document relating to the applicable Sale Transaction, (ii) waived any right to a jury trial in connection with any disputes relating to the Bidding Procedures, an Auction, or the construction and enforcement of any agreement or any other document relating to the Sale Transaction, and (iii) consented to the entry of a final order or judgment in any way related to the Bidding Procedures, an Auction, or the construction and enforcement of any agreement or any other document relating to the Sale Transaction if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

## Reservation of Rights

The Debtors reserve the right, in their reasonable discretion and subject to the exercise of their business judgment, after consultation with the Consultation Parties, to alter or terminate these Bidding Procedures, to waive terms and conditions set forth herein with respect to all potential bidders, extend the deadlines set forth herein, alter the assumptions set forth herein, provide reasonable accommodations to the Stalking Horse Bidder and any Additional Stalking Horse Bidder with respect to such terms, conditions, and deadlines of the Bidding and Auction Process to promote further bids by such bidders on any additional Locations not included in the Stalking Horse Package or any Addition Stalking Horse Package (including, without limitation, extending time deadlines as may be required for such Stalking Horse Bidder to comply with any additional filing and review procedures with the Federal Trade Commission in connection with their previous respective HSR Filings or any other Antitrust Law) and/or to terminate discussions with any and all prospective acquirers and investors (except for the Successful Bidder) at any time and without specifying the reasons therefor, in each case to the extent not materially inconsistent with these Bidding Procedures and/or the Bidding Procedures Order; provided that the Debtors' exercise of their discretion in evaluating bids and administering the Bidding and Auction Process does not permit, and shall not be construed as permitting, the Debtors to materially deviate from the procedures, terms, conditions, and protections set forth in these Bidding Procedures and/or the Bidding Procedures Order.

WEIL:\97323793\7\44444.0008

## **Schedule 1**

Locations in the Stalking Horse Package

**Six (6) Locations Included In the Stalking Horse Bid**

| # | Location Name | Debtor | Street Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|---|---|
| 1 | Production and Distribution Center | Fairway Bakery LLC | 400 Walnut Avenue | Bronx | NY | 10454 | USA |
| 2 | Downtown | Fairway Broadway LLC | 2131 Broadway | New York | NY | 10023 | USA |
| 3 | Chelsea | Fairway Chelsea LLC | 55 W 25th Street a/k/a 766 Avenue of the Americas | New York | NY | 10010 | USA |
| 4 | Upper East Side | Fairway East 86th Street LLC | 230-240 E. 86th Street | New York | NY | 10022 | USA |
| 5 | Kips Bay | Fairway Kips Bay LLC | 542-580 Second Avenue | New York | NY | 10016 | USA |
| 6 | Uptown | Fairway Uptown LLC | 2328 12th Avenue | New York | NY | 10027 | USA |

## **Schedule 2**

Other Locations

**Nine (9) Other Locations**

| # | Location Name | Debtor | Street Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|---|---|
| 1 | Douglaston | Fairway Douglaston LLC | 242-02 61st Avenue | Douglaston | NY | 11362 | USA |
| 2 | Georgetowne | Fairway Georgetowne LLC | 2149 Ralph Avenue | Brooklyn | NY | 11234 | USA |
| 3 | Plainview | Fairway Group Plainview LLC | 50 Manetto Hill Road | Plainview | NY | 10023 | USA |
| 4 | Paramus | Fairway Paramus LLC | #4 Fashion Center Mall Route 17 North 30 Ridgewood Avenue | Paramus | NJ | 7652 | USA |
| 5 | Pelham | Fairway Pelham LLC | 847 Pelham Parkway | Pelham Manor | NY | 10803 | USA |
| 6 | Red Hook | Fairway Red Hook LLC | 480-500 Van Brunt Street | Brooklyn | NY | 11231 | USA |
| 7 | Stamford | Fairway Stamford LLC | 699 Canal Street | Stamford | CT | 6902 | USA |
| 8 | Westbury | Fairway Westbury LLC | 1258 Corporate Drive | Westbury | NY | 11590 | USA |
| 9 | Woodland Park | Fairway Woodland Park LLC | 1510 Route 46 West | Woodland Park | NJ | 7424 | USA |

**<u>Exhibit 2</u>**

**Form of Sale Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
In re                                                    :
                                                         :        **Chapter 11**
**FAIRWAY GROUP HOLDINGS**                               :
**CORP.**, *et al.*,                                     :        **Case No. 20-[_____] (___)**
                                                         :
            **Debtors.**[1]                              :        **(Joint Administration Pending)**
-------------------------------------------------------------------x

### NOTICE OF SALE, BIDDING
### PROCEDURES, AUCTIONS, AND SALE HEARINGS

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

Fairway Group Holdings Corp. and its chapter 11 affiliate debtors, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), filed with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") a motion (ECF No. [__]) (the "**Motion**")[2] for the entry of orders (i) an order (the "**Bidding Procedures Order**")[2] (a) approving bidding procedures in connection with the sale or disposition of substantially all of the Debtors' assets (the "**Assets**"); (b) approving Stalking Horse Bid Protections for the Stalking Horse Bidder (as hereinafter defined); (c) authorizing the designation of additional stalking horse bidders; (d) scheduling auctions (the "**Auctions**") of the Assets and hearings (each, a "**Sale Hearing**") to consider approval of proposed sale transactions; (e) approving the form and manner of notice of sales of the Assets, the Auctions, and the Sale Hearings; (f) approving the form and manner of notice to each non-Debtor counterparty (each, a "**Counterparty**") to executory contracts and unexpired leases (collectively, the "**Contracts** and **Leases**") regarding the Debtors' potential assumption and assignment of their Contracts and Leases and of the Debtors' calculation of the amount necessary to cure all monetary defaults thereunder (collectively, the "**Cure Costs**"); (g) approving procedures for the assumption and assignment of Contracts (the "**Assumption and Assignment Procedures**"); and (h) granting related relief; and (ii) one or more orders (each, a "**Sale Order**") (a) authorizing the sale of the Assets free and clear of all liens, claims, interests, and encumbrances; (b) authorizing the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Fairway Group Holdings Corp. (2788); Fairway Group Acquisition Company (2860); Fairway Bakery LLC (4129); Fairway Broadway LLC (8591); Fairway Chelsea LLC (0288); Fairway Construction Group, LLC (2741); Fairway Douglaston LLC (2650); Fairway East 86th Street LLC (3822); Fairway eCommerce LLC (3081); Fairway Georgetowne LLC (9609); Fairway Greenwich Street LLC (6422); Fairway Group Central Services LLC (7843); Fairway Group Plainview LLC (8643); Fairway Hudson Yards LLC (9331); Fairway Kips Bay LLC (0791); FN Store LLC (9240); Fairway Paramus LLC (3338); Fairway Pelham LLC (3119); Fairway Pelham Wines & Spirits LLC (3141); Fairway Red Hook LLC (8813); Fairway Stamford LLC (0738); Fairway Stamford Wines & Spirits LLC (3021); Fairway Staten Island LLC (1732); Fairway Uptown LLC (8719); Fairway Westbury LLC (6240); and Fairway Woodland Park LLC (9544).  The location of the Debtors' corporate headquarters is 2284 12th Avenue, New York, New York 10027.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Bidding Procedures Order.

assumption and assignment of proposed assumed Contracts and Leases (collectively, the "**Proposed Assumed Contracts**"); and (c) granting related relief.

On [__], 2020, the Bankruptcy Court entered the Bidding Procedures Order (ECF No. [__]), approving the relief requested in the Motion.

## Stalking Horse Bid

A binding stalking horse bid (the "**Stalking Horse Bid**") has been submitted by Village Super Market, Inc. (the "**Stalking Horse Bidder**"). The Stalking Horse Bidder has executed an asset purchase agreement (the "**Stalking Horse Agreement**")[3] for the purchase of the Debtors' locations and related assets identified on **Exhibit A** annexed hereto (the "**Stalking Horse Package**"). The Stalking Horse Bid is subject to higher or otherwise better offers submitted in accordance with the terms and provisions of the Bidding Procedures.

The Debtors are seeking to sell substantially all of their assets (the "**Assets**"), including their fourteen (14) operating grocery stores, bakeries, and beer, wine, and liquor stores, their production and distribution center, and all related assets, including, but not limited to, inventory, intellectual property, prepaid expenses, and furniture, fixtures, and equipment.

Assets not included in the Stalking Horse Package are referred to herein as the "**Other Assets**." A complete list of the Other Assets available for sale pursuant to the Bidding Procedures and the scheduled Auction Dates for such Assets, is included hereto as **Exhibit B**.

A party may submit a bid for any individual Asset (or combination of Assets) listed on **Exhibit A** and/or **Exhibit B** whether or not such asset is included in the Stalking Horse Package, in each case, in accordance with the terms and provisions of the Bidding Procedures.

## IMPORTANT DATES AND DEADLINES

- *Auctions*. Auctions for the Assets have been scheduled for (i) [**March 10, 2020 at [__] (Eastern Time)**] with respect to the Stalking Horse Package, and (ii) [**March 11, 2020 at [__] (Eastern Time)**] with respect to the Other Assets and, if necessary, will be conducted at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153. The Auction date for each Asset is set forth on the Exhibits hereto. The Debtors reserve the right to adjourn or continue the Auction of any Asset to a later date.

- *Sale Objection Deadlines*. Objections to a proposed Sale Transaction, including any objection to the sale of any Assets free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code and/or entry of a Sale Order, must be (i) filed in accordance with the Bidding Procedures Order, (ii) filed with the Bankruptcy Court, and (iii) served on the Objection Notice Parties (as identified and defined in the Bidding Procedures) by no later than (i) [**February 28, 2020 at 4:00 p.m. (Eastern Time)**], with respect to the proposed sale of the Stalking Horse Package

---

[3] The Stalking Horse Agreement is attached as **Exhibit C** to the Motion.

WEIL:\97345822\1\44444.0008

to the Stalking Horse Bidder pursuant to the Stalking Horse Agreement, or (ii) [**March 19, 2020 at 4:00 p.m. (Eastern Time)**], with respect to the sale of the Stalking Horse Package to a Successful Bidder (other than the Stalking Horse Bidder pursuant to the Stalking Horse Agreement), or a sale of the Other Assets to a Successful Bidder, following an Auction**.

- *__Sale Hearings__*.  The Sale Hearing shall be held before the Bankruptcy Court, [●], before the Honorable [●], United States Bankruptcy Judge, on (i) [**March 10, 2020**], with respect to the sale of the Stalking Horse Package to the Stalking Horse Bidder if no Auction is held with respect thereto, or (ii) [**March 26, 2020**], with respect to a sale of the Stalking Horse Package to a Successful Bidder following an Auction and a sale of the Other Assets to a Successful Bidder.

## Additional Information

Any party interested in submitting a bid for the Assets should contact the Debtors' advisors at PJ Solomon, L.P., 1345 6th Avenue, New York, NY 10105 (Attn:  Scott Moses (smoses@pjsolomon.com) and Josh Heft (jheft@pjsolomon.com)).

Copies of the Motion, the Bidding Procedures Order, the Bidding Procedures, and the Stalking Horse Agreement may be obtained free of charge at the website dedicated to the Debtors' chapter 11 cases maintained by their claims and noticing agent and administrative advisor, Omni Agent Solutions, located at www.omniagentsolutions.com/Fairway.

## Reservation of Rights

The Debtors reserve the right to, in their reasonable business judgment, in a manner consistent with their fiduciary duties and applicable law, and in consultation with the Consultation Parties, modify the Bidding Procedures; waive terms and conditions set forth therein; extend the deadlines set forth therein; announce at the Auctions modified or additional procedures for conducting the Auctions; and provide reasonable accommodations to the Stalking Horse Bidder with respect to such terms, conditions, and deadlines of the bidding and auction process to promote further bids by such bidder, in each case, to the extent not materially inconsistent with the Bidding Procedures and the Bidding Procedures Order.  **Except as provided in the Stalking Horse Agreement, nothing shall obligate the Debtors to consummate or pursue any transaction with respect to any Asset with any bidder**.

**THE FAILURE OF ANY PERSON OR ENTITY TO FILE AND SERVE AN OBJECTION IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER BY THE APPLICABLE SALE OBJECTION DEADLINE SHALL FOREVER BAR SUCH PERSON OR ENTITY FROM ASSERTING ANY OBJECTION TO THE MOTION, SALE ORDERS, THE PROPOSED SALE TRANSACTIONS, OR THE DEBTORS' CONSUMMATION OF THE STALKING HORSE AGREEMENT OR ANY OTHER**

WEIL:\97345822\1\44444.0008

**ASSET PURCHASE AGREEMENT EXECUTED BY THE DEBTORS AND A SUCCESSFUL BIDDER AT THE AUCTION.**

Dated: [_____], 2020
New York, New York

                    _____

                    WEIL, GOTSHAL & MANGES LLP
                    767 Fifth Avenue
                    New York, New York  10153
                    Telephone:  (212) 310-8000
                    Facsimile:  (212) 310-8007
                    Ray C. Schrock, P.C.
                    Sunny Singh

                    *Proposed Attorneys for Debtors
                    and Debtors in Possession*

WEIL:\97345822\1\44444.0008

## <u>Exhibit 3</u>

**Form of Assumption and Assignment Notice**

WEIL:\97276692\10\44444.0008

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
|                                         |   |                              |
|-----------------------------------------|---|------------------------------|
| In re                                   | : |                              |
|                                         | : | **Chapter 11**               |
| **FAIRWAY GROUP HOLDINGS**              | : |                              |
| **CORP.**, *et al.*,                    | : | **Case No. 20-[_____] (___)** |
|                                         | : |                              |
| Debtors.[1]                             | : | **(Joint Administration Pending)** |

---------------------------------------------------------------x

**NOTICE OF CURE COSTS AND PROPOSED**
**ASSUMPTION AND ASSIGNMENT OF EXECUTORY**
**CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH SALE**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

Fairway Group Holdings Corp. and its chapter 11 affiliate debtors, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), filed with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") a motion (ECF No. [__]) (the "**Motion**")[2] for the entry of orders (i) an order (the "**Bidding Procedures Order**")[2] (a) approving bidding procedures in connection with the sale or disposition of substantially all of the Debtors' assets (the "**Assets**"); (b) approving Stalking Horse Bid Protections for the Stalking Horse Bidder (as hereinafter defined); (c) authorizing the designation of additional stalking horse bidders; (d) scheduling auctions (the "**Auctions**") of the Assets and hearings (each, a "**Sale Hearing**") to consider approval of proposed sale transactions; (e) approving the form and manner of notice of sales of the Assets, the Auctions, and the Sale Hearings; (f) approving the form and manner of notice to each non-Debtor counterparty (each, a "**Counterparty**") to executory contracts and unexpired leases (collectively, the "**Contracts and Leases**") regarding the Debtors' potential assumption and assignment of their Contracts and Leases and of the Debtors' calculation of the amount necessary to cure all monetary defaults thereunder (collectively, the "**Cure Costs**"); (g) approving procedures for the assumption and assignment of Contracts (the "**Assumption and Assignment Procedures**"); and (h) granting related relief; and (ii) one or more orders (a) authorizing the sale of the Assets free and clear of all

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Fairway Group Holdings Corp. (2788); Fairway Group Acquisition Company (2860); Fairway Bakery LLC (4129); Fairway Broadway LLC (8591); Fairway Chelsea LLC (0288); Fairway Construction Group, LLC (2741); Fairway Douglaston LLC (2650); Fairway East 86th Street LLC (3822); Fairway eCommerce LLC (3081); Fairway Georgetowne LLC (9609); Fairway Greenwich Street LLC (6422); Fairway Group Central Services LLC (7843); Fairway Group Plainview LLC (8643); Fairway Hudson Yards LLC (9331); Fairway Kips Bay LLC (0791); FN Store LLC (9240); Fairway Paramus LLC (3338); Fairway Pelham LLC (3119); Fairway Pelham Wines & Spirits LLC (3141); Fairway Red Hook LLC (8813); Fairway Stamford LLC (0738); Fairway Stamford Wines & Spirits LLC (3021); Fairway Staten Island LLC (1732); Fairway Uptown LLC (8719); Fairway Westbury LLC (6240); and Fairway Woodland Park LLC (9544). The location of the Debtors' corporate headquarters is 2284 12th Avenue, New York, New York 10027.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Bidding Procedures Order.

liens, claims, interests, and encumbrances; (b) authorizing the assumption and assignment of proposed assumed Contracts and Leases (collectively, the "**Proposed Assumed Contracts**"); and (c) granting related relief.

On [__], 2020, the Bankruptcy Court entered the Bidding Procedures (ECF No. [__]), approving the relief requested in the Motion, including the bidding procedures attached to the Bidding Procedures Order as **Exhibit 1** (the "**Bidding Procedures**").

**You are receiving this Notice because you may be a Counterparty to a Contract or Lease of the Debtors that is proposed to be assumed and assigned to the Stalking Horse Bidder or one or more other bidders.**

## Stalking Horse Bid

A binding stalking horse bid (the "**Stalking Horse Bid**") has been submitted by Village Super Market, Inc. The Stalking Horse Bidder has executed an asset purchase agreement (the "**Stalking Horse Agreement**")[3] for the purchase of the Debtors' locations and related assets identified on **Schedule 1** to the Bidding Procedures. The Proposed Assumed Contracts included in the Stalking Horse Package as of the date hereof and the Debtors' calculation of the Cure Costs with respect thereto are set forth on **Exhibit A** annexed hereto.

The inclusion of any Contract or Lease on **Exhibit A** does not constitute an admission that a particular Proposed Assumed Contract is an executory contract or unexpired lease within the meaning of the Bankruptcy Code or require or guarantee that such Proposed Assumed Contract ultimately will be assumed or assigned. All rights of the Debtors with respect thereto are reserved.

Pursuant to the terms of the Bidding Procedures Order, the Debtors may designate Additional Stalking Horse Bidders (as defined in the Bidding Procedures) for the Other Assets. Notice of any such designation, including the execution of any asset purchase agreement with an Additional Stalking Horse Bidder and the provision of any bid protections in connection therewith, shall be provided in accordance with the terms of the Bidding Procedures Order.

## Cure Costs

In accordance with the Assumption and Assignment Procedures and the Bidding Procedures Order, the Debtors shall, in connection with a Sale Transaction with a Successful Bidder (as defined in the Bidding Procedures) at the Auction (whether such bidder be the Stalking Horse Bidder or other bidder prevailing at the Auction), assume and assign to the Successful Bidder (or its designated assignee, if applicable) certain Contracts and Leases of the Debtors, whether or not such Contracts and Leases are included in the Stalking Horse Package and set forth on **Exhibit A** annexed hereto.

Each of the Contracts and Leases (excluding the Proposed Assumed Contracts set forth on **Exhibit A** annexed hereto) that are designated for assumption and assignment in

---

[3] The Stalking Horse Agreement is attached at **Exhibit C** to the Motion.

WEIL:\97347727\1\44444.0008

connection with a Sale Transaction with a Successful Bidder and the Debtors' calculation of the Cure Costs with respect thereto are set forth on **Exhibit B** annexed hereto.  Each of the executory contracts and unexpired leases set forth on **Exhibit B** annexed hereto are proposed to be assumed and assigned in connection with a Sale Transaction with a Successful Bidder [at the applicable Auction] that is ***not*** a Sale Transaction with the Stalking Horse Bidder pursuant to the Stalking Horse Agreement.

The inclusion of any Contract or Lease on **Exhibit B** does not constitute an admission that a particular Contract or Lease is an executory contract or unexpired lease within the meaning of the Bankruptcy Code or require or guarantee that such Contract or Lease ultimately will be assumed or assigned.  All rights of the Debtors with respect thereto are reserved.

## **Objections**

### A.  Cure Objections

Any objection to the proposed assumption or assignment of a Contract or Lease identified on **Exhibit A** or **Exhibit B** annexed hereto, the subject of which objection is the Debtors' proposed Cure Costs, must be (i) filed in accordance with the Bidding Procedures Order; (ii) filed with the Bankruptcy Court; and (iii) served on the Objection Notice Parties (as defined in the Bidding Procedures Order) by no later than (a) [**February 28, 2020 at 4:00 p.m. (Eastern Time)**] with respect to Contracts and Leases included on **Exhibit A** as designated for assumption and assignment to the Stalking Horse Bidder pursuant to the Stalking Horse Agreement, or (b) **seven (7) calendar days after the service of this Assumption and Assignment Notice** with respect to Contracts and Leases included on **Exhibit B**.

**IF A COUNTERPARTY FAILS TO FILE WITH THE BANKRUPTCY COURT AND SERVE ON THE OBJECTION NOTICE PARTIES A TIMELY CURE OBJECTION, THE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION WITH REGARD TO THE AMOUNT TO CURE ANY DEFAULT UNDER THE APPLICABLE EXECUTORY CONTRACT OR UNEXPIRED LEASE. THE CURE COSTS SET FORTH ON EXHIBIT A AND EXHIBIT B ANNEXED HERETO, AS APPLICABLE, SHALL BE CONTROLLING AND WILL BE THE ONLY AMOUNT NECESSARY TO CURE OUTSTANDING DEFAULTS UNDER THE APPLICABLE EXECUTORY CONTRACT OR LEASE UNDER BANKRUPTCY CODE SECTION 365(b), NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE EXECUTORY CONTRACT OR UNEXPIRED LEASE, OR ANY OTHER DOCUMENT, AND THE APPLICABLE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY ADDITIONAL CURE OR OTHER AMOUNTS WITH RESPECT TO SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE AGAINST THE DEBTORS, ANY SUCCESSFUL BIDDER, OR THE PROPERTY OF ANY OF THEM.**

### B.  Adequate Assurance Objections

Any objection to the proposed assumption or assignment of a Contract or Lease identified on **Exhibit A** annexed hereto, the subject of which is the Stalking Horse Bidder's (or its known assignee's) proposed form of adequate assurance of future performance with respect to

3

such Proposed Assumed Contract must be (i) filed in accordance with the Bidding Procedures Order; (ii) filed with the Bankruptcy Court; and (iii) served on the Objection Notice Parties by no later than [**February 28, 2020, at 4:00 p.m. (Eastern Time)**].

Any objection to the proposed assumption or assignment of a Contract or Lease identified on **Exhibit B** annexed hereto, the subject of which is the applicable bidder's (as listed on **Exhibit B**) proposed form of adequate assurance of future performance with respect to such Proposed Assumed Contract must be (i) filed in accordance with the Bidding Procedures Order; (ii) filed with the Bankruptcy Court; and (iii) served on the Objection Notice Parties by no later than **(7) calendar days after the service of this Assumption and Assignment Notice**.

**IF A COUNTERPARTY FAILS TO FILE WITH THE BANKRUPTCY COURT AND SERVE ON THE OBJECTION NOTICE PARTIES A TIMELY ADEQUATE ASSURANCE OBJECTION, THE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION WITH REGARD TO ADEQUATE ASSURANCE OF FUTURE PERFORMANCE OF THE APPLICABLE EXECUTORY CONTRACT OR UNEXPIRED LEASE.  THE SUCCESSFUL BIDDER (OR ITS DESIGNATED ASSIGNEE, IF APPLICABLE) SHALL BE DEEMED TO HAVE PROVIDED ADEQUATE ASSURANCE OF FUTURE PERFORMANCE WITH RESPECT TO THE APPLICABLE CONTRACT OR LEASE IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 362(f)(2)(B), NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE EXECUTORY CONTRACT OR UNEXPIRED LEASE, OR ANY OTHER DOCUMENT.**

### Sale Hearings

If the Stalking Horse Bid is the only Qualified Bid received by the Debtors in respect of the Stalking Horse Package by the Global Bid Deadline (as defined in the Bidding Procedures Order), the Sale Hearing for the Stalking Horse Package shall be held before the Bankruptcy Court before the Honorable [●], United States Bankruptcy Judge, in the Bankruptcy Court, located at [●], on [**March 10, 2020 at [__] (Eastern Time)**].

If (i) a Qualified Bid (other than the Stalking Horse Bid) is received by the Debtors in respect of the Stalking Horse Package by the Global Bid Deadline, and/or (ii) a Qualified Bid is received by the Debtors in respect of the Other Assets, the applicable Sale Hearing shall be held before the Bankruptcy Court before the Honorable [●], United States Bankruptcy Court Judge, in the Bankruptcy Court, located at [●], on [**March 26, 2020 at [__] (Eastern Time)**].

### Additional Information

Copies of the Motion, the Bidding Procedures Order, the Bidding Procedures, and the Stalking Horse Agreement may be obtained free of charge at the website dedicated to the

Debtors' chapter 11 cases maintained by their claims and noticing agent and administrative advisor, Omni Agent Solutions, located at www.omniagentsolutions.com/Fairway.

Dated  [_____], 2020
      New York, New York

                             _____

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Proposed Attorneys for Debtors and Debtors in Possession*

5

**<u>Exhibit B</u>**

**Form of Sale Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **FAIRWAY GROUP HOLDINGS** | : | |
| **CORP.**, *et al.*, | : | **Case No. 20-[_____] (___)** |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |

-------------------------------------------------------------x

### ORDER (I) APPROVING ASSET PURCHASE AGREEMENT AMONG SELLERS AND BUYER; (II) AUTHORIZING SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES; (III) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND LEASES IN CONNECTION THEREWITH; AND (IV) GRANTING RELATED RELIEF

Upon the motion, dated January 23, 2020 (ECF No. [__]) (the "**Sale Motion**"),[2] of

Fairway Group Holdings Corp. and its debtor affiliates, as debtors and debtors in possession in the

above-captioned chapter 11 cases (collectively, the "**Debtors**") seeking, among other things, entry

of an order (the "**Sale Order**"), pursuant to sections 105, 363, and 365 of title 11 of the United

States Code (the "**Bankruptcy Code**") and Rules 2002, 6004, and 6006 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rules 6004-1 and 6006-1 of the Local

Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Fairway Group Holdings Corp. (2788); Fairway Group Acquisition Company (2860); Fairway Bakery LLC (4129); Fairway Broadway LLC (8591); Fairway Chelsea LLC (0288); Fairway Construction Group, LLC (2741); Fairway Douglaston LLC (2650); Fairway East 86th Street LLC (3822); Fairway eCommerce LLC (3081); Fairway Georgetowne LLC (9609); Fairway Greenwich Street LLC (6422); Fairway Group Central Services LLC (7843); Fairway Group Plainview LLC (8643); Fairway Hudson Yards LLC (9331); Fairway Kips Bay LLC (0791); FN Store LLC (9240); Fairway Paramus LLC (3338); Fairway Pelham LLC (3119); Fairway Pelham Wines & Spirits LLC (3141); Fairway Red Hook LLC (8813); Fairway Stamford LLC (0738); Fairway Stamford Wines & Spirits LLC (3021); Fairway Staten Island LLC (1732); Fairway Uptown LLC (8719); Fairway Westbury LLC (6240); and Fairway Woodland Park LLC (9544).  The location of the Debtors' corporate headquarters is 2284 12th Avenue, New York, New York 10027.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Purchase Agreement (as defined herein) or, if not defined in the Purchase Agreement, the meanings ascribed to them in the Sale Motion.

(the "**Local Rules**"), (i) authorizing the sale of the Acquired Assets free and clear of all liens,

claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code,

(ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases

of nonresidential real property of the Debtors in connection therewith; and (iii) granting related

relief, all as more fully set forth in the Sale Motion; and the Court having entered this Court's prior

order, dated [__], 2020 (ECF No. [__]) (the "**Bidding Procedures Order**"), approving

competitive bidding procedures for the Acquired Assets (the "**Bidding Procedures**") and granting

certain related relief; and Village Super Market, Inc. (the "**Buyer**") having submitted the highest

and best bid for the Acquired Assets, as reflected in that certain Asset Purchase Agreement, dated

as of January 22, 2020 by and among Fairway Group Holdings Corp. and certain of its wholly-

owned Debtor subsidiaries, as the Sellers, and Village Super Market, Inc., as the Buyer (as may be

amended pursuant to the terms thereof and this Sale Order, the "**Purchase Agreement**"), a copy

of which is annexed hereto as **Exhibit A**, pursuant to which the Debtors have agreed, among other

things, to sell the Acquired Assets to the Buyer, including the Transferred Contracts that will be

assumed and assigned to the Buyer, on the terms and conditions set forth in the Purchase

Agreement (collectively, the "**Sale Transaction**"); and the Court having conducted a hearing on

the Sale Motion (the "**Sale Hearing**") on [__], 2020, at which time all interested parties were

offered an opportunity to be heard with respect to the Sale Motion and the Bidding Procedures

Order was approved; and the Court having reviewed and considered (a) the Sale Motion and the

exhibits thereto, (b) the Purchase Agreement, (c) the Bidding Procedures Order; (d) the Declaration

of Scott Moses of PJ Solomon, L.P. in Support of the Sale Motion (attached Exhibit D to the Sale

Motion), and (e) the arguments and representations of counsel made, and the evidence proffered

or adduced, at the Sale Hearing; and it appearing that due and proper notice of the Sale Motion,

2

the Purchase Agreement, the Bidding Procedures Order, and the proposed form of this Sale Order

(the "**Proposed Sale Order**") having been provided in accordance with the Bidding Procedures

Order; [and all objections to the Sale Motion with respect to the relief granted by this Sale Order

having been withdrawn, resolved, or overruled as provided in this Sale Order]; and it appearing

that the relief requested in the Sale Motion and granted herein is in the best interests of the Debtors,

their estates and creditors, and all parties in interest in these chapter 11 cases; and upon the record

of the Sale Hearing and these chapter 11 cases; and after due deliberation thereon; and sufficient

cause appearing therefor,

### IT IS HEREBY FOUND AND DETERMINED THAT:

A.      **Fed. R. Bankr. P. 7052**.  The findings and conclusions set forth herein constitute

the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made

applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following

findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the

following conclusions of law constitute findings of fact, they are adopted as such.  The Court's

findings shall also include any oral findings of fact and conclusions of law made by the Court

during or at the conclusion of the Sale Hearing.

B.      **Jurisdiction and Venue**.  This Court has jurisdiction to decide the Sale Motion,

and jurisdiction over the Sale Transaction and the property of the Debtors' estates, including the

Acquired Assets, pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b).  This matter is a core

proceeding pursuant to 28 U. S.C. § 157(b)(2).  Venue of these chapter 11 cases and the Sale

Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

C.      **Statutory and Rule Predicates**.  The  statutory and other legal predicates for the

relief sought in the Sale Motion are sections 105(a), 363, and 365 of the Bankruptcy Code,

3

Bankruptcy Rules 2002, 4001, 6004, 6006, 9007, and 9014, Local Rules 6004-1 and 6006-1, and the Amended Guidelines for the Conduct of Asset Sales, Approved by Administrative Order Number 383 in the United States Bankruptcy Court for the Southern District of New York.

D.      **Notice and Opportunity to Object**.  As evidenced by the certificates of service filed with the Court, due, proper, timely, adequate, and sufficient notice of, and a fair and reasonable opportunity to object to and to be heard with respect to the Sale Motion, the Sale Hearing, the Sale Transaction, the sale of the Acquired Assets free and clear of any Interests or Claims (as defined herein), the Proposed Sale Order, and the assumption and assignment of the executory contracts and unexpired leases to be assumed and assigned to Buyer pursuant to this Sale Order, has been provided by the Debtors, as required by sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014 and in compliance with the Bidding Procedures Order, to all Persons entitled to such notice, including, but not limited to, the following: (i) all counterparties to the Transferred Contracts (the "**Counterparties**" and, each, a "**Counterparty**"), (ii) all other Sale Notice Parties (as defined in the Sale Motion); and (iii) all other persons and entities as directed by the Bankruptcy Court.  Such notice was good, sufficient, and appropriate under the circumstances, and complied in all respects with the Bidding Procedures Order.  No other or further notice of the foregoing is required.  With respect to Persons in interest whose identities could not be reasonably ascertained by the Debtors, publication of the Sale Notice in the national edition of *USA Today* and in the *New York Times* on [__], 2020 (*see* Affidavit of Publication (ECF No. [__])) was sufficient and reasonably calculated to provide notice to such Persons under the circumstances.

E.      **Disclosures**.  The disclosures made by the Debtors in the Sale Motion, the Sale Notice, and related notices and documents filed with the Court concerning the Purchase

4

Agreement, the Bidding Procedures Order, the hearing to consider approval of the Sale Motion, the Sale Transaction, and the Sale Hearing were good, complete, and adequate.

F.      **Final Order**.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

G.      **Sound Business Purpose**.  The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for approval of the Sale Motion, the Purchase Agreement, and the Sale Transaction and in entering into the Purchase Agreement and related or ancillary agreements thereto (collectively, the "**Related Agreements**").  The Debtors' entry into and performance under the Purchase Agreement and the Related Agreements (i) are a result of due deliberation by the Debtors and constitute a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties; (ii) provide value to and are beneficial to the Debtors' estates, and are in the best interests of the Debtors and their stakeholders; and (iii) are reasonable and appropriate under the circumstances.  Business justifications for the Sale Transaction include, but are not limited to, the following: (a) the Purchase Agreement constitutes the highest and best offer received for the Acquired Assets; (b) the Purchase Agreement presents the best opportunity to maximize the value of the Acquired Assets on a going-concern basis and avoid decline and devaluation of the Acquired Assets; (c) unless the Sale Transaction and all of the other transactions contemplated by the Purchase Agreement are concluded expeditiously, as provided for pursuant to the Purchase Agreement, recoveries to the Debtors' creditors may be materially diminished; (d) the value of the Debtors' estates will be maximized through the sale of the Acquired Assets pursuant to the Purchase Agreement; and (e) the Purchase Agreement presents the best opportunity for continued employment for a significant number of the Debtors' employees.

5

H.      **Compliance with Bidding Procedures**.      The Bidding Procedures were substantively and procedurally fair to all parties.  The Debtors, the Buyer, and their respective counsel and other advisors have complied with the Bidding Procedures and the Bidding Procedures Order in all respects.

I.      **Highest or Best Value**.  The Debtors and their advisors, including PJ Solomon, L.P., engaged in a robust and extensive marketing and sale process over a period of over eight (8) months, both prior to the Commencement Date and through the postpetition sale process pursuant to the Bidding Procedures and the Bidding Procedures Order.  The Debtors conducted a fair and open sale process.  The sale process, the Bidding Procedures were non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any person or entity to make an offer to purchase the Acquired Assets.  The process conducted by the Debtors and their advisors pursuant to the Bidding Procedures resulted in the highest or best value for the Acquired Assets for the Debtors and their estates, and any other available transaction would not have yielded as favorable an economic result for the Debtors' estates, creditors, and other parties in interest.

J.      **Fair Consideration**.  The consideration to be paid by the Buyer under the Purchase Agreement (i) constitutes fair and reasonable consideration for the Acquired Assets, (ii) is the highest and best offer for the Acquired Assets, (iii) will provide a greater recovery for the Debtors' estates and creditors than would be provided by any other practically available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and other laws of the United States, any state, territory, possession, the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing.

K.      **No Successor or Other Derivative Liability**.  By consummating the Sale Transaction pursuant to the Purchase Agreement (including operating certain Stores under the

6

Debtors' trade names: (i) Buyer is not a mere continuation of any Seller or any other Debtor or any Debtor's estate, and there is no continuity, no common identity, and no continuity of enterprise between Buyer and any Debtor; (ii) Buyer is not a successor to any Debtor or any Debtor's estate by reason of any theory of law or equity, and the Sale Transaction does not amount to a consolidation, merger, or *de facto* merger of Buyer and the Debtors; and (iii) neither Buyer nor any of its successors, assigns, members, partners, principals, and shareholders (or equivalent) shall assume or in any way be responsible for any obligation or liability of any Debtor (or any Affiliates thereof) and/or any Debtor's estate, including any obligation under any collective bargaining agreement or labor practice agreement, except as expressly provided in the Purchase Agreement. The sale and transfer of the Acquired Assets to the Buyer, including the assumption by the Debtors and assignment, transfer, and/or sale to the Buyer of the Transferred Contracts, will not subject the Buyer to any liability (including any successor liability) with respect to the operation of the Debtors' business prior to the Closing or by reason of such transfer, except that, upon the Closing, the Buyer shall become liable for the applicable Assumed Liabilities.

L.    **No *Sub Rosa* Plan**.  The Sale Transaction neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan of reorganization of the Debtors.  The Sale Transaction does not constitute a *sub rosa* or *de facto* plan of reorganization or liquidation as it does not propose to (i) impair or restructure existing debt of, or equity interests in, the Debtors, (ii) impair or circumvent voting rights with respect to any plan proposed by the Debtors, (iii) circumvent chapter 11 safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code, or (iv) classify claims or equity interests or extend debt maturities.

7

M.    **Good Faith; No Collusion**.  The Debtors, the Buyer, and their respective counsel

and advisors, have negotiated, proposed, and entered into the Purchase Agreement, the Related

Agreements, and each of the transactions contemplated therein in good faith, without collusion

and from arm's-length bargaining positions.  The Buyer is a "good faith purchaser" and is acting

in good faith within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled

to all the protections afforded thereby.  The Buyer has proceeded in good faith in all respects.

Specifically, (i) the Buyer recognized that the Debtors were free to deal with any other party

interested in acquiring the Acquired Assets; (ii) the Buyer complied with the provisions of the

Bidding Procedures Order; (iii) the Buyer's bid was subjected to competitive Bidding Procedures

as set forth in the Bidding Procedures Order; (iv) the Buyer has not violated section 363(n) of the

Bankruptcy Code by any action or inaction; and (v) all payments to be made by the Buyer and all

other material agreements or arrangements entered into by the Buyer and the Debtors in connection

with the Sale Transaction have been disclosed and are appropriate.  The sale price in respect of the

Acquired Assets was not controlled by any agreement among potential bidders and neither the

Debtors nor the Buyer have engaged in collusion or any conduct that would cause or permit the

Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of

the Bankruptcy Code.  The Purchase Agreement was not entered into for the purpose of hindering,

delaying, or defrauding creditors under the Bankruptcy Code or under laws of the United States,

any state, territory, or possession, or the District of Columbia.  The Buyer is not an "insider" or

"affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code,

and no common identity of incorporators, directors, or controlling stockholders exists between the

Buyer and the Debtors.

8

N.    **Assumption and Assignment Notices**.  As evidenced by the certificates of service filed with the Court, and in accordance with the provisions of the Bidding Procedures Order, the Debtors have served prior to the Sale Hearing Assumption and Assignment Notices, which provided notice of the Debtors' intent to assume and assign the Transferred Contracts (including any contracts added to the initial list of Transferred Contracts designated by the Stalking Horse Bidder (the "**Supplemental Contracts**") and excluding any contracts subsequently removed from such initial list, in each case in accordance with the Purchase Agreement), and of the related proposed Cure Costs upon each Counterparty to the Transferred Contracts.  The service of the Assumption and Assignment Notices was good, sufficient, and appropriate under the circumstances and no further notice need be given with respect to the Cure Costs for the assumption and assignment of the Transferred Contracts.  All Counterparties have had a reasonable opportunity to object both to the Cure Costs listed on the applicable Assumption and Assignment Notice and to the assumption and assignment of the Transferred Contracts, including the Supplemental Contracts, to the Buyer.  No defaults exist in the Debtors' performance under the Transferred Contracts as of the date of this Sale Order other than the failure to pay the Cure Costs or defaults that are not required to be cured.

O.    **Free and Clear Sale**.  The Debtors may sell the Acquired Assets free and clear of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), rights, liabilities, encumbrances, and other interests of any kind or nature whatsoever against the Debtors or the Acquired Assets, including, without limitation, any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, employee pension or benefit plan claims, multiemployer benefit

9

plan claims, retiree healthcare or life insurance claims, or claims for Taxes of or against the Debtors, any claims under, or trusts or liens created by, PACA[3] or PASA,[4] and any derivative, vicarious, transferee or successor liability claims, rights or causes of action (whether in law or in equity, under any law, statute, rule or regulation of the United States, any state, territory, or possession, or the District of Columbia), whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether known or unknown, and whether imposed by agreement, understanding, law, equity, or otherwise arising under or out of, in connection with, or in any way related to the Debtors, the Debtors' interests in the Acquired Assets, the operation of the Debtors' business before the effective time of the Closing pursuant to the Purchase Agreement, or the transfer of the Debtors' interests in the Acquired Assets to the Buyer, and all Excluded Liabilities (collectively, excluding any Assumed Liabilities, the "**Claims**"), because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code have been satisfied; provided that nothing herein shall be deemed, or construed as, a ruling or determination by this Court that the Assumed Liabilities encumber the Acquired Assets.  Without limiting the generality of the foregoing, "Claims" shall include any and all liabilities or obligations whatsoever arising under or out of, in connection with, or in any way relating to: (i) any of the employee benefit plans, including any Claims related to unpaid contributions or current or potential withdrawal or termination liability; (ii) any of the Debtors' collective bargaining agreements; (iii) the Worker Adjustment and Retraining Notification Act of 1988; or (iv) any of the Debtors' current and former employees.  Those holders of Claims who did not object (or who ultimately withdrew their objections, if any) to the Sale Transaction or the Sale Motion are deemed to have

---

[3] "**PACA**" means the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. §§ 499a, *et seq.*) or any similar state laws.

[4] "**PASA**" means the Packers and Stockyards Act (7 U.S.C. §§ 181 *et seq.*) or any similar state laws.

WEIL:\95670212\13\44444.0005

consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Claims who did object that have an interest in the Acquired Assets could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claim pursuant to section 363(f)(5) or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and, therefore, are adequately protected by having their Claims that constitute interests in the Acquired Assets, if any, attach solely to the proceeds of the Sale Transaction ultimately attributable to the property in which they have an interest, in the same order of priority and with the same validity, force, and effect that such holders had prior to the Sale Transaction, subject to any defenses of the Debtors.

P.     **Buyer's Reliance on Free and Clear Sale**.  The Buyer would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby if the sale of the Acquired Assets was not free and clear of all Interests and Claims, or if the Buyer would, or in the future could, be liable for any such Interests or Claims, including, as applicable, certain liabilities related to the Business that will not be assumed by the Buyer, as described in the Purchase Agreement.  A sale of the Acquired Assets other than one free and clear of all Interests and Claims would adversely impact the Debtors, their estates, and their creditors, and would yield substantially less value for the Debtors' estates, with less certainty than provided under the Sale Transaction.

Q.     The total consideration to be provided under the Purchase Agreement reflects the Buyer's reliance on this Sale Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the Acquired Assets free and clear of all Interests and Claims (including, without limitation, any potential derivative, vicarious, transferee, or successor liability Interests or Claims).

11

R.    **Assumption and Assignment of Transferred Contracts**.  The assumption and

assignment of the Transferred Contracts are integral to the Purchase Agreement, are in the best

interests of the Debtors and their estates, and represent the valid and reasonable exercise of the

Debtors' sound business judgment.    Specifically, the assumption and assignment of the

Transferred Contracts (i) is necessary to sell the Acquired Assets to the Buyer, (ii) allows the

Debtors to sell their business to the Buyer as a going concern, (iii) limits the losses suffered by

counterparties to the Transferred Contracts, and (iv) maximizes the recoveries to other creditors of

the Debtors by avoiding claims against the Debtors' estates that would arise from the Debtors'

rejection of the Transferred Contracts.  Any Counterparty to any Transferred Contract, including

any Supplemental Contract, that has not actually filed with the Court an objection to such

assumption or to such assignment as of the date specified in the Bidding Procedures Order (as such

date may have been modified or extended in accordance with the terms of the Bidding Procedures

Order) is deemed to have consented to such assumption and assignment.

S.    **Adequate Assurance of Future Performance**.    Counterparties to Transferred

Contracts, including the Supplemental Contracts, were provided with notice and adequate

assurance of future performance for the Buyer (*see* Affidavit of Service (ECF No. [__])) and were

required to file any objections to Buyer's ability to provide adequate assurance of future

performance as contemplated under sections 365(b)(l)(C) and 365(f)(1) of the Bankruptcy Code

("**Adequate Assurance Objections**"), by established deadlines.  Counterparties to Transferred

Contracts, including the Supplemental Contracts, that failed to timely file an Adequate Assurance

Objection are forever barred from objecting to the assumption and assignment of such Transferred

Contracts.  Based on evidence adduced at the hearing and based on the record in these chapter 11

cases, to the extent necessary, the Debtors have satisfied the requirements of section 365 of the

12

Bankruptcy Code, including sections 365(b)(l)(A), 365(b)(l)(B), 365(b)(l)(C), and 365(f) of the

Bankruptcy Code, in connection with the sale and assumption and assignment of the Transferred

Contracts to the extent provided under the Purchase Agreement and (i) Sellers or Buyer will cure,

in accordance with the terms set forth in this Sale Order and the Purchase Agreement, any default

existing prior to the date of the assumption the applicable Transferred Contract, within the meaning

of section 365(b)(1)(A) of the Bankruptcy Code; (ii) Sellers have provided compensation or

adequate assurance of compensation to any party for any actual pecuniary loss to such party

resulting from a default prior to the date hereof under any of the Transferred Contracts, within the

meaning of section 365(b)(l)(B) of the Bankruptcy Code; and (iii) Buyer has provided adequate

assurance of future performance of and under the Transferred Contracts, within the meaning of

sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code based on the Buyer declaration, if any,

and the other evidence adduced at the Sale Hearing.  With respect to each of the Transferred

Contracts, the Debtors have met all applicable requirements of section 365(b) of the Bankruptcy

Code.  Accordingly, the Transferred Contracts may be assumed by the Debtors and assigned to the

Buyer as provided under the Purchase Agreement.  The assumption and assignment of each

Transferred Contract is approved notwithstanding any provision in such Transferred Contract or

other restrictions prohibiting its assignment or transfer.  The applicable Assumption and

Assignment Notice(s) provided by the Debtors is also sufficient to advise the non-Debtor

counterparties to the Transferred Contracts that, pursuant to the Purchase Agreement, the Buyer's

decision on which executory contracts and unexpired leases will be assumed and assigned may not

be made until immediately prior to the Closing.

        T.      [**<u>No Breach of Union Obligations</u>**.  The unions affected by the sale of the Acquired

Assets have consented to such sale and have waived their rights to assert against any of the Buyer,

the Debtors, the Debtors' estates, or any other party any claims or other rights arising under the successorship provisions of any collective bargaining agreement or similar agreement in relation to such sale.]

U.     **Validity of Transfer**.  As of the Closing and payment of the Purchase Price, the transfer of the Acquired Assets to the Buyer will be a legal, valid, and effective transfer of the Acquired Assets, and will vest the Buyer with all right, title, and interest of the Debtors in and to the Acquired Assets, free and clear of all Claims.  The consummation of the Sale Transaction is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code and all of the applicable requirements of such sections have been complied with in respect of the Sale Transaction.

V.     The Debtors (i) have full corporate or limited liability company (as applicable) power and authority to execute the Purchase Agreement, the Related Agreements, all other documents contemplated thereby, and the Sale Transaction has been duly and validly authorized by all necessary corporate action of the Debtors, (ii) have all of the corporate or limited liability company (as applicable) power and authority necessary to consummate the transactions contemplated by the Purchase Agreement and the Related Agreements; and (iii) upon entry of this Sale Order, other than any consents identified in the Purchase Agreement (including with respect to antitrust matters), need no consent or approval from any other Person to consummate the Sale Transaction.

W.     **Acquired Assets are Property of the Estates**.  The Acquired Assets constitute property of, and good title is vested in, the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  The Debtors are the sole and rightful owners of the Acquired Assets with

14

all right, title, and interest to transfer and convey the Acquired Assets to the Buyer, and no other

Person has any ownership right, title, or interests therein.

X.    **Valid and Binding Contract**.  The Purchase Agreement is a valid and binding

contract between the Debtors and the Buyer and shall be enforceable pursuant to its terms.  The

Purchase Agreement, the Sale Transaction, and the consummation thereof shall be specifically

enforceable against and binding upon (without posting any bond) the Debtors and any chapter 7

or chapter 11 trustee appointed in these chapter 11 cases, and shall not be subject to rejection or

avoidance by the foregoing parties or any other Person.

Y.    Other than claims arising under the Purchase Agreement, the Debtors agree and

acknowledge that they have no claims against the Buyer.

Z.    **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**.  Based on the record at the

Sale Hearing, and for the reasons stated on the record at the Sale Hearing, the sale of the Acquired

Assets must be approved and consummated promptly in order to preserve the value of the Acquired

Assets.  Therefore, time is of the essence in consummating the Sale Transaction, and the Debtors

and the Buyer intend to close the Sale Transaction as soon as reasonably practicable.  The Debtors

have demonstrated compelling circumstances and good, sufficient, and sound business purposes

and justifications for the immediate approval and consummation of the Sale Transaction as

contemplated by the Purchase Agreement.  Accordingly, there is cause to lift the stay contemplated

by Bankruptcy Rules 6004(h) and 6006(d) with regards to the transactions contemplated by this

Sale Order.

AA.    **Single Integrated Transaction**.  The Purchase Agreement and Sale Transaction

must be approved and the Closing must occur to preserve the value of the Debtors' assets.  Entry

of this Sale Order approving the Purchase Agreement and all provisions thereof is a necessary

15

condition precedent to Buyer consummating the Sale Transaction.  The transactions contemplated by the Purchase Agreement, including the sale and transfer of a Store or group of Stores, as applicable, on the Closing Date to the Buyer, are inextricably linked technically and economically and collectively constitute a single, integrated transaction.

BB.    **Legal and Factual Bases**.  The legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein.

### NOW, THEREFORE, IT IS ORDERED THAT:

1.    **Sale Motion is Granted**.  The Sale Motion and the relief requested therein (to the extent not previously granted by this Court pursuant to the Bidding Procedures Order or otherwise) is granted and approved as set forth herein.

2.    **Objections Overruled**.  All objections (except for Cure Objections, if any, that have been adjourned, as provided in Paragraph 28 below, solely to the extent such objections relate to any asserted cure obligations pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code), if any, to the Sale Motion or the relief requested therein that have not been withdrawn with prejudice, waived, or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits with prejudice.

3.    **Notice**.  Notice of the Sale Motion, the Bidding Procedures, the Sale Hearing, the Sale Transaction, the sale of the Acquired Assets free and clear of any Interests or Claims, the assumption and assignment of the Transferred Contracts, and the Proposed Sale Order was adequate, reasonable, appropriate, and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

4.    **Fair Purchase Price**.  The consideration provided by the Buyer pursuant to the Purchase Agreement (a) is fair and adequate; (b) constitutes reasonably equivalent value and fair

consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia (including the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and similar laws); and (c) will provide an equal or greater recovery for the Debtors' creditors than would be provided by any other reasonably practicable available alternative.

5. **Payment of Proceeds**. Payment of the Purchase Price shall be deposited by wire transfer into an account designated by the Debtors to be applied to the obligations under the DIP Facility and the Prepetition Obligations (as such term is defined in the orders approving the DIP Facility (the "**DIP Orders**")) in accordance with the terms of the DIP Orders and subject to the rights of parties in interest thereunder.

6. **Approval of Purchase Agreement**. The Purchase Agreement and all transactions contemplated therein (including, but not limited to, all Related Agreements contemplated thereby), and all of the terms and conditions thereof, are hereby approved as a valid exercise of the Debtors' business judgment. Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, the Debtors are authorized to perform under and make all payments required by the Purchase Agreement and all Related Agreements as and when due thereunder without further order of the Court. The failure specifically to include any particular provision of the Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement (including, but not limited to, all Related Agreements contemplated thereby) be authorized and approved in its entirety.

## Sale and Transfer of Acquired Assets

7. Pursuant to sections 105(a), 363(b), and 365 of the Bankruptcy Code, the Debtors, acting by and through their existing agents, representatives and officers, are authorized and empowered, without further order of the Court, to take any and all actions necessary or appropriate

17

to: (i) consummate and close the Sale Transaction pursuant to and in accordance with the terms and conditions of the Purchase Agreement; (ii) transfer and assign all right, title, and interest in and to all Acquired Assets, property, licenses, and rights to be conveyed in accordance with the terms and conditions of the Purchase Agreement; and (iii) execute and deliver, perform under, consummate, and implement the Purchase Agreement and all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and the Sale Transaction, including any Related Agreements, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement and such other ancillary documents.  The Acquired Assets shall be transferred to the Buyer, and upon the  Closing, such transfer shall (a) be valid, legal, binding, and effective; and (b) vest the Buyer with all right, title, and interest of the Debtors in and to the Acquired Assets.

8.      All Persons that are currently in possession of any or all of the Acquired Assets are hereby directed to surrender possession of such Acquired Assets to the Buyer at Closing.  To the extent required by the Purchase Agreement, the Debtors agree to exercise commercially reasonable efforts to assist the Buyer in assuring that all Persons that are presently, or on the Closing Date may be, in possession of any or all of such Acquired Assets will surrender possession of the Acquired Assets to either (a) the Debtors before the Closing Date or (b) the Buyer on or after the Closing Date.

9.      All Persons are prohibited from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets to the Buyer in accordance with the Purchase Agreement and this Sale Order; provided that the foregoing restriction shall not prevent any party from appealing this Sale Order in accordance with applicable law or opposing any appeal of this Sale Order.

18

WEIL:\95670212\13\44444.0005

10.     Each and every any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

11.     To the maximum extent available under applicable law, and to the extent provided for under the Purchase Agreement, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration, application, and governmental authorization or approval of the Debtors with respect to the Acquired Assets for a reasonable period of time pending Buyer's obtaining of any licenses, permits, registrations, applications, and/or governmental authorizations or approvals in its own name.  To the maximum extent available under applicable law, and to the extent provided for under the Purchase Agreement, all such licenses, permits, registrations, applications, and governmental authorizations and approvals are deemed to have been transferred to the Buyer as of the Closing Date and shall remain in place for the Buyer's benefit until either new licenses and permits are obtained or existing licenses and permits are transferred in accordance with applicable administrative procedures.  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any grant, permit, or license relating to the operation of the Acquired Assets sold, transferred, assigned, or conveyed to Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale Transaction.

12.     On the Closing Date, this Sale Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Acquired Assets under the Purchase Agreement or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in and to all of the Acquired Assets to the Buyer.

19

### Transfer of Assets Free and Clear

13.    Pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, upon the  Closing Date and pursuant to  and except as otherwise set forth in the Purchase Agreement, the Acquired Assets shall be transferred to Buyer free and clear of all encumbrances, claims (as defined in section 101(5) of the Bankruptcy Code), interests, and liens, including the Excluded Liabilities, mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining agreements, leases, licenses, options, deeds of trust, security interests, possessory interests (including those under section 365(h) of the Bankruptcy Code), other interests, conditional sale or other title retention agreements, pledges, and other liens (including mechanics', materialman's, and other consensual and non-consensual liens and statutory liens), judgments, demands, encumbrances, rights of first refusal, offsets, contracts, recoupment, rights of recovery, claims for reimbursement, contribution, indemnity, exoneration, products liability, alter-ego, environmental, or tax, decrees of any court or foreign or domestic governmental entity, or charges of any kind or nature, if any, including any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, debts arising in any way in connection with any agreements, acts, or failures to act, including any pension liabilities, retiree medical benefit liabilities, liabilities related to the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), liabilities related to the Internal Revenue Code, or any other liability relating to Debtors' current and former employees, including any liabilities under any collective bargaining agreement or labor practice agreement, retiree healthcare or life insurance claims or claims for Taxes of or against the Debtors (except as otherwise provided for in the Purchase Agreement), any claims under, or trusts or liens created by PACA or PASA, and any derivative, vicarious, transferee or successor liability claims, rights or causes of action (whether in law or in equity, under any law, statute, rule, or regulation of the United States, any

20

state, territory, or possession thereof or the District of Columbia), whether arising prior to or subsequent to the Commencement Date, of the Debtors or any of the Debtors' predecessors or Affiliates, claims, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of these bankruptcy cases, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under doctrines of successor liability (other than Assumed Liabilities and Permitted Liens) (collectively, the "**Interests or Claims**"), with all such Interests or Claims to attach to the cash proceeds of the Sale Transaction in the order of their priority, with the same validity, force, and effect that they now have as against the Acquired Assets, subject to any claims and defenses the Debtors may possess with respect thereto. Without limiting the generality of the foregoing, "Interests or Claims" shall include any and all liabilities or obligations whatsoever arising under or out of, in connection with, or in any way relating to (in each case, other than Assumed Liabilities and Permitted Liens) (a) any labor agreements or any of the employee benefit plans, including any Interests or Claims related to unpaid contributions or current or potential withdrawal or termination liability; (b) any of the Debtors' collective bargaining agreements; (c) the Worker Adjustment and Retraining Notification Act of 1988, as amended, or other comparable state or local law; and (d) any of the Debtors' current and former employees.

14.    Those holders of Interests or Claims who did not object (or who ultimately withdrew their objections, if any) to the Sale Transaction are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Interests or Claims who did object

21

that have an interest in the Acquired Assets could be compelled in a legal or equitable proceeding to accept money satisfaction of such Interest or Claim pursuant to section 363(f)(5) or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their Interests or Claims that constitute interests in the Acquired Assets, if any, attach solely to the proceeds of the Sale Transaction ultimately attributable to the property in which they have an interest, in the same order of priority and with the same validity, force, and effect that such holders had prior to the Sale Transaction, subject to any defenses of the Debtors.  Nothing herein shall be deemed or construed as a ruling or determination by this Court that the Assumed Liabilities encumber the Acquired Assets.

15.    Except to the extent included in Assumed Liabilities or Permitted Liens, or to enforce the Purchase Agreement, all persons and entities (and their respective successors and assigns), including all lenders, debt security holders, equity security holders, governmental, tax, and regulatory authorities, governmental units, lenders, parties to executory contracts and unexpired leases, contract Counterparties, customers, licensors, litigation claimants, employees and former employees, dealers and sale representatives, pension plans, labor unions, trade creditors, and any other creditors holding Interests or Claims against the Debtors or the Acquired Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity, or otherwise), arising under or out of, in connection with, or in any way relating to, the Debtors, the transfer of the Acquired Assets to Buyer, or the Acquired Assets or the Debtors' businesses prior to the Closing Date,  hereby are forever barred, estopped, and permanently enjoined from asserting any Interests or Claims relating to the Acquired Assets or the

22

transfer of the Acquired Assets against Buyer or its successors, designees, assigns, or property, or

the Acquired Assets transferred to Buyer, including, without limitation, taking any of the following

actions with respect to or based on any Interest or Claim relating to the Acquired Assets or the

transfer of the Acquired Assets to Buyer (other than Assumed Liabilities): (a) commencing or

continuing in any manner any action or other proceeding against Buyer or its successors or assigns,

assets or properties; (b) enforcing, attaching, collecting, or recovering in any manner any

judgment, award, decree, or order against Buyer or its successors or assigns, assets, or properties;

(c) creating, perfecting, or enforcing any Interest or Claims against Buyer, its successors or assigns,

assets or properties; (d) asserting an Interest or Claims as a setoff, right of subrogation, or

recoupment of any kind against any obligation due Buyer or its successors or assigns;

(e) commencing or continuing any action in any manner or place that does not comply, or is

inconsistent, with the provisions of this Sale Order or the agreements or actions contemplated or

taken in respect thereof; or (f) interfering with, preventing, restricting, prohibiting, or otherwise

enjoining the consummation of the Sale Transaction. No such persons or entities shall assert or

pursue against Buyer or its successors or assigns any such Interest or Claim.

16.    This Sale Order (a) shall be effective as a determination that, as of the Closing, all

Interests or Claims have been unconditionally released, discharged, and terminated as to the Buyer

and the Acquired Assets, and that the conveyances and transfers described herein have been

effected; and (b) is and shall be binding upon and govern the acts of all Persons, including all filing

agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds,

registrars of deeds, administrative agencies, governmental departments, secretaries of federal,

state, county, and local officials, and all other Persons who may be required by operation of law,

the duties of their office, or contract, to accept, file, register, or otherwise record or release any

WEIL:\95670212\13\44444.0005

documents or instruments that reflect that the Buyer is the assignee and owner of the Acquired Assets free and clear of all Interests or Claims, or who may be required to report or insure any title or state of title in or to any lease (all such entities being referred to as "**Recording Officers**").  All Recording Officers are authorized and specifically directed to strike recorded encumbrances, claims, liens, and other interests against the Acquired Assets recorded prior to the date of this Sale Order.  A certified copy of this Sale Order may be filed with the appropriate Recording Officers to evidence cancellation of any recorded encumbrances, claims, liens, and other interests against the Acquired Assets recorded prior to the date of this Sale Order.  All Recording Officers are hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement and Related Agreements.

17.    As of and after the Closing, (a) each of the Debtors' creditors is hereby authorized and directed to execute such documents and take all other actions as may be necessary to release its Interests or Claims in the Acquired Assets (if any) as such Interests or Claims may have been recorded or may otherwise exist; and (b) any Acquired Asset that may be subject to a statutory or mechanic's lien shall be turned over and such liens shall attach to the proceeds of the Sale Transaction in the same priority they currently enjoy with respect to the Acquired Asset.

18.    Following the Closing, no holder of any Interest or Claim shall interfere with the Buyer's title to or quiet use and enjoyment of the Acquired Assets based on or related to any such Interest or Claim or based on any actions the Debtors may take in these chapter 11 cases.

## No Successor or Other Derivative Liability

19.    Buyer and its successors and assigns, members, partners, principals, and shareholders (or equivalent) are not and shall not be deemed or considered to (a) be a legal successor, or otherwise be deemed a successor to any of the Debtors or their estates; (b) have, *de*

24

*facto* or otherwise, merged with or into any of the Debtors or their estates; (c) have a common identity with the Debtors; (d) have a continuity of enterprise with the Debtors; or (e) be a continuation or substantial continuation, or be holding itself out as a mere continuation, of any of the Debtors or their respective estates, businesses, or operations, in each case, by any law or equity, and the Buyer has neither assumed nor is it in any way responsible for any liability or obligation of the Debtors or the Debtors' estates, except with respect to the Assumed Liabilities.  Except as expressly set forth in the Purchase Agreement, the Buyer and its respective successors and assigns, members, partners, principals and shareholders (or equivalent) shall have no (i) liability or responsibility for any Claim against the Debtors; (ii) liability or responsibility with respect to any Interests or Claims or Excluded Liability and shall not be required to satisfy the same in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly; or (iii)  successor, transferee, or vicarious liability of any kind or character, including, without limitation, under any theory of foreign, federal, state, or local antitrust, environmental, successor, tax, ERISA, assignee or transferee liability, labor, product liability, employment, *de facto* merger, substantial continuity, or other law, rule, regulation, or doctrine, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated, with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, without limitation, liabilities on account of any Taxes or other Governmental Authority fees, contributions, or surcharges, in each case, arising, accruing, or payable under, out of, in connection with, or in any way relating to, the operation of the Acquired Assets prior to the Closing Date or arising based on actions of the Debtors or their Affiliates taken after the Closing Date.

25

20.     Without limiting the effect or scope of the foregoing, as of the Closing (except as expressly set forth in the Purchase Agreement), the Buyer and its affiliates, members, successors, and assigns shall have no liability for any Interest, Claim, or Excluded Liabilities, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as a transferee or successor or otherwise, of any kind, nature, or character whatsoever, by reason of any theory of law or equity, including, without limitation, Interests or Claims arising under (a) any employment or labor agreements, including without limitation, any Affected Labor Agreement or the termination thereof; (b) any pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of or related to any of the Debtors or any Debtor's affiliates or predecessors or any current or former employees of any of the foregoing, including, without limitation, the Employee Benefit Plans and any participation or other agreements related to the Employee Benefit Plans, or the termination of any of the foregoing; (c) the Debtors' business operations or the cessation thereof; (d) any litigation involving one or more of the Debtors; and (e) any employee, workers' compensation, occupational disease, or unemployment or temporary disability related law, including, without limitation, claims that might otherwise arise under or pursuant to (i) ERISA, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, as amended, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Worker Adjustment and Retraining Notification Act of 1988, (vii) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (viii) the Americans with Disabilities Act, (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, (x) the Multiemployer Pension Plan Amendments Act of 1980, (xi) state and local discrimination laws, (xii) state and local unemployment compensation

26

laws or any other similar state and local laws, (xiii) state workers' compensation laws, (xiv) any

other state, local, or federal employee benefit laws, regulations, or rules relating to, wages,

benefits, employment, or termination of employment with any of the Debtors or their predecessors;

(xv) any antitrust laws; (xvi) any product liability or similar laws, whether state, federal, or

otherwise; (xvii) any environmental laws, rules, or regulations, including, without limitation, under

the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§

9601, et seq., or similar state statutes; (xviii) PACA or PASA; (xix) any bulk sales or similar laws;

(xx) any federal, state, or local tax statutes, regulations, or ordinances, including, without

limitation, the Internal Revenue Code; and (xxi) any common law doctrine of *de facto* merger or

successor or transferee liability, successor-in-interest liability theory, or any other theory of or

related to successor liability, in each case whether known or unknown as of the Closing, now

existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or

unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the

Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing, or

payable under, out of, in connection with, or in any way relating to, the operation of the Acquired

Assets prior to each applicable Closing Date or arising based on actions of the Debtors taken after

each applicable Closing Date.

## **Assumption and Assignment of Transferred Contracts**

21.    Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and subject to

and conditioned upon the occurrence of the Closing Date, Sellers' assumption and assignment to

Buyer, and Buyer's assumption on the terms set forth in the Purchase Agreement of the Transferred

Contracts (including, for the avoidance of doubt, any Supplemental Contracts included on a

Supplemental Assumption and Assignment Notice) is hereby approved in its entirety, and the

27

requirements of section 365 of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

22.    Subject to and condition upon the occurrence of the Closing Date, the Debtors are hereby authorized, in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code, to assume and assign the Transferred Contracts to the Buyer free and clear of all Interests and Claims (including all Excluded Liabilities), and to execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Transferred Contracts to the Buyer as provided in the Purchase Agreement.

23.    Upon the Closing, the Buyer shall be fully and irrevocably vested with all right, title, and interest of the Debtors in and to the Transferred Contracts and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Transferred Contracts.   The Buyer acknowledges and agrees that from and after the Closing, subject to and in accordance with the Purchase Agreement, it shall comply with the terms of each assumed and assigned Transferred Contract in their entirety, including any indemnification obligations expressly contained in such Transferred Contract that could arise as a result of events or omissions that occur from and after the Closing, unless any such provisions are not enforceable pursuant to the terms of this Sale Order.   The assumption by the Debtors and assignment to the Buyer of a Transferred Contract shall not be, or result in, a default under any such Transferred Contract or constitute a termination of any such Transferred Contract.

24.    Buyer has provided adequate assurance of future performance for the Transferred Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

28

25.     All Cure Costs shall be determined in accordance with the Bidding Procedures Order and paid in cash by the Debtors or the Buyer in accordance with the terms of the Purchase Agreement after the Closing.

26.     Payment of the Cure Costs by the Debtors or the Buyer shall (a) be in full satisfaction and cure of any and all defaults under the Transferred Contracts, whether monetary or non-monetary, and (b) compensate the Counterparties for any actual pecuniary loss resulting from such defaults.  Each Counterparty shall be forever barred, estopped, and permanently enjoined from asserting against the Debtors or the Buyer, their respective affiliates, successors, or assigns, or the property of any of them, any assignment fee, rent acceleration, rent increase on account of assignment, default, breach, claim, pecuniary loss, or condition to assignment arising under or related to the Transferred Contracts, existing as of the date that such Transferred Contracts are assumed or arising by reason of the Closing.  Nothing in this Sale Order shall affect the rights of the Buyer, to the extent such rights are provided in the Purchase Agreement, to add or remove any Transferred Contracts to or from the list of Transferred Contracts set forth in the Purchase Agreement in accordance with the terms thereof.

27.     The Cure Costs for the Transferred Contracts, including the Supplemental Contracts, for which no timely Cure Objection was filed are hereby fixed at the amounts set forth on the applicable Assumption and Assignment Notices, and Counterparties to such Transferred Contracts are forever bound by such Cure Costs.  Pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, Sellers or the Buyer shall pay to the applicable Counterparty the Cure Costs relating to any Transferred Contracts for which no timely Cure Objection was filed on the Closing Date in accordance with the Purchase Agreement.  Upon payment of such Cure Costs as provided for herein, the Counterparties to such Transferred Contracts are hereby enjoined from taking any

29

action against the Debtors and the Debtors' estates (and any respective successor entity) Buyer or the Acquired Assets with respect to any Claim for cure.

28.    To the extent not resolved prior to entry of this Sale Order, a Cure Objection with respect to the Transferred Contracts may be decided at a subsequent hearing if, pending resolution of such Cure Objection (an "**Adjourned Cure Objection**"), the Debtors maintain a cash reserve (a "**Cure Cost Reserve**") equal to the lesser of (a) the amount the objecting Counterparty has asserted to be required to cure the asserted defaults under the applicable Proposed Assumed Contract and (b) such other cash reserve amount as may be ordered by the Court, until a Cure Cost amount is agreed to by the parties or determined by the Court; provided that if the Debtors maintain a letter of credit or similar security deposit for the Debtors' obligations under a Proposed Assumed Contract to a Counterparty asserting a Cure Objection, the Debtors shall not be required to fund a Cure Cost Reserve to the extent of the existing amounts available under such letter of credit or other security deposit maintained by such Counterparty.  Notwithstanding the existence of an Adjourned Cure Objection, the Proposed Assumed Contract may be deemed assumed and assigned to the Stalking Horse Bidder, the Additional Stalking Horse Bidder (if applicable), or, if an Auction is held, the Successful Bidder, as of the applicable Closing Date if the Debtors maintain a Cure Cost Reserve.  Upon resolution of a Cure Objection, the Cure Cost Reserve shall be reduced as appropriate, and such available cash shall be applied to the Obligations in accordance with the terms of the DIP Orders.

29.    Pursuant to sections 365(f)(1) and (3), the Transferred Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, including all obligations of the Buyer as the assignee of the Transferred Contracts, notwithstanding any provision in any Transferred Contract or under applicable law

30

(including, without limitation, those of the type described in sections 365(e)(1) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer.

30.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all Counterparties are forever barred and permanently enjoined from raising or asserting against the Debtors and the Debtors' estates (and any respective successor entity) or the Buyer any defaults, cross-defaults, breach, claim, pecuniary loss, rent accelerations, escalations, rent increase, assignment fees, increases or any other fees charged to the Buyer or the Debtors existing as of the date of assumption of the Transferred Contracts or as a result of the assumption or assignment of the Transferred Contracts on the  Closing Date.  For the avoidance of doubt, and without limiting the generality of the foregoing, any provision in a Transferred Contract, any other document, or under applicable law that prohibits, restricts or otherwise impairs assignment of the Transferred Contracts or the Buyer's ability to operate the Stores is hereby void and of no force or effect, including any provision that (a) requires any or all of the proceeds from the assignment of such Transferred Contract be paid to or shared with the applicable Counterparty or distributed in a manner inconsistent with the terms of the Purchase Agreement, an agreement between the Debtors and the Buyer to assume and assign the Transferred Contract, or the intent of the Debtors and the Buyer with respect to the distribution of such proceeds; (b) terminates any extension option rights or any other rights of the Buyer under such Transferred Contract; (c) cross-defaults to or from any other lease or executory contract that is not a Transferred Contract; (d) restricts the Buyer's operation of the Stores with respect to radius, use, location, and exclusivity; (e) contains operating covenants or "go-dark" provisions that would purport to terminate or modify any Transferred Contract before assumption and assignment to the Buyer; (f) requires a Counterparty's consent prior to assignment of the Transferred Contract to the Buyer; (g) requires prior notice from the

31

Buyer before changing the name or banner of a Store previously operated by one of the Sellers; or (h) restricts the Buyer's use or assignment of any beer, wine, spirits, or liquor licenses or similar permits.

31.    Upon the Debtors' assignment of Transferred Contracts to the Buyer under the provisions of this Sale Order, no default shall exist under any Transferred Contracts, and no Counterparty to any Transferred Contracts shall be permitted to declare a default by any Debtor or the Buyer or otherwise take action against the Buyer as a result of any Debtor's financial condition, bankruptcy, or failure to perform any of its obligations under the relevant Transferred Contract. Any provision in a Transferred Contract, other document, or under applicable law that prohibits or conditions the assignment or sublease of such Transferred Contract (including without limitation, the granting of a lien therein) or allows the relevant Counterparty to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon such assignment or sublease, constitutes an unenforceable anti-assignment provision that is void and of no force or effect. The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Transferred Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Buyer's rights to enforce every term and condition of the Transferred Contract. Any party having the right to consent to the assumption or assignment of any Transferred Contracts that failed to object to such assumption or assignment is deemed to have consented to such assumption and assignment as required by section 365(c) of the Bankruptcy Code.

32.    **Statutory Mootness**. The transactions contemplated by the Purchase Agreement and Related Agreements are undertaken by the Buyer without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein of the Sale Transaction shall neither

32

affect the validity of the Sale Transaction nor the transfer of the Acquired Assets or the assignment of Transferred Contracts to the Buyer, free and clear of Interests or Claims, unless such authorization is duly stayed before the Closing Date pending such appeal.  The Buyer is a good faith purchaser of the Acquired Assets and is entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code.  The Debtors and the Buyer will be acting in good faith if they proceed to consummate the Sale Transaction at any time after entry of this Sale Order.

33.    **No Avoidance of Purchase Agreement**.  Neither the Debtors nor the Buyer has engaged in any conduct that would cause or permit the Purchase Agreement or Related Agreements to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code. Accordingly, the Purchase Agreement, Related Agreements, and the Sale Transaction shall not be avoidable under section 363(n) of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Purchase Agreement, Related Agreements, or the Sale Transaction.

34.    [**No Breach of Union Obligations**.  The unions affected by the sale of the Acquired Assets have consented to such sale and have waived their rights to assert against any of the Buyer, the Debtors, the Debtors' estates, or any other party any claims or other rights arising under the successorship provisions of any collective bargaining agreement or similar agreement in relation to such sale, and no union shall have any such claims or other rights against such parties arising under the successorship provisions of any collective bargaining agreement or similar agreement in relation to such sale.]

35.    **Waiver of Bankruptcy Rules 6004(h), 6006(d), and 7062**.  Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d), 7062, or any applicable provisions of the Local Rules, this Sale Order shall not be stayed after the entry hereof, but shall be effective and

33

enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply.  Time is of the essence in closing the Sale Transaction and the Debtors and the Buyer may close the Sale Transaction as soon as practicable.  Any party objecting to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to the Closing Date, or risk its appeal being foreclosed as moot.

36.    **Binding Effect of Sale Order**.    The terms and provisions of the Purchase Agreement and this Sale Order shall be binding in all respects upon the Debtors, their estates, and their creditors, all holders of equity interests in the Debtors, all holders of any Interests or Claims (whether known or unknown) against any Debtor, any holders of Interests or Claims against, or on all or any portion of, the Acquired Assets, all Counterparties (including any collective bargaining agreement or labor agreement), Buyer and all successors and assigns of Buyer, leaseholders, governmental units, and any trustees, examiners, or other fiduciary under any section of the Bankruptcy Code, if any, subsequently appointed in any of these chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of these chapter 11 cases.  The terms and provisions of the Purchase Agreement and this Sale Order shall inure to the benefit of the Debtors, their estates and their creditors, the Buyer, and its respective affiliates, successors, and assigns.

37.    **Conflicts; Precedence**.  In the event that there is a direct conflict between the terms of this Sale Order, the Purchase Agreement, or any documents executed in connection therewith, the provisions contained in this Sale Order, the Purchase Agreement, any documents executed in connection therewith shall govern, in that order.  Nothing contained in any chapter 11 plan hereinafter confirmed in these chapter 11 cases, any order confirming such plan, or in any other order of any type or kind entered in these chapter 11 cases (including, without limitation, any order

34

entered after any conversion of any or all of these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code) or in any related proceeding shall alter or derogate from the provisions of the Purchase Agreement or the terms of this Sale Order.  For the avoidance of doubt, nothing herein shall modify, alter, impair, or otherwise affect any of the provisions of the DIP Orders or the DIP Documents, or the rights or remedies of the DIP Agent or the DIP Lenders under the DIP Documents (each as defined in the DIP Orders) except with respect to the Acquired Assets.

38.    **Modification of Purchase Agreement**.  The Purchase Agreement, the Related Agreements, and any other related agreements, documents, or other instruments executed in connection therewith, may be modified, amended, or supplemented by the parties thereto, in a writing signed each party, and in accordance with the terms thereof, without further order of the Court; provided that any such modification, amendment, or supplement shall not materially change the terms of the Purchase Agreement, Related Agreements, or any documents or other instruments executed in connection therewith.  The Debtors shall provide the Consultation Parties with prior notice of any such modification, amendment, or supplement of the Purchase Agreement, and shall consult with the Consultation Parties with respect thereto.  For the avoidance of doubt, all material modifications, amendments, or supplements that have a material or an adverse effect on the Debtors' estates or their creditors shall require Court approval and the reasonable consent of Requisite Consenting Creditors (as defined in the RSA) and the DIP Agent (acting at the direction of the Requisite DIP Lenders, each as defined in the DIP Motion).

39.    **Bulk Sales; Taxes**.  No bulk sales law, bulk transfer law, or similar law of any state or other jurisdiction (including those relating to Taxes other than Transfer Taxes) shall apply in any way to the transactions contemplated by the Purchase Agreement, the Related Agreements, the Sale Motion, or this Sale Order.  Except as otherwise expressly provided in the Purchase

Agreement, all obligations of the Debtors relating to Taxes, whether arising under any law, by the Purchase Agreement, or otherwise, shall be the obligation of and fulfilled and paid by the Debtors.

40. **<u>Transferred Contract Prorations</u>**.  Subject to and in accordance with Section 2.8 of the Purchase Agreement, to the extent not previously paid by the Debtors, upon the Closing, the Buyer shall become responsible for any accruing but unbilled charges relating to year-end reconciliations under the Transferred Contracts (including, but not limited to, common area maintenance charges and percentage rents) that are billed to the Buyer by the applicable Counterparty subsequent to the Closing.

41. **<u>Retention of Jurisdiction</u>**.  This Court shall retain exclusive jurisdiction to, among other things, interpret, enforce, and implement the terms and provisions of this Sale Order and the Purchase Agreement, all amendments thereto, and any waivers and consents thereunder (and of each of the agreements executed in connection therewith) to adjudicate disputes related to this Sale Order or the Purchase Agreement (and such other related agreements, documents, or other instruments) and to enforce the injunctions set forth herein.

Dated: _____, 2020
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

36

## **Exhibit C**

**Stalking Horse Agreement**

Execution Version

---

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**FAIRWAY GROUP HOLDINGS CORP.**

**AND**

**VILLAGE SUPER MARKETS, INC.**

**JANUARY 22, 2020**


**THIS DOCUMENT SHALL BE KEPT CONFIDENTIAL PURSUANT TO THE TERMS OF THE CONFIDENTIALITY AGREEMENT ENTERED INTO BY THE RECIPIENT HEREOF AND, IF APPLICABLE, ITS AFFILIATES AND REPRESENTATIVES, WITH RESPECT TO THE SUBJECT MATTER HEREOF.**

---

# TABLE OF CONTENTS

Page

ARTICLE I    DEFINITIONS ..................................................................................1

    Section 1.1    Definitions ............................................................................1
    Section 1.2    Interpretations .....................................................................15

ARTICLE II    PURCHASE AND SALE ...............................................................17

    Section 2.1    Purchase and Sale of Acquired Assets ............................17
    Section 2.2    Assumed Liabilities ............................................................17
    Section 2.3    Consideration; Deposit; Escrow Amount .......................17
    Section 2.4    Closing ................................................................................19
    Section 2.5    Closing Payments and Deliveries .....................................19
    Section 2.6    Inventory .............................................................................20
    Section 2.7    Allocation............................................................................22
    Section 2.8    Proration..............................................................................22
    Section 2.9    Removal of Excluded Assets .............................................23
    Section 2.10    Casualty and Condemnation ...........................................24

ARTICLE III    SELLERS' REPRESENTATIONS AND WARRANTIES ...........................24

    Section 3.1    Organization; Good Standing and Qualification............24
    Section 3.2    Authorization of Transaction ...........................................25
    Section 3.3    No Conflict; Government Filings .....................................25
    Section 3.4    Real Property ......................................................................25
    Section 3.5    Proceedings; Decrees ........................................................26
    Section 3.6    Labor Relations...................................................................26
    Section 3.7    Brokers' Fees .....................................................................26
    Section 3.8    Taxes ...................................................................................26
    Section 3.9    Employee Benefits .............................................................26
    Section 3.10    Environmental Matters.....................................................27
    Section 3.11    Compliance with Laws; Permits .....................................28
    Section 3.12    Title to Assets ...................................................................28

ARTICLE IV    BUYER'S REPRESENTATIONS AND WARRANTIES ...........................28

    Section 4.1    Organization of Buyer; Good Standing and Qualification ..............28
    Section 4.2    Authorization of Transaction ...........................................29
    Section 4.3    No Conflict; Government Filings .....................................29
    Section 4.4    Proceedings; Decrees ........................................................29
    Section 4.5    Brokers' Fees .....................................................................29
    Section 4.6    Sufficient Funds; Adequate Assurances .........................29
    Section 4.7    Buyer Information..............................................................30
    Section 4.8    Disclaimer of Other Representations and Warranties....................30

i

## TABLE OF CONTENTS
(continued)

Page

ARTICLE V        PRE-CLOSING COVENANTS .................................................................30

Section 5.1     Conduct of the Business Pending the Closing ................................30
Section 5.2     Cooperation .....................................................................................31
Section 5.3     Regulatory Approvals .....................................................................31
Section 5.4     Bankruptcy Court Matters...............................................................33
Section 5.5     Notices and Consents ......................................................................35
Section 5.6     Notice of Developments ..................................................................35
Section 5.7     Access; No Contact .........................................................................36
Section 5.8     Bulk Transfer Laws..........................................................................36
Section 5.9     Replacement Bonding Requirements................................................36
Section 5.10    Supply Agreement ...........................................................................367

ARTICLE VI       OTHER COVENANTS ........................................................................37

Section 6.1     Further Assurances...........................................................................37
Section 6.2     Access; Enforcement; Record Retention .........................................37
Section 6.3     Treatment of Affected Labor Agreements.......................................37
Section 6.4     Covered Employees .........................................................................38
Section 6.5     Transfer Taxes .................................................................................41
Section 6.6     Insurance Matters.............................................................................41
Section 6.7     Press Releases and Public Announcements ....................................41

ARTICLE VII      CONDITIONS TO OBLIGATION TO CLOSE .................................42

Section 7.1     Conditions to Each Party's Obligations...........................................42
Section 7.2     Conditions to Buyer's Obligations...................................................42
Section 7.3     Conditions to Sellers' Obligations...................................................42
Section 7.4     No Frustration of Closing Conditions..............................................43

ARTICLE VIII     TERMINATION...................................................................................43

Section 8.1     Termination of Agreement...............................................................43
Section 8.2     Effect of Termination.......................................................................44
Section 8.3     Lease Indemnity...............................................................................44

ARTICLE IX       MISCELLANEOUS ...........................................................................44

Section 9.1     Survival.............................................................................................44
Section 9.2     Expenses ..........................................................................................44
Section 9.3     Entire Agreement.............................................................................45
Section 9.4     Incorporation of Exhibits and Disclosure Schedule........................45
Section 9.5     Amendments and Waivers ...............................................................45

ii

# TABLE OF CONTENTS
(continued)

Page

Section 9.6    Succession and Assignment.................................................................45
Section 9.7    Notices...............................................................................................45
Section 9.8    Governing Law and Venue; Submission to Jurisdiction; Selection of
Forum; Waiver of Trial by Jury..........................................................46
Section 9.9    Specific Performance........................................................................47
Section 9.10   Severability.......................................................................................47
Section 9.11   No Third Party Beneficiaries ...........................................................47
Section 9.12   Non-Recourse....................................................................................47
Section 9.13   Interest...............................................................................................48
Section 9.14   Limitation on Liability......................................................................48
Section 9.15   Mutual Drafting.................................................................................48
Section 9.16   Disclosure Schedule..........................................................................48
Section 9.17   Headings; Table of Contents.............................................................49
Section 9.18   Counterparts; Facsimile and Electronic Signatures .........................49
Section 9.19   Limitations Under Applicable Law ..................................................49

EXHIBITS

Exhibit A          Form of Escrow Agreement
Exhibit B          Form of Bill of Sale
Exhibit C          Form of Assignment and Assumption Agreement
Exhibit D          Form of Lease Assignment and Assumption Agreement
Exhibit E          Form of IP Assignment and Assumption Agreement

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of January 22, 2020, by and among FAIRWAY GROUP HOLDINGS CORP., a Delaware corporation, (the "Company"), and the direct or indirect wholly-owned Subsidiaries of the Company set forth on Schedule A (together with the Company, "Sellers"), and VILLAGE SUPER MARKET, INC., a New Jersey corporation ("Buyer"). Each of Buyer and each Seller is referred to herein as a "Party" and, collectively, as the "Parties".

### WITNESSETH

WHEREAS, Sellers and certain of their affiliates are contemplating filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on or about January 23, 2020, in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, Sellers operate the five (5) supermarkets at the locations set forth in Section 3.4 of the Disclosure Schedule under the heading "Stores" (each a "Store" and, collectively, the "Stores"), operate the Production Distribution Center (the "PDC"), and own or license certain of the Intellectual Property used in the conduct of Business from the Stores; and

WHEREAS, subject to the terms and upon the conditions set forth herein, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to purchase, acquire and assume from Sellers, all of the Acquired Assets (as defined below) and Assumed Liabilities (as defined below), all as more specifically provided herein.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties hereby agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.1    Definitions.  For purposes of this Agreement:

"Acquired Assets" means, without duplication, all of Sellers' right, title, and interest in and to all of the following assets of Sellers directly used or held for use exclusively in the operation of the Stores and (to the extent applicable) located at the Stores on the Closing Date:

(a)    all Inventory of Sellers Related to the Business (other than Excluded Inventory);

(b)    the Furnishings and Equipment owned by Sellers and Related to the Business (other than Excluded Furnishings and Equipment);

(c)    the Leases set forth on Section 1.1 of the Disclosure Schedule under the heading "Assumed Leases" (the "Assumed Leases"), together with (to the extent of Sellers' interest therein) the buildings, fixtures and improvements located on or attached to such real

1

property, and all rights arising therefrom, and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto, and all rights of Seller under any non-disturbance agreement with the lessor of an Assumed Lease or its lenders, subject to the rights of the applicable landlord (including rights to ownership or use of such property) under the Assumed Leases; provided, however, that Buyer may remove the Leases for the Harlem Store and the Chelsea Store (each, a "Non-Core Store"), and the PDC, from the list of Assumed Leases at any time prior to the later of the date that is (i) forty-five (45) days from the date hereof and (ii) two (2) days prior to the date of the Auction (and, in connection therewith, Buyer shall, in good faith, seek to determine whether to remove any such Lease as soon as practicable, and to promptly notify Sellers of any final determination made with respect thereto); provided, further, however, that removal of any such Lease from the list of Assumed Leases shall not affect the Purchase Price;

(d)      all rights under those Contracts set forth on Section 1.1 of the Disclosure Schedules under the heading "Transferred Contracts" (including a Modified Labor Agreement), other than those Contracts that expire or that are terminated prior to the Closing in accordance with their respective terms (such Contracts, together with the Assumed Leases, the "Transferred Contracts"), including the right to possess or use the property that is the subject of the Transferred Contract, together with any Contracts added to or removed from Section 1.1 of the Disclosure Schedules by Buyer by notice delivered to Sellers at any time during the period from and after the date hereof at any time prior to five (5) days prior to the Auction, if any, or ten (10) days prior to the Sale Hearing if no Auction is held; provided, that (x) Sellers shall not reject or terminate any Contract used or held for use exclusively in the operation of the Stores without Buyer's consent prior to the foregoing deadlines and (y) Buyer shall not be permitted to add any Contracts previously rejected in the Bankruptcy Cases; and provided, further, that any Contract on Section 1.1 of the Disclosure Schedule which, as determined by Sellers, relates solely to either the Harlem Store, the Chelsea Store or the PDC shall be deemed removed from Section 1.1 of the Disclosure Schedule and shall not constitute a Transferred Contract if the Lease with respect to such facility is removed from the list of Assumed Leases in accordance with subsection (c) above;

(e)      all of Sellers' security deposits, prepaid rent, and prepaid expenses previously paid by Sellers to fulfill Sellers' obligations under the Assumed Leases (other than any adequate assurance deposits posted in accordance with section 366 of the Bankruptcy Code) and, to the extent transferable, other deposits Related to the Business (the "Prepaid Expenses") that are included in the Prepaid Expenses Amount and paid in accordance with Section 2.3;

(f)      to the extent assignable or transferable, all warranties related to any of the foregoing;

(g)      to the extent that any Affected Union enters into a Modified Labor Agreement with Buyer, all rights under such Modified Labor Agreement;

(h)      with respect to each Store, the amount of cash set forth on Section 1.1 of the Disclosure Schedule under the heading "Per Store Cash Closing Balance" to be left at such Store following the close of business on the date which is the date before the Closing (the "Per Store Cash Closing Balance");

WEIL:\97314662\8\44444.0008

(i)      all Permits of Sellers exclusively Related to the Business, to the extent requested by Buyer and assignable to Buyer under applicable Law (and, for the avoidance of doubt, solely to the extent the applicable Governmental Authority consents to or otherwise approves the assignment or transfer of the applicable Permit) other than those Permits listed on Section 1.1 of the Disclosure Schedule under the heading "Excluded Permits";

(j)      all in-store processors, front-end systems, point-of-sale systems (including self-checkout equipment), credit card readers, computers, computer equipment, hardware, software, peripherals, pin pads and direct access storage devices, in each case, that are owned by Sellers;

(k)      any Intellectual Property owned by Sellers, including, for the avoidance of doubt, the name "Fairway" or "Fairway Markets" and all other marks set forth on Section 1.1 of the Disclosure Schedule under the heading "Marks", any name or trademark, service mark, trade name, logo, trade dress, Internet domain name or other indicia of origin that includes, relates to or derives from any such name, or any related abbreviations, acronyms or other formatives based on any such name, whether alone or in combination with any other words, phrases, or designs, and all registrations, applications and renewals thereof, all rights and goodwill associated therewith and any name or trademark, service mark, trade name, logo, Internet domain name, or other indicia of origin that is confusingly similar thereto or derived therefrom (collectively, the "Seller Marks"); and

(l)      all books and records of Sellers exclusively related to operation of the Business, including records relating to payroll, sales, and expenses, the plans, specifications, keys, passwords, and combinations for the Stores and PDC, as applicable, and those other items set forth on Section 1.1 of the Disclosure Schedule under the heading "Acquired Assets";

provided, however, notwithstanding anything to the contrary set forth in this definition, the Acquired Assets shall not include any Excluded Assets.

"Affected Labor Agreements" means the collective bargaining agreements covering any of the Covered Employees, each of which is listed on Section 1.1 of the Disclosure Schedule under the heading "Affected Labor Agreements", none of which are to be assumed by the Buyer.

"Affected Unions" means the unions identified on Section 1.1 of the Disclosure Schedule under the heading "Affected Unions".

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by Contract, or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Allocation Principles" has the meaning set forth in Section 2.7.

"Antitrust Law" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and all other Laws and Decrees that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition, whether in the United States or elsewhere.

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.5(a)(ii).

"Assumed Leases" has the meaning set forth in the definition of "Acquired Assets".

"Assumed Liabilities" means solely the following Liabilities of each of the Sellers as of the Closing Date Related to the Business:

        (a)      all Liabilities under the Transferred Contracts (including all Cure Costs);

        (b)      all amounts allocated to Buyer under Section 2.7 and all Transfer Taxes allocated to Buyer pursuant to Section 6.5;

        (c)      all Prorated Charges apportioned to Buyer in accordance with Section 2.8;

        (d)      all Liabilities, including those relating to or arising under Environmental Laws, relating to or arising out of the ownership or operation of the Stores or any Acquired Asset by Buyer from and after the Closing Date; and

        (e)      to the extent that any Affected Union enters into a Modified Labor Agreement with Buyer, all Liabilities arising under such Modified Labor Agreement, in each case, from and after the Closing date;

provided, however, that notwithstanding anything to the contrary set forth in this definition, the Assumed Liabilities shall not include any Excluded Liabilities.

"Auction" has the meaning set forth in Section 5.4(c)(ii).

"Back-up Termination Date" means the first to occur of (a) consummation of the transaction with the winning bidder at the Auction, (b) Buyer's receipt of notice from Seller of the release by Seller of Buyer's obligations under Section 5.4(d), and (c) forty-five (45) days after the conclusion of the Auction.

"Bankruptcy Cases" means the contemplated Chapter 11 cases of Sellers and certain of their Affiliates.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bidding Procedures Order" means an order of the Bankruptcy Court, in form and substance reasonably acceptable to Buyer and Sellers that, among other things, approves (a) bidding procedures, (b) bid protections granted to stalking horse buyer(s) including the Termination Payment, (c) the form and manner of notice of Auction(s), sale transaction(s), and

Sale Hearing(s), and the conduct of the Auction, (d) the procedures for assumption and assignment of Contracts and Leases, (e) the date for Auction(s), if necessary, and Sale Hearing(s), and (f) affords Buyer the status of a party in interest in the Bankruptcy Cases, and (g) provides for the Buyer Carve Out.

"Bill of Sale" has the meaning set forth in Section 2.5(a)(i).

"Bonding Requirements" means standby letters of credit, guarantees, indemnity bonds and other financial commitment credit support instruments issued by third parties on behalf of Sellers or any of their respective Subsidiaries or Affiliates regarding any of the Acquired Assets.

"Break-Up Fee" has the meaning set forth in Section 5.4(a).

"Broadway Inventory, Cash and Prepaid Amount" has the meaning set forth in Section 2.3(a)(ii).

"Broadway Store" means the Store operated by Sellers at 2131 Broadway, New York, NY 10023.

"Business" means the operation of the Stores and the PDC by Sellers.

"Business Day" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the Laws of the State of New York or is a day on which banking institutions located in the State of New York are authorized or required by Law or other governmental action to close.

"Buyer" has the meaning set forth in the preamble.

"Buyer Carve Out" means a decree from the Bankruptcy Court that the collateral securing any claim of any holder of a Lien against the assets of the Sellers shall be used to pay the Termination Payment, and any of Buyer's Damages, in accordance with this Agreement.

"Buyer 401(k) Plan" has the meaning set forth in Section 6.4(d).

"Buyer Proration Amount" has the meaning set forth in Section 2.8(d).

"Cash Equivalents" means cash, checks, money orders, funds in time and demand deposits or similar accounts, marketable securities, short-term investments, and other cash equivalents and liquid investments.

"Cash Purchase Price" has the meaning set forth in Section 2.3(a).

"Chelsea Inventory, Cash and Prepaid Amount" has the meaning set forth in Section 2.3(a)(viii).

"Chelsea Store" means the Store operated by the Sellers at 766 6th Avenue, New York, NY 10010.

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

5

"Closing" has the meaning set forth in Section 2.4.

"Closing Date" has the meaning set forth in Section 2.4.

"COBRA" has the meaning set forth in Section 6.4(g).

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Collective Bargaining Agreement" shall mean each collective bargaining agreement, labor contract or memorandum of understanding entered into with a union governing the terms and conditions of employment of a Covered Employee.

"Company" has the meaning set forth in the preamble.

"Competing Bid" has the meaning set forth in Section 5.4(b).

"Confidentiality Agreement" means the confidentiality agreement, dated as of October 14, 2019, by and between the Company and Buyer.

"Contract" means any agreement, contract, license, arrangement, commitment, promise, obligation, right, instrument, document or other similar understanding, which in each case is in writing and signed by parties intending to be bound thereby.

"Contracting Parties" has the meaning set forth in Section 9.12.

"Covered Employee" means an employee of the Company or any of its Subsidiaries at the Closing whose duties relate primarily to the Business, including such employees who are on short-term disability, long-term disability, military leave, or any other approved leave of absence as of the Closing; provided, however, Covered Employee shall exclude any employee of the Company or any of its Subsidiaries at the Closing whose duties relate primarily to a Store or the PDC if such Store or the PDC is not sold in connection with the Closing.

"Cure Costs" means all amounts payable in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by the applicable Seller and assignment to Buyer of the Transferred Contracts; provided, however, that Cure Costs shall not include obligations under Transferred Contracts which constitute administrative expenses in the Bankruptcy Cases, and provided, further, however, that with respect to each Assumed Lease, the Cure Costs shall not exceed the sum of one month's rent (including any related common area maintenance charges or taxes for such period) with respect thereto.

"Damages" means any actual losses, claims, liabilities, debts, damages, fines, penalties or costs (in each case, including reasonable out-of-pocket expenses).

"Decree" means any judgment, decree, ruling, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, administrative order, or any other order of any Governmental Authority.

"Disclosure Schedule" has the meaning set forth in Article III.

"Employee Benefit Plans" has the meaning set forth in Section 3.9(a).

"Environmental Law" means any applicable Law relating to the protection of the environment or natural resources, including the use, handling, transportation, treatment, storage, disposal, release or threat of release or discharge of Hazardous Materials.

"Environmental Permit" means any Permit that is required by a Governmental Authority under any Environmental Law and necessary to operate the Business as of the Agreement Date.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" means Citibank, N.A.

"Escrow Agreement" means that certain Escrow Agreement, dated as of the date hereof, by and among Sellers, Buyer, and the Escrow Agent, a copy of which is attached hereto as Exhibit A.

"Escrow Amount" has the meaning set forth in Section 2.3(b).

"Excluded Assets" means, without duplication, all assets of Sellers as of the Closing that are not expressly included in the Acquired Assets, including:

(a)    any of Sellers' other supermarkets, distribution centers, administrative offices and facilities, and all assets or properties located thereon or otherwise related thereto that are not identified as Acquired Assets;

(b)    any asset of Sellers that is (i) not located in the Stores or the PDC and not Related to the Business or (ii) inseparable from any other business of Sellers or any of their Affiliates (other than the Business), in each case, including (A) organizational documents, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other documents relating to Sellers' organization, maintenance, existence, and operation; (B) books and records related to (1) Taxes paid or payable by Sellers or (2) any claims, obligations or liabilities not included in Assumed Liabilities; and (C) any Tax refund, deposit, prepayment, credit, attribute, or other Tax asset of or with respect to any of the Sellers;

(c)    all capital stock of the Company or any of the Company's Subsidiaries;

(d)    all Cash Equivalents (other than the Per Store Cash Closing Balances) and accounts receivable;

(e)    all Permits that are not part of the Acquired Assets as provided herein;

(f)    all insurance policies and binders and all rights thereunder, including all rights to recoveries, refunds and credits and to make claims thereunder;

7

(g)     all of Sellers' rights under this Agreement or any Related Agreement;

(h)     all of Sellers' rights under any Contracts related to any Excluded Asset, unless such Contract is a Transferred Contract;

(i)     any and all automobiles, trucks, tractors, and trailers;

(j)     any other rebate, payment, reimbursement or refund arising from the Business prior to the Closing;

(k)     other than the right to use or possess any property which is the subject of a Transferred Contract, all leased equipment located at or used in the Stores;

(l)     any assets or other funding vehicle related to any Employee Benefit Plan;

(m)     the Furnishings and Equipment described on Section 1.1 of the Disclosure Schedule under the heading "Excluded Furnishings and Equipment" (the "Excluded Furnishings and Equipment");

(n)     all (i) books and records that Sellers are required by Law to retain or that Sellers determine are necessary or advisable to retain; provided, however, that Buyer shall have the right to make copies of any portions of such retained books and records Related to the Business, Acquired Assets or Assumed Liabilities, or Transferred Employees; (ii) information management systems of Sellers, other than point of sale systems and Inventory management systems or any other systems serving the Stores; (iii) documents relating to proposals to acquire the Business by Persons other than Buyer; and (iv) personnel files for Covered Employees who are not hired by Buyer;

(o)     all Contracts other than the Transferred Contracts;

(p)     all Excluded Inventory;

(q)     all claims, proceeds, causes of action, choses in action, rights of recovery and rights of set-off of any kind against any Person arising out of or relating to the Acquired Assets in connection with events occurring on or before the Closing (other than any proceeds explicitly contemplated to be transferred to Buyer hereunder) including those arising under chapter 5 of the Bankruptcy Code;

(r)     all customer data and information derived from branded loyalty promotion or co-branded credit card programs and other similar information related to customer purchases at the Stores;

(s)     adequate assurance deposits posted in accordance with section 366 of the Bankruptcy Code; and

(t)     those items set forth on Section 1.1 of the Disclosure Schedule under the heading "Excluded Assets".

8

"Excluded Furnishings and Equipment" has the meaning set forth in the definition of Excluded Assets.

"Excluded Inventory" means the following inventory of goods, merchandise or other inventory of Sellers located at the Stores or the PDC: (a) damaged, obsolete or unsalable items, including items which have passed their 'sell by' date; (b) any scanned based traded merchandise (including greeting cards and magazines) or merchandise held on consignment; (c) any seasonal or holiday item for any season or holiday which will not occur within 120 days after the Closing Date; (d) any inventory item that, as of the Closing Date, is not transferable under applicable Law; and (e) or any Inventory that, during the seven (7) day period prior to the Closing Date, is transferred (i) to a Store from any other retail facility operated by Sellers or their Affiliates as of the date hereof, or (ii) to a Store from the PDC after Buyer removes the PDC lease from the schedule of Assumed Leases.

"Excluded Liabilities" means, without duplication, any Liability which is not an Assumed Liability, including the following Liabilities of Sellers:

(a)    any Liability not relating to or arising out of the Business or the Acquired Assets, including any Liability exclusively relating to or exclusively arising out of the Excluded Assets;

(b)    any Liability of Sellers for Taxes (except as provided for in Section 2.8 and Section 6.5 or constituting Cure Costs);

(c)    all indebtedness of Sellers for borrowed money, all accounts payable (except for Cure Costs), and any Claims against Sellers that are not Assumed Liabilities);

(d)    all Liabilities of Sellers under this Agreement or any Related Agreement and the transactions contemplated hereby or thereby; and

(e)    any Liability of any Seller or any of its Affiliates under a Multiemployer Plan.

"Furnishings and Equipment" means all fixtures, trade fixtures, store models, shelving, and refrigeration equipment owned by Sellers and located at the Stores, including those items listed on Section 1.1 of the Disclosure Schedule under the headings "Furnishings and Equipment".

"GAAP" means United States generally accepted accounting principles consistently applied.

"Governmental Authority" means any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity (including the IRS).

"Harlem Inventory, Cash and Prepaid Amount" has the meaning set forth in Section 2.3(a)(vii).

9

"Harlem Store" means the Store operated by a Seller at 2328 12th Avenue, New York, NY 10027.

"Hazardous Materials" means any substance, material or waste that is defined or regulated as "hazardous," "toxic," "radioactive," a "pollutant," a "contaminant" or words of similar regulatory effect under any applicable Environmental Law, including asbestos, polychlorinated biphenyls, radioactive materials, petroleum and petroleum by-products and distillates.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Independent Accounting Firm" has the meaning set forth in Section 2.7.

"Intellectual Property" means: (a) all issued patents and patent applications, together with all reissuances, continuations, continuations-in-part, divisionals, extensions and reexaminations thereof; (b) all trademarks, service marks, trade dress, logos, trade names, and Internet domain names, together with all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith ("Marks"); (c) all copyrights, together with all registrations and applications for registration therefor and renewals in connection therewith; (d) all trade secrets, know-how, technology, improvements, and inventions; and (e) all computer software (including data and databases).

"Interest Rate" means the prime lending rate reported by the Wall Street Journal as of the date of the payment was due plus one and one-half percent (1.5%) per month (or, if lower, the maximum interest rate allowed by law), compounded monthly, until the date such payment is made.

"Interim Cash" has the meaning set forth in Section 2.6(g).

"Inventory" means all inventory of goods, merchandise, food, beverages, Supplies, tobacco inventory and other products (including, to the extent transferable to Buyer pursuant to the transactions contemplated hereby and under applicable Law, alcohol and other alcoholic beverages), in each case, that is offered for sale to customers at the Stores and owned by Sellers, other than Excluded Inventory.

"Inventory Count" has the meaning set forth in Section 2.6(a).

"Inventory Date" has the meaning set forth in Section 2.6(a).

"Inventory Purchase Price" has the meaning set forth in Section 2.6(b).

"Inventory Taker" has the meaning set forth in Section 2.6(a).

"IP Assignment and Assumption Agreement" has the meaning set forth in Section 2.5(a)(iv).

"IRS" means the U.S. Internal Revenue Service.

10

"Kips Bay Inventory, Cash and Prepaid Amount" has the meaning set forth in Section 2.3(a)(vi).

"Kips Bay Store" means the Store operated by Sellers at 550 2nd Avenue, New York, NY 10016.

"Knowledge of Sellers" means the actual knowledge of the individuals identified on Section 1.1 of the Disclosure Schedule under the heading "Knowledge Parties".

"Law" means any constitution applicable to, and any statute, treaty, code, rule, regulation, ordinance, or legally binding requirement of, any Governmental Authority.

"Lease" means a lease, sublease, license, concession, option, contract, extension letter, easement, reciprocal easement, assignment, termination agreement, subordination agreement, nondisturbance agreement, estoppel certificate or other agreement (written or oral), and any amendments or supplements to the foregoing, and recorded memoranda of any of the foregoing.

"Lease Assignment and Assumption Agreements" has the meaning set forth in Section 2.5(a)(iii).

"Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising.

"Lien" means any mortgage, pledge, lien, charge, security interest, option, right of first refusal, easement, security agreement or other encumbrance or restriction on the use or transfer of any property; provided, however, that "Lien" shall not be deemed to include any license of Intellectual Property.

"Loss" has the meaning set forth in Section 2.10(a).

"Material Adverse Effect" means any effect or change that has a material adverse effect on the condition of the Acquired Assets or the Business, taken as a whole, other than any effects or changes arising from or related to, (a) general business or economic conditions in any of the geographical areas in which the Stores operate, (b) any condition or occurrence affecting retail grocery generally, (c) national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack, (d) financial, banking, or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index), (e) the occurrence of any act of God or other calamity or force majeure events (whether or not declared as such), including any natural disaster, fire, flood, hurricane, tornado, or other weather event, (f) changes in Law or accounting rules, (g) the taking of any action contemplated by this Agreement or any Related Agreement or taken with the consent of the other Party, (h) any effects or changes as a result of the announcement or pendency of this Agreement, (i) any filing or motion made under sections 1113 or 1114 of the Bankruptcy Code, (j) the sale of the Excluded Assets to any third parties by any Seller or any of its Affiliates, (k) any effects or changes arising from or related

11

to the breach of the Agreement by Buyer, (l) any failure by Sellers to meet internal or published projections, estimates or forecasts of revenues, earnings or other measures of financial or operating performance by any period, (m) the failure of Sellers to obtain any consent, permit, authorization, waiver or approval required in connection with the transactions contemplated hereby, (n) any items set forth in the Disclosure Schedule, or (o) any matter of which Buyer is aware on the date hereof (<u>provided</u>, that the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded by this clause (o), except in the case of the foregoing clauses (a), (b), (c) or (f), to the extent such effect or change is (or would reasonably be expected to be) disproportionately adverse with respect to the Acquired Assets or the Business, in each case, taken as a whole, compared to other Persons in the industry in which Sellers conduct the Business, but, in such case, only the incremental disproportionate impact of such effects, changes, conditions, circumstances, developments or events shall be taken into account in determining whether a "Material Adverse Effect" has occurred).

"<u>Modified Labor Agreement</u>" means a new collective bargaining agreement with an Affected Union that is entered into by Buyer and an Affected Union.

"<u>Monthly Prorated Charges</u>" has the meaning set forth in <u>Section 2.8(a)</u>.

"<u>Multiemployer Plan</u>" has the meaning set forth in <u>Section 3.9(c)</u>.

"<u>Net Prorated Charges</u>" has the meaning set forth in <u>Section 2.8(d)</u>.

"<u>Non-Core Store</u>" has the meaning set forth in the definition of "<u>Acquired Assets</u>".

"<u>Non-Core Store Assets</u>" has the meaning set forth in <u>Section 2.3</u>.

"<u>Non-Party Affiliates</u>" has the meaning set forth in <u>Section 9.12</u>.

"<u>Order</u>" means any order, judgment, injunction, ruling, writ, award or Decree of any Governmental Authority.

"<u>Ordinary Course of Business</u>" means the ordinary and usual course of normal day to day operations of the Business through the date hereof consistent with past practice.

"<u>Outside Date</u>" has the meaning set forth in <u>Section 8.1(b)(ii)</u>.

"<u>Party</u>" and "<u>Parties</u>" have the meanings set forth in the preamble.

"<u>PDC</u>" has the meaning set forth in the preamble.

"<u>PDC Assets</u>" has the meaning set forth in <u>Section 2.3</u>.

"<u>PDC Inventory, Cash and Prepaid Amount</u>" has the meaning set forth in <u>Section 2.3(a)(x)</u>.

"<u>Per Store Cash Closing Balance</u>" has the meaning set forth in the definition of Acquired Assets.

WEIL:\97314662\8\44444.0008

"Permit" means any franchise, approval, permit, license, order, registration, certificate, variance or similar right obtained from any Governmental Authority.

"Permitted Lien" means: (a) Liens for Taxes not yet due and payable; (b) mechanic's, workmen's, repairmen's, carrier's or other similar Liens, including all statutory liens, arising or incurred in the Ordinary Course of Business (in an aggregate amount not to exceed $250,000); (c) with respect to leased or licensed real or personal property, the terms and conditions of the lease, license, sublease or other occupancy agreement applicable thereto; (d) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property; (e) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects that do not or would not reasonably be expected to have a Material Adverse Effect; (f) matters that would be disclosed on an accurate survey of the real property; (g) Liens shown in any title commitment, report or policy, or otherwise of record, other than Liens arising under the UCC, Liens securing any judgment, or any Lien securing the payment of money; (h) Liens arising out of, under or in connection with this Agreement or any Related Agreement; and (i) Liens created by or through, or resulting from, any facts or circumstances relating to Buyer or its Affiliates.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

"Prepaid Expenses" has the meaning set forth in the definition of Acquired Assets.

"Prepaid Expenses Amount" means aggregate amount of all Prepaid Expenses.

"Proceeding" means any action, cause of action, suit, claim, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative, or arbitral, whether at Law or in equity and whether before any Governmental Authority.

"Proposal" has the meaning set forth in Section 6.3.

"Prorated Charges" means (a) the Monthly Prorated Charges, (b) the non-monthly real estate related payments prorated pursuant to Section 2.8(b) and (c) the real estate Taxes and assessments and other Taxes (other than Transfer Taxes), in each case, (i) imposed upon or assessed directly against the Acquired Assets as of the Closing (including personal property Taxes and similar Taxes), in each case, for the Tax period in which the Closing occurs and (ii) prorated pursuant to Section 2.8(c).

"Proration Period" has the meaning set forth in Section 2.8(c).

"Purchase Price" has the meaning set forth in Section 2.3(a).

"Purchase Price Allocation" has the meaning set forth in Section 2.7.

13

"Related Agreements" means the Bill of Sale, the Assignment and Assumption Agreement, the IP Assignment and Assumption Agreement, and the Lease Assignment and Assumption Agreements.

"Related Orders" has the meaning set forth in Section 5.4(c).

"Related to the Business" means used or held for use exclusively in the operation of the Stores by a Seller or, in the case of a Liability, to the extent accrued, reserved or incurred in connection with the operation of the Stores by a Seller.

"Representative" means, when used with respect to a Person, the Person's controlled Affiliates (including Subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, stockholders, partners, employees, agents, incorporators, representatives, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants), and financing sources.

"Seller 401(k) Plan" has the meaning set forth in Section 6.4(d).

"Sale Hearing" means a hearing before the Bankruptcy Court to approve this Agreement and the Sale Order.

"Sale Order" means an order of the Bankruptcy Court in form and substance reasonably satisfactory to the Parties (a) approving (i) this Agreement and the execution, delivery, and performance by Sellers of this Agreement and the other instruments and agreements contemplated hereby; (ii) the sale of the Acquired Assets to Buyer free and clear of all Liens, other than any Permitted Liens or any Assumed Liabilities; (iii) the assumption of the Assumed Liabilities by Buyer on the terms set forth herein; and (iv) the assumption and assignment to Buyer of the Transferred Contracts on the terms set forth herein; (b) determining that Buyer is a good faith Buyer, and that Buyer is not a successor to the Sellers for any purpose; and (c) providing that the Closing will occur in accordance with the terms and conditions hereof.

"Seller Marks" has the meaning set forth in the definition of "Acquired Assets".

"Seller Proration Amount" has the meaning set forth in  Section 2.8(d).

"Sellers" has the meaning set forth in the preamble.

"Store" and "Stores" have the meanings set forth in the recitals.

"Subsidiary" means, with respect to any Person, on any date, any other Person (a) the accounts of which would be consolidated with and into those of the applicable Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date or (b) of which securities or other ownership interests representing more than fifty percent (50%) of the equity or more than fifty percent (50%) of the ordinary voting power or, in the case of a partnership, more than fifty percent (50%) of the general partnership interests or more than fifty percent (50%) of the profits or losses are, as of such date, owned, controlled or held by such Person or one or more subsidiaries of such Person.

WEIL:\97314662\8\44444.0008

"<u>Supplies</u>" shall mean cleaning supplies (including materials, solutions and waxes), small wares, office supplies, production supplies and any similar items at the Stores.

"<u>Tax</u>" or "<u>Taxes</u>" means any United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

"<u>Tax Return</u>" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"<u>Termination Payment</u>" has the meaning set forth in <u>Section 5.4(a)</u>.

"<u>Transfer Tax</u>" has the meaning set forth in <u>Section 6.5</u>.

"<u>Transferred Contracts</u>" has the meaning set forth in the definition of "<u>Acquired Assets</u>".

"<u>Transferred Employee</u>" has the meaning set forth in <u>Section 6.4(a)</u>.

"<u>Treasury Regulations</u>" means the regulations promulgated by the U.S. Department of the Treasury under the Code, including proposed and temporary regulations.

"<u>UCC</u>" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"<u>WARN Act</u>" means, collectively, the Worker Adjustment and Retraining Notification Act of 1989 and any similar state or local Law.

"<u>86th Street Inventory, Cash and Prepaid Amount</u>" has the meaning set forth in <u>Section 2.3(a)(iv)</u>.

"<u>86th Street Store</u>" means the Store operated by Sellers at 240 East 86th Street, New York, NY 10028.

Section 1.2    <u>Interpretations</u>.  Unless otherwise indicated herein to the contrary:

(a)    When a reference is made in this Agreement to an Article, Section, Exhibit, Schedule, clause or subclause, such reference shall be to an Article, Section, Exhibit, Schedule, clause or subclause of this Agreement.

(b)    The words "include," "includes" or "including" and other words or phrases of similar import, when used in this Agreement, shall be deemed to be followed by the words "without limitation."

15

(c)    The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)    The word "if" and other words of similar import shall be deemed, in each case, to be followed by the phrase "and only if."

(e)    The use of "or" herein is not intended to be exclusive.

(f)    The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

(g)    All terms defined in this Agreement have their defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein.

(h)    References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder. References to any Contract are to that Contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof. References herein to a Person are also to its successors and permitted assigns. Any reference herein to a Governmental Authority shall be deemed to include reference to any successor thereto.

(i)    Any reference herein to "Dollars" or "$" shall mean United States dollars.

(j)    The specification of any dollar amount in the representations, warranties, or covenants contained in this Agreement is not intended to imply that such amounts or higher or lower amounts are or are not material, and Buyer shall not use the fact of the setting of such amounts in any dispute or controversy between the Parties as to whether any obligation, item, or matter is or is not material.

(k)    References in this Agreement to materials or information "furnished to Buyer" and other phrases of similar import include all materials or information made available to Buyer or its Representatives in the data room prepared by Sellers or provided to Buyer or its Representatives in response to requests for materials or information.

(l)    References from or through any date means, unless otherwise specified, from and including or through and including such date, respectively. References to "days" shall refer to calendar days unless Business Days are specified. If any period expires on a day which is not a Business Day or any event or condition is required by the terms of this Agreement to occur or be fulfilled on a day which is not a Business Day, such period shall expire or such event or condition shall occur or be fulfilled, as the case may be, on the next succeeding Business Day.

(m)    Unless the context otherwise requires, the word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not simply mean "if."

16

# ARTICLE II
# PURCHASE AND SALE

Section 2.1    <u>Purchase and Sale of Acquired Assets</u>.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer will purchase from Sellers, and Sellers will sell, transfer, assign, convey, and deliver to Buyer, all of the Acquired Assets free and clear of Liens or Claims to the maximum extent permitted under applicable bankruptcy law, except for Permitted Liens.

Section 2.2    <u>Assumed Liabilities</u>.  On the terms and subject to the conditions set forth in this Agreement, as partial consideration for the Acquired Assets, Buyer shall, effective as of the Closing, assume all Assumed Liabilities.  Buyer agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms thereof, including paying or causing to be paid, at or prior to the Closing, all Cure Costs.

Section 2.3    <u>Consideration; Deposit; Escrow Amount</u>.

(a)    The consideration for the Acquired Assets shall be (i) an aggregate Dollar amount equal to the sum of (A) $68.6 million dollars (subject to adjustment pursuant to the final sentence of this <u>Section 2.3(a)</u>) (the "<u>Cash Purchase Price</u>"), *plus* (B) the Seller Proration Amount, if any, *plus* (C) Cure Costs, if any, *minus* (D) the Buyer Proration Amount, if any (such calculation, the "<u>Purchase Price</u>") and (ii) Buyer's assumption of the Assumed Liabilities. The Cash Purchase Price is allocated among the Stores and the PDC as follows:

(i)    $27,000,000 to the Broadway Store;

(ii)    $1,890,000 (the "<u>Broadway Inventory, Cash and Prepaid Amount</u>") (subject to adjustment pursuant to the final sentence of this <u>Section 2.3(a)</u>) to the Inventory, Per Store Cash Closing Balances and Prepaid Expenses attributable to the Broadway Store;

(iii)    $27,000,000 to the 86th Street Store;

(iv)    $1,400,000 (the "<u>86th Street Inventory, Cash and Prepaid Amount</u>") (subject to adjustment pursuant to the final sentence of this <u>Section 2.3(a)</u>) to the Inventory, Per Store Cash Closing Balances and Prepaid Expenses attributable to the 86th Street Store;

(v)    $2,600,000 to the Kips Bay Store;

(vi)    $1,420,000 (the "<u>Kips Bay Inventory, Cash and Prepaid Amount</u>") (subject to adjustment pursuant to the final sentence of this <u>Section 2.3(a)</u>) to the Inventory, Per Store Cash Closing Balances and Prepaid Expenses attributable to the Kips Bay Store;

(vii)    $1,560,000 (the "<u>Harlem Inventory, Cash and Prepaid Amount</u>") (subject to adjustment pursuant to the final sentence of this <u>Section 2.3(a)</u>) to the Inventory, Per Store Cash Closing Balances and Prepaid Expenses attributable to the Harlem Store;

17

(viii)    $920,000 (the "Chelsea Inventory, Cash and Prepaid Amount") (subject to adjustment pursuant to the final sentence of this Section 2.3(a)) to the Inventory, Per Store Cash Closing Balances and Prepaid Expenses attributable to the Chelsea Store;

(ix)    $1,750,000 to the PDC; and

(x)    $3,060,000 (the "PDC Inventory, Cash and Prepaid Amount") (subject to adjustment pursuant to the final sentence of this Section 2.3(a)) to the Inventory, Per Store Cash Closing Balances and Prepaid Expenses attributable to the PDC.

After the completion of the Inventory Count, to the extent the amounts of Inventory, Per Store Cash Closing Balances or Prepaid Expenses delivered by Sellers to Buyer at Closing are less than or greater than the applicable amounts set forth in clause (ii), (iv) (vi), (vii), (viii) or (x) above, the Cash Purchase Price shall be increased or decreased, as applicable, by such amount on a dollar for dollar basis. The Broadway Inventory, Cash and Prepaid Amount, the 86th Street Inventory, Cash and Prepaid Amount, the Kips Bay Inventory, Cash and Prepaid Amount, the Harlem Inventory, Cash and Prepaid Amount, the Chelsea Inventory, Cash and Prepaid Amount, or the PDC Inventory, Cash and Prepaid Amount shall be then so adjusted, provided, that in the event Buyer elects to remove the Leases for (x) either or both of the Non-Core Stores and/or (y) the PDC from the list of Assumed Leases, in each case in accordance with the terms of this Agreement, then Sellers may, in their sole discretion:

(i)    in the case of the removal of Lease(s) for the Non-Core Store(s), elect to (A) deem (1) the Inventory, Cash, and Prepaid Expenses for such Non-Core Store and (2) all other Acquired Assets that, as reasonably determined by Sellers, relate solely to such Non-Core Store (collectively, the "Non-Core Store Assets"), as Excluded Assets, and (B) decrease the Cash Purchase Price by (x) $1,560,000 with respect to the Harlem Store and (y) $920,000 with respect to the Chelsea Store; or

(ii)    in the case of the removal of the Lease for the PDC, elect to (A) deem (x) the Inventory, Cash, and Prepaid Expenses attributable to the PDC and (y) all other Acquired Assets that, as reasonably determined by Sellers, relate primarily to the PDC (collectively, the "PDC Assets"), as Excluded Assets, and (B) decrease the Cash Purchase Price by (x) $3,060,000.

If Sellers do not so elect to treat the Non-Core Store Assets or PDC Assets as Excluded Assets, (i) such Assets shall remain Acquired Assets and (ii) there shall be no adjustment to the (A) Harlem Inventory, Cash and Prepaid Amount, (B) Chelsea Inventory, Cash and Prepaid amount, (C) PDC Inventory, Cash and Prepaid Amount or (D) Purchase Price, and the Inventory, Per Store Cash Closing Balances and Prepaid Expenses attributable to the Harlem Store, the Chelsea Store or the PDC, as the case may be, shall be delivered to Buyer, in which case the Parties will cooperate in good faith to agree on a mutually acceptable manner in which to transfer the applicable assets to Buyer.

(b)    Upon the execution of this Agreement, pursuant to the terms of the Escrow Agreement, Buyer shall, within one (1) Business Day following the date hereof, deposit with the Escrow Agent the sum of $6.86 million dollars by wire transfer of immediately available funds

18

(the "Escrow Amount"), to be released by the Escrow Agent and delivered to either Buyer or Sellers, in accordance with the provisions of the Escrow Agreement. Pursuant to the Escrow Agreement, the Escrow Amount (together with all accrued investment income thereon, if any) shall be distributed as follows:

      (i)     if the Closing shall occur, the Escrow Amount shall be paid to Sellers and applied towards the Purchase Price payable by Buyer to Sellers under Section 2.3(a) and all accrued investment income thereon, if any, shall be delivered to Buyer at the Closing;

      (ii)    if this Agreement is terminated by Sellers pursuant to Section 8.1(d) (subject to Buyer's right to contest the validity of Seller's termination) the Escrow Amount, together with all accrued investment income thereon, if any, shall be delivered to Sellers; or

      (iii)   if this Agreement is terminated for any reason other than by any Seller pursuant to Section 8.1(d), the Escrow Amount, together with all accrued investment income thereon, shall in each case be returned to Buyer.

Section 2.4    Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York (or such other location as shall be mutually agreed upon by Sellers and Buyer) (the "Closing Date"), as soon as reasonably practicable, and in no event later than three (3) Business Days, following the date upon which the last to be satisfied or waived of each of the conditions set forth in Article VII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions) shall have been satisfied or waived in accordance with this Agreement.  For purposes of this Agreement and the transactions contemplated hereby, the Closing will be deemed to occur and be effective, and title to and risk of loss associated with the Acquired Assets, shall be deemed to occur at 12:01 am, New York City time, on the Closing Date.

Section 2.5    Closing Payments and Deliveries.

      (a)    At the Closing, Sellers will deliver or cause to be delivered to Buyer the following:

      (i)     a duly executed Bill of Sale substantially in the form of Exhibit B (the "Bill of Sale");

      (ii)    a duly executed Assignment and Assumption Agreement substantially in the form of Exhibit C (the "Assignment and Assumption Agreement");

      (iii)   a duly executed Assignment and Assumption of Lease for each of the Assumed Leases substantially in the form of Exhibit D (each a "Lease Assignment and Assumption Agreement" and collectively, the "Lease Assignment and Assumption Agreements");

19

(iv)    a duly executed IP Assignment and Assumption Agreement substantially in the form of <u>Exhibit E</u> (the "<u>IP Assignment and Assumption Agreement</u>");

(v)    an executed certificate of non-foreign status from each Seller in compliance with Treasury Regulations Section 1.1445-2;

(vi)    a duly executed certificate from an officer of each Seller to the effect that each of the conditions specified in <u>Section 7.2(a)</u> and <u>Section 7.2(b)</u> is satisfied; and

(vii)    all keys, passwords and codes necessary to access the Stores and the PDC, each of which shall be delivered in person at the Closing.

(b)    At the Closing, Buyer will deliver or cause to be delivered to Sellers the following:

(i)    the Purchase Price (less the Escrow Amount, which shall be released to Sellers by the Escrow Agent), by wire transfer of immediately available funds, to an account or accounts as directed by Sellers;

(ii)    the Bill of Sale duly executed by Buyer;

(iii)    the Assignment and Assumption Agreement duly executed by Buyer;

(iv)    the Lease Assignment and Assumption Agreements duly executed by Buyer;

(v)    the IP Assignment and Assumption Agreement duly executed by Buyer; and

(vi)    a duly executed certificate from an officer of Buyer to the effect that each of the conditions specified in <u>Section 7.3(a)</u> and <u>Section 7.3(b)</u> are satisfied.

Section 2.6    <u>Inventory</u>.

(a)    A physical count of the Inventory, and calculation of the value thereof, at each of the Stores and the PDC (the "<u>Inventory Count</u>") shall be made by a nationally-recognized, independent inventory service (the "<u>Inventory Taker</u>") selected and engaged by Sellers, and reasonably acceptable to Buyer, no more than two (2) days prior to the anticipated Closing Date, or on such other date as the Parties may mutually agree (the date of such physical count being the "<u>Inventory Date</u>").  The Inventory Taker shall conduct the physical count of the Inventory in accordance with instructions set forth in Section 2.6 of the Disclosure Schedule and otherwise in accordance with the terms and conditions of this <u>Section 2.6</u> and the usual and customary practices of the industry (and according to the Inventory Taker's established inventory policies and procedures, copies of which shall be furnished to Buyer and Sellers prior to the Inventory Date).

(b)    The fees and expenses of the Inventory Taker shall be borne fifty percent (50%) by Buyer and fifty percent (50%) by Sellers.  The physical inventory (and the Inventory

WEIL:\97314662\8\44444.0008

Purchase Price to be paid by Buyer for the Inventory) shall not include Inventory that is Excluded Inventory.  The Inventory Taker shall value all Inventory carried in the Stores and the PDC on the Inventory Date, excluding the Excluded Inventory (but including any portion or all of the Excluded Inventory that Buyer deems Inventory), at the percentages set forth on Section 2.6(b) of the Disclosure Schedule (such value, the "<u>Inventory Purchase Price</u>").  Except for the Excluded Inventory, all merchandise received at each Store and the PDC prior to the commencement of the physical count of the Inventory at such Store and the PDC must be included in the inventory taking process, and shall be set forth on the Inventory Count.

(c)    Buyer, on the one hand, and Sellers collectively, on the other hand, shall each appoint a Representative to be present during the physical count of the Inventory.  At an agreed-upon date and time no later than one (1) day prior to the start of the physical count of the Inventory at a Store and the PDC, such Representatives shall tour the Store and the PDC to agree upon items of Excluded Inventory and to ensure segregation of such items from the Inventory to be counted in connection with the physical count at the Store or the PDC.  Such Representatives shall cooperate in good faith to agree on the inclusion of any item of merchandise as Inventory and/or the valuation of any such item of Inventory.  In the event that such Representatives do not agree on the value of the Inventory for any Store or the PDC because such Representatives disagree as to whether certain items should be counted as Excluded Inventory or as to Sellers' cost of Inventory, the opinion of the Inventory Taker shall be final and binding.

(d)    The Inventory Count shall (i) be summarized for each Store and the PDC using an inventory certificate to be provided by the Inventory Taker, which must be executed by a Representative of Buyer and a Representative of Sellers prior to either such Representative leaving the applicable Store and the PDC and (ii) show the total cost of the Inventory for each Store and the PDC determined in the manner provided in Section 2.6 of the Disclosure Schedule.

(e)    Buyer shall make application to the applicable authorities to transfer any alcohol and alcoholic beverages included in the Inventory to Buyer, and any such application shall be made promptly after the execution of this Agreement and shall be diligently pursued by Buyer, at Buyer's sole cost and expense.  Sellers, at no out-of-pocket cost or expense to Sellers, shall reasonably cooperate with Buyer and use their commercially reasonable efforts to provide any documents or information necessary to assist in effectuating said transfer and execute such consents or other papers as may reasonably be required.

(f)    Notwithstanding Sellers' obligations in <u>Section 5.1</u> to conduct the Business in the Ordinary Course of Business, Sellers may sell down Excluded Inventory without replenishment prior to the applicable Inventory Date for each Store and the PDC.

(g)    Immediately on completion of the Inventory Count, (i) all receipts from Inventory sold shall become property of Buyer (the "<u>Interim Cash</u>") except as required by applicable Law, Sellers shall grant Buyer access to the Stores and the PDC to begin provisioning the Stores and the PDC with Buyer's goods, all of which shall remain the property of Buyer until the Closing. If the Closing does not occur for any reason, Buyer shall be entitled to remove its goods from the Stores and the PDC and the Interim Cash shall be paid to Sellers.

21

(h)       The Parties shall meet at a mutually agreed date between fourteen (14) and seven (7) days prior to the Closing to review the status of the Inventory and the valuation methodology to be employed by the Inventory Taker.  The Parties shall in good faith seek to cause the Inventory Count to be conducted outside of normal business hours, and to schedule the Closing on the first Business Day after completion of the Inventory Count.

Section 2.7       Allocation; Dispute Resolution.  Buyer and Sellers agree to allocate the Purchase Price (as finally determined hereunder) and the Assumed Liabilities among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations thereunder (the "Allocation Principles"), provided, however, that for the purposes of this Section 2.7, the Parties shall not be required to allocate the Purchase Price among the Stores, the Intellectual Property or the PDC in accordance with Section 2.3(a).  No later than thirty (30) days after the Closing Date, Sellers shall deliver to Buyer an allocation of the Purchase Price and the Assumed Liabilities as of the Closing Date among the Acquired Assets, determined in a manner consistent with the Allocation Principles (the "Purchase Price Allocation") for Buyer's review and comment.  Any reasonable comments provided by Buyer to Sellers under this Section 2.7 within thirty (30) days of the delivery of the Purchase Price Allocation shall be considered by Sellers in good faith.  If Buyer agrees in writing with the Purchase Price Allocation or fails to provide comments to the Purchase Price Allocation within thirty (30) days following receipt thereof from Seller, the Purchase Price Allocation shall be conclusive and binding on the Parties.  If the Parties are unable to agree on the Purchase Price Allocation after good faith consultation, the matters in dispute shall be referred for resolution to a nationally recognized accounting firm reasonably acceptable to Sellers and Buyer (in either case, the "Independent Accounting Firm"), the expenses (including engagement fees) of which shall be borne equally by Buyer, on the one hand, and Sellers collectively, on the other hand.  The Independent Accounting Firm shall resolve any disputed matters as promptly as practicable, and the Independent Accounting Firm's decision with respect to any such matter shall be conclusive and binding on the Parties.  None of the Parties will take any position inconsistent with the Purchase Price Allocation on any Tax Return or in any audit or Tax proceeding, in each case, unless otherwise required by applicable Law or by a final determination by a Governmental Authority.  Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 2.7 shall survive the Closing without limitation.

Section 2.8       Proration.

(a)       On the Closing Date all monthly payments for the month in which the Closing occurs (including base rent, common area maintenance fees, and utility charges) under the Assumed Leases transferred at the Closing (the "Monthly Prorated Charges") shall be apportioned and prorated between Sellers and Buyer as of the Closing Date with (i) Buyer bearing the expense of Buyer's proportionate share of such Monthly Prorated Charges that shall be equal to the product obtained by multiplying (A) a fraction, the numerator being the amount of the Monthly Prorated Charges under the applicable Assumed Lease and the denominator being the total number of days in the lease month in which the Closing occurs, times (B) the number of days in such lease month following the day that immediately precedes the Closing Date, and (ii) Sellers bearing the remaining portion of such Monthly Prorated Charges.

(b)    As to all non-monthly real estate related payments, including the percentage rent payable under any Assumed Lease, the same shall be apportioned between Sellers and Buyer as of 12:01 a.m. on the Closing Date.  If any amounts are payable in installments, all installments due through the Closing together with the accrued but unpaid portion of any other installments not yet due as of the Closing shall be prorated based on the periods of time covered by such installments occurring before and after the Closing Date.

(c)    (i) Real estate Taxes and assessments and (ii) other Taxes (in each case, other than Transfer Taxes) imposed upon or assessed directly against the Acquired Assets as of the Closing (including personal property Taxes and similar Taxes), in each case, for the Tax period in which the Closing occurs (the "Proration Period"), shall be apportioned and prorated between Sellers and Buyer as of the Closing Date with Buyer bearing the expense of Buyer's proportionate share of such Taxes that shall be equal to the product obtained by multiplying (A) a fraction, the numerator being the amount of the Taxes and the denominator being the total number of days in the Proration Period, times (B) the number of days in the Proration Period following the Closing Date.  If the Closing shall occur before a new real estate or personal property Tax rate is fixed for the applicable property, or if the amount of any such Tax cannot be ascertained on the Closing Date, apportionment and proration of Taxes for such property at the Closing shall be upon the basis of the old Tax rate for the preceding fiscal year applied to the latest assessed valuation. Promptly after the new Tax rate is fixed, the apportionment of Taxes shall be recomputed by the Parties and any discrepancy resulting from such recomputation and any errors or omissions in computing apportionments at the Closing shall be promptly corrected and the proper party reimbursed within thirty (30) days following such recomputation.

(d)    The net amount of all Prorated Charges under Section 2.8(a), Section 2.8(b) and Section 2.8(c) shall be reduced, including below zero, by the amount of any such Prorated Charges that were paid by Seller prior to the Closing (the "Net Prorated Charges"). To the extent that the Net Prorated Charges is a positive number (i.e., Seller has not paid the entirety of its net Prorated Charges) such amount shall be referred to as the "Buyer Proration Amount" and if a negative number (i.e., Seller has paid more than its net Prorated Charges) such amount shall be referred to as the "Seller Proration Amount".  Except as set forth in this Section 2.8, no amounts paid or payable under or in respect of any Acquired Assets or group of Acquired Assets shall be apportioned and prorated between Sellers and Buyer.

(e)    Subject to the last two sentences of Section 2.8(c), if any of the items subject to apportionment under the foregoing provisions cannot be apportioned at the Closing because of the unavailability of the information necessary to compute such apportionment, or if any errors or omissions in computing apportionments at the Closing are discovered subsequent to the Closing, such item(s) shall be reapportioned and such errors and omissions corrected as soon as practicable after the Closing Date (and for a period of ninety (90) days thereafter) and the proper Party reimbursed.

Section 2.9    Removal of Excluded Assets.  As promptly as practicable following the Closing Date (and in any event within ten (10) Business Days), Seller shall remove at its expense all of the Excluded Assets that are located at the Stores and the PDC. Any Excluded Assets not timely removed by Sellers may be disposed of by Buyer in its sole and unreviewable discretion, without the incurrence of any Liability on the part of Buyer.

23

Section 2.10    Casualty and Condemnation.

(a)    If, during the period beginning on the date hereof and ending on the Closing Date, any Acquired Assets (not including Inventory), or any Stores or the PDC, are damaged or destroyed, by fire or other casualty, and, subject to Section 2.10(b), the amount required to repair, restore or reconstruct such Acquired Asset(s) to the condition it was in prior to the casualty (the "Loss") exceeds $750,000 (as determined by Sellers' insurance appraiser), then the Cash Purchase Price shall be reduced by the amount of such Loss (provided that any such reduction shall in no event exceed the amount allocated to the applicable asset in Section 2.3).  In each case, Sellers shall have the right to any insurance proceeds with respect thereto.  If any Acquired Assets constituting the property on which a Store or the PDC is located is subject to a taking or condemnation which materially interferes with Buyer's ability to operate the subject Store or the PDC in substantially the same manner as operated by Sellers as of the date hereof, then Buyer may elect not to purchase such Store (other than the Broadway Store or the 86th Street Store) or the PDC and the Cash Purchase Price shall be reduced by the amount allocated to the Acquired Assets with respect to such Store (other than the Broadway Store or the 86th Street Store) or the PDC.  Subject to Section 2.10(b), the foregoing shall represent Buyer's sole and exclusive rights and recourse with respect to an event described in this Section 2.10(a).  For the avoidance of doubt, the foregoing shall be subject to any rights of the applicable landlord or its lender(s) as to any affected Store or the PDC.  This Agreement shall stay in full force and effect with respect to any Store and the PDC subject to a casualty, condemnation or taking, subject to Section 2.10(b).

(b)    If, prior to the Closing, (i) either the Broadway Store or the 86th Street Store is damaged or destroyed by fire or other casualty and Loss incurred with respect to such Store is (A) estimated to cost in excess of $4,000,000, or (ii) (A) any portion of the real property on which the Broadway Store or the 86th Street Store is located is condemned and (B) such condemnation would reasonably be expected to have a material adverse impact on Buyer's ability to operate such Store in substantially the same manner as operated by Sellers as of the date hereof, then Buyer may, by delivering written notice of such election to Seller no later than two (2) days prior to the Closing Date, terminate this Agreement, which shall be treated as a termination by Buyer under Section 8.1(c).

# ARTICLE III
## SELLERS' REPRESENTATIONS AND WARRANTIES

Sellers represent and warrant to Buyer that the statements contained in this Article III are true and correct except as set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule").

Section 3.1    Organization; Good Standing and Qualification.    Each Seller is a corporation or limited liability company, as applicable, duly organized, validly existing and in good standing under the Laws of the state of its incorporation or formation. Each Seller has, subject to the necessary authority from the Bankruptcy Court, all requisite corporate or other organizational power and authority to own, lease and operate its assets and to carry on its business, as now being conducted, except where the failure to be so organized, existing, or in good standing or have such power and authority would not reasonably be expected to have a Material Adverse Effect.

24

Section 3.2    Authorization of Transaction.  Subject to the Bankruptcy Court's entry of the Sale Order and any other Related Order to close the sale of the Acquired Assets in accordance with this Agreement, each Seller has full power and authority (including full corporate or other organizational power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.  The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which each Seller is a party have been duly authorized by such Seller.  Upon due execution hereof by each Seller, this Agreement (assuming due authorization and delivery by Buyer) shall constitute, subject to the Bankruptcy Court's entry of the Sale Order and any other Related Order, the valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principles of equity.

Section 3.3    No Conflict; Government Filings.  Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in Article II), will (a) conflict with or result in a breach of the organizational documents of any Seller, (b) subject to the entry of the Sale Order and any other Related Order, materially violate any Law or Decree to which any Seller is subject in respect of the Acquired Assets, or (c) subject to the entry of the Sale Order and any other necessary Order to close the sale of the Acquired Assets, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any material Contract to which any Seller is a party or to which any of the Acquired Assets is subject, except, in the case of either clause (b) or (c), for such conflicts, violations, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Other than (x) the applicable requirements of the HSR Act and (y) as required or pursuant to the Bankruptcy Code, the Sale Order and any other Related Order, no Seller is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or prevent or materially impair or delay any Seller's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 3.4    Real Property. Section 3.4 of the Disclosure Schedule sets forth the location of each Store and the PDC, each of which is leased to a Seller by a third party, and a list of all Assumed Leases.  Sellers have made available to Buyer a true and complete copy of each Assumed Lease to the extent in their possession.  With respect to each Assumed Lease, (a) assuming due authorization and delivery by the other party thereto, such Assumed Lease constitutes the valid and legally binding obligation of each Seller party thereto and, to the Knowledge of Sellers, the counterparty thereto, enforceable against such Seller and, to the Knowledge of Sellers, the counterparty thereto in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity, and (b) neither such Seller nor, to Knowledge of Sellers, the counterparty thereto is in breach or default under such Assumed Lease, except (i) for those defaults that will be cured in

25

accordance with the Sale Order or waived in accordance with section 365 of the Bankruptcy Code (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Leases) or (ii) to the extent such breach or default would not reasonably be expected to be material to the Business.  Sellers have no written notice of any pending or threatened taking of any of the property subject to any Assumed Lease.

Section 3.5    <u>Proceedings; Decrees</u>.  Other than the Bankruptcy Case, as of the date of this Agreement, there is no Proceeding pending for which Sellers have received notice that (a) would reasonably be expected to have a Material Adverse Effect or (b) challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby.  To the Knowledge of Sellers, no Seller is subject to any outstanding Decree that would (i) reasonably be expected to have a Material Adverse Effect or (ii) prevent or materially delay such Seller's ability to consummate the transactions contemplated hereby or perform in any material respect its obligations hereunder.

Section 3.6    <u>Labor Relations</u>.  No Seller is a party to or bound by any Collective Bargaining Agreement covering the Covered Employees.

Section 3.7    <u>Brokers' Fees</u>.  Other than the fees and expenses payable to Peter J. Solomon Company and CBRE, Inc. in connection with the transactions contemplated hereby, which shall be borne by Sellers, no Seller has entered into any Contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated hereby for which Buyer could become liable or obligated to pay.

Section 3.8    <u>Taxes</u>.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)    Sellers (with respect to the Business) have filed all Tax Returns required to be filed with the appropriate Tax authorities in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted or to be obtained on behalf of Sellers), and all Taxes shown as due on such Tax Returns have been paid.

(b)    Sellers (with respect to the Business) have withheld and paid over to the appropriate Tax authority (or is properly holding for such payment) all Taxes required by Law to be withheld and paid in connection with amounts owing to any employee or independent contractor.

(c)    Notwithstanding anything in this Agreement to the contrary, the representations and warranties made in this <u>Section 3.8</u> and <u>Section 3.9</u> are the sole and exclusive representations and warranties made by Sellers regarding Taxes.

Section 3.9    <u>Employee Benefits and Costs</u>.

(a)    Section 3.9(a) of the Disclosure Schedule lists all "employee benefit plans," as defined in section 3(3) of ERISA, and all other material employee benefit plans or arrangements (other than governmental plans and statutorily required benefit arrangements), including bonus or incentive plans, deferred compensation arrangements, severance pay, sick leave, vacation pay, disability, medical insurance and life insurance maintained or contributed to by Sellers and their

WEIL:\97314662\8\44444.0008

Subsidiaries as of the date hereof with respect to Covered Employees (the "Employee Benefit Plans").

(b)     True, correct and complete copies of the following documents, with respect to each of the Employee Benefit Plans, have, to the extent applicable, been made available to Buyer: (i) any plan documents, and all material amendments thereto, (ii) the most recent Forms 5500 and (iii) the most recent summary plan descriptions (including letters or other documents updating such descriptions).

(c)     No Employee Benefit Plan is an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) subject to Title IV of ERISA, Section 412 of the Code or Section 302 of ERISA (including any "multiemployer plan" within the meaning of Section (3)(37) of ERISA (a "Multiemployer Plan")).

(d)     Each of the Employee Benefit Plans sponsored by Sellers and its Subsidiaries that is intended to qualify under Section 401(a) of the Code has been determined by the IRS to be so qualified, and, to the Knowledge of Sellers, nothing has occurred with respect to the operation of any such plan which could reasonably be expected to result in the revocation of such favorable determination.

(e)     Each of the Employee Benefit Plans has been established, maintained and operated in accordance with its terms and the requirements of all applicable Laws, except as would not reasonably be expected to have a Material Adverse Effect.

(f)     There are no material claims or causes of action pending or, to the Knowledge of Sellers, threatened in writing during the one (1) year prior to the date of this Agreement against Sellers in connection with any Employee Benefit Plan.  As of the date hereof, Sellers are not engaged or involved in any Proceedings brought by or on behalf of any of the Covered Employees and, to the Knowledge of Sellers, no such Proceedings have been threatened in writing during the one (1) year prior to the date of this Agreement, except for such Proceedings that would not reasonably be expected to have a Material Adverse Effect.

(g)     Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby (alone or in conjunction with any other event) will (i) entitle any Covered Employee to any compensation or benefit (or increase thereto) or (ii) accelerate the time of payment or vesting, or trigger any payment or funding, of any compensation or benefits with respect to any Covered Employee under any Employee Benefit Plan.

(h)     Section 3.9(h) of the Disclosure Schedule contains a complete list of all employees of the Stores and the PDC as of the date of this Agreement to whom Buyer is obligated to make offers of employment, including the beginning date of employment, rate of pay or salary, and benefits attributable to such employee.

Section 3.10    Environmental Matters.

(a)     Sellers with respect to the Business are in compliance in all material respects with Environmental Laws, which compliance includes obtaining, maintaining and complying with Environmental Permits.

27

(b)    There are no actions pending or, to the Knowledge of Sellers, threatened in writing, against Sellers with respect to the Business alleging that Sellers are violating, or responsible for a material Liability under, Environmental Laws.

(c)    Notwithstanding anything in this Agreement to the contrary, the representations and warranties made by Seller in this Section 3.10 are the sole and exclusive representations and warranties made regarding environmental matters, including those related to Environmental Laws or Environmental Permits.

Section 3.11    Compliance with Laws; Permits.

(a)    Sellers are in compliance with all Laws applicable to the Business, except where the failure to be in compliance would not reasonably be expected to result in a Material Adverse Effect.  Sellers have not received any written notice of or been charged with the violation of any Laws, except where such violation would not reasonably be expected to result in a Material Adverse Effect.

(b)    Sellers have all Permits which are required for the operation of the Business as presently conducted, except where the absence of which would not reasonably be expected to result in a Material Adverse Effect.  Sellers are not in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which Sellers are parties, except where such default or violation would not reasonably be expected to result in a Material Adverse Effect.

Section 3.12    Title to Assets.  Immediately prior to the Closing, Sellers will have good and valid title to, or the right to use, the tangible Acquired Assets, free and clear of all Liens (other than Permitted Liens). Pursuant to the Sale Order, Sellers will convey such title or rights to use, all of the tangible Acquired Assets, free and clear of all Liens (other than Permitted Liens).  None of the Acquired Assets in Seller's possession as of the Closing shall be the property of others, or held on consignment, except as set forth in Section 3.12 of the Disclosure Schedule.

Section 3.13    Financial Statements. The financial statements set forth in Section 3.13 of the Disclosure Schedule, present fairly in all material respects the sales and expenses generated from and incurred at the Stores and the PDC for the periods specified.

Section 3.14    Occupancy. No Person other than Sellers or its business invitees has the right to occupy any of the Stores or the PDC. All of the Stores and the PDC shall be delivered to Buyer on the Closing Date free of the right of any other Person to occupy or use such properties.

## ARTICLE IV
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to each Seller that the statements contained in this Article IV are true and correct, except as set forth in Buyer's disclosure schedule accompanying this Agreement.

Section 4.1    Organization of Buyer; Good Standing and Qualification.    Buyer is a corporation duly organized, validly existing, and in good standing under the Laws of the State of

28

New Jersey and has all requisite corporate or similar power and authority to own, lease, and operate its assets and to carry on its business as now being conducted.

Section 4.2    Authorization of Transaction.  Buyer has full power and authority to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.  The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which Buyer is a party have been duly authorized by Buyer.  This Agreement (assuming due authorization and delivery by Sellers) constitutes the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principles of equity.

Section 4.3    No Conflict; Government Filings.  Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in Article II) will (a) conflict with or result in a breach of the certificate of incorporation or bylaws, or other organizational documents, of Buyer, (b) violate any Law or Decree to which Buyer is, or its assets or properties are, subject or (c) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.  Other than the applicable requirements of the HSR Act, Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.4    Proceedings; Decrees.  There is no Proceeding pending or, to the knowledge of Buyer, threatened in writing that challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby.  Neither Buyer nor any of its Subsidiaries is subject to any outstanding Decree that would prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.5    Brokers' Fees.  Buyer has not entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Sellers or any of their Affiliates could become liable or obligated to pay.

Section 4.6    Sufficient Funds; Adequate Assurances.  Buyer has, and upon the Closing will have, immediately available funds sufficient for the satisfaction of all of Buyer's obligations under this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Buyer in connection with the transactions contemplated hereby. Buyer has not incurred, and is not contemplating or aware of, any obligation, commitment,

29

restriction or other Liability of any kind, in each case that would impair or adversely affect such resources, funds or capabilities.

Section 4.7    <u>Buyer Information</u>.  As of the date hereof, Buyer has disclosed to Sellers any and all potential issues under any Antitrust Law that may be credibly raised about the transactions contemplated hereby.  As of the date hereof, Buyer has provided to Sellers true, correct, and complete information relating to the businesses and sales of Buyer and its Subsidiaries and joint ventures upon which Sellers can reasonably determine whether any objections to the transactions contemplated hereby may be credibly asserted under any Antitrust Law.

Section 4.8    <u>Disclaimer of Other Representations and Warranties</u>.  Buyer hereby acknowledges that, except for the representations and warranties contained in <u>Article III</u> (as modified by the Disclosure Schedule) or expressly contained in any Related Agreement, neither Sellers nor any other Person shall be deemed to have made, and none of Buyer or its Representatives is relying on, any representation or warranty, express or implied, including as to the accuracy or completeness of any information regarding any Sellers, any Acquired Assets, any Assumed Liabilities or any other matter.  Notwithstanding anything herein to the contrary, but without limitation of any representation or warranty expressly contained in this <u>Article IV</u> or any Related Agreement, BUYER HEREBY ACKNOWLEDGES THAT NO SELLER MAKES ANY OTHER (AND HEREBY DISCLAIMS EACH OTHER) REPRESENTATION, WARRANTY, OR GUARANTY WITH RESPECT TO THE VALUE, CONDITION, OR USE OF THE ACQUIRED ASSETS, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. BUYER ACKNOWLEDGES THAT, SHOULD THE CLOSING OCCUR, BUYER WILL ACQUIRE THE ACQUIRED ASSETS AND ASSUME THE ASSUMED LIABILITIES ON AN "AS IS" CONDITION AND ON A "WHERE IS" BASIS, WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED (INCLUDING ANY WITH RESPECT TO ENVIRONMENTAL, HEALTH, OR SAFETY MATTERS).  Buyer hereby acknowledges that Sellers disclaim all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any director, officer, employee, agent, consultant, or representative of Sellers or any of their Affiliates).

**ARTICLE V**
**PRE-CLOSING COVENANTS**

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

Section 5.1    <u>Conduct of the Business Pending the Closing</u>.

(a)    Prior to the Closing, except (i) as set forth on Section 5.1(a) of the Disclosure Schedule, (ii) as required by applicable Law or by order of the Bankruptcy Court, (iii) as required or contemplated by this Agreement or (iv) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), each Seller will use commercially reasonable efforts to (A) conduct the Business only in the Ordinary Course of

30

Business, (B) preserve the present business operations, organization and goodwill of the Business and (C) preserve the present relationships with material vendors and suppliers of the Business.

(b)      Except (i) as set forth on Section 5.1(b) of the Disclosure Schedule, (ii) as required or contemplated by applicable Law or by order of the Bankruptcy Court, (iii) as otherwise contemplated by this Agreement or (iv) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), no Seller shall, solely as it relates to the Business:

(i)      other than in the Ordinary Course of Business, as required by any applicable collective bargaining agreement or Law or pursuant to any Contract in effect as of the date of this Agreement or as permitted by any Employee Benefit Plan, with respect to any Transferred Employees (A) materially increase the annual level of compensation of any Covered Employee or (B) materially increase the coverage or benefits available under any (or create any new) Employee Benefit Plan;

(ii)      subject any of the Acquired Assets to any Lien, except for Permitted Liens and any Lien securing any debtor in possession loan facility or granted in an order authorizing use of cash collateral; provided, however, Seller's obligation to deliver the Acquired Assets free of Liens shall include any Liens granted under any debtor in possession loan facility or cash collateral order; or

(c)      During the period commencing  on the date that is seven (7) days prior to the Closing Date, Sellers shall not transfer Inventory to any of the Stores or the PDC from any other retail facility operated by Sellers as of the date hereof.

Section 5.2      Cooperation.

(a)      Upon the terms and subject to the conditions set forth in this Agreement, each of the Parties shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper, or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, except as otherwise specifically provided in Section 5.2 or Section 5.4.

(b)      Without limiting the generality of the foregoing, Buyer shall not take any action, or permit any of its Subsidiaries to take any action, to materially diminish the ability of any Party to consummate, or materially delay any Party's ability to consummate, the transactions contemplated hereby, including any action that is intended or would reasonably be expected to result in any of the conditions to any Party's obligations to consummate the transactions contemplated hereby set forth in Article VII to not be satisfied.

Section 5.3      Regulatory Approvals.

(a)      Subject to the terms and conditions herein, each of the Parties shall use their respective best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper, or advisable to consummate and make effective the transactions contemplated by this Agreement as promptly as practicable, and in any case, prior to the Outside

31

Date (including the satisfaction, but not waiver, of the conditions precedent set forth in <u>Article VII</u>). Each of the Parties shall use their respective best efforts to obtain consents of all Governmental Authorities necessary to consummate the transactions contemplated by this Agreement (including the provision of any notices to and making of any filings with any Governmental Authorities). Each Party shall make an appropriate filing pursuant to the HSR Act within ten (10) Business Days after the date of this Agreement (unless mutually agreed in writing). Each Party shall supply as promptly as practicable to the appropriate Governmental Authorities any additional information and documentary material that may be requested pursuant to the HSR Act . Without limiting the foregoing, (i) the Parties shall not voluntarily extend any waiting period or other applicable time period under the HSR Act or enter into any agreement with any Governmental Authority to delay, or otherwise not to consummate as soon as practicable the transactions contemplated hereby, except with the prior written consent of the other Parties, which consent may be withheld in the sole discretion of the non-requesting Party, and (ii) Buyer and Sellers agree, at Buyer's sole cost, to take any and all actions that are necessary or reasonably advisable to avoid or eliminate each and every impediment under the HSR Act that may be asserted or required by any Governmental Authority to consummate the transactions contemplated by this Agreement as expeditiously as possible, and in any event prior to the Outside Date, including (A) proposing, negotiating, committing to, effecting and agreeing to, by consent decree, hold separate order, or otherwise, the sale, divestiture, license, hold separate, and other disposition of, any entities, operations, assets, divisions, businesses, product lines, customers or facilities of the Business or Buyer, or their respective Affiliates, (B) creating, terminating, amending or assigning existing relationships, ventures, contractual rights, or obligations of the Business or Buyer, (C) amending, assigning, or terminating existing licenses or other agreements (and entering into such new licenses or other agreements), (D) otherwise taking or committing to any and all actions that would limit Buyer's freedom of action with respect to, or its ability to retain or hold, directly or indirectly, any businesses, assets, products, or equity interests of the Business or Buyer, or their respective Affiliates, and (E) entering into any governmental order, consent decree or other agreement to effectuate any of the foregoing. All filing fees incurred in connection with the HSR Act shall be borne by Buyer.

(b)    Each Party to this Agreement shall promptly notify the other Parties of any oral or written communication it receives from any Governmental Authority relating to the matters that are the subject of this Agreement, permit the other Parties to review in advance any communication proposed to be made by such Party (or its advisors) to any Governmental Authority, and provide the other Parties with copies of all correspondence, filings or other communications between them or any of their Representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement. No Party shall agree to participate in any meeting or substantive discussion with any Governmental Authority in respect of any such filings, investigation or other inquiry unless, to the extent reasonably practicable, it consults with the other Parties in advance and, to the extent practicable and permitted by such Governmental Authority, gives the other Parties the opportunity to attend and participate at such meeting. Subject to the Confidentiality Agreement and applicable Law, the Parties will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other Parties may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods under any Law in any relevant jurisdiction. Nothing in this <u>Section 5.3(b)</u> shall be applicable to Tax matters.

32

(c)     In the event any Proceeding by any Governmental Authority or other Person is commenced that questions the validity or legality of the transactions contemplated hereby, seeks to temporarily or permanently enjoin the transactions contemplated hereby, or seeks Damages in connection therewith, Buyer agrees to cooperate with Sellers and use best efforts to defend against such Proceeding and, if any Decree is issued in any such Proceeding, to use best efforts to have such Decree vacated, lifted, reversed or overturned and to cooperate reasonably regarding any other impediment to the consummation of the transactions contemplated hereby.

(d)     Notwithstanding anything in this Agreement to the contrary, Buyer acknowledges on behalf of itself and its Affiliates and its and their Affiliates and Representatives, successors and assigns that the operation of the Business shall remain in the dominion and control of Sellers until the Closing and that Buyer and its Affiliates and Representatives shall not provide, directly or indirectly, any directions or orders to any director, officer or employee of Sellers with respect to the operation of the Business, except as specifically contemplated or permitted by this Article V or as otherwise consented to in advance by an executive officer of Sellers.

Section 5.4     Bankruptcy Court Matters.

(a)     Approval of Break-Up Fee and Expense Reimbursement.  In the event that a Competing Bid is consummated, in consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Sellers, Sellers shall pay Buyer, in accordance with the terms hereof and, subject to the entry of and terms of the Bidding Procedures Order, a break-up fee in an amount equal to three percent (3)% of the Cash Purchase Price (the "Break-Up Fee" or "Termination Payment").  The Termination Payment shall be paid on the first Business Day following the date of consummation of a Competing Bid from the proceeds of a Competing Bid (or from other assets of Sellers if the Competing Bid does not result in provision of sufficient Cash Equivalents to Seller to make such payment) if no material breach by Buyer of this Agreement has occurred.  Nothing in this Section 5.4 shall relieve Buyer or Sellers of any Liability for a breach of this Agreement prior to the date of termination.  For the avoidance of doubt, each Party may pursue any remedies available to it for such breaches by the other Party prior to such termination, in accordance with the terms hereof.  Upon payment of the Termination Payment to Buyer in accordance with this Section 5.4(a), Sellers and their respective Representatives and Affiliates, on the one hand, and Buyer and its Representatives and Affiliates, on the other, will be deemed to have fully released and discharged each other from any Liability resulting from the termination of this Agreement and neither Sellers, their Representatives or Affiliates, on the one hand, nor Buyer, its Representatives or Affiliates, on the other hand, or any other Person will have any other remedy or cause of action under or relating to this Agreement or any applicable Law, including for reimbursement of expenses.

(b)     Competing Transaction. This Agreement is subject to approval of the procedures set forth in the Bidding Procedures Order, including with respect to payment of the Termination Payment, and the consideration by Sellers of higher or better competing bids in respect of all or any part of the Acquired Assets in accordance with the Bidding Procedures Order (whether in combination with other assets of Sellers or their Affiliates or otherwise, and whether by sale or proposal of a plan of reorganization that vests control over the Acquired Assets in a Person other than Buyer) (each a "Competing Bid"). From the date hereof (and any prior time) and

33

until the transactions contemplated hereby are consummated, Sellers are permitted to and to cause their Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates and Representatives) in connection with a Competing Bid, including, to (and to cause their Representatives and Affiliates to) respond to any inquiries or offers to purchase all or any part of the Acquired Assets, (including supplying information relating to the Business and the assets of Sellers to prospective purchasers).  Any Competing Bid or combination of Competing Bids which Sellers deem higher or better than the terms of this Agreement shall be disclosed to Buyer promptly following Seller making such determination.

(c)    Bankruptcy Court Filings.

(i)    As soon as reasonably practicable following the execution of this Agreement and the commencement of the Bankruptcy Cases, Sellers shall file with the Bankruptcy Court a motion seeking entry of the Bidding Procedures Order (which shall, among other things, approve and authorize payment of the Termination Payment, and shall establish procedures for the conduct of the Auction, and to determine Cure Costs for the Acquired Assets), and shall diligently prosecute such motion. The Bidding Procedures Order shall authorize and direct Sellers to pay any Termination Payment due to Buyer from collateral of any secured party.  Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Bidding Procedures Order. In the event the entry of the Bidding Procedures Order shall be appealed, Sellers and Buyer shall use their respective commercially reasonable efforts to defend such appeal.

(ii)    Provided Buyer is selected as the winning bidder in respect of the Acquired Assets at the auction, if any, undertaken in accordance with the Bidding Procedures Order with respect to the Acquired Assets (the "Auction"), or if no Competing Bid is submitted with respect to the Acquired Assets, Sellers shall diligently seek entry of the Sale Order and any other necessary orders to close the sale of the Acquired Assets (the "Related Orders") by the Bankruptcy Court in accordance with the terms and conditions of the Bidding Procedures Order. Buyer and Sellers understand and agree that the consummation of the transactions contemplated by this Agreement is subject to approval by the Bankruptcy Court. Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and any Related Orders including a finding of adequate assurance of future performance by Buyer, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. Buyer shall not, without the prior written consent of Sellers, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Acquired Assets hereunder. In the event the entry of the Sale Order shall be appealed, Sellers and Buyer shall use their respective commercially reasonable efforts to defend such appeal.

(iii)    Sellers shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Transferred Contracts and to determine the amount of the Cure Costs; provided, that nothing herein shall preclude Sellers from filing such

34

motions, including upon commencement of the Bankruptcy Cases, to reject any Contracts that are not Transferred Contracts.

(d)    <u>Back-up Bidder</u>.  Sellers and Buyer agree that, in the event that Buyer is not the winning bidder at the Auction, if and only if (i) Buyer submits the second highest or second best bid at the Auction for the Acquired Assets which is memorialized by an acceptable agreement incorporating terms established at the Auction, or the terms of this Agreement constitute the second highest or best bid for the Acquired Assets, and (ii) Sellers give written notice to Buyer on or before the Back-up Termination Date, stating that Sellers (A) failed to consummate the sale of the Acquired Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder, Buyer shall promptly consummate the transactions contemplated hereby upon the terms and conditions as set forth herein, or as set forth on the record of the Auction, including the Purchase Price, as the same may be increased by Buyer at the Auction.

Section 5.5    <u>Notices and Consents</u>.

(a)    Sellers will give, or will cause to be given, any notices to third parties, and each of the Parties will use its commercially reasonable efforts to obtain any third party consents or sublicenses, in connection with the matters referred to in Section 5.5(a) of the Disclosure Schedule or as are otherwise required to consummate the transactions contemplated hereby; <u>provided</u>, <u>however</u>, that (i) Sellers shall control all correspondence and negotiations with third parties regarding any such matters, (ii) neither the Company nor any of its Subsidiaries shall be required to pay any consideration therefor, (iii) Sellers shall not be obligated to initiate any Proceedings to obtain such consent or approval, and (iv) Buyer shall pay any reasonable costs, or bear any reasonable effects as a result of amendments or modifications to any Transferred Contract, in either case as is necessary to obtain such consent or sublicense, and if Buyer refuses to pay such costs, such Acquired Asset shall be excluded from the transactions hereunder and there shall be no adjustment to the Purchase Price on account of such exclusion and Buyer will indemnify Sellers for any Damages as a result thereof, including any Damages from any inability of either Seller (including any Subsidiary of any Seller) to perform under a Contract that otherwise would be a Transferred Contract as a result of the other transactions contemplated hereby.

(b)    Without limiting <u>Section 5.3</u>, each of the Parties will give any notices to, make any filings with, and use its reasonable best efforts to obtain any authorizations, consents, and approvals of Governmental Authorities in connection with the matters referred to in Section 5.5(b) of the Disclosure Schedule or as are otherwise necessary and appropriate to consummate the transactions contemplated hereby.

(c)    Seller will give notices required by any WARN Act applicable to the employees of the Stores and the PDC no later than sixty (60) days prior to Closing.

Section 5.6    <u>Notice of Developments</u>.  Each Seller and Buyer will give prompt written notice to the other Parties of (a) the existence of any fact or circumstance, or the occurrence of any event, of which to the Knowledge of Sellers, or to the knowledge of Buyer, as applicable, would reasonably be likely to cause a condition to a Party's obligations to consummate the transactions contemplated hereby set forth in <u>Article VII</u> not to be satisfied as of a reasonably foreseeable Closing Date, or (b) the receipt of any notice or other communication from any Governmental

WEIL:\97314662\8\44444.0008

Authority in connection with the transactions contemplated by this Agreement; provided, however, that the delivery of any such notice pursuant to this Section 5.6 shall not (i) be deemed to amend or supplement this Agreement, (ii) cure any breach of, or non-compliance with, any other provision of this Agreement or (iii) limit the remedies available to the Party receiving such notice; provided, further, that the terms and conditions of the Confidentiality Agreement shall apply to any information provided under this Section 5.6. The Parties agree that Buyer and Sellers' respective compliance or failure of compliance with this Section 5.6 shall not be taken into account for purposes of determining whether the conditions referred to in Section 7.1, Section 7.2 or Section 7.3, respectively, shall have been satisfied.

Section 5.7    Access; No Contact.    Upon the reasonable request of Buyer, and to the extent not otherwise prohibited by applicable Law, (i) after the date of this Agreement and prior to Closing, Sellers will permit Buyer and its Representatives to have, upon reasonable advance written notice, reasonable access to all premises, properties, books and records and Assumed Leases included in the Acquired Assets, and to management of Sellers, during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of any Seller and (ii) after entry of the Bidding Purchase Order by the Bankruptcy Court, Sellers will permit Buyer and its Representatives to discuss possible modifications to any Assumed Lease with the applicable counterparty thereto, and to interview employees to whom Buyer is required or intends to provide offers of employment in accordance with Section 6.4(a); provided, however, that, for avoidance of doubt, (a) the foregoing shall not require any Person to waive, or take any action with the effect of waiving, its attorney-client privilege with respect thereto or any confidentiality obligations to which Seller is bound and (b) Buyer and its Representatives shall not conduct any intrusive sampling or testing of environmental media such as soil, groundwater or building materials; provided, further, that the auditors and accountants of any Seller, or any of their respective Affiliates or the Business shall not be obligated to make any work papers available to any Person except in accordance with such auditors' and accountants' normal disclosure procedures and then only after such Person has signed a customary agreement relating to such access to work papers in form and substance reasonably acceptable to such auditors or accountants. If reasonably requested by Sellers, Buyer shall enter into a customary and mutually acceptable joint defense agreement with Sellers with respect to any information to be provided to Buyer pursuant to this Section 5.7. Prior to the Closing, except as provided above, Buyer shall not, and shall cause its Representatives not to, contact any employees, vendors, customers, suppliers, landlords or licensors of any Seller in connection with or pertaining to any subject matter of this Agreement except with the prior written consent of each Seller.

Section 5.8    Bulk Transfer Laws.    Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws or similar Laws of any jurisdiction in connection with the transactions contemplated by this Agreement, including the United Nations Convention on the Sale of Goods, and hereby waives all claims related to the non-compliance therewith.

Section 5.9    Replacement Bonding Requirements.    On or prior to the Closing Date, Buyer shall, at the election of Buyer, either (a) provide replacement guarantees, standby letters of credit or other assurances of payment with respect to all Bonding Requirements, in form and substance reasonably satisfactory to Sellers and any landlords, banks or other counterparty thereto, and, both prior to and following the Closing Date, Buyer and Sellers shall cooperate to obtain a release in form and substance reasonably satisfactory to Buyer and Sellers with respect to all

36

Bonding Requirements, or (b) Buyer shall deliver to Sellers an irrevocable, unconditional standby letter of credit in favor of Sellers in an amount equal to the amount of such Bonding Requirements, issued by a bank rated "A" or better by Standard and Poor's, in form and substance reasonably satisfactory to Sellers.

Section 5.10    Supply Agreement.  On or prior to the Closing Date, upon Sellers' request, Buyer and Seller(s) shall enter into good faith negotiations to enter into a product supply agreement, effective as of the Closing, in form and substance reasonably acceptable to the Parties, pursuant to which Buyer, or one or more of its Affiliates, will sell Inventory to Seller(s) for sale in other supermarkets operated by Seller(s) and their Affiliates.  Such supply agreement will have a term of up to four (4) months, and otherwise be on terms (including with respect to levels of supply and pricing) mutually agreed in good faith between the Parties, and consistent with general standards prevailing in the gourmet grocery industry.  The Parties will use reasonable best efforts to effect the foregoing, including obtaining any necessary consents.

## ARTICLE VI
## OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing:

Section 6.1    Further Assurances.  In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will, at the requesting Party's sole cost and expense, take such further action (including the execution and delivery of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation, providing materials and information) as the other Party may reasonably request which actions shall be reasonably necessary to transfer, convey or assign to Buyer all of the Acquired Assets or to confirm Buyer's assumption of the Assumed Liabilities.

Section 6.2    Access; Enforcement; Record Retention.  From and after the Closing, upon request by any Seller, Buyer will permit Sellers and their Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of Buyer, to all premises, properties, personnel, books and records, and Contracts of or related to the Acquired Assets or the Assumed Liabilities for any reasonable business purpose, including (a) preparing Tax Returns and in connection with any audit with respect to any Taxes, (b) monitoring or enforcing rights or obligations of any Seller under this Agreement or any of the Related Agreements, or (c) complying with the requirements of any Governmental Authority; provided, however, that, for avoidance of doubt, the foregoing shall not require Buyer to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege, (ii) such action could reasonably be expected to result in violation of applicable Law, or (iii) providing such access or information would reasonably be expected to be disruptive to its normal business operations.  Buyer agrees to maintain the files or records which are contemplated by the first sentence of this Section 6.2 in a manner consistent in all material respects with its document retention and destruction policies, as in effect from time to time, for six (6) years following the Closing.

Section 6.3    Treatment of Affected Labor Agreements.  With respect to Covered Employees under an Affected Labor Agreement, Buyer shall engage in good faith negotiations, in

37

coordination with Sellers, to reach mutually satisfactory modifications to the relevant Affected Labor Agreement with each of the Affected Unions and to enter into a Modified Labor Agreement with each of the Affected Unions. Sellers consent to Buyer having direct conversations and negotiations, not including Sellers, with each of the Affected Unions concerning the terms and conditions of a Modified Labor Agreement; provided, that Buyer shall provide reasonably advance notice to Sellers in advance of any direct conversations and negotiations with the Affected Unions and Buyer shall keep Sellers apprised of the status of such negotiations and developments as promptly as practicable. Such Modified Labor Agreement shall constitute a Transferred Contract. Buyer, in coordination with Sellers, shall propose a Modified Labor Agreement to each Affected Union (each, a "Proposal"), which Proposal may be modified as a result of Buyer's and/or Sellers' good faith negotiations with the Affected Unions. Buyer agrees to cooperate with Sellers in providing each Affected Union with complete and reliable information to allow the Affected Unions to evaluate the Proposal. For all purposes under this Section 6.3, Buyer acknowledges the requirements of sections 1113 and 1114 of the Bankruptcy Code and agrees to use good faith reasonable best efforts to cooperate with Sellers in ensuring compliance with any applicable provisions thereof.

Section 6.4      Covered Employees.

(a)      Offer of Employment.  At least twenty (20) days prior to the Closing Date, Buyer or one of its Affiliates shall make a written offer of employment, effective as of the Closing Date, to (i) each of the Covered Employees employed at a Store (for the avoidance of doubt, subject to the proviso set forth in the definition of Covered Employee) and (ii) at least fifty percent (50%) of the Covered Employees employed at the PDC, in each case, (A) at the same location of employment as such Covered Employee's location of employment as of immediately prior to Closing, (B) on the same terms and conditions of employment as in effect immediately prior to Closing, except as modified by a Modified Labor Agreement, or as otherwise set forth in this Agreement, and (C) with compensation and benefits at a level consistent with Section 6.4(c) or Section 6.4(c) of the Disclosure Schedule.  For purposes of this Section 6.4, any Covered Employee who becomes employed by Buyer or one of its Affiliates in accordance with this Section 6.4(a) is referred to as a "Transferred Employee." With respect to union-represented Covered Employees, such offers shall also be consistent with the terms and conditions required by the Modified Labor Agreements, as applicable. With respect to any Covered Employee who is on a long-term disability leave of absence as of the Closing Date, such offer shall be contingent upon such Covered Employee returning to active status within a reasonable period. Notwithstanding the foregoing, nothing herein shall be construed as to prevent Buyer from terminating the employment of any Covered Employee, consistent with applicable law and the governing Modified Labor Agreements, as applicable, at any time following the Closing Date. All offers of employment to Covered Employees not governed by a Modified Labor Agreement shall be for "at will" employment. Notwithstanding anything to the contrary set forth in this Section 6.4, no Covered Employee shall be offered an employment contract.

(b)      Covered Employees and Employee Benefit Plans.

(i)      Liabilities.  Effective as of the Closing, Buyer shall, or shall cause an Affiliate to, assume any and all Liabilities relating to, arising out of, or resulting from the employment or services, of any Transferred Employee, to the extent such Liabilities

38

are based on any event which first occurs or exists on or after the Closing. Nothing set forth herein shall require Buyer to assume any Liability of Seller to any employee arising out of Seller's operation of the Business or any business, or arising from operation or ownership of the Acquired Assets, prior to Closing.  Seller shall retain, as the case may be, any and all Liabilities relating to, arising out of, or resulting from the employment or services, or termination of employment or services, of (A) any Transferred Employee, including under any Collective Bargaining Agreement, to the extent such Liabilities arise prior to the Closing and (B) any Covered Employee who does not become a Transferred Employee. Nothing contained herein shall obligate Buyer to pay or satisfy any liability to any employee of Seller for any severance benefits.

(ii)     Benefit Plans.  Effective as of the Closing, Seller or its applicable Subsidiary shall terminate the participation of each Transferred Employee and such Transferred Employee's eligible dependents in each Employee Benefit Plan.

(c)     Compensation and Benefits.

(i)     Commencing on the Closing Date and continuing through the first anniversary of the Closing Date, Buyer or its Affiliates shall provide or cause to be provided to the Transferred Employees not covered by a Modified Labor Agreement who remain in Buyer's employ, (A) a base salary or wage rate, as applicable, and (B) employee benefits, no less favorable than provided to other employees working in stores operated by Buyer or its Affiliates in New York City.

(ii)     Buyer or its Affiliates shall provide Transferred Employees with the severance benefits provided to other employees working in stores operated by Buyer or its Affiliates in New York City, or under any Modified Labor Agreement, as applicable.

(iii)     As of the Closing Date, Buyer will honor the governing Modified Labor Agreements to the extent executed prior to Closing.

(d)     401(k) Plan.  Effective as of the Closing, and subject to the terms of the Modified Labor Agreements, each Transferred Employee eligible to participate in the tax-qualified defined contribution plan maintained by Sellers and their Subsidiaries (the "Seller 401(k) Plan") shall be eligible to participate in a defined contribution plan sponsored by Buyer or its Affiliates that is intended to be qualified under Section 401(a) of the Code (a "Buyer 401(k) Plan"). Effective as of the Closing, in accordance with the terms of the Seller 401(k) Plan, the Seller 401(k) Plan shall provide Transferred Employees with the right to elect a distribution from the Seller 401(k) Plan and Buyer shall use commercially reasonable efforts to cause the Buyer 401(k) Plan to accept the rollover by any Transferred Employees of any "eligible rollover distribution" (within the meaning of Section 402(c)(4) of the Code) from the Seller 401(k) Plan, including plan loans.

(e)     Multiemployer Plans.  The Sale Order shall provide that with respect to any Multiemployer Plan to which Seller is a party or by which it is bound, Buyer shall have no Liability.

(f)     Accrued Vacation.  Subject to the terms of the Modified Labor Agreements (i) Buyer or its Affiliates shall provide each Transferred Employee with credit for the same number

WEIL:\97314662\8\44444.0008

of vacation and sickness benefit days such Transferred Employee has accrued but not used during the calendar year in which the Closing Date occurs, subject to and in accordance with applicable Law or Buyer's policies governing other employees working in stores operated in New York City by Buyer or its Affiliates.

(g)    Welfare Benefit Claims; COBRA.  On the Closing Date, Sellers and their Subsidiaries shall cease to provide welfare coverage to each Transferred Employee and his or her covered dependents who are covered by a welfare benefit plan sponsored by Sellers and their Subsidiaries, and Buyer or its Affiliates shall commence providing such coverage to such individuals, subject to and in accordance with Buyer's policies governing other New York City employees of Buyer or its Affiliates. Sellers shall be responsible in accordance with its applicable welfare plans (and the applicable welfare plans of their Subsidiaries) in effect prior to the Closing Date for all reimbursement claims (such as medical and dental claims) for expenses incurred, and for all non-reimbursement claims (such as life insurance claims) incurred, under Sellers' or their Subsidiaries' Employee Benefit Plans that are welfare benefit plans prior to the Closing Date by the Transferred Employees and their dependents.  Buyer or its Affiliates shall be responsible in accordance with the applicable welfare plans of Buyer's Affiliate for all reimbursement claims (such as medical and dental claims) for expenses incurred, and for all non-reimbursement claims (such as life insurance claims) based on facts or events which first occur on or after the Closing Date (or the date of commencement of employment with Buyer, if later) by Transferred Employees and their dependents.  For purposes of this Section 6.4(g), a claim shall be deemed to have been incurred as follows: (i) for health, dental and prescription drug benefits, upon provision of such services, (ii) for life, accidental death and dismemberment and business travel accident insurance benefits, upon the death, disability or accident giving rise to such benefits, and (iii) for hospital-provided health, dental, prescription drug or the benefits that become payable with respect to any hospital confinement, on such employee's admission to the hospital.  Sellers or their Subsidiaries shall provide coverage required by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") under Sellers' or their Subsidiaries' Employee Benefit Plans that are group health plans with respect to qualifying events occurring prior to the Closing Date. Buyer and its Affiliates shall provide coverage required by COBRA to Transferred Employees and their eligible dependents or beneficiaries under Buyer's group health plans with respect to qualifying events occurring on and after the Closing Date.

(h)    No Third Party Beneficiary Rights.  The Parties agree that nothing in this Section 6.4, whether express or implied, is intended to create any third party beneficiary rights in any Covered Employee.

(i)    Cooperation.  After the Closing Date, the parties shall cooperate with each other to provide such current information regarding the Transferred Employees on an ongoing basis as may be necessary to facilitate determinations of eligibility for, and payments of benefits to, the Transferred Employees under any applicable employee benefit that continues to be maintained by Seller or its Affiliates.  Buyer shall, and shall cause its Affiliates to, permit Transferred Employees to provide such assistance to Seller as may be required in respect of claims against Seller or its Affiliates, whether asserted or threatened, to the extent that, in Seller's opinion, (i) a Transferred Employee has knowledge of relevant facts or issues, or (ii) a Transferred Employee's assistance is reasonably necessary in respect of any such claim, at no cost or expense

40

to Buyer. Seller shall provide Buyer with all relevant records (or copies thereof) with respect to all Transferred Employees' employment by Buyer to the extent allowed by Law.

Section 6.5    Transfer Taxes.  Buyer shall pay any stamp, documentary, filing, recording, registration, sales, use, transfer, added-value or other non-income Tax, fee or governmental charge (a "Transfer Tax") imposed under applicable Law in connection with the transactions contemplated hereby.  Accordingly, if any Seller is required by Law to pay any such Transfer Taxes, Buyer shall promptly reimburse such Seller for the amount of such Transfer Taxes actually paid by such Seller.  The party that is required by applicable Law to file any Tax Returns in connection with Transfer Taxes described in the immediately preceding sentence shall prepare and timely file such Tax Returns. The Parties shall cooperate to permit the filing party to prepare and timely file any such Tax Returns.

Section 6.6    Insurance Matters.  Buyer acknowledges that, upon Closing, all insurance coverage provided in relation to Sellers, the Stores, the PDC or the Acquired Assets that is maintained by any Seller or its Affiliates (whether such policies are maintained with third party insurers or with such Seller or its Affiliates) shall cease to provide any coverage to Buyer, the Stores, the PDC, or the Acquired Assets, and no further coverage shall be available to Buyer, the Stores, the PDC, or the Acquired Assets under any such policies.

Section 6.7    Press Releases and Public Announcements.  No Party shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of the other Parties, unless a press release or public announcement is required (a) by applicable Law or Decree of the Bankruptcy Court or (b) any announcement by Sellers to its employees, customers and suppliers to the extent Sellers reasonably determines in good faith that such announcement is necessary or advisable in connection with the transactions contemplated hereby.  If any such announcement or other disclosure is required by applicable Law or a Decree of the Bankruptcy Court, the disclosing Party shall give the nondisclosing Parties prior notice of, and an opportunity to comment on, the proposed disclosure.  The Parties acknowledge that Sellers shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order.

Section 6.8    Use of Seller Marks.  Except as expressly provided in this Section 6.8, after the Closing, no Seller shall use, or have the right to use, any of the Seller Marks.  Buyer hereby grants to Sellers and its Affiliates a limited, non-exclusive, non-transferable, non-sublicensable right to continue to use the Seller Marks for no more than 120 days after Closing in substantially the same manner as the Sellers or its Affiliates, as applicable, used such marks before the Closing. Sellers' use of the Seller Marks shall be strictly in accordance with this Section 6.8.  Sellers shall use reasonable diligent efforts to minimize and eliminate use of the Seller Marks.  As soon as reasonably practicable after the Closing Date, and in any event within 120 days thereafter, Sellers shall (a) cease and discontinue use of all Seller Marks and (b) complete the removal of the Seller Marks from all products, signage, properties, stationery and promotional or other marketing materials and other tangible, public-facing assets of Sellers.  Notwithstanding anything set forth herein to the contrary, each of Sellers may at all times after the Closing use the Seller Marks in tax, legal, employment or other records, as required by Law or the rules of any applicable stock exchange, or as part of any factual statement.  As soon as reasonably practicable after Closing,

41

Sellers shall change their names, and modify the caption in the Bankruptcy Cases, to the extent such names include any of the Seller Marks.

## ARTICLE VII
## CONDITIONS TO OBLIGATION TO CLOSE

Section 7.1    Conditions to Each Party's Obligations.  The respective obligation of each Party to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)    all applicable waiting periods under any Antitrust Law shall have expired or otherwise been terminated;

(b)    no material Decree shall be in effect that prohibits the consummation of the transactions contemplated by this Agreement; and

(c)    the Bankruptcy Court shall have entered (i) the Sale Order and (ii) any Related Order (if any), and no order staying, reversing, modifying, or materially amending such orders shall be in effect on the Closing Date.

Section 7.2    Conditions to Buyer's Obligations.  Buyer's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)    the representations and warranties set forth in Article III shall have been true and correct on the date hereof and as of the Closing in all material respects (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date);

(b)    Sellers shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(c)    each delivery contemplated by Section 2.5(a) to be delivered to Buyer shall have been delivered; and

(d)    the Buyer's Carve Out remains in force and effect, and the Sale Order has been entered no later than April 20, 2020.

Section 7.3    Conditions to Sellers' Obligations.  Sellers' obligations to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(a)    the representations and warranties set forth in Article IV shall have been true and correct in all material respects (except that any representation or warranty that is qualified by materiality shall have been true and correct in all respects) on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date);

42

(b)    Buyer shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects; and

(c)    each payment contemplated by Section 2.5(b) to be made to Sellers shall have been made, and each delivery contemplated by Section 2.5(b) to be delivered to Sellers shall have been delivered.

Section 7.4    No Frustration of Closing Conditions.  Neither Buyer nor Sellers may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in Section 7.2 or Section 7.3, as the case may be, to be satisfied if such failure was caused by such Party's or its Affiliates' failure to use its reasonable best efforts (or best efforts, with respect to those matters contemplated by Section 5.3) to satisfy the conditions to the consummation of the transactions contemplated hereby or by any other breach of a representation, warranty, or covenant hereunder.

## ARTICLE VIII
## TERMINATION

Section 8.1    Termination of Agreement.  The Parties may terminate this Agreement at any time prior to the Closing as provided below:

(a)    by the mutual written consent of the Parties;

(b)    by any Party by giving written notice to the other Parties if:

(i)    any court of competent jurisdiction or other competent Governmental Authority shall have enacted or issued a Law or Decree or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such Law or Decree or other action shall have become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 8.1(b)(i) shall not be available to Buyer if the failure to consummate the Closing because of such action by a Governmental Authority shall be due to the failure of Buyer to have fulfilled any of its obligations under this Agreement; or

(ii)    the Closing shall not have occurred prior to April 30, 2020 (the "Outside Date"); provided, however, that if the Closing shall not have occurred on or before the Outside Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyer or Sellers, then the breaching Party may not terminate this Agreement pursuant to this Section 8.1(b)(ii).

(c)    by Buyer by giving written notice to each Seller (x) if there has been a breach by any Seller of any representation, warranty, covenant or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Buyer at the Closing set forth in Section 7.2(a) and Section 7.2(b), and such breach has not been waived by Buyer, or, if such breach is curable, cured by such Seller prior to the earlier to occur of (i) ten (10) days after receipt of Buyer's notice of intent to terminate and (ii) the Outside Date, or (y) upon the occurrence of the termination events described in Section 2.10(b);

43

(d)      by any Seller by giving written notice to Buyer and the other Sellers if there has been a breach by Buyer of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Sellers at the Closing set forth in <u>Section 7.3(a)</u> and <u>Section 7.3(b)</u>, and such breach has not been waived by such Seller, or, if such breach is curable, cured by Buyer prior to the earlier to occur of (i) ten (10) days after receipt of such Seller's notice of intent to terminate and (ii) the Outside Date; or

(e)      by Sellers or Buyer, if (i) (x) Sellers enter into a definitive agreement with respect to a Competing Bid, (y) the Bankruptcy Court enters an order approving a Competing Bid and (z) the Person making the Competing Bid consummates the Competing Bid, or (ii) the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement, subject to Buyer's right to payment of the Termination Payment, if applicable, in accordance with the provisions of <u>Section 5.4(a)</u>.

Section 8.2    <u>Effect of Termination</u>.  If any Party validly terminates this Agreement pursuant to <u>Section 8.1</u>, all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that <u>Article I</u>, <u>Section 4.8</u>, <u>Section 8.3</u>, <u>Article IX</u>, and this <u>Section 8.2</u> shall survive any such termination) and no Party shall have any Liability (except as set forth in <u>Section 8.3</u>) to the other Party hereunder; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 8.2</u> shall relieve any Party from Liability for any breach occurring prior to any such termination (but solely to the extent such breach was willful, or intentionally fraudulent); <u>provided</u>, <u>further</u>, that the maximum Liability of Sellers under this Agreement shall not exceed the amount of the Termination Payment.

Section 8.3    <u>Lease Indemnity</u>. If this Agreement is terminated pursuant to <u>Section 8.1(d)</u>, subject to Seller's obligation to transfer the Assumed Leases to a Back-up Bidder, if any, Buyer shall indemnify Sellers for all Liabilities and Damages arising out of any Store Lease or Lease of the PDC assumed by Sellers which is not transferred by Sellers to any other Person.

## ARTICLE IX
## MISCELLANEOUS

Section 9.1    <u>Survival</u>.  Except for any covenant that by its terms is to be performed (in whole or in part) by any Party following the Closing, none of the representations, warranties, or covenants of any Party set forth in this Agreement or in any certificate delivered pursuant to <u>Section 2.5(a)</u> or <u>Section 2.5(b)</u> shall survive, and each of the same shall terminate and be of no further force or effect as of, the Closing.

Section 9.2    <u>Expenses</u>.  Except as otherwise expressly set forth herein, each Party will bear its own costs and expenses incurred in connection with the preparation and execution of this Agreement and the Related Agreements, the compliance herewith and therewith and the transactions contemplated hereby, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts and consultants.  For the avoidance of doubt, Buyer shall pay all recording fees arising from the transfer of the Acquired Assets.

WEIL:\97314662\8\44444.0008

Section 9.3    <u>Entire Agreement</u>.    This Agreement, together with any documents, instruments and certificates explicitly entered referred to herein, the Related Agreements and the Confidentiality Agreement constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

Section 9.4    <u>Incorporation of Exhibits and Disclosure Schedule</u>.    The Exhibits to this Agreement and the Disclosure Schedule are incorporated herein by reference and made a part hereof.

Section 9.5    <u>Amendments and Waivers</u>.    No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein.    No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.    No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.    No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this <u>Section 9.5</u> except as expressly provided herein.    Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

Section 9.6    <u>Succession and Assignment</u>.    This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.    No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other Parties.

Section 9.7    <u>Notices</u>.    All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.    Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) on the day such communication was sent by e-mail unless the sender receives a "bounceback" or similar indication that the e-mail was not delivered to the recipient; or (d) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

      If to any Seller:    Fairway Group Holdings Corp.
                              2284 12th Avenue
                              New York, NY 10027
                              Attention: Nathalie Augustin
                              E-mail: Nathalie.Augustin@fairwaymarket.com

WEIL:\97314662\8\44444.0008

With a copy (which shall not constitute notice to Sellers) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Ray C. Schrock, P.C., Gavin Westerman and Sunny Singh
E-mail: ray.schrock@weil.com, gavin.westerman@weil.com and sunny.singh@weil.com

If to Buyer:          Village Super Market, Inc.
                      733 Mountain Ave.
                      Springfield, NJ 07081
                      Attention: John Van Orden
                      Email: john.vanorden@wakefern.com

                      With a copy (which shall not constitute notice to Buyer) to:
                      Wollmuth Maher & Deutsch LLP
                      500 Fifth Avenue
                      New York, NY 10110
                      Attention: Paul R. DeFilippo, Esq.
                      Email: PDefilippo@wmd-law.com

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this <u>Section 9.7</u>.

     Section 9.8    <u>Governing Law and Venue; Submission to Jurisdiction; Selection of Forum; Waiver of Trial by Jury</u>.

     (a)    This Agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the state of New York without regard to the conflict of laws rules or principles thereof (or any other jurisdiction) to the extent that such laws, rules or principles would direct a matter to another jurisdiction, except as otherwise required under the laws of the state of New York.

     (b)    Each of the Parties agrees that: (i) it shall bring any Proceeding in connection with, arising out of or otherwise relating to this Agreement, any instrument or other document delivered pursuant to this Agreement or the transactions contemplated by this Agreement exclusively in the Bankruptcy Courts; and (ii) solely in connection with such Proceedings, (A) irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Courts, (B) waives any objection to the laying of venue in any such Proceeding in the Bankruptcy Courts, (C) waives any objection that the Bankruptcy Courts are an inconvenient forum or do not have jurisdiction over any Party, (D) agrees that mailing of process or other papers in connection with any such Proceeding in the manner provided in <u>Section 9.7</u> or in such other manner as may be permitted by applicable Law shall be valid and sufficient service thereof and

46

(E) it shall not assert as a defense any matter or claim waived by the foregoing clauses (A) through (D) of this Section 9.8(b) or that any Order issued by the Bankruptcy Courts may not be enforced in or by the Bankruptcy Courts; provided, however, that (x) if the Bankruptcy Cases have not been commenced or (y) upon the closing of the Bankruptcy Cases, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the U.S. District Court for the Southern District of New York sitting in New York County or the Commercial Division of the Courts of the State of New York sitting in the County of New York and any appellate court from any thereof, for the resolution of any such Proceeding. The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Proceeding arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

(c)     EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Section 9.9     Specific Performance. Each Party acknowledges and agrees that irreparable damage would occur, and no adequate remedy other than specific performance would exist at Law or in equity, in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached (or any Party threatens such a breach). Therefore, it is agreed that each Party shall be entitled, without the requirement of posting a bond or other security, to injunctive relief to prevent any breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof. Such remedies shall, however, be cumulative and not exclusive and shall be in addition to any other remedies which any Party may have under this Agreement or otherwise. The Parties further agree not to assert that a remedy of specific enforcement is unenforceable, invalid, contrary to applicable Law or inequitable for any reason, and not to assert that a remedy of monetary Damages would provide an adequate remedy for any such breach or that Buyer or Sellers, as applicable, otherwise have an adequate remedy at Law.

Section 9.10     Severability. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

Section 9.11     No Third Party Beneficiaries. Except as set forth in this Section 9.11 and Section 9.12, this Agreement shall not confer any rights or remedies upon any Person other than Buyer, each Seller, and their respective successors and permitted assigns.

Section 9.12     Non-Recourse. All claims or causes of action (whether in contract or in tort, at Law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement or the Related Agreements may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (the "Contracting Parties"). In no event shall any Contracting Party have any shared or vicarious Liability for the actions or omissions of any other Person. No

47

Person who is not a Contracting Party, including any Contracting Party's Representatives ("Non-Party Affiliates"), shall have any Liability (whether in contract or in tort, at Law or in equity, or granted by statute or based upon any theory that seeks to impose Liability of an entity party against its owners or Affiliates) for any claims, causes of action, obligations or Liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Related Agreements or based on, in respect of, or by reason of this Agreement or the Related Agreements or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such Liabilities, claims and obligations against any such Non-Party Affiliates. Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at Law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-Party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of this Agreement or the Related Agreements or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Agreements. The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of this Section 9.12.

Section 9.13    Interest.    If any payment required to be made to a Party under this Agreement is made after the date on which such payment is due, interest shall accrue on such amount from (but not including) the due date of the payment to (and including) the date such payment is actually made at the Interest Rate. All computations of interest pursuant to this Agreement shall be made on the basis of a year of three hundred sixty five (365) days, in each case for the actual number of days from (but not including) the first day to (and including) the last day occurring in the period for which such interest is payable.

Section 9.14    Limitation on Liability.    Notwithstanding anything to the contrary in this Agreement or any Related Agreement, in no event shall any Party have any Liability under this Agreement or any Related Agreement for any consequential, special, incidental, indirect or punitive damages, lost profits or similar items (including loss of revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to a breach or alleged breach of this Agreement); provided, that such limitation with respect to lost profits shall not limit any Party's right to recover contract damages in connection with such Party's failure to close in breach or violation of this Agreement.

Section 9.15    Mutual Drafting.    The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 9.16    Disclosure Schedule.    All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement. The representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule. The disclosure of

48

any matter in any section of the Disclosure Schedule shall be deemed to be a disclosure for all purposes of this Agreement and all other sections of the Disclosure Schedule to which such matter relates. The listing of any matter shall expressly not be deemed to constitute an admission by Sellers, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement. No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. In no event shall the listing of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Sellers' representations, warranties, or covenants set forth in this Agreement. All attachments to the Disclosure Schedule are incorporated by reference into the applicable section of the Disclosure Schedule in which they are directly or indirectly referenced. The information contained in the Disclosure Schedule is in all respects provided subject to the Confidentiality Agreement.

Section 9.17    Headings; Table of Contents. The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.18    Counterparts; Facsimile and Electronic Signatures. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

Section 9.19    Limitations Under Applicable Law. Notwithstanding anything to the contrary contained in this Agreement, Sellers' obligations hereunder shall be subject to limitations under applicable Law, including Sections 1113 and 1114 of the Bankruptcy Code.

*[The remainder of this page is intentionally left blank.]*

WEIL:\97314662\8\44444.0008

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

SELLERS:

**FAIRWAY GROUP HOLDINGS CORP.**

By: _____

Name: Nathalie Augustin

Title:   Senior Vice President, General Counsel,
        & Secretary

**FAIRWAY GROUP ACQUISITION CO.**

By: _____

Name:  Nathalie Augustin

Title:  Senior Vice President, General Counsel,
        & Secretary

[Signature Page to Asset Purchase Agreement]

**FAIRWAY BROADWAY LLC**

By: _____

Name:  Nathalie Augustin

Title:   Senior Vice President, General Counsel,
         & Secretary

[Signature Page to Asset Purchase Agreement]

**FAIRWAY EAST 86TH STREET LLC**

By: _____

Name:  Nathalie Augustin

Title:  Senior Vice President, General Counsel,
       & Secretary

**FAIRWAY BAKERY LLC**

By: _____
Name:  Nathalie Augustin
Title:  Senior Vice President, General Counsel,
        & Secretary

**FAIRWAY CHELSEA LLC**

By: _____

Name:  Nathalie Augustin

Title:   Senior Vice President, General Counsel,
         & Secretary

**FAIRWAY UPTOWN LLC**

By: _____

Name:  Nathalie Augustin

Title:   Senior Vice President, General Counsel,
& Secretary

**FAIRWAY KIPS BAY LLC**

By: _____

Name:  Nathalie Augustin

Title:  Senior Vice President, General Counsel,
& Secretary

BUYER:

**VILLAGE SUPER MARKET, INC.**

By: _____

Name: John J. Sumas

Title: Co-President, Director & General Counsel

By: _____

Name: John Van Orden

Title: Chief Financial Officer

[Signature Page to Asset Purchase Agreement]

## ESCROW AGREEMENT

This **ESCROW AGREEMENT** (this "Agreement") is made and entered into as of January [●], 2020, by and among Fairway Group Holdings Corp., a Delaware corporation (the "Company"), Village Super Market, Inc., a New Jersey corporation ("Buyer" and, together with the Company, sometimes referred to individually as a "Party" and collectively as the "Parties"), and Citibank, N.A., as escrow agent (the "Escrow Agent").

## RECITALS

WHEREAS, the Company and certain of its wholly-owned subsidiaries (such subsidiaries, together with the Company, the "Sellers") and certain of their affiliates are contemplating filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code on or about January [●], 2020 in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, this Agreement is being entered into pursuant to that certain Asset Purchase Agreement, by and among Sellers and Buyer, dated as of the date hereof (the "APA"). Capitalized terms used but not otherwise defined herein shall have the respective meanings set forth in the APA;

WHEREAS, the Parties have agreed to establish an escrow arrangement in accordance with the APA pursuant to which Buyer desires to purchase, acquire and assume from Sellers, all of the Acquired Assets and Assumed Liabilities, all as more specifically provided therein; and

WHEREAS, the APA contemplates that within one (1) Business Day of the execution of the APA, Buyer shall deposit (or cause to be deposited) an amount equal to $6,860,000 (the "Escrow Amount") with the Escrow Agent to be held in an escrow account (the "Escrow Account") pending the closing pursuant to the terms hereof. The Escrow Amount, together with any investment proceeds thereon, and subject to any reduction for distributions made pursuant to the terms hereof, are referred to herein, collectively, as the "Escrow Funds".

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the Parties agree as follows:

1.      Appointment.  The Parties hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, to open and maintain the Escrow Account upon the terms and conditions set forth in this Agreement.  The Escrow Agent hereby accepts such appointment and agrees to open and maintain the Escrow Account and to act as escrow agent in accordance with the terms and conditions set forth herein. The Escrow Agent shall not disburse or release any of the Escrow Funds except in accordance with the terms of this Agreement.

2.      Escrow Funds.

(a)      On the date hereof, Buyer shall deposit with the Escrow Agent the Escrow Amount in immediately available funds to be held in the Escrow Account.

(b)    All products and proceeds of the Escrow Funds, including all interest, dividends, gains and other income earned with respect thereto, shall be retained by the Escrow Agent and reinvested in the Escrow Funds and shall become part of the Escrow Funds; and shall be disbursed as part of the Escrow Funds in accordance with the terms and conditions of this Agreement.

3.    Investment of Escrow Funds.

(a)    The Escrow Agent shall invest the Escrow Amount in an interest-bearing deposit obligation of Citibank N.A. insured by the Federal Deposit Insurance Corporation ("FDIC") to the applicable limits with an initial rate of 0.25%.  The Parties acknowledge that the initial interest rate is subject to change from time to time and shall be reflected in the monthly statement provided to the Parties.  The Escrow Funds shall at all times remain available for distribution in accordance with Section 4 below.

(b)    The Escrow Agent shall prepare and send an account statement to all parties listed as recipients of such statements in the "Notice Section" on a monthly basis reflecting activity in the Escrow Account for the preceding month.

(c)    The Escrow Agent shall have no responsibility for any investment losses resulting from the investment, reinvestment or liquidation of the escrowed property, as applicable, provided that the Escrow Agent has made such investment, reinvestment or liquidation of the escrowed property in accordance with the terms, and subject to the conditions of this Agreement. The Escrow Agent does not have a duty nor will it undertake any duty to provide investment advice.

4.    Disposition and Termination of the Escrow Funds.

(a)    Escrow Funds.  The Parties shall act in accordance with, and the Escrow Agent shall hold and release the Escrow Funds as follows:

(i)    Upon receipt by the Escrow Agent of a Joint Release Instruction with respect to the Escrow Funds, the Escrow Agent shall promptly, but in any event within two (2) Business Days after receipt of a Joint Release Instruction, disburse, as directed in such Joint Release Instruction, all or part of the Escrow Funds from the Escrow Account, but only to the extent funds are available.

(ii)    Upon receipt by the Escrow Agent of a copy of Final Determination from any Party, the Escrow Agent shall on the fifth (5th) Business Day following receipt of such Final Determination, disburse, as directed in such Final Determination, all or part of the Escrow Funds from the Escrow Account specified in such Final Determination, but only to the extent funds are available. The Escrow Agent will act on such Final Determination without further inquiry.

(iii)    All payments of any part of the Escrow Funds shall be made by wire transfer of immediately available funds as set forth in the Joint Release Instruction or Final Determination, as applicable.

2

(iv)    Any instructions setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution of any funds on deposit in the Escrow Account under the terms of this Agreement must be in writing, executed by the appropriate Party or Parties as evidenced by the signatures of the person or persons set forth on Exhibit A-1 and Exhibit A-2 and delivered to the Escrow Agent either (x) by confirmed facsimile only at the fax number set forth in Section 11 below or (y) attached to an e-mail received on a Business Day from an e-mail address set forth in Section 11 below. In the event a Joint Release Instruction or Final Determination is delivered to the Escrow Agent, whether in writing, by facsimile or otherwise, the Escrow Agent is authorized to seek confirmation of such instruction by telephone call back to the person or persons designated in Exhibits A-1 and/or A-2 annexed hereto (the "Call Back Authorized Individuals"), and the Escrow Agent may rely upon the confirmations of anyone purporting to be a Call Back Authorized Individual. To assure accuracy of the instructions it receives, the Escrow Agent may record such call backs. If the Escrow Agent is unable to verify the instructions, or is not satisfied with the verification it receives, it will not execute the instruction until all such issues have been resolved. The persons and telephone numbers for call backs may be changed only in writing, executed by an authorized signer of applicable Party set forth on Exhibit A-1 or Exhibit A-2, actually received and acknowledged by the Escrow Agent.

(b)    Certain Definitions.

(i)    "Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are not required or authorized by law to be closed in New York, New York.

(ii)    "Final Determination" means, with respect to the disposition of the Escrow Funds in the Escrow Account, a final non-appealable order of any court of competent jurisdiction, including the Bankruptcy Court, which may be issued, together with (A) a certificate of the prevailing Party to the effect that such order is final and non-appealable and from a court of competent jurisdiction having proper authority and (B) the written payment instructions of the prevailing Party to effectuate such order.

(iii)    "Joint Release Instruction" means the joint written instruction executed by an authorized signer of each of Buyer and the Company in the form attached as Exhibit B directing the Escrow Agent to disburse all or a portion of the Escrow Funds.

(iv)    "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

5.    Escrow Agent. The Escrow Agent undertakes to perform only such duties as are expressly set forth herein, which shall be deemed purely ministerial in nature, and no other duties, including but not limited to any fiduciary duties, shall be implied. The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document between the Parties, nor shall the Escrow Agent be required to determine if any Person has complied with

3

any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement. Notwithstanding the terms of any other agreement between the Parties, the terms and conditions of this Agreement will control the actions of Escrow Agent. The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any Joint Release Instruction or Final Determination furnished to it hereunder and believed by it to be genuine and to have been signed and presented by an authorized signer of the proper Party or Parties. Concurrent with the execution of this Agreement, the Parties shall deliver to the Escrow Agent authorized signers' forms in the form of <u>Exhibit A-1</u> and <u>Exhibit A-2</u> attached hereto. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. The Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Funds. In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any Party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be directed otherwise in a Joint Release Instruction or Final Determination. The Escrow Agent may interplead all of the assets held hereunder into a court of competent jurisdiction or may seek a declaratory judgment with respect to certain circumstances, and thereafter be fully relieved from any and all liability or obligation with respect to such interpleaded assets or any action or nonaction based on such declaratory judgment. The Escrow Agent may consult with legal counsel of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions hereof or its duties hereunder. The Escrow Agent will not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that the Escrow Agent's fraud, gross negligence or willful misconduct was the cause of any direct loss to either Party. To the extent reasonably practicable, the Parties agree to pursue any redress or recourse in connection with any dispute without making the Escrow Agent a party to the same. Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for any special, indirect, punitive, incidental or consequential losses or damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such losses or damages and regardless of the form of action, except in the case of the Escrow Agent's fraud, gross negligence or willful misconduct as adjudicated by a court of competent jurisdiction.

6.   <u>Resignation and Removal of Escrow Agent</u>. The Escrow Agent (a) may resign and be discharged from its duties or obligations hereunder by giving sixty (60) calendar days advance notice in writing of such resignation to the Parties specifying a date when such resignation shall take effect or (b) may be removed, with or without cause, by Buyer and the Company acting jointly at any time by providing written notice to the Escrow Agent; provided that any such resignation or removal shall not relieve the Escrow Agent from any liability that arose from any action or inaction that occurred prior to the effective date of such resignation or removal. Any entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of the Escrow Agent's line of business may be transferred, shall be the Escrow Agent under this Agreement without further act. The Escrow Agent's sole responsibility after such sixty (60) day notice period expires or after receipt of written notice of removal shall be to hold and safeguard the Escrow Funds (without any obligation to reinvest the same) and to deliver the same (i) to a substitute or successor escrow agent pursuant to a joint written designation from

4

the Parties, (ii) as set forth in a Joint Release Instruction or (iii) in accordance with the directions of a Final Determination, and, at the time of such delivery, the Escrow Agent's obligations hereunder shall cease and terminate.  In the event the Escrow Agent resigns, if the Parties have failed to appoint a successor escrow agent prior to the expiration of sixty (60) calendar days following receipt of the notice of resignation, the Escrow Agent may petition any court of competent jurisdiction for the appointment of such a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto.

7.    Fees and Expenses.  All fees and expenses of the Escrow Agent are described in Schedule 1 attached hereto and shall be paid by Buyer. The fees agreed upon for the services to be rendered hereunder are intended as full compensation for the Escrow Agent services as contemplated by this Agreement.

8.    Indemnity.  Each of the Parties shall jointly and severally indemnify, defend and hold harmless the Escrow Agent and its affiliates and their respective successors, assigns, directors, officers, agents and employees (the "Indemnitees") from and against and with respect to, any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses (including the reasonable and documented fees and expenses of one outside counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively "Escrow Agent Losses") arising out of or in connection with (a) the Escrow Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, except to the extent that such Escrow Agent Losses, as determined by a court of competent jurisdiction, in a final non-appealable judgment, have been caused by the fraud, gross negligence or willful misconduct of such Indemnitee, or (b) its following any instructions or other directions from the Parties received in accordance with this Agreement. Notwithstanding anything to the contrary herein, Buyer and the Company agree, solely as between themselves, that any obligation for indemnification under this Section 8 (or for reasonable fees and expenses of the Escrow Agent described in Section 7) shall be borne by the Party or Parties determined by a court of competent jurisdiction in a final non-appealable judgment to be responsible for causing the loss, damage, liability, cost or expense against which the Escrow Agent is entitled to indemnification or, if no such determination is made, then one half by Buyer and one half by the Company. The Parties acknowledge that the foregoing indemnities shall survive the resignation or removal of the Escrow Agent or the termination of this Agreement.

9.    Tax Matters.

(a)    Buyer shall be responsible for and the taxpayer on all taxes due on the interest or income earned, if any, on the Escrow Funds. The Escrow Agent shall report any interest or income earned on the Escrow Funds to the Internal Revenue Service ("IRS") or other taxing authority on IRS Form 1099. Prior to the date hereof, the Parties shall provide the Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 as applicable and such other forms and documents that the Escrow Agent may reasonably request.

(b)     The Escrow Agent shall be responsible only for information reporting and withholding with respect to income earned on the Escrow Funds.  The Escrow Agent shall withhold any taxes required to be withheld by applicable law, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities.

(c)     The Escrow Agent, its affiliates, and its employees are not in the business of providing tax or legal advice to any taxpayer outside of Citigroup, Inc. and its affiliates.  This Agreement and any amendments or attachments hereto are not intended or written to be used, and may not be used or relied upon, by any such taxpayer or for the purpose of avoiding tax penalties.   Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

10.    Covenant of Escrow Agent.  The Escrow Agent hereby agrees and covenants with Buyer and the Company that it shall perform all of its obligations under this Agreement and shall not deliver custody or possession of any of the Escrow Funds to anyone except pursuant to the express terms of this Agreement or as otherwise required by law.

11.    Notices.  All notices, requests, demands and other communications required under this Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) by facsimile transmission with written confirmation of receipt, (iii) on day of transmission if sent by electronic mail ("e-mail") with a PDF attachment executed by an authorized signer of the Party/ Parties to the e-mail address given below, and written confirmation of receipt is obtained promptly after completion of the transmission, (iv) by overnight delivery with a reputable national overnight delivery service, or (v) by mail or by certified mail, return receipt requested, and postage prepaid. If any notice is mailed, it shall be deemed given two (2) Business Days after the date such notice is deposited with the United States Postal Service. If notice is given to a Party, it shall be given at the address for such Party set forth below. It shall be the responsibility of the Parties to notify the Escrow Agent and the other Party in writing of any name or address changes.

if to the Company, then to:

Fairway Group Holdings Corp.
2284 12th Avenue
New York, NY 10027
Attention:     Nathalie Augustin
E-mail:     Nathalie.Augustin@fairwaymarket.com

with a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

| | |
|---|---|
| Attention: | Ray C. Schrock, P.C. |
| | Gavin Westerman |
| | Sunny Singh |
| Email: | ray.schrock@weil.com |
| | gavin.westerman@weil.com |
| | sunny.singh@weil.com |
| Telephone: | (212) 310-8000 |
| Facsimile: | (212) 310-8007 |

or, if to Buyer, then to:

Village Super Market, Inc.
733 Mountain Ave.
Springfield, NJ 07081
Attention: John Van Orden

with a copy (which shall not constitute notice) to:

Wollmuth Maher & Deutsch LLP
500 Fifth Avenue
New York, NY 10110

| | |
|---|---|
| Attention: | Paul R. Defilippo, Esq. |
| Email: | pdefilippo@wmd-law.com |
| Telephone: | (212) 382-3300 |
| Facsimile: | (212) 382-0050 |

or, if to the Escrow Agent, then to:

Citibank, N.A.
Citi Private Bank
388 Greenwich Street, 29th Floor
New York, NY  10013

| | |
|---|---|
| Attn: | William T. Lynch |
| Telephone: | 212-783-7108 |
| Facsimile: | 212-783-7131 |
| E-mail: | william.lynch@citi.com |

7

Notwithstanding the above, in the case of communications delivered to the Escrow Agent pursuant to the foregoing clause (i) through (iv) of this <u>Section 11</u>, such communications shall be deemed to have been given on the date received by the Escrow Agent.  In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate.

12.    <u>Termination.</u>  This Agreement shall terminate on the first to occur of (a) the distribution of all of the amounts in the Escrow Funds in accordance with this Agreement or (b) delivery to the Escrow Agent of a written notice of termination executed jointly by the Company and Buyer after which this Agreement shall be of no further force and effect except that the provisions of <u>Section 8</u> hereof shall survive termination.

13.    <u>Miscellaneous.</u>  The provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by all of the Parties. Neither this Agreement nor any right or interest hereunder may be assigned in whole or in part by any Party without the prior consent of the other Parties.  This Agreement shall be governed by and construed under the laws of the State of New York. Each Party irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the exclusive jurisdiction of the Bankruptcy Court for so long as the Company or any of its direct or indirect subsidiaries is subject to jurisdiction of the Bankruptcy Court (and following such time, the courts located in the State of New York) in any legal proceeding arising out of or relating to this Agreement and agrees that all claims in respect of such legal proceeding may be heard and determined in such court and (y) agrees not to (i) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (ii) bring any action or legal proceeding arising out of or relating to this Agreement in any other court. The Parties hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising from or relating to this Agreement.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  All signatures of the Parties to this Agreement may be transmitted by facsimile or electronic transmission in portable document format (.pdf), and such facsimile or .pdf will, for all purposes, be deemed to be the original signature of such Party whose signature it reproduces, and will be binding upon such Party.  If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.  The Parties represent, warrant and covenant that each document, notice, instruction or request provided by such Party to the Escrow Agent shall comply with applicable laws and regulations.  Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the Parties to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written.  Except as expressly provided in <u>Sections 8</u>, nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than the Escrow Agent and the Parties any legal or equitable right, remedy, interest or claim under or in respect of this Agreement or any funds escrowed hereunder.

8

14.    <u>Compliance with Court Orders</u>.    In the event that any escrow property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties or to any other Person, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

15.    <u>Further Assurances</u>.    Following the date hereof, each party shall deliver to the other parties such further information and documents and shall execute and deliver to the other parties such further instruments and agreements as any other party shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purpose hereof or to assure to any other party the benefits hereof.

16.    <u>Assignment</u>.    No assignment of the interest of any of the Parties shall be binding upon the Escrow Agent unless and until written notice of such assignment shall be filed with and consented to by the Escrow Agent (such consent not to be unreasonably withheld).    Any transfer or assignment of the rights, interests or obligations hereunder in violation of the terms hereof shall be void and of no force or effect.

17.    <u>Force Majeure.</u>    The Escrow Agent shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, but not limited to, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility), it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

18.    <u>Compliance with Federal Law</u>.    To help the U.S. Government fight the funding of terrorism and money laundering activities and to comply with Federal law requiring financial institutions to obtain, verify and record information on the source of funds deposited to an account, the Parties agree to provide the Escrow Agent with the name, address, taxpayer identification number, and remitting bank for all Parties depositing funds at Citibank pursuant to the terms and conditions of this Agreement.    For a non-individual person such as a business entity, a charity, a trust or other legal entity, the Escrow Agent will ask for documentation to verify its formation and existence as a legal entity.    The Escrow Agent may also ask to see financial statements, licenses, an identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

19.    <u>Use of Citibank Name.</u>    No publicly distributed printed or other material in any language, including prospectuses, notices, reports, and promotional material which mentions "Citibank" by name or the rights, powers, or duties of the Escrow Agent under this Agreement

9

shall be issued by any other parties hereto, or on such party's behalf, without the prior written consent of the Escrow Agent.

\* \* \* \* \*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

COMPANY:

**FAIRWAY GROUP HOLDINGS CORP.**

By: _____
Name: _____
Its: _____

BUYER:

**VILLAGE SUPER MARKET, INC.**

By: _____
Name: _____
Its: _____

By: _____
Name: _____
Its: _____

ESCROW AGENT:

**CITIBANK, N.A.**

By: _____
Name: William T. Lynch
Its:                                     Director

*Signature Page to Escrow Agreement*

## Schedule 1

**ESCROW AGENT FEE SCHEDULE**
**Citibank, N.A., Escrow Agent**

**Acceptance Fee**
To cover the acceptance of the Escrow Agent appointment, the study of the Agreement, and supporting documents submitted in connection with the execution and delivery thereof, and communication with other members of the working group:

    **Fee: WAIVED**

**Administration Fee**
The annual administration fee covers maintenance of the Escrow Account including safekeeping of assets in the escrow account, normal administrative functions of the Escrow Agent, including maintenance of the Escrow Agent's records, follow-up of the Agreement's provisions, and any other safekeeping duties required by the Escrow Agent under the terms of the Agreement. Fee is based on Escrow Amounts being deposited in an interest bearing deposit account, FDIC insured to the applicable limits. Fee is payable simultaneously at time of funding of the escrow account.

    **Fee: WAIVED**

**Tax Preparation Fee**
To cover preparation and mailing of Forms 1099-INT, if applicable for the escrow parties for each calendar year:

    **Fee: WAIVED**

**Transaction Fees**
To oversee all required disbursements or release of property from the escrow account to any escrow party, including cash disbursements made via check and/or wire transfer, fees associated with postage and overnight delivery charges incurred by the Escrow Agent as required under the terms and conditions of the Agreement:

    **Fee: WAIVED**

**Other Fees**
Material amendments to the Agreement: additional fee(s), if any, to be discussed at time of amendment.

---

**TERMS AND CONDITIONS**: The above schedule of fees does not include charges for out-of-pocket expenses or for any services of an extraordinary nature that Citibank or its legal counsel may be called upon from time to time to perform. Fees are also subject to satisfactory review of the documentation, and Citibank reserves the right to modify them should the characteristics of the transaction change. Citibank's participation in this program is subject to internal approval of the third party depositing monies into the escrow account to be established hereunder. The Acceptance Fee, if any, is payable upon execution of the Agreement. Should this schedule of fees be accepted and agreed upon and work commenced on this program but subsequently halted and the program is not brought to market, the Acceptance Fee and legal fees incurred, if any, will still be payable in full.

## EXHIBIT A-1

### Certificate as to the Company's Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of the Company and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under this Agreement, on behalf of the Company.  The below listed persons (must list at least two individuals, if applicable) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of Escrow Funds from the escrow account(s).

Name / Title / Telephone                    Specimen Signature

_____          _____
Name                                      Signature

_____
Title

_____          _____
Phone                                     Mobile Phone

_____          _____
Name                                      Signature

_____
Title

_____          _____
Phone                                     Mobile Phone

_____          _____
Name                                      Signature

_____
Title

_____          _____
Telephone                                 Mobile Phone

NOTE: Actual signatures are required above.  Electronic signatures, "Docusigned" signatures and/or signature fonts are not acceptable.

*Exhibit to Escrow Agreement*

## EXHIBIT A-2

### Certificate as to Buyer's Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Buyer and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under this Agreement, on behalf of Buyer.  The below listed persons (must list at least two individuals, if applicable) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of Escrow Funds from the escrow account(s).

<u>Name / Title / Telephone</u>                              <u>Specimen Signature</u>

_____          _____
Name                                                       Signature

_____
Title

_____          _____
Phone                                                     Mobile Phone

_____          _____
Name                                                       Signature

_____
Title

_____          _____
Phone                                                     Mobile Phone

_____          _____
Name                                                       Signature

_____
Title

_____          _____
Telephone                                              Mobile Phone

NOTE: Actual signatures are required above.  Electronic signatures, "Docusigned" signatures and/or signature fonts are not acceptable.

**Exhibit B**
**Form of Joint Written Instructions**

**JOINT WRITTEN INSTRUCTIONS**
[_____] [__], 2020

Via Email

Citibank, N.A.
c/o Citi Private Bank
388 Greenwich Street, 29th Floor
New York, NY 10013
Attn: William T. Lynch
E-mail: william.lynch@citi.com

Sir or Madam:

Reference is made to that certain Escrow Agreement, dated as of January [●], 2020 (as amended, supplemented or otherwise modified from time to time, the "Escrow Agreement"), by and among Village Super Market, Inc. ("Buyer"), Fairway Group Holdings Corp. (the "Company") and CITIBANK, N.A. (the "Escrow Agent"). Capitalized terms used and not otherwise defined in this joint written instruction shall have the meanings given to such terms in the Escrow Agreement.

Pursuant to Section 4 of the Escrow Agreement, the Company and Buyer hereby instruct the Escrow Agent to release and distribute $[___] of the Escrow Funds [,which constitutes the interest accrued thereon,] that is in the Escrow Account [to [Buyer][the Company]] by wire transfer of immediately available funds in accordance with the wire transfer instructions attached hereto as Annex I.

Very truly yours,

[Buyer]

By: _____
Name:
Title:

[the Company]

By: _____
Name:
Title:

**<u>Annex I to Joint Written Instructions</u>**
**Wire Instructions**

## BILL OF SALE

This **BILL OF SALE** (this "Bill of Sale") is entered into and effective as of [●], 2020, by and among Fairway Group Holdings Corp., a Delaware corporation (the "Company"), and the direct and indirect wholly-owned Subsidiaries of the Company that are signatories thereto (together with the Company, the "Sellers") and Village Super Market, Inc., a New Jersey Corporation ("Buyer"). Sellers and Buyer are referred to collectively herein as the "Parties."

WHEREAS, Sellers and Buyer are parties to that certain Asset Purchase Agreement, dated January 22, 2020 (the "Purchase Agreement") (capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Purchase Agreement); and

WHEREAS, the execution and delivery of this Bill of Sale is contemplated by Sections 2.5(a)(i) and 2.5(b)(ii) of the Purchase Agreement.

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in the Purchase Agreement, and in consideration of the representations, warranties and covenants set forth in the Purchase Agreement, the Parties hereby agree as follows:

1.      Sale and Acceptance of Acquired Assets.  For true and lawful consideration paid to Sellers by Buyer, the sufficiency of which is hereby acknowledged, effective as of the Closing, Buyer hereby purchases from Sellers and Sellers hereby sell, transfer, assign, convey, and deliver to Buyer all of the Acquired Assets, free and clear of Liens or Claims to the maximum extent permitted under applicable bankruptcy law, except for Permitted Liens.  As of the Closing, Buyer hereby accepts the foregoing sale, transfer, assignment, conveyance and delivery.

2.      Conflict.  The sale, transfer, assignment, conveyance, and delivery of the Acquired Assets made hereunder are made in accordance with and subject to all the terms and conditions of the Purchase Agreement (including, without limitation, the representations, warranties, covenants, and agreements contained therein), which is incorporated herein by reference and which terms and conditions shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of a conflict between the terms and conditions of this Bill of Sale and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede, and prevail.  Notwithstanding anything to the contrary in this Bill of Sale, nothing herein is intended to, nor shall it, extend, amplify, reduce or otherwise alter the representations, warranties, covenants, obligations, and remedies of the Parties contained in the Purchase Agreement or the survival thereof.

3.      Notices.  Any notice, request, or other document to be given hereunder to any Party shall be given in the manner specified in Section 9.7 of the Purchase Agreement.  Any Party may change its address for receiving notices, requests, and other documents by giving written notice of such change to the other Parties.

4.      Severability.  The invalidity or unenforceability of any provision of this Bill of Sale shall not affect the validity or enforceability of any other provisions of this Bill of Sale.

5.      Enforceability.  In the event that any of the provisions of this Bill of Sale shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Bill of Sale shall otherwise remain in full force and effect.

6.　　Amendments and Waivers.  No amendment of any provision of this Bill of Sale shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein.  No waiver of any breach of this Bill of Sale shall be construed as an implied amendment or agreement to amend or modify any provision of this Bill of Sale.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.  No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Bill of Sale shall be binding unless this Bill of Sale is amended or modified in writing pursuant to the first sentence of this Section 6 except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

7.　　Further Assurances.  In case at any time after the Closing any further action is necessary to carry out the purposes of this Bill of Sale, each of the Parties will, at the requesting Party's sole cost and expense, take such further action (including the execution and delivery of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation, providing materials and information) as the other Party may reasonably request which actions shall be reasonably necessary to transfer, convey or assign to Buyer all of the Acquired Assets or to confirm Buyer's assumption of the Assumed Liabilities.

8.　　Counterparts; Facsimile and Electronic Signatures.  This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Bill of Sale or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

9.　　Governing Law.  This Bill of Sale shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the state of New York without regard to the conflict of laws rules or principles thereof (or any other jurisdiction) to the extent that such laws, rules or principles would direct a matter to another jurisdiction, except as otherwise required under the laws of the state of New York.

10.　　Succession and Assignment.  This Bill of Sale shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign either this Bill of Sale or any of its rights, interests, or obligations hereunder without the prior written consent of the other Parties.

11.　　Third Party Beneficiaries and Obligations.  This Bill of Sale shall not confer any rights or remedies upon any Person other than Buyer, each Seller, and their respective successors and permitted assigns.

12.　　Entire Agreement.  This Bill of Sale, together with the Purchase Agreement and the exhibits and the documents referred to in the Purchase Agreement, the Related Agreements and the Confidentiality Agreement constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

* * * * *

2

IN WITNESS WHEREOF, the Parties have executed this Bill of Sale as of date first above written.

**SELLERS**:

FAIRWAY GROUP HOLDINGS CORP.

By:_____
Name:
Title:

FAIRWAY GROUP ACQUISITION CO.

By:_____
Name:
Title:

FAIRWAY BROADWAY LLC

By:_____
Name:
Title:

FAIRWAY EAST 86TH STREET LLC

By:_____
Name:
Title:

FAIRWAY KIPS BAY LLC

By:_____
Name:
Title:

FAIRWAY CHELSEA LLC

By:_____
Name:
Title:

FAIRWAY BAKERY LLC

By:_____
Name:
Title:


FAIRWAY UPTOWN LLC

By:_____
Name:
Title:

*[Signature Page to Bill of Sale]*

**<u>BUYER</u>**:

VILLAGE SUPER MARKET, INC.

By:_____
Name:
Title:

<u>EXHIBIT C</u>

## <u>ASSIGNMENT AND ASSUMPTION AGREEMENT</u>

This **ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "<u>Agreement</u>") is entered into and effective as of [●], 2020, by and among Fairway Group Holdings Corp., a Delaware corporation (the "<u>Company</u>"), and the direct and indirect wholly-owned Subsidiaries of the Company that are signatories thereto (together with the Company, the "<u>Sellers</u>") and [●], a [●] ("<u>Buyer</u>"). Sellers and Buyer are referred to collectively herein as the "<u>Parties</u>."

WHEREAS, the Parties are parties to that certain Asset Purchase Agreement, dated January 22, 2020 (the "<u>Purchase Agreement</u>") (capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Purchase Agreement); and

WHEREAS, the execution and delivery of this Agreement is contemplated by Sections 2.5(a)(ii) and 2.5(b)(iii) of the Purchase Agreement.

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in the Purchase Agreement, and in consideration of the representations, warranties and covenants set forth in the Purchase Agreement, the Parties hereby agree as follows:

1) <u>Assignment and Assumption.</u>  Effective as of the Closing, Sellers hereby sell, transfer, assign, convey, and deliver to Buyer, all of the Acquired Assets, including, without limitation, all of Sellers' right, title, and interest in and to the Transferred Contracts, free and clear of Liens or Claims to the maximum extent permitted under applicable bankruptcy law, except for Permitted Liens and Buyer hereby assumes all Assumed Liabilities. Buyer agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms thereof, including paying or causing to be paid, at or prior to the Closing, all Cure Costs.

2) <u>Conflict.</u>  The assignment and assumption of the Acquired Assets and the Assumed Liabilities made hereunder are made in accordance with and subject to the Purchase Agreement (including, without limitation, the representations, warranties, covenants, and agreements contained therein), which is incorporated herein by reference.  In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede, and prevail.  Notwithstanding anything to the contrary in this Agreement, nothing herein is intended to, nor shall it, extend, amplify, impair, or otherwise alter the representations, warranties, covenants, obligations, or remedies of the Parties contained in the Purchase Agreement or the survival thereof.

3) <u>Notices.</u>  Any notice, request, or other document to be given hereunder to any Party shall be given in the manner specified in Section 9.7 of the Purchase Agreement.  Any Party may change its address for receiving notices, requests, and other documents by giving written notice of such change to the other Parties.

4) <u>Severability.</u>  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.

5) <u>Enforceability.</u>  In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

6)    <u>Amendments and Waivers.</u>  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.   No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this <u>Section 6</u> except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

7)    <u>Further Assurances.</u>  In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will, at the requesting Party's sole cost and expense, take such further action (including the execution and delivery of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation, providing materials and information) as the other Party may reasonably request which actions shall be reasonably necessary to transfer, convey or assign to Buyer all of Sellers' right, title and interest in and to the Acquired Assets or to confirm Buyer's assumption of the Assumed Liabilities.

8)    <u>Counterparts; Facsimile and Electronic Signatures.</u>  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original

9)    <u>Governing Law.</u>  This Agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the state of New York without regard to the conflict of laws rules or principles thereof (or any other jurisdiction) to the extent that such laws, rules or principles would direct a matter to another jurisdiction, except as otherwise required under the laws of the state of New York.

10)   <u>Succession and Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other Parties.

11)   <u>Third Party Beneficiaries and Obligations.</u>  This Agreement shall not confer any rights or remedies upon any Person other than Buyer, each Seller, and their respective successors and permitted assigns.

12)   <u>Entire Agreement.</u>  This Agreement, together with the Purchase Agreement and the exhibits and the documents referred to in the Purchase Agreement, the Related Agreements and the Confidentiality Agreement constitute the entire agreement between the Parties and supersede any

2

prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

* * * * *

3

IN WITNESS WHEREOF, the Parties have executed this Agreement as of date first above written.

**SELLERS**:

FAIRWAY GROUP HOLDINGS CORP.

By: _____
Name:
Title:

FAIRWAY GROUP ACQUISITION CO.

By:_____
Name:
Title:

FAIRWAY BROADWAY LLC

By:_____
Name:
Title:

FAIRWAY EAST 86TH STREET LLC

By:_____
Name:
Title:

FAIRWAY KIPS BAY LLC

By:_____
Name:
Title:

FAIRWAY CHELSEA LLC

By:_____
Name:
Title:

*[Signature Page to Assignment and Assumption Agreement]*

FAIRWAY BAKERY LLC

By:_____
Name:
Title:


FAIRWAY UPTOWN LLC

By:_____
Name:
Title:

**<u>BUYER</u>**:

VILLAGE SUPER MARKET, INC.

By: _____
Name:
Title:

*[Signature Page to Assignment and Assumption Agreement]*

## ASSIGNMENT AND ASSUMPTION OF LEASE

This **ASSIGNMENT AND ASSUMPTION OF LEASE** (this "Assignment") is entered into and effective as of [●], 2020, by and among Fairway Group Holdings Corp., a Delaware corporation (the "Company"), [●], a [●] and a direct or indirect wholly-owned Subsidiary of the Company (together with the Company, the "Sellers") and [●], a [●] ("Buyer"). Sellers and Buyer are referred to collectively herein as the "Parties."

WHEREAS, the Parties are parties to that certain Asset Purchase Agreement, dated January 22, 2020 (the "Purchase Agreement") (capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Purchase Agreement);

WHEREAS, the execution and delivery of this Assignment is contemplated by Sections 2.5(a)(iii) and 2.5(b)(iv) of the Purchase Agreement; and

WHEREAS, Sellers desire to sell, transfer, assign, convey, and deliver to Buyer the Lease described in Schedule I attached hereto including all amendments, modifications, and supplements thereto (collectively, the "Lease"), and Buyer desires to accept an assignment of the Lease together with all right, title, and interest of Sellers thereunder. The property encumbered by the Lease (the "Leased Premises") is described on Schedule II attached hereto.

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in the Purchase Agreement, and in consideration of the representations, warranties and covenants set forth in the Purchase Agreement, the Parties hereby agree as follows:

1)  Assignment and Assumption of Lease.  Effective as of the Closing related to the Lease, Sellers hereby sell, transfer, assign, convey, and deliver to Buyer all of Sellers' estate, right, title and interest as tenant of the leasehold estate described under the Lease, and Buyer hereby accepts the sale, transfer, assignment, conveyance, and delivery of Sellers' estate, rights, title and interest in, to and under such leasehold estate.

2)  Assumption of Assumed Liabilities.  Effective as of the Closing related to the Lease, Sellers hereby assign and Buyer hereby (i) unconditionally and irrevocably assumes and agrees to pay, discharge, or perform when due, and release and discharge Sellers and their successors and assigns completely and forever from, all obligations and liabilities of any kind arising out of, or required to be performed under, such assigned Lease on or after the Closing Date related to the Lease, and (ii) unconditionally and irrevocably assumes, undertakes and agrees to pay, satisfy, perform and discharge in full, as and when due, and release and discharge Sellers and their successors and assigns completely and forever from, all of the Assumed Liabilities and all obligations and liabilities of any kind arising out of Buyer's assumption of the Assumed Liabilities. Notwithstanding anything to the contrary contained herein, the Excluded Liabilities are specifically excluded from the Assumed Liabilities assumed by Buyer hereby and such Excluded Liabilities are not assigned by Sellers or assumed by Buyer.

3)  Condition of the Leased Premises. Sellers shall deliver, and Buyer shall accept, possession of the Leased Premises in its "AS-IS, WHERE-IS, WITH ALL FAULTS" condition and without any representation or warranty, orally or in writing, by Sellers. No promise of Sellers to alter, remodel, or improve the Leased Premises has been made by Sellers to Buyer.

4)  Conflict.  The assignment and assumption of the Lease (and the obligations thereunder) made hereunder are made in accordance with and subject to all the terms and conditions of the Purchase

Agreement (including, without limitation, the representations, warranties, covenants, and agreements contained therein), which is incorporated herein by reference and which terms and conditions shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede, and prevail. Notwithstanding anything to the contrary in this Agreement, nothing herein is intended to, nor shall it, extend, amplify, reduce or otherwise alter the representations, warranties, covenants, obligations and remedies of the Parties contained in the Purchase Agreement or the survival thereof.

5) <u>Notices</u>. Any notice, request, or other document to be given hereunder to any Party shall be given in the manner specified in Section 9.7 of the Purchase Agreement. Any Party may change its address for receiving notices, requests, and other documents by giving written notice of such change to the other Parties.

6) <u>Severability</u>. The invalidity or unenforceability of any provision of this Assignment shall not affect the validity or enforceability of any other provisions of this Assignment.

7) <u>Enforceability</u>. In the event that any of the provisions of this Assignment shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Assignment shall otherwise remain in full force and effect.

8) <u>Amendments and Waivers</u>. No amendment of any provision of this Assignment shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Assignment shall be construed as an implied amendment or agreement to amend or modify any provision of this Assignment. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Assignment shall be binding unless this Assignment is amended or modified in writing pursuant to the first sentence of this <u>Section 8</u> except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

9) <u>Counterparts; Facsimile and Electronic Signatures.</u> This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Assignment or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

10) <u>Governing Law</u>. This Assignment shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the state of New York without regard to the conflict of laws rules or principles thereof (or any other jurisdiction) to the extent that such laws, rules or principles would direct a matter to another jurisdiction, except as otherwise required under the laws of the state of New York.

2

11)    <u>Succession and Assignment</u>.  This Assignment shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign either this Assignment or any of its rights, interests, or obligations hereunder without the prior written consent of the other Parties.

12)    <u>Third Party Beneficiaries and Obligations</u>.  This Assignment shall not confer any rights or remedies upon any Person other than Buyer, each Seller, and their respective successors and permitted assigns.

13)    <u>Recordation</u>.  Subject to the following two sentences, this Assignment shall be recorded in the appropriate public records of the county in which the Leased Premises is located to the extent permitted by law. Sellers make no representation regarding the recordability of this Assignment, nor the Lease or related documents. Sellers shall bear no liability for the failure of the Lease, this Assignment, or related documents to be recorded.

14)    <u>Entire Agreement</u>.  This Assignment, together with the Purchase Agreement and the exhibits and the documents referred to in the Purchase Agreement, the Related Agreements and the Confidentiality Agreement constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

* * * * *

WEIL:\97335463\5\44444.0008

IN WITNESS WHEREOF, the Parties have executed this Assignment as of the date first above written.

FAIRWAY GROUP HOLDINGS CORP.

By: _____
Name:
Title:

[ADD NOTARY JURAT ACCEPTABLE IN EACH JURISDICTION]

*[Signature Page to Assignment and Assumption of Lease]*

[SELLER]


By: _____
Name:
Title:



[ADD NOTARY JURAT ACCEPTABLE IN EACH JURISDICTION]

[BUYER]


By: _____
Name:
Title:



[ADD NOTARY JURAT ACCEPTABLE IN EACH JURISDICTION]

**SCHEDULE I**

Leases

[List Lease in the following form:

Lease dated [●], by and between [●], a [●], as landlord, and [●], a [●], as tenant, recorded [●], at Book [●], page [●], in the records of [●] County, [●], [as amended by that certain [●] dated [●].]]

**SCHEDULE II**

Leased Premises

WEIL:\97335463\5\44444.0008

<u>EXHIBIT E</u>

<u>INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT</u>

This **INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT** (this "<u>Assignment</u>") is entered into and effective as of [●], 2020, by and among Fairway Group Holdings Corp., a Delaware corporation (the "<u>Company</u>") and the direct and indirect wholly-owned Subsidiaries of the Company that are signatories hereto (together with the Company, the "<u>Sellers</u>") and [●], a [●] ("<u>Buyer</u>"). Sellers and Buyer are referred to collectively herein as the "<u>Parties</u>."

WHEREAS, the Parties are parties to that certain Asset Purchase Agreement, dated January 22, 2020 (the "<u>Purchase Agreement</u>") (capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Purchase Agreement);

WHEREAS, Sellers are the owners of certain Intellectual Property, including the Intellectual Property listed in the attached <u>Schedule A</u> (the "<u>Assigned IP</u>");

WHEREAS, pursuant to the Purchase Agreement, Sellers have agreed to sell, transfer, assign, convey and deliver all of the Assigned IP to Buyer;

WHEREAS, the execution and delivery of this Assignment is contemplated by Sections 2.5(a)(iv) and 2.5(b)(v) of the Purchase Agreement; and

WHEREAS, Sellers and Buyer now seek to consummate the assignment, sale and transfer of the Assigned IP.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants contained herein and in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1)      <u>Assignment</u>. Effective as of the Closing, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Sellers have sold, assigned, transferred and set over, and do hereby sell, assign, transfer and set over to Buyer the Assigned IP and all rights associated therewith, including, but not limited to, (i) all goodwill of Sellers' business associated with said Assigned IP, together with any trademark and/or service mark applications and/or registrations including the same for the United States and all foreign countries and any registrations that may issue therefor in the United States and any foreign countries, (ii) all rights to file any future registrations or patents for any of the Assigned IP, and (iii) all common law rights associated with the Assigned IP, (iv) all causes of action or other rights that may be asserted under the Assigned IP; the same to be held and enjoyed by Buyer for its own use and enjoyment, and for the use and enjoyment of its successors, assigns and other legal representatives, as fully and entirely as the same would have been held and enjoyed by Sellers if this assignment and sale had not been made, together with all claims by Sellers for damages by reason of past infringement of any trademark or service mark which arises from the Assigned IP, with the right to sue for, and collect the same for its own use and benefit, and for the use and benefit of its successors, assigns or other legal representatives.

2)      <u>Proxy</u>. Upon reasonable request by Buyer, Sellers agree to execute all documents necessary to perfect the right, title, and interest conveyed herein in and to Buyer. In the event that Sellers are unable or unwilling to fully perform its obligations under this Assignment, to the extent necessary to perfect such right, title, and interest in and to Buyer, Sellers hereby irrevocably designate and appoint Buyer or its assigns and their duly authorized officers and agents as Sellers' agents and attorneys-in-fact to act for and in Sellers' behalf and instead of Sellers, to execute and file any registration, application or other document and to do all other lawfully permitted acts in connection with the Assigned IP.

3)    <u>Notices.</u>  Any notice, request, or other document to be given hereunder to any Party shall be given in the manner specified in Section 9.7 of the Purchase Agreement.  Any Party may change its address for receiving notices, requests, and other documents by giving written notice of such change to the other Parties.

4)    <u>Severability.</u>  The invalidity or unenforceability of any provision of this Assignment shall not affect the validity or enforceability of any other provisions of this Assignment.

5)    <u>Enforceability</u>.  In the event that any of the provisions of this Assignment shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Assignment shall otherwise remain in full force and effect.

6)    <u>Amendments and Waivers.</u>  No amendment of any provision of this Assignment shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein.  No waiver of any breach of this Assignment shall be construed as an implied amendment or agreement to amend or modify any provision of this Assignment.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.  No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Assignment shall be binding unless this Assignment is amended or modified in writing pursuant to the first sentence of this <u>Section 6</u> except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

7)    <u>Further Assurances</u>. In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will, at the requesting Party's sole cost and expense, take such further action (including the execution and delivery of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation, providing materials and information) as the other Party may reasonably request which actions shall be reasonably necessary to transfer, convey or assign to Buyer all of the Assigned IP.

8)    <u>Counterparts; Facsimile and Electronic Signatures.</u>  This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Assignment or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

9)    <u>Governing Law.</u>  This Assignment shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the state of New York without regard to the conflict of laws rules or principles thereof (or any other jurisdiction) to the extent that such laws, rules or principles would direct a matter to another jurisdiction, except as otherwise required under the laws of the state of New York.

10)    <u>Succession and Assignment</u>.  This Assignment shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign either this Assignment or any of its rights, interests, or obligations hereunder without the prior written consent of the other Parties.

2

11)    <u>Third Party Beneficiaries and Obligations.</u>  This Assignment shall not confer any rights or remedies upon any Person other than Buyer, each Seller, and their respective successors and permitted assigns.

12)    <u>Entire Agreement.</u>  This Assignment, together with the Purchase Agreement and the exhibits and the documents referred to in the Purchase Agreement, the Related Agreements and the Confidentiality Agreement constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

\* \* \* \* \*

3

IN WITNESS WHEREOF, the Parties have executed this Assignment as of date first above written.

**SELLERS**:

FAIRWAY GROUP HOLDINGS CORP.

By: _____
Name:
Title:

FAIRWAY GROUP ACQUISITION CO.

By:_____
Name:
Title:

FAIRWAY BROADWAY LLC

By:_____
Name:
Title:

FAIRWAY EAST 86TH STREET LLC

By:_____
Name:
Title:

FAIRWAY KIPS BAY LLC

By:_____
Name:
Title:

FAIRWAY CHELSEA LLC

By:_____
Name:
Title:

*[Signature Page to IP Assignment and Assumption Agreement]*

FAIRWAY BAKERY LLC

By:_____
Name:
Title:


FAIRWAY UPTOWN LLC

By:_____
Name:
Title:

*[Signature Page to IP Assignment and Assumption Agreement]*

**<u>BUYER</u>**:


VILLAGE SUPER MARKET, INC.

By:_____
Name:
Title:

**SCHEDULE A**

**ASSIGNED IP**

## Exhibit D

**Moses Declaration**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
In re                                        :
                                             :        **Chapter 11**
**FAIRWAY GROUP HOLDINGS**                   :
**CORP.**, *et al.*,                         :        Case No. 20-[_____] (____)
                                             :
             Debtors.[1]                     :        **(Joint Administration Pending)**
------------------------------------------------------------x

**DECLARATION OF SCOTT MOSES IN SUPPORT OF MOTION OF DEBTORS
FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES FOR SALE
OF DEBTORS' ASSETS, (B) APPROVING STALKING HORSE BID PROTECTIONS,
(C) AUTHORIZING DESIGNATION OF ADDITIONAL STALKING HORSE
BIDDERS, (D) SCHEDULING AUCTIONS FOR AND HEARINGS TO APPROVE
SALES OF DEBTORS' ASSETS, (E) APPROVING FORM AND MANNER OF
NOTICE OF SALES, AUCTIONS, AND SALE HEARINGS, (F) APPROVING
ASSUMPTION AND ASSIGNMENT PROCEDURES AND FORM AND MANNER
OF NOTICE OF ASSUMPTION AND ASSIGNMENT, AND (G) GRANTING
RELATED RELIEF; AND (II)(A) AUTHORIZING SALE OF DEBTORS' ASSETS
FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES,
(B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Fairway Group Holdings Corp. (2788); Fairway Group Acquisition Company (2860); Fairway Bakery LLC (4129); Fairway Broadway LLC (8591); Fairway Chelsea LLC (0288); Fairway Construction Group, LLC (2741); Fairway Douglaston LLC (2650); Fairway East 86th Street LLC (3822); Fairway eCommerce LLC (3081); Fairway Georgetowne LLC (9609); Fairway Greenwich Street LLC (6422); Fairway Group Central Services LLC (7843); Fairway Group Plainview LLC (8643); Fairway Hudson Yards LLC (9331); Fairway Kips Bay LLC (0791); FN Store LLC (9240); Fairway Paramus LLC (3338); Fairway Pelham LLC (3119); Fairway Pelham Wines & Spirits LLC (3141); Fairway Red Hook LLC (8813); Fairway Stamford LLC (0738); Fairway Stamford Wines & Spirits LLC (3021); Fairway Staten Island LLC (1732); Fairway Uptown LLC (8719); Fairway Westbury LLC (6240); and Fairway Woodland Park LLC (9544).  The location of the Debtors' corporate headquarters is 2284 12th Avenue, New York, New York 10027.

Scott Moses, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      My name is Scott Moses.  I am over the age of 18 and competent to testify.

2.      I am a Managing Director with PJ Solomon, L.P. ("**Solomon**"), a leading financial advisory and investment banking firm, and a member of Solomon's Operating Committee.  I am also the Head of the Food Retail and Restaurants Investment Banking practice group (the "**Food Retail Advisory Group**"), specializing in grocery and restaurant sector mergers & acquisitions and strategic advice.  In May 2019, Solomon was engaged to serve as investment banker to the above-captioned debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**").  I submit this declaration in support of the *Motion of Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for Sales of Debtors' Assets* (the "**Bidding Procedures**"), *(B) Approving Stalking Horse Bid Protections, (C) Authorizing Designation of Additional Stalking Horse Bidders, (D) Scheduling Auctions for and Hearings to Approve Sales of Debtors' Assets, (E) Approving Form and Manner of Notice of Sales, Auctions, and Sale Hearings, (F) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment, and (G) Granting Related Relief; and (II)(A) Authorizing Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (the "**Motion**").[2]

## Qualifications

3.      I have more than 18 years of experience advising corporations and other constituents on strategic and financial matters, with a particular focus on mergers, acquisitions,

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

WEIL:\97342796\6\44444.0008

sales and divestitures of traditional and specialty grocers.  I joined Solomon as Managing Director, Head of the Food Retail & Restaurants Investment Banking and a member of Solomon's Operating Committee in 2016.

4.      Before joining Solomon, I was the Head of Food, Drug and Specialty Retail Investment Banking at Sagent Advisors, prior to which I worked in the retail investment banking groups at JPMorgan, Citigroup and Dresdner Kleinwort Wasserstein.  I received a B.A. from the University of Pennsylvania and both M.B.A. and J.D. degrees from Columbia University.

5.      Founded in 1989, Solomon is a leading independent investment banking advisory firm that provides strategic and financial advisory services, including advisory services in connection with mid- to large-scale corporate restructuring transactions.  A controlling interest in Solomon is owned by Natixis, a leading French financial services firm.  Solomon currently has approximately 80 investment banking professionals.  Solomon's professionals have extensive experience in providing financial advisory and investment banking services to companies across a range of industries as well as to financially distressed companies and creditors, equity holders, and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court.

6.      Solomon's Food Retail Advisory Group provides investment banking advisory services to public and private clients across various food retail sectors, including traditional and specialty grocery stores, drug stores, club stores, convenience stores, wholesalers and restaurants.  The members of Solomon's Food Retail Advisory Group have extensive experience in the food retail sector, including working (both at Solomon and at prior firms) with clients such as Kroger, on its $800 million acquisition of Roundy's; Lucky's Market, on its sale of a meaningful equity stake to Kroger; Sprouts Farmers Market, on its merger with Henry's Farmers

3

Market (owned at the time by Apollo); Sunflower Farmers Market, on its sale to Sprouts Farmers Market; Mi Pueblo, on its sale to KKR; New Seasons, on its recently announced sale to Good Food Holdings/Emart; Fred's, on its sales of prescription assets to CVS and Walgreens; Martin's, on its sale to SpartanNash; Best Market, on its sale to Lidl; Supervalu, on its sale of Shop & Save to Schnucks; El Rancho, on its sale of growth equity to Albertsons; Central Grocers, on its sales of Strack & Van Til to Indiana Grocery Group and of its distribution of assets to Supervalu; Marsh Supermarkets, on its sales of assets to Kroger and Fresh Encounter; Southeastern Grocers, on its sale of selected prescription assets to CVS Health; Fresh & Easy, on the sale of its produce manufacturing facility to Calavo Growers; United Supermarkets on its sale to Albertson's; Haggen Food & Pharmacy, on the sales of its core business to Albertson's, its non-core stores to various retailers and its previous sale to Comvest Partners; Briar Development, on the sale of its portfolio of various Haggen real estate assets to Merlone Geier; Pro's Ranch Markets, on the sale of its California region stores to Vallarta Supermarkets; Weis Markets, on its sale of SuperPetz to Petco; Jean Coutu, on its sale of Eckerd Drug and Brooks Pharmacy to Rite Aid; Ahold, on its sale of U.S. Foodservice to KKR and CD&R and Cerberus Capital, on its original acquisition of Albertson's non-core stores.

7.    In addition, Solomon and its professionals have assisted and advised numerous financially troubled companies from a variety of industries in complex financial restructurings, both out of court and in chapter 11 cases. Solomon professionals have been retained in numerous large, complex chapter 11 cases, including, among others, *In re Payless Holdings, LLC*, Case No. 19-40883 (Bankr. E.D. Mo. Mar. 19, 2019); *In re Quicksilver, Inc.*, Case No. 15-11880 (Bankr. D. Del. Oct. 28, 2015); *In re HH Liquidation, LLC* (f/k/a *In re Haggen Holdings, LLC*), Case No. 15-11874 (KG) (Bankr. D. Del. Oct. 8, 2015); *In re The Dolan Company*, Case

4

No. 14-10614 (Bankr. D. Del. Apr. 15, 2014); *In re MES Int'l, Inc.*, Case No. 09-14109 (Bankr. D. Del. Feb. 26, 2010); *In re CD Liquidation Co., LLC*, Case No. 09-13038 (Bankr. D. Del. Sept. 15, 2009); *In re Lear Corp.*, Case No. 09-14326 (Bankr. S.D.N.Y. Aug. 25, 2009); *In re Building Materials Holding Corp.*, Case No. 09-12074 (Bankr. D. Del. July 16, 2009); *In re Eddie Bauer Holdings Inc.*, Case No. 09-12099 (Bankr. D. Del. July 7, 2009); *In re Polaroid Corp.*, Case No. 08-46617 (Bankr. D. Minn. Feb. 9, 2009); *In re Tweeter Home Entm't Grp., Inc.*, Case No. 07-10787 (Bankr. D. Del. July 13, 2007); *In re M Fabrikant & Sons, Inc.*, Case No. 06-12737 (Bankr. S.D.N.Y. May 25, 2007); *In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (Bankr. D. Del. Dec. 6, 2006); *In re Dana Corp.*, Case No. 06-10354 (Bankr. S.D.N.Y. March 9, 2006); *In re JL French Auto. Castings, Inc.*, Case No. 06-10119 (Bankr. D. Del. March 22, 2006); and *In re AI Realty Marketing of New York, Inc.*, Case No. 01-40252 (Bankr. S.D.N.Y. Sept. 11, 2002).

8.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' operations and finances, personal knowledge gleaned during the course of my engagement with the Debtors, my discussions with the Debtors' senior management or members of the Solomon team, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial affairs.  I am authorized to submit this Declaration.  If called upon to testify, I could and would testify competently to the facts set forth herein.

### Prepetition Marketing and Sale Process

9.      In May 2019, the Debtors engaged Solomon to serve as their investment banker to, among other things, market substantially all of the Debtors' assets (collectively, the "**Assets**"), including (a) fourteen (14) grocery stores, cafes, and beer, wine, and liquor stores leased and operated by the Company (collectively, the "**Fairway Stores**"); (b) an approximately 240,000

5

square foot production and distribution center (the "**PDC**") leased and operated by the Company; and (c) and the Company's related leasehold interests, inventory, prepaid expenses, intellectual property, furniture, fixtures, and equipment, and other Assets owned by the Debtors.    After exploring various possible avenues for resolving the Company's operational and financial challenges, the Debtors, in consultation with Solomon, determined that an expedient sale of Assets was necessary both to avoid a fire-sale liquidation of the Debtors' Assets, and to maximize value for the Debtors' estates and preserve as many jobs of the Debtors' employees as possible.

10.    To implement this sale strategy, the Debtors and Solomon identified a broad array of parties that were expected to have the interest and ability to consummate a transaction on terms acceptable to the Debtors.    After reviewing the Debtors' store portfolio, Solomon and the Debtors decided that value would be maximized by selling a significant number of stores to buyers who would continue to operate the Fairway Stores as grocery stores.    Solomon contacted eighty-two (82) entities, including twenty-six (26) potential strategic buyers.    The strategic buyers identified by the Debtors and Solomon included both competitors operating within the Debtors' geographic region (*i.e.*, in-market buyers) and companies operating outside of the Debtors' geographic region (*i.e.*, out-of-market buyers).    Solomon compiled a comprehensive information package, containing store-by-store information for the Debtors' entire store portfolio, which was designed to be shared with these strategic buyers upon the signing of a confidentiality agreement. Based on responses from those entities, Solomon provided forty (40) parties with a confidential information memorandum containing confidential information regarding the Company's businesses, including financial and operational performance.    Of those parties, five (5) expressed serious interest in consummating a transaction with the Company and four (4) were granted access to a data room containing additional confidential information regarding the Assets.

6

11.      During the week of November 4, 2019 Solomon reached out to selected interested parties, provided the Company's updated second quarter performance results and requested refreshed bids by November 15, 2019 (the "**Prepetition Refreshed Bid Deadline**"). Two (2) updated bids were received by the Prepetition Refreshed Bid Deadline.  All of the bidders indicated that they were not willing to assume pension liability or other collective bargaining agreement obligations and inquired as to the Company's ability to deliver assets free and clear of such obligations.

12.      During the week of November 18, 2019, Solomon contacted a selected group of sixteen (16) potential bidders to ascertain their interest in pursuing an acquisition of all or certain assets of the Company free and clear of certain liabilities.   On December 2, 2019, Solomon distributed a process letter and draft stalking horse asset purchase agreement to ten (10) interested parties and informed parties that the deadline to submit best and final bids was on December 16, 2019 (the "**Prepetition Final Bid Deadline**").   In submitting their best and final bids, parties were required to confirm their willingness to serve as a "stalking horse" under section 363 of the Bankruptcy Code.   On the Prepetition Final Bid Deadline, two (2) leading bids emerged as potential stalking horse bidders.   In evaluating the proposals, the Debtors and Solomon analyzed, among other things, (a) the amount and type of consideration offered by each potential buyer; (b) the profitability of the stores included in each proposal; (c) the leasehold value of the stores included in proposal; and (d) each proposal's assumed assets and liabilities.

13.      After extensive deliberations with its advisors and secured lenders and several rounds of negotiations with bidders, the Company elected to pursue the offer of Village Super Market, Inc. (the "**Stalking Horse Bidder**") for the sale of five (5) Fairway Stores, the PDC, and related assets (the "**Stalking Horse Bid**") and executed an asset purchase agreement (the

"**Stalking Horse Agreement**") on January 22, 2020.  The Stalking Horse Bidder is an owner and operator of supermarkets in the eastern United States.

14.      The marketing process for the Debtors' Assets has been, and is expected to remain, comprehensive and vibrant.  The Debtors are continuing their discussions with certain bidders who have expressed interest in the Assets, including the leasehold interests and all other related assets for the Stores not included in the Stalking Horse Bid.[3]  These discussions, which began prior to the commencement of these chapter 11 cases, may result in the submission of additional bids, and pursuant to the Motion and Bidding Procedures, may result in additional stalking horse bidders for Assets not covered by the Stalking Horse Bid.  In addition, during the postpetition period, Solomon has marketed and will continue to market the Assets (subject to the terms of the non-solicitation clauses contained in the Stalking Horse Agreement).

15.      Proceeding with a postpetition marketing and competitive bidding and auction process will result in the highest or best bids for the Assets.  The goal of the process is to have new or existing bidders submit offers for the Assets, whether or not such Assets are included in the Stalking Horse Bid, and to the extent appropriate and permitted by the Bidding Procedures, consider bids in combination, all in an effort to obtain the maximum value for the Assets, maximize the value of the Debtors' estates, and preserve as many jobs as possible.

## Need for an Expeditious Sale Process

16.      Ample business justifications exist to sell the Assets contained in the Stalking Horse Package (as defined herein) (and the Debtors' other Assets) pursuant to the procedures proposed in the Motion.  Due to, among other things, fierce competition in the retail

---

[3] The Stalking Horse Agreement provides that the Stalking Horse Bidder has the right to remove certain Fairway Stores from the Assets covered by the Stalking Horse Bid within an established period of time before any auction or hearing with respect to the sale to the Stalking Horse Bidder.

WEIL:\97342796\6\44444.0008

grocery store sector and the Debtors' financial constraints, their business has significantly deteriorated in the past several months. In order to preserve going concern value and the employment of several thousand employees, it is imperative that the sale process proceed expeditiously. With the Stalking Horse Bid in place, the Debtors are prepared to execute the last leg of their sale process, which will include a further postpetition marketing campaign, consistent with the terms of the Stalking Horse Agreement and the Bidding Procedures.

17.    Moreover, as a condition to providing necessary liquidity, the Debtors' DIP Lenders have established various milestones (the "**Milestones**")[4] for completing a sale of substantially all of the Debtors' Assets, such as:

| Prior to Commencement Date | Debtors shall have entered into a Stalking Horse Agreement for sale of substantial portion of Debtors' assets |
|---|---|
| No later than two (2) days after Commencement Date | Debtors shall file Motion requesting (i) order approving Bidding Procedures and authorizing Stalking Horse Bid Protections, and (ii) order approving sale of Debtors' assets to highest and best bidder for Debtors' assets, including through Stalking Horse Agreement |
| No later than twenty-five (25) days after Commencement Date | Debtors shall have obtained entry of Bidding Procedures Order |
| No later than fifty (50) days after Commencement Date | Bankruptcy Court shall have entered Sale Order approving winning bid to Stalking Horse Bid (if no Auction held); or<br><br>Debtors shall complete Auction for substantially all assets in accordance with Bidding Procedures (other than Stalking Horse Package if no other Qualified Bids received) |
| No later than fifty-five (55) days after Commencement Date | Debtors shall have consummated sale to Stalking Horse Bidder (if no Auction held) |
| No later than sixty-five (65) days after the Commencement Date | Bankruptcy Court shall have entered Sale Order(s) approving winning bid(s) resulting from Auction(s) |

---

[4] In the event of any inconsistencies between the provisions of the DIP Documents and the general description of the Milestones in this Motion, the DIP Documents shall control.

WEIL:\97342796\6\44444.0008

| No later than sixty-eight (68) days after Commencement Date | Debtors shall have consummated sale(s) of Stalking Horse Package to winning bidder(s) at Auction(s) |
|---|---|
| No Later than seventy (70) days after Commencement Date | Debtors shall have consummated sale(s) of Other Assets to winning bidder(s) at Auction(s) |

18.     Access to the DIP Facility is critical to the Debtors' ability to continue their operations and manage their bankruptcy estates through the conclusion of the sale process.  Failure to adhere to the Milestones could jeopardize the Debtors' available borrowings under the DIP Facility and, in turn, compromise the sale process and the Debtors' ability to maximize recoveries for creditors.  In light of the foregoing, I believe that the proposed timeline is both reasonable and necessary under the circumstances of these chapter 11 cases.  Moreover, I believe that in view of the exhaustive marketing process that was initialized prepetition, the proposed timeline is adequate to assure that the Assets are sold at fair value.

19.     In addition, I believe an expeditious postpetition sale timeline is appropriate and most efficient in light of the exhaustive prepetition market process.  Many of the potential buyers that I believe are most likely to make Qualified Bids on the Assets were engaged by Solomon and the Company prior to the Commencement Date in connection with the Fairway Stores, had the opportunity to make proposals prepetition, and are aware of the Company's goal of effectuating a prompt sale process.  To ensure these potential buyers are notified of the commencement of the postpetition sale process and can formulate bids based on renewed interest, the Company is sending an updated process letter to solicit bids on the Assets in connection with filing the Motion.  Moreover, I believe that new potential bidders that engage postpetition will have sufficient time to consider a transaction and develop a bid, given the thirty (30) days of notice, or more, of the Global Bid Deadline based on the filing of the Motion and service of the process letter.  If an attractive opportunity presents itself for Assets not included in the Stalking Horse

10

Package, the Bidding Procedures allow the Company flexibility, with the involvement of the Consultation Parties, to consider such opportunities that maximize the value for the Assets.

## The Proposed Sale Transaction

20.     The Stalking Horse Agreement contemplates a sale of five (5) Fairway Stores, the PDC, prepaid expenses, related inventory, furniture, fixtures, and equipment, and other assets (the "**Stalking Horse Package**"), for total consideration of (a) cash in the amount of approximately $70 million, plus the costs to cure prepetition defaults under executory contracts and unexpired leases assumed and assigned to the Stalking Horse Bidder (limited to one month of prepetition rent with respect to leases), subject to certain adjustments and prorations under the Stalking Horse Agreement, and (b) the Stalking Horse Bidder's assumption of certain liabilities under the Stalking Horse Agreement.  The Stalking Horse Agreement constitutes the best offer available for the Stalking Horse Package at this time.  Moreover, it is my opinion that subjecting the Stalking Horse Bid to the competitive bidding and auction process established by the Bidding Procedures will result in the realization of the best value for those Assets contained in the Stalking Horse Package.

## Bidding Procedures and Stalking Horse Bid Protections

21.     The Bidding Procedures and the Stalking Horse Agreement contain standard stalking horse bid protections.  In particular, the Stalking Horse Agreement provides for the payment of a break-up fee in an amount equal to three percent (3%) of the cash purchase price of the Stalking Horse Package (the "**Termination Payment**") as an administrative expense that will be included in the "Carve-Out" (as defined in the DIP Orders) in the event that the Stalking Horse Bid is not selected or the Debtors consummate one or more sale transactions for the Assets in the Stalking Horse Package with one or more other bidders.  The Bidding Procedures establish

11

bidding requirements and also provide that if the Stalking Horse Bidder bids on the Stalking Horse

Package at the auction and ultimately is selected as the successful bidder for the Stalking Horse

Package, the Stalking Horse Bidder will be entitled to a credit in the amount of its Termination

Payment against the increased purchase price for the Stalking Horse Package.

22.    The Stalking Horse Bidder was unwilling to hold open its offer without

assurance of payment of the Termination Payment under the conditions set forth in the Stalking

Horse Agreement and the Bidding Procedures.    The Termination Payment promotes more

competitive bidding for the Assets in the Stalking Horse Package by inducing the Stalking Horse

Bidder to hold its offer open as a minimum bid on which other bidders and the Debtors can rely.

In so doing, the Stalking Horse Bidder has helped lay the foundation for the final phase of the

Debtors' sale process.    The Stalking Horse Bid will serve as a catalyst for other bids.    Executing

the Stalking Horse Agreement has put the Debtors in a comfortable position to solicit competing

bids that may be materially higher or of otherwise better than the Stalking Horse Bid.    The Stalking

Horse Bid provides assurance that the price at which the Assets in the Stalking Horse Package are

sold will reflect their true worth.    Accordingly, I believe that the Debtors' decision to offer the

Termination Payment is (a) commensurate to the real and substantial benefits conferred upon the

Debtors' estates by the Stalking Horse Bidder; and (b) fair, reasonable, and appropriate in light of

the size and nature of the proposed sale and the efforts that have been and will be expended by the

Stalking Horse Bidder.

23.    The Bidding Procedures were heavily negotiated between the Stalking

Horse Bidder, the Debtors, and the Ad Hoc Group and DIP Lenders.    They are designed to facilitate

the most robust and competitive bidding process possible under the circumstances.    The Bidding

Procedures provide an appropriate framework for the Debtors to review, analyze, and compare all

bids received to determine which bids are in the best interests of the Debtors' estates and their economic stakeholders. Sale transactions governed by the Bidding Procedures will serve the important objectives of obtaining not only a fair and reasonable purchase price for the Assets, but also the highest or best value for the Assets, which will inure to the benefit of all parties in interest in these chapter 11 cases.

24.     Some purchasers may only be interested in purchasing Assets not included in the Stalking Horse Bid. Accordingly, the Bidding Procedures specifically allow those parties to submit bids for Assets not included in the Stalking Horse Package. They also permit, but do not require, the Debtors to conduct separate auctions for such Assets. These procedures were designed with the goal of encouraging the sale of as much of the Assets on a going concern basis as possible while providing the Debtors maximum flexibility in deciding whether to execute such sales, based on the Debtors' reasonable business judgment. It is my opinion that the Bidding Procedures will, in fact, accomplish this goal.

25.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 23, 2020 in New York, New York.

/s/ Scott Moses_____