WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Attorneys for Debtors and*
*Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                                            :
In re                                                       :    **Chapter 11**
                                                            :
**FAIRWAY GROUP HOLDINGS CORP.**, *et al.*,    :    **Case No. 20-10161 (JLG)**
                                                            :
                   **Debtors.**[1]                          :    **(Jointly Administered)**
                                                            :    **(ECF No. 449)**
------------------------------------------------------------X

**NOTICE OF FILING OF (I) AMENDMENT TO ASSET
PURCHASE AGREEMENT BETWEEN DEBTORS AND VILLAGE
SUPER MARKET, INC. AND (II) SUPPLY AGREEMENT BETWEEN
<u>FAIRWAY GROUP HOLDINGS CORP. AND VSM NY DISTRIBUTION LLC</u>**

**PLEASE TAKE NOTICE THAT:**

        1.      On April 20, 2020, the United States Bankruptcy Court for the Southern District of
New York entered the *Order (I) Approving Asset Purchase Agreement Among the Debtors and
Village Super Market, Inc.; (II) Authorizing Sale of Certain of the Debtors' Assets Free and Clear
of Liens, Claims, Interests, and Encumbrances; (III) Authorizing Assumption and Assignment of
Certain Executory Contracts and Leases in Connection Therewith; and (IV) Granting Related
Relief* (ECF No. 449) (the "**Village Sale Order**"), which annexed as an exhibit a copy of the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are as follows: Fairway Group Holdings Corp. (2788); Fairway Group Acquisition Company (2860); Fairway
Bakery LLC (4129); Fairway Broadway LLC (8591); Fairway Chelsea LLC (0288); Fairway Construction Group,
LLC (2741); Fairway Douglaston LLC (2650); Fairway East 86th Street LLC (3822); Fairway eCommerce LLC
(3081); Fairway Georgetowne LLC (9609); Fairway Greenwich Street LLC (6422); Fairway Group Central Services
LLC (7843); Fairway Group Plainview LLC (8643); Fairway Hudson Yards LLC (9331); Fairway Kips Bay LLC
(0791); FN Store LLC (9240); Fairway Paramus LLC (3338); Fairway Pelham LLC (3119); Fairway Pelham Wines
& Spirits LLC (3141); Fairway Red Hook LLC (8813); Fairway Stamford LLC (0738); Fairway Stamford Wines &
Spirits LLC (3021); Fairway Staten Island LLC (1732); Fairway Uptown LLC (8719); Fairway Westbury LLC (6240);
and Fairway Woodland Park LLC (9544). The location of the Debtors' corporate headquarters is 2284 12th Avenue,
New York, New York 10027. Fairway Community Foundation Inc., a charitable organization, owned by Fairway
Group Holdings Corp., is not a debtor in these proceedings.

executed asset purchase agreement between Fairway Group Holdings Corp. and certain of its debtor affiliates in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), as Sellers, and Village Super Market, Inc. ("**Village**"), as Buyer, dated March 25, 2020 (as amended, the "**Village Purchase Agreement**").[2]

2.    In accordance with Paragraph 39 of the Village Sale Order, the Debtors and Village have agreed to certain non-material modifications to the Village Purchase Agreement, reflected in an amendment to the Village Purchase Agreement, an executed version of which is annexed hereto as <u>**Exhibit A**</u>, dated as of May 6, 2020 (the "**Village Purchase Agreement Amendment**").

3.    In accordance with Section 5.10 of the Village Purchase Agreement (as amended by Section 2.7 of the Village Purchase Agreement Amendment), on May 6, 2020, Fairway Group Holdings Corp. and VSM NY Distribution LLC ("**VSM**"), an affiliate of Village, entered into an agreement, substantially in the form annexed hereto as <u>**Exhibit B**</u>, pursuant to which VSM will supply products for certain of the Debtors' stores not included in the sale to Village under the Village Purchase Agreement.

4.    On the date hereof, the initial Closing of the Village Sale Transaction occurred, pursuant to which the PDC, the Chelsea Store, and the Harlem Parking Lot were transferred to Village.  The Debtors intend to continue consummating the Closings of the remaining Stores in accordance with the terms of the Village Purchase Agreement and anticipate that all of the Closings will have occurred by May 15, 2020.


Dated:  May 6, 2020
    New York, New York

/s/ Sunny Singh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Attorneys for Debtors and*
*Debtors in Possession*

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Village Sale Order or the Village Purchase Agreement, as applicable.

WEIL:\97421081\9\44444.0009

## __Exhibit A__

**Village Purchase Agreement Amendment**

WEIL:\97421081\9\44444.0009

## AMENDMENT TO ASSET PURCHASE AGREEMENT

This Amendment (this "Amendment") dated as of May 6, 2020, amends that certain Asset Purchase Agreement (the "Agreement"), dated as of March 25, 2020 by and among Fairway Group Holdings Corp., a Delaware corporation, (the "Company"), and the direct or indirect wholly-owned Subsidiaries of the Company set forth on Schedule A thereto (together with the Company, "Sellers"), and Village Super Market, Inc., a New Jersey corporation ("Village"), which Agreement was partially assigned to VSM NY Holdings LLC, a New York limited liability company ("Village Holdings"), pursuant to that certain Assignment and Assumption Agreement, dated as of April 7, 2020, by and between Village and Village Holdings, and that certain Assignment and Assumption Agreement, dated as of April 16, 2020, by and between Village Holdings and VSM NY Distribution LLC, a New York limited liability company ("Village Distribution", and together with Village Holdings, the "Buyer"). Each of Buyer and each Seller is referred to herein as a "Party" and, collectively, as the "Parties".

WITNESSETH

WHEREAS, the Parties desire to amend the Agreement pursuant to Section 9.7 thereof on the terms set forth below.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Definitions.  Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Agreement.

## ARTICLE II
## AMENDMENTS

Section 2.1    Definitions. Section 1.1 of the Agreement is hereby amended by adding the following definitions:

(a)    "Closing Schedule" has the meaning set forth in Section 2.4(b).

(b)    "Initial Closing" has the meaning set forth in Section 2.4(a).

Section 2.2    Consideration; Deposit; Escrow Amount. Section 2.3(b) of the Agreement is hereby deleted and replaced in its entirety by the following:

(a)    "(b) As of May 6, 2020, Buyer has deposited $7,600,000 with the Escrow Agent (the "Escrow Amount"), to be released by the Escrow Agent and delivered to either Buyer or Sellers, in accordance with the provisions of the Escrow Agreement. Upon the execution of the Amendment to this Agreement, pursuant to the terms of the Escrow Agreement, Buyer shall, within one (1) Business Day following the date of the Amendment, deposit with the Escrow Agent

an additional three million dollars ($3,000,000) by wire transfer of immediately available funds, and such additional deposit, with the previously deposited amount, shall be the Escrow Amount. Pursuant to the Escrow Agreement, the Escrow Amount (together with all accrued investment income thereon, if any) shall be distributed as follows:

      (i)     at the later of the Closings of the 86th Street Store or the Kips Bay Store, that portion of the Escrow Amount in excess of the Purchase Price allocated to the Pelham Store and the Pelham Inventory, Cash and Prepaid Amount, in each case as set forth in Section 2.3(a) (the "Pelham Purchase Price"), shall be paid to Sellers and applied towards the Purchase Price payable by Buyer to Sellers under Section 2.3(a) as indicated on the Closing Schedule. At the final Closing of the Acquired Assets, so much balance of the Escrow Amount as necessary to pay the Pelham Purchase Price shall be delivered to Sellers, and the balance of the Escrow Amount shall be delivered to Buyer together with all accrued investment income thereon, if any;

      (ii)    if this Agreement is terminated by Sellers pursuant to Section 8.1(d) (subject to Buyer's right to contest the validity of Seller's termination) the Escrow Amount, together with all accrued investment income thereon, if any, shall be delivered to Sellers; and

      (iii)   if this Agreement is terminated for any reason other than by any Seller pursuant to Section 8.1(d), the Escrow Amount, together with all accrued investment income thereon, shall in each case be returned to Buyer."

     Section 2.3   Closing. Section 2.4 of the Agreement is hereby deleted and replaced in its entirety by the following:

      (a)    "(a) The closings of the transactions contemplated by this Agreement (each, a "Closing") shall occur electronically (via electronic mail and/or facsimile) for each Store and the PDC on the date set forth on the Closing Schedule unless otherwise agreed by Buyer and Sellers (each, a "Closing Date") subject to the satisfaction or waiver of each of the applicable conditions set forth in Article VII (other than those conditions that by their nature are to be satisfied at the applicable Closing, but subject to the satisfaction or waiver of those conditions). Each reference to the Closing in the Agreement shall mean the applicable Closing unless otherwise specified in this Agreement. For purposes of this Agreement and the transactions contemplated hereby, the applicable Closing will be deemed to occur and be effective, and title to and risk of loss associated with the Acquired Assets, shall be deemed to occur at 12:01 am, New York City time, on the applicable Closing Date.

      (b)    A Closing schedule for the Stores and the PDC, which includes the date and target time of each Closing, the Store(s) to be purchased at each Closing and the Inventory Taker for such Store or the PDC (such Closing schedule, as amended from time to time in accordance with this Section 2.4(b), the "Closing Schedule") is attached hereto as Exhibit F. If the Inventory Count has not been reconciled and the Purchase Price for such Store's or the PDC's Inventory has not been agreed between Buyer and Seller as of the Closing for a Store or the PDC which is scheduled to close on the same date that an Inventory Count has been completed, Buyer shall pay the amount for such Store's or the PDC's Inventory set forth in Section 2.3(a) of this Agreement

2

and the Closing on such Store or the PDC will occur in accordance with Exhibit F. The Parties shall reconcile the Inventory Purchase Price after Closing on such Store or the PDC prior to the next Closing, and any adjustments required as a result of such reconciliation shall be made at the time of calculation of the Purchase Price at the next Closing. For the avoidance of doubt, such reconciliation shall not in any way delay the applicable Closings. If any Inventory Count has not been reconciled by the final Closing, the Parties shall deposit the amount in dispute with the Escrow Agent to be released to the appropriate Party at the conclusion of the Inventory reconciliation. If the Parties have not reconciled all the Inventory Counts and agreed on a purchase price of the disputed Inventory within fifteen (15) days after the final Closing, they will appoint a mutually agreed third party to determine the purchase price of such Inventory, whose decision shall be binding.

Section 2.4    Closing Payments and Deliveries. Section 2.5 of the Agreement is hereby deleted and replaced in its entirety by the following:

(a)    "(a) At the Initial Closing, Sellers will deliver or cause to be delivered to Buyer the following:

(i)    a duly executed Bill of Sale substantially in the form of Exhibit B (the "Bill of Sale") for the Acquired Assets to be acquired and Assumed Liabilities to be assumed at the Initial Closing;

(ii)    a duly executed Assignment and Assumption Agreement substantially in the form of Exhibit C (the "Assignment and Assumption Agreement") for the Acquired Assets to be acquired and Assumed Liabilities to be assumed at the Initial Closing;

(iii)    a duly executed Assignment and Assumption of Lease for each of the Assumed Leases to be assigned and assumed at the Initial Closing, substantially in the form of Exhibit D (each a "Lease Assignment and Assumption Agreement" and collectively, the "Lease Assignment and Assumption Agreements");

(iv)    an executed certificate of non-foreign status from each Seller in compliance with Treasury Regulations Section 1.1445-2;

(v)    a duly executed certificate from an officer of each Seller to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) with respect to the Acquired Assets to be acquired and Assumed Liabilities to be assumed at the Initial Closing is satisfied;

(vi)    a duly executed license substantially in the form attached hereto as Exhibit G;

(vii)    a duly executed product supply agreement substantially in the form attached hereto as Exhibit H; and

3

(viii)    all keys, passwords and codes necessary to access the Store(s) and PDC to be acquired at the Initial Closing, each of which shall be delivered in person at the applicable Store subject to the Initial Closing.

(b)    At the Initial Closing, Buyer will deliver or cause to be delivered to Sellers the following:

(i)    the Purchase Price for the Acquired Assets to be acquired at the Initial Closing, by wire transfer of immediately available funds, to an account or accounts as directed by Sellers;

(ii)    the Bill of Sale duly executed by Buyer for the Acquired Assets to be acquired and Assumed Liabilities to be assumed at the Initial Closing;

(iii)    the Assignment and Assumption Agreement duly executed by Buyer for the Acquired Assets to be acquired and Assumed Liabilities to be assumed at the Initial Closing;

(iv)    the Lease Assignment and Assumption Agreements duly executed by Buyer for each of the Assumed Leases to be assigned and assumed at the Initial Closing; and

(v)    a duly executed license substantially in the form attached hereto as Exhibit G;

(vi)    a duly executed product supply agreement substantially in the form attached hereto as Exhibit H; and

(vii)    a duly executed certificate from an officer of Buyer to the effect that each of the conditions specified in Section 7.3(a) and Section 7.3(b) with respect to the Acquired Assets to be acquired and Assumed Liabilities to be assumed at the Initial Closing is satisfied.

(c)    At the occurrence of each Closing from and after the Initial Closing, Sellers will deliver or cause to be delivered to Buyer the following:

(i)    a duly executed Bill of Sale for the Acquired Assets to be acquired and Assumed Liabilities to be assumed at such Closing;

(ii)    a duly executed Assignment and Assumption Agreement for the Acquired Assets to be acquired and Assumed Liabilities to be assumed at such Closing;

(iii)    a duly executed Lease Assignment and Assumption Agreement for each of the Assumed Leases to be assigned and assumed at such Closing;

(iv)    a duly executed certificate from an officer of each Seller to the effect that each of the conditions specified in Section 7.4(a) and Section 7.4(b) with respect to

4

the Acquired Assets to be acquired and Assumed Liabilities to be assumed at such Closing is satisfied; and

(v)    all keys, passwords and codes necessary to access the Stores to be acquired at such Closing, each of which shall be delivered in person at the applicable Store subject to such Closing.

(d)    At the occurrence of each Closing from and after the Initial Closing, Buyer will deliver or cause to be delivered to Sellers the following:

(i)    the Purchase Price for the Acquired Assets to be acquired at such Closing by wire transfer of immediately available funds, to an account or accounts as directed by Sellers;

(ii)    the Bill of Sale duly executed by Buyer for the Acquired Assets to be acquired and Assumed Liabilities to be assumed at such Closing;

(iii)    the Assignment and Assumption Agreement duly executed by Buyer for the Acquired Assets to be acquired and Assumed Liabilities to be assumed at such Closing;

(iv)    the Lease Assignment and Assumption Agreements duly executed by Buyer for each of the Assumed Leases to be assigned and assumed at such Closing; and

(v)    a duly executed certificate from an officer of Buyer to the effect that each of the conditions specified in Section 7.5(a) and Section 7.5(b) with respect to the Acquired Assets to be acquired and Assumed Liabilities to be assumed at such Closing is satisfied is satisfied.

(e)    At the occurrence of the Closing of the 86th Street Store, Sellers will deliver or cause to be delivered to Buyer the following (and, for the avoidance of doubt, so long as the Closings with respect to the Stores other than the Pelham Store have been consummated):

(i)    a duly executed IP Assignment and Assumption Agreement substantially in the form of Exhibit E (the "IP Assignment and Assumption Agreement").

(f)    At the occurrence of the Closing of the 86th Street Store, Buyer will deliver or cause to be delivered to Sellers the following (and, for the avoidance of doubt, so long as the Closings with respect to the Stores other than the Pelham Store have been consummated):

(i)    the IP Assignment and Assumption Agreement duly executed by Buyer."

Section 2.5    Inventory.

(a)    Section 2.6(a) of the Agreement is hereby deleted and replaced in its entirety by the following:

5

(i)      "(a) A physical count of the Inventory, and calculation of the value thereof, at each of the Stores and the PDC (the "Inventory Count") shall be made by the inventory taker set forth in the Closing Schedule (the "Inventory Taker") on the applicable dates set forth on the Closing Schedule, or on such other date(s) as the Parties may mutually agree (the date of such physical count being an "Inventory Date").  The Inventory Taker shall conduct the physical count of the Inventory in accordance with instructions set forth in Section 2.6 of the Disclosure Schedule and otherwise in accordance with the terms and conditions of this Section 2.6 and the usual and customary practices of the industry (and when the Inventory Taker is not one of the Parties, according to the Inventory Taker's established inventory policies and procedures, copies of which shall be furnished to Buyer and Sellers prior to the Inventory Date; and when the Inventory Taker is one of the Parties, according to policies and procedures agreed between Buyer and Sellers). Each of Seller and Buyer shall make available the appropriate personnel at each Inventory Count."

(b)      The first sentence of Section 2.6(b) is hereby deleted and replaced in its entirety by the following:

(i)      "(b) The fees and expenses of the Inventory Taker that is a third party shall be borne fifty percent (50%) by Buyer and fifty percent (50%) by Sellers."

(c)      The last sentence of Section 2.6(c) is hereby deleted in its entirety and replaced in its entirety by the following:

(i)      "In the case where the Inventory Taker is one of the Parties, neither Party's determination of the value of the Inventory shall be entitled to greater weight than the other Party's.  If the Parties cannot agree on the value of such Inventory, the dispute shall be submitted to a qualified and mutually agreed independent third party to resolve such dispute."

(d)      Section 2.6(d) of the Agreement is hereby deleted and replaced in its entirety by the following:

(i)      "(d) The Inventory Count shall (i) be summarized for each Store and the PDC using an inventory certificate to be provided by the Inventory Taker, which must be executed by a Representative of Buyer and a Representative of Sellers prior to either such Representative leaving the applicable Store and the PDC, (ii) show the total cost of the Inventory for each Store and the PDC determined in the manner provided in Section 2.6(b) of the Disclosure Schedule, and (iii) note any unresolved disputes with respect to cost of the Inventory."

(e)      Section 2.6(g) of the Agreement is hereby deleted and replaced in its entirety by the following:

(i)      "(g) If a Store is closed for business in order to conduct the Inventory Count, such Store shall be reopened as promptly as practicable following the completion of the Inventory Count and operated by Sellers until Closing on such Store. Stores at which the Inventory Count is conducted outside of normal business hours shall be opened for

6

business the following day at the regular time so long as such Inventory Count has been completed by such time. Commencing on completion of the Inventory Count at each Store or the PDC, all receipts from Inventory sold shall become property of Buyer (the "Interim Cash"). Except as required by applicable Law, after completion of the Inventory Count for each Store or the PDC, Sellers shall grant Buyer access to the Stores and the PDC to begin provisioning the Stores and the PDC with Buyer's goods, all of which shall remain the property of Buyer until the Closing. If the Closing does not occur for any reason, Buyer shall be entitled to remove its goods from the Stores and the PDC and the Interim Cash shall be paid to Sellers."

(f)     Section 2.6 of the Agreement is hereby amended by adding the following Section 2.6(i)

(i)     "(i) Sellers shall use commercially reasonable efforts to continue to use Sellers' regular ordering practice and to produce orders and accept regularly scheduled deliveries of Inventory to the Stores, including any deliveries scheduled for the Inventory Date and the Closing Date for a particular Store, in each case, taking into account any limitations arising due to COVID-19; provided, however, that with respect to any Inventory orders placed prior to, but not yet delivered to a Store or the PDC by the Closing Date for such Store or the PDC, Buyer shall pay Seller the cost of the Inventory set forth in the invoice for such Inventory order at the applicable Closing, and any adjustments to such payment arising from nonconforming goods or under delivery shall be reconciled at the next Closing; provided that there shall be no such adjustment unless Buyer has delivered to Seller evidence of any such nonconforming goods or under delivery of the type customarily permitting Seller to reduce the amount otherwise owing to the vendor (with such evidence being in a form that can be submitted to the vendor for purposes of effecting the reduction of such amount due). Sellers shall provide Buyer with copies of all orders for Inventory for delivery to the Stores or the PDC issued from and after May 4, 2020 at the time Seller requests payment for such an invoice. The Inventory delivered to a Store on the Inventory Date for such Store shall (A) be segregated from other Store Inventory which is being included in the Inventory Count, (B) not be packed out, and (C) not be counted in the Inventory Count; provided that, if the Inventory Count has been taken for a particular section of the Store, the Inventory which has been segregated from other Store Inventory and not packed out may then be packed out in such sections of the Store where the Inventory Count has been completed. Any shipments of Inventory to Sellers received at a Store or the PDC which is not included in the Inventory Count at such Store or the PDC shall be transferred to Buyer at Closing and Sellers shall be paid the cost of such goods set forth in the invoice for such shipment."

Section 2.6     Pre-Closing Covenants. The preamble to Section 5.1 of the Agreement is hereby deleted and replaced in its entirety by the following:

(a)     "The Parties agree as follows with respect to the period between the execution of this Agreement and the applicable Closing (except as otherwise expressly stated to apply to a different period, and solely with respect to the Acquired Assets not sold and Assumed Liabilities not assumed pursuant to prior Closings):"

7

Section 2.7    <u>Supply Agreement</u>. Section 5.10 of the Agreement is hereby deleted in its entirety and replaced by the following:

(a)    "<u>Supply Agreement</u>. On or prior to the PDC Closing Date, Buyer and Seller(s) shall enter into a product supply agreement substantially in the form set forth on Exhibit H, effective as of the Closing Date for the PDC. Unpaid amounts under such supply agreement shall constitute Buyer's Damages, which are included in the Buyer's Carve Out."

Section 2.8    <u>Seller Marks</u>.  Section 6.8 of the Agreement is hereby amended to add the following:

(a)    "From and after the Initial Closing, Seller hereby grants to Buyer and its Affiliates a limited, non-exclusive, non-transferable, non-sublicensable right to use the Seller Marks with respect to any supermarket location or the PDC which is an Acquired Asset for which Buyer has consummated the transaction in accordance with the terms of the Agreement, until the Seller Marks are transferred and assigned to Buyer or its Affiliates in accordance with the terms of the Agreement. If this Agreement is terminated prior to such transfer and assignment, such right to use the Seller Marks will terminate and be of no further force and effect ninety (90) days following such termination of this Agreement. Buyer and its Affiliates may use the Seller Marks only in substantially the same manner as Sellers used the Seller Marks before the Closing.  Until Closing on the Seller Marks, Buyer and its Affiliates may use the Seller Marks only strictly in accordance with this Section 6.8."

Section 2.9    <u>Code Violations</u>. A new Section 6.9 of the Agreement is hereby added as follows:

(a)    "<u>Code Violations</u>. Following the applicable Closings, Sellers shall resolve any outstanding code or municipal violations on record prior to the applicable Closings issued by any federal, state, or local government agencies or entities with respect to any of the Assumed Leases, and in connection therewith, attend any hearings or proceedings with respect thereto. In connection with the foregoing, Buyer shall reasonably cooperate with Sellers in order to close any such violations with the applicable agency or entity. To the extent there are any amounts due and outstanding with respect to such violations at the applicable Closings, Seller shall be responsible for any such amounts after the Closing. Seller's obligations with respect to such code violations shall not be released or discharged by any chapter 11 plan proposed by the Debtors."

Section 2.10    <u>Conditions to Obligation to Close</u>. Article VII of the Agreement is hereby deleted and replaced in its entirety by the following:

(a)    "

## ARTICLE VII
## CONDITIONS TO OBLIGATION TO CLOSE

Section 7.1    <u>Conditions to Each Party's Obligations</u>.  The respective obligation of each Party to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

8

(a)      prior to the Initial Closing, all applicable waiting periods under any Antitrust Law shall have expired or otherwise been terminated;

(b)      no material Decree shall be in effect that prohibits the consummation of the transactions contemplated by this Agreement; and

(c)      the Bankruptcy Court shall have entered (i) the Sale Order and (ii) any Related Order (if any), and no order staying, reversing, modifying, or materially amending such orders shall be in effect on the Closing Date.

Section 7.2    <u>Conditions to Buyer's Obligations to Effect the Initial Closing</u>.  Buyer's obligation to consummate the transactions contemplated hereby in connection with the Initial Closing is subject to satisfaction or waiver of the following conditions:

(a)      the representations and warranties set forth in <u>Article III</u> shall have been true and correct on the date hereof and as of the Initial Closing in all material respects (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date);

(b)      Sellers shall have performed and complied with its covenants and agreements hereunder through the Initial Closing in all material respects;

(c)      each delivery contemplated by <u>Section 2.5(a)</u> to be delivered to Buyer shall have been delivered; and

(d)      the Buyer's Carve Out remains in force and effect, and the Sale Order has been entered no later than April 20, 2020.

Section 7.3    <u>Conditions to Sellers' Obligations to Effect the Initial Closing</u>.  Sellers' obligations to consummate the transactions contemplated hereby in connection with the Initial Closing are subject to satisfaction or waiver of the following conditions:

(a)      the representations and warranties set forth in <u>Article IV</u> shall have been true and correct in all material respects (except that any representation or warranty that is qualified by materiality shall have been true and correct in all respects) on the date hereof and as of the Initial Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date);

(b)      Buyer shall have performed and complied with its covenants and agreements hereunder through the Initial Closing in all material respects; and

(c)      each payment contemplated by <u>Section 2.5(b)</u> to be made to Sellers shall have been made, and each delivery contemplated by <u>Section 2.5(b)</u> to be delivered to Sellers shall have been delivered.

Section 7.4    <u>Conditions to Buyer's Obligations to Effect each Subsequent Closing</u>.

9

Buyer's obligation to consummate the transactions contemplated hereby in connection with each Closing following the Initial Closing is subject to satisfaction or waiver of the following conditions:

(a)     the representations and warranties set forth in <u>Article III</u> with respect to the applicable Acquired Assets and Assumed Liabilities shall have been true and correct on the date hereof and as of the applicable Closing in all material respects (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date);

(b)     Sellers shall have performed and complied with its covenants and agreements hereunder through the applicable Closing in all material respects;

(c)     each delivery contemplated by <u>Section 2.5(c)</u> to be delivered to Buyer shall have been delivered; and

(d)     the Buyer's Carve Out remains in force and effect, and the Sale Order has been entered no later than April 20, 2020.

Section 7.5     <u>Conditions to Sellers' Obligations to Effect the Initial Closing</u>.  Sellers' obligations to consummate the transactions contemplated hereby in connection with each Closing following the Initial Closing are subject to satisfaction or waiver of the following conditions:

(a)     the representations and warranties set forth in <u>Article IV</u> shall have been true and correct in all material respects (except that any representation or warranty that is qualified by materiality shall have been true and correct in all respects) on the date hereof and as of the applicable Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date);

(b)     Buyer shall have performed and complied with its covenants and agreements hereunder through the applicable Closing in all material respects; and

(c)     each payment contemplated by <u>Section 2.5(d)</u> to be made to Sellers shall have been made, and each delivery contemplated by <u>Section 2.5(d)</u> to be delivered to Sellers shall have been delivered.

Section 7.6     <u>No Frustration of Closing Conditions</u>.  Neither Buyer nor Sellers may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in <u>Section 7.2</u>, <u>Section 7.3</u>, <u>Section 7.4</u> or <u>Section 7.5</u> as the case may be, to be satisfied if such failure was caused by such Party's or its Affiliates' failure to use its reasonable best efforts (or best efforts, with respect to those matters contemplated by <u>Section 5.3</u>) to satisfy the conditions to the consummation of the transactions contemplated hereby or by any other breach of a representation, warranty, or covenant hereunder."

Section 2.11     <u>Termination</u>. Section 8.1 the Agreement is hereby deleted and replaced in its entirety by the following:

10

(a)      "Termination of Agreement. The Parties may terminate this Agreement at any time prior to the Initial Closing (or, if set forth below, prior to any subsequent Closings not yet occurred) as provided below:

(a)      by the mutual written consent of the Parties;

(b)      by any Party by giving written notice to the other Parties if:

(i)      any court of competent jurisdiction or other competent Governmental Authority shall have enacted or issued a Law or Decree or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such Law or Decree or other action shall have become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 8.1(b)(i) shall not be available to Buyer if the failure to consummate the Initial Closing because of such action by a Governmental Authority shall be due to the failure of Buyer to have fulfilled any of its obligations under this Agreement; or

(ii)      the final Closing shall not have occurred prior to May 20, 2020 (the "Outside Date"); provided, however, that if the Closing shall not have occurred on or before the Outside Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyer or Sellers, then the breaching Party may not terminate this Agreement pursuant to this Section 8.1(b)(ii). To the extent written notice of termination is provided subsequent to the Initial Closing or any other Closing, such termination shall only apply to the Acquired Assets not sold and Assumed Liabilities not assumed pursuant to prior Closings.

(c)      with respect to the Initial Closing, by Buyer by giving written notice to each Seller (x) if there has been a breach by any Seller of any representation, warranty, covenant or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Buyer at the Initial Closing set forth in Section 7.2(a) and Section 7.2(b), and such breach has not been waived by Buyer, or, if such breach is curable, cured by such Seller prior to the earlier to occur of (i) ten (10) days after receipt of Buyer's notice of intent to terminate and (ii) the Outside Date, or (y) upon the occurrence of the termination events described in Section 2.10(b);

(d)      with respect to the Initial Closing, by any Seller by giving written notice to Buyer and the other Sellers if there has been a breach by Buyer of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Sellers at the Initial Closing set forth in Section 7.3(a) and Section 7.3(b), and such breach has not been waived by such Seller, or, if such breach is curable, cured by Buyer prior to the earlier to occur of (i) ten (10) days after receipt of such Seller's notice of intent to terminate and (ii) the Outside Date;

(e)      by Sellers or Buyer, if (i) (x) Sellers enter into a definitive agreement with respect to a Competing Bid, (y) the Bankruptcy Court enters an order approving a Competing Bid and (z) the Person making the Competing Bid consummates the Competing Bid, or (ii) the Bankruptcy Court enters an order that precludes the consummation of the transactions

11

contemplated hereby on the terms and conditions set forth in this Agreement, subject to Buyer's right to payment of the Termination Payment, if applicable, in accordance with the provisions of Section 5.4(a);

(f)       with respect to each Closing following the Initial Closing, by Buyer by giving written notice to each Seller (x) if there has been a breach by any Seller of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Buyer at such Closing set forth in Section 7.4(a) and Section 7.4(b) and such breach has not been waived by Buyer, or, if such breach is curable, cured by such Seller prior to the earlier to occur of (i) ten (10) days after receipt of Buyer's notice of intent to terminate and (ii) the Outside Date, or (y) upon the occurrence of the termination events described in Section 2.10(b); or

(g)       with respect to each Closing following the Initial Closing, by any Seller by giving written notice to Buyer and the other Sellers if there has been a breach by Buyer of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Sellers at such Closing set forth in Section 7.5(a) and Section 7.5(b), and such breach has not been waived by such Seller, or, if such breach is curable, cured by Buyer prior to the earlier to occur of (i) ten (10) days after receipt of such Seller's notice of intent to terminate and (ii) the Outside Date."

Section 2.12   Survival. Section 9.1 the Agreement is hereby deleted and replaced in its entirety by the following:

(a)       "Survival. Except for any covenant that by its terms is to be performed (in whole or in part) by any Party following the applicable Closing (including any covenants to be performed in connection with any subsequent Closing), none of the representations, warranties, or covenants of any Party set forth in this Agreement or in any certificate delivered pursuant to Section 2.5(a), Section 2.5(b), Section 2.5(c) or Section 2.5(d) shall survive, and each of the same shall terminate and be of no further force or effect as of, the applicable Closing."

## ARTICLE III
## MISCELLANEOUS

Section 3.1       Except as expressly amended by Article II of this Amendment, all terms and conditions of the Agreement remain in full force and effect.

Section 3.2       The section headings contained in this Amendment are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Amendment.

Section 3.3       This Amendment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Amendment or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

Section 3.4    This Amendment, together with any documents, instruments and certificates explicitly entered referred to herein constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

Section 3.5    The Exhibits to this Amendment are incorporated herein by reference and made a part hereof.

Section 3.6    This Amendment shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the state of New York without regard to the conflict of laws rules or principles thereof (or any other jurisdiction) to the extent that such laws, rules or principles would direct a matter to another jurisdiction, except as otherwise required under the laws of the state of New York.

Section 3.7    The Parties have participated jointly in the negotiation and drafting of this Amendment.    In the event an ambiguity or question of intent or interpretation arises, this Amendment shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Amendment.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, the Parties have executed this Amendment as of the date first written above.

SELLERS:

**FAIRWAY GROUP HOLDINGS CORP.**

By: _Nathalie Aug_____
Name: Nathalie Augustin
Title:  Senior Vice President, General Counsel,
       & Secretary

**FAIRWAY GROUP ACQUISITION CO.**

By: _Nathalie Aug_____
Name: Nathalie Augustin
Title:  Senior Vice President, General Counsel,
       & Secretary

**FAIRWAY BROADWAY LLC**

By: _Nathalie Aug_____
Name: Nathalie Augustin
Title:  Senior Vice President, General Counsel,
       & Secretary

**FAIRWAY EAST 86TH STREET LLC**

By: _Nathalie Aug_____
Name: Nathalie Augustin
Title:  Senior Vice President, General Counsel,
       & Secretary

[Signature Page to Amendment to Asset Purchase Agreement]

**FAIRWAY BAKERY LLC**

By: _____
Name: Nathalie Augustin
Title: Senior Vice President, General Counsel,
        & Secretary

**FAIRWAY CHELSEA LLC**

By: _____
Name: Nathalie Augustin
Title: Senior Vice President, General Counsel,
        & Secretary

**FAIRWAY UPTOWN LLC**

By: _____
Name: Nathalie Augustin
Title: Senior Vice President, General Counsel,
        & Secretary

**FAIRWAY KIPS BAY LLC**

By: _____
Name: Nathalie Augustin
Title: Senior Vice President, General Counsel,
        & Secretary

**FAIRWAY PELHAM LLC**

By: _____
Name: Nathalie Augustin
Title: Senior Vice President, General Counsel,
        & Secretary

[Signature Page to Amendment to Asset Purchase Agreement]

**FAIRWAY PELHAM WINES & SPIRITS
LLC**

By: _Nathalie Aug_____
Name:  Nathalie Augustin
Title:   Senior Vice President, General Counsel,
         & Secretary


**FAIRWAY GROUP CENTRAL SERVICES
LLC**

By: _Nathalie Aug_____
Name:  Nathalie Augustin
Title:   Senior Vice President, General Counsel,
         & Secretary

[Signature Page to Amendment to Asset Purchase Agreement]

BUYER:

**VSM NY HOLDINGS LLC**

**By: Village Super Market, Inc., its sole member**

By:
Name: John Van Orden
Title:  Chief Financial Officer

**VSM NY DISTRIBUTION LLC**

**By: Village Super Market, Inc., its sole member**

By:
Name:  John Van Orden
Title:    Chief Financial Officer

[Signature Page to Amendment to Asset Purchase Agreement]

**<u>Exhibit B</u>**

**Form of Supply Agreement**

**Execution Version**

## SUPPLY AGREEMENT

This Supply Agreement (hereafter, the "Agreement") is made as of the 6th day of May, 2020 (the "Effective Date"), between VSM NY Distribution LLC, a New York limited liability company, with offices at 733 Mountain Avenue, Springfield, New Jersey 07081 ("Supplier"), and Fairway Group Holdings Corp., a Delaware corporation with offices at 2284 12th Avenue, New York, New York 10027 ("Fairway"), each referred to herein individually as a "Party" and collectively as the "Parties."

## RECITALS

**WHEREAS**, Fairway and Village Super Market, Inc., a New Jersey corporation ("Village"), are parties to that certain Asset Purchase Agreement, dated March 25, 2020 and as amended (the "Purchase Agreement"), which Purchase Agreement was partially assigned by Village to VSM NY Holdings LLC, a New York limited liability company ("VSM NY Holdings"), pursuant to that certain Assignment and Assumption Agreement, dated as of April 7, 2020, by and between Village and VSM NY Holdings, and that certain Assignment and Assumption Agreement, dated as of April 16, 2020, by and between VSM NY Holdings and Supplier;

**WHEREAS**, Supplier is the manufacturer and/or distributer of various types of kitchen (prepared foods), bakery, dried fruit and nuts ("DFN"), and cheese products (collectively, the "Products"); and

**WHEREAS**, Fairway desires to engage Supplier to supply to the retail store locations set forth on Schedule A attached hereto (the "Fairway Stores") with its requirements of the Products set forth on Schedule B attached hereto (the "Covered Products"); and

**WHEREAS**, Supplier has advised Fairway of its willingness, ability, and desire to supply the Covered Products to the Fairway Stores pursuant to the terms and conditions set forth in this Agreement.

**NOW THEREFORE**, in consideration of the mutual promises and covenants set forth herein and other good and valuable consideration, the sufficiency of which is hereby acknowledged by the Parties, intending to be legally bound, agree as follows:

1.      **Covered Products.**

1.1      Definitions.    Capitalized terms shall have the meanings specified throughout this Agreement or as set forth directly below. Capitalized terms used in this Agreement but not defined in this Agreement shall have the respective meanings for such terms set forth in the Purchase Agreement.

(i)      "DFN Covered Products" means dried fruit and nut Products.

(ii)      "<u>Non-DFN Covered Products</u>" means Products other than DFN Products.  For the avoidance of doubt, cheese, specialty Products, kitchen Products, cut fruit, and bakery Products shall be deemed Non-DFN Covered Products for purposes of this Agreement.

(iii)      "<u>Private Label Covered Products</u>" means Products manufactured or packaged by Supplier bearing the Seller Marks.

1.2      <u>Scope</u>.  For the duration of the Term (defined in <u>Section 5.1</u> below), the Fairway Stores shall have the option, but not the requirement, to purchase from Supplier Covered Products to stock the Fairway Stores; <u>provided that</u>, (i) Supplier reserves the right to discontinue any Covered Product at any time by providing Fairway with not less than 21 days' prior written notice and Fairway acknowledges that it will have to make alternative supply arrangements for such discontinued Covered Product, and (ii) if Fairway intends to close any Fairway Store, take action to reject any lease on any Fairway Store, or not have a Fairway Store purchase Covered Products from Supplier (each a "<u>Discontinued Store</u>"), it shall provide Supplier with not less than 21 days' prior written notice of its intent to do so.  Fairway's right to purchase Covered Products for delivery to a Discontinued Store shall cease on the 21st day after issuance of such notice, unless sooner terminated as provided herein. The list of Fairway Stores and their respective addresses are set forth on <u>Schedule A</u> attached hereto. Notwithstanding anything to the contrary herein, the Parties acknowledge and agree that Fairway may engage other third party suppliers, without restriction or penalty, to supply any goods, materials, or products, including, without limitation, Covered Products.

1.3      <u>Product Modifications</u>.  For any Covered Product manufactured by Supplier, Supplier may make modifications or improvements to the composition of a Covered Product in its sole discretion.

1.4      <u>Location for Delivery</u>.  Supplier shall deliver all Covered Products to a common carrier employed or engaged by Fairway FOB at the Supplier's dock (the "<u>PDC Dock</u>" and such common carrier, the "<u>Common Carrier</u>").

1.5      <u>Shelf Life</u>.  The shelf-life for the Covered Products shall conform to the earlier of (i) the specifications provided to Fairway by Supplier, (ii) Supplier's internal policies, and (iii) any applicable manufacturer's policy.  Supplier guarantees that the Covered Products shall be in adherence with their applicable minimum shelf-life expiration dates at the time the Covered Products are delivered to the Common Carrier at the PDC Dock.

2.      **Pricing and Payment.**

2.1      <u>Pricing</u>.

(i)      <u>Schedule B</u> sets forth the name of each Covered Product, the size per unit of each Covered Product, and the price per unit of each Covered Product (the "<u>Price Per Unit</u>") as charged by Fairway as of the Effective Date.

WEIL:\97474847\2\44444.0009

(ii)    With respect to DFN Covered Products, the Parties agree that the Price Per Unit of each DFN Covered Product shall be increased by 10% on the Effective Date, and may be increased by additional amounts in accordance with Section 2.1(iii) below.

(iii)    With respect to Non-DFN Covered Products and Private Label Covered Products, Supplier shall have the right to, upon 7 days' prior written notice to Fairway, increase the Price Per Unit as in effect on the Effective Date of any Non-DFN Covered Product or Private Label Covered Product by up to 5% per week; provided that, the total Price Per Unit increase of any Non-DFN Covered Product or Private Label Covered Product during the Term shall not exceed 120% of the Price Per Unit of any Non-DFN Covered Product or Private Label Covered Product as in effect on the Effective Date; provided further that, Supplier may increase the Price Per Unit of any Covered Product in excess of 120% of the Effective Date Price Per Unit upon 7 days' prior written notice to Fairway if it provides Fairway with information and supporting invoices or similar documentation showing that Supplier's costs incurred in purchasing or manufacturing such item have increased making such increase necessary in order to allow Supplier to recover all its costs plus a reasonable profit on sale of such item.

2.2    Invoicing; Payment Terms; Credit Limit.

(i)    Invoices will be rendered with each delivery, and will be payable as provided herein.  Each Invoice will also include the costs of the Common Carrier that takes delivery of the Covered Products from the PDC Dock and delivers them to the applicable Fairway Store.  Supplier's business week is deemed to start on Sunday and end on Saturday (the "Business Week").  Following the conclusion of each Business Week, Supplier shall render a statement to Fairway consisting of all unpaid invoices rendered during the prior Business Week on the Monday (or Tuesday if Monday is not a Business Day) following the end of the prior Business Week (each, a "Statement").  Payment of undisputed amounts set forth in each Statement shall be made in via ACH or wire transfer in immediately available funds within five calendar days of issuance and Fairway's receipt of the Statement.  If Fairway pays an Invoice prior to its receipt of a Statement identifying that Invoice as unpaid, it shall concurrently notify Supplier by email that such payment has been made.

(ii)    Amounts due and payable to Supplier hereunder shall be entitled to first priority administrative expense status in Fairway's bankruptcy cases, and shall be joint and several obligations of all Fairway affiliates that are debtors in such cases.   It shall be a condition to the effectiveness of this Agreement that Order providing for the Buyer Carve Out, which includes all amounts which may become due and payable to Supplier under this Agreement, shall not have been reversed or stayed, and will remain in effect until all amounts due and payable to Supplier hereunder have been paid in full.  For the avoidance of doubt, unpaid amounts under this Agreement shall constitute Buyer's Damages, which are included in the Buyer's Carve Out.

(iii)    The maximum amount of unpaid Invoices which may be issued, due and payable and unpaid at any one time under this Agreement (collectively the "Outstandings"), shall not exceed $450,000.00 in the aggregate (the "Credit Limit").  Supplier may refuse to accept any additional Purchase Orders, and may suspend services and deliveries of Covered Product hereunder at any time when the Outstandings are equal to or greater than the Credit Limit. In order

WEIL:\97474847\2\44444.0009

for Fairway to obtain a resumption of services and deliveries of Covered Products after Outstandings are equal or greater than the Credit Limit, Fairway must reduce Outstandings to less than 75% of the Credit Limit, and pay in full all interest and Late Fees. If the Outstandings, together with interest and Late Fees, exceed the Credit Limit for more than three days, Supplier may also terminate this Agreement in accordance with <u>Section 5.1</u>.

       2.3   <u>Interest Charges; Late Fees</u>.  Any amounts due under Invoices that are not timely paid in full when due shall bear interest at the rate of 5% per annum or the maximum contract rate of interest permitted by applicable Law, whichever is less, from and after the date such amounts were due, until paid in full.    In addition, Fairway shall pay Supplier a late fee of 5% of the amount of any Invoice that is not paid when due (the "<u>Late Fee</u>").    A payment is delinquent if for any reason Supplier does not receive the payment on or before the date due.  The Late Fee is not interest or a penalty and is only intended to compensate Supplier for the increased administrative and management costs due to such late payment.

       2.4   <u>Delivery and Risk of Loss</u>.  The Price Per Unit for all Covered Products shall be FOB the PDC Dock, and Fairway shall pay all costs of insurance, freight and other charges with respect to delivery of such goods to the stores.  Title and risk of loss, damage, theft, or destruction of the Covered Products shall pass to Fairway when the Covered Products are delivered by Supplier to the Common Carrier.

       2.5   <u>Taxes</u>.  The Price Per Unit of each Covered Product is exclusive of, and Supplier is solely responsible for and shall pay, all applicable value added, goods and services, sales, use, consumption, service or similar tax of any kind whatsoever, required to be paid to a taxing authority with respect to the Covered Products.  In connection with the foregoing, Fairway will make available to Supplier any resale certificate, information regarding out-of-state use of materials, services or sale, and other exemption certificates or information with respect to the Covered Products that is reasonably requested by Supplier. For the avoidance of doubt, each Party shall bear its own income tax costs with respect to the activities covered by this Agreement.

**3.**      **Fulfillment.**

       3.1   <u>Order Placement and Fulfillment</u>.  All purchases of the Covered Products shall be placed via purchase orders (each a "<u>Purchase Order</u>" or "<u>PO</u>"), shall be submitted by email, electronic data interchange system, or other mutually agreeable method, and shall be irrevocable by Fairway.  All Purchase Orders to be filled during a Business Week (i) shall be delivered no later than 48 hours prior to the Applicable Fairway Store Delivery Date/Time, (ii) shall indicate, by the applicable stock keeping unit, the Covered Products being purchased, the relevant quantities, the Fairway Store such Covered Products are to be delivered to, and the day and time that the Common Carrier will take delivery of such Covered Products for an applicable Fairway Store (the "<u>Applicable Fairway Store Delivery Date/Time</u>"); provided that, such time must be during Supplier's normal business hours, and (iii) may include such other details as the Parties mutually agree.

       3.2   <u>Frequency of Delivery</u>.  Each Fairway Store shall only be permitted to have one Applicable Fairway Store Delivery Date/Time per day.

WEIL:\97474847\2\44444.0009

3.3    <u>Service Level</u>.  Supplier shall provide Fairway with levels of service and quality at least consistent with the standards as to which Supplier operates its own business and no less than the general standards prevailing in the gourmet grocery industry with respect to fulfilling Fairway's requirements of Covered Products in compliance with the terms and conditions hereof and ensuring the delivery of such Covered Products in an accurate and timely manner.  Towards that end, the Parties shall compare, on a weekly basis, the Purchaser Orders submitted by Fairway to the Covered Products actually received by Fairway in order to calculate Supplier's weekly service level rate (the "<u>Service Level Rate</u>").  For the duration of the Term, and subject to supply disruptions caused by the COVID-19 public health crisis in accordance with <u>Section 12.3</u>, Supplier shall maintain a Service Level Rate in regards to each Covered Product category (i.e., DFN Covered Products, Non-DFN Covered Products, and Private Label Covered Products) of at least 70% (<u>e.g.</u>, if the Purchase Order requested 100 DFN Covered Products, Supplier must have delivered 70 conforming DFN Covered Products).

3.4    <u>Inspections and Rejection of Covered Products</u>.  Upon the Common Carrier delivering Covered Products to a Fairway Store, such Fairway Store's quality assurance department (the "<u>Assurance Personnel</u>") shall immediately inspect such delivered Covered Products.  In the event that the Assurance Personnel believe that (i) certain  Covered Products included on the applicable Purchase Order were not included in the delivery, or (ii) any of the delivered Covered Products are damaged, non-merchantable, subject to recall, materially defective, tampered with, or non-conforming ("<u>Non-Conforming Goods</u>"), the Assurance Personnel shall be required to (A) indicate any such issues on the bill of lading with a reasonable explanation (the "<u>Marked Bill of Lading</u>"), and (B) at Supplier's option, either return such Non-Conforming Goods within 24 hours to Supplier, or destroy same.  Upon Supplier's review and acceptance of the Marked Bill of Lading and its timely receipt of the Non-Conforming Goods, Supplier shall issue a credit to Fairway for the purchase price of the Non-Conforming Goods and an amount equal to the costs thereof or related to destroying or delivering the Non-Conforming Goods to Supplier.

4.    **Shipping.**

All Covered Products shall be packaged and delivered to the Common Carrier FOB at the PDC Dock.  Covered Products will be delivered in accordance with Village's ordinary and customary standard of care, in compliance with Supplier's and Village's internal policies, and in compliance with applicable Law (including, without limitation, local ordinances such as parking and neighborhood hour restrictions).

5.    **Term and Termination.**

5.1    <u>Term</u>.  The term of this Agreement (the "<u>Term</u>") shall commence on the Effective Date and shall continue thereafter for a period of 120 days. This Agreement will terminate as to any Discontinued Store no later than 21 days after receipt of the notice required by <u>Section 1.2</u> above.  This Agreement may be terminated if Outstandings, interest and Late Fees payable pursuant to <u>Article 2</u> exceed the Credit Limit for three days and Fairway has not paid such

excess within two days of receipt of written notice thereof from Supplier.  This Agreement may also be terminated at any time pursuant to the provisions set forth in <u>Section 7</u> below.

        5.2.   <u>Rights upon Termination</u>.  The termination of this Agreement by either Party shall not affect the rights and liabilities of the other Party arising during any point when the Agreement is in effect.  Upon termination of this Agreement pursuant to this <u>Article 5</u> or <u>Article 7</u>, all rights and obligations of the Parties hereunder shall terminate and be of no further force or effect, other than Supplier's right to receive any and all payments due to it hereunder, <u>Sections 2.2</u> to <u>2.5</u>, this <u>Section 5.2</u>, <u>Article 7</u>, <u>Section 9.1</u>, <u>Section 9.2</u>, <u>Article 10</u>, <u>Article 11</u>, and <u>Article 12</u>, which shall continue in full force and effect.

**6.**      **Confidentiality**.

        All information confidential or proprietary in nature (whether or not specifically labeled or identified as "confidential") furnished by either Party or its Representative to the other Party or its Representative pursuant to this Agreement shall be considered "Proprietary Information" (as defined in the Confidentiality Agreement) and subject to the terms and conditions of the Confidentiality Agreement *mutatis mutandis*. Notwithstanding the foregoing, Fairway acknowledges that Supplier and its Affiliates compete with Fairway in the supermarket business, and will continue to do so from and after the Effective Date. The Parties agree that Supplier and its Affiliates will be free to compete with Fairway in the supermarket business from and after the Effective Date without thereby breaching the terms of the Confidentiality Agreement, and Supplier and its Affiliates will not incur any liability to Fairway based on its use of Confidential Information obtained in connection with supplying Fairway pursuant to this Agreement. Fairway and its Affiliates release Supplier and its Affiliates from any provision of any agreement that would purport to limit, condition, or restrict Supplier and its Affiliates' right to compete with Fairway in the supermarket business from and after the date of this Agreement.

**7.**      **Default and Remedies.**

        7.1   <u>Default Events</u>.  The following events shall be considered a default of this Agreement: (i) Fairway's failure to pay any amount when due and payable hereunder, which failure continues unremedied for a period of three days after such due date that Fairway has not paid within two (2) days of receipt of written notice thereof from Supplier or (ii) the breach by Supplier or Fairway of any applicable material term, representation, warranty, covenant, condition, or other obligation of this Agreement with such breach remaining uncured for a period of at least thirty (30) days (the "<u>Cure Period</u>") after the breaching-Party has received written notice of said breach (each of (i) and (ii), a "<u>Default Event</u>").

        7.2   <u>Termination Rights</u>.  Fairway may terminate this Agreement, in its entirety or with respect to a Fairway Store(s), at any time upon 21 days' prior written notice to Supplier. Upon a Default Event, in addition to a Party's remedies available at law, the non-defaulting Party shall have the right to terminate this Agreement with immediate effect.  The Parties agree that in any action to interpret or enforce this Agreement, the prevailing Party may be entitled to recover its reasonable legal fees and costs of suit in addition to any other amounts due hereunder.

WEIL:\97474847\2\44444.0009

8.      **Non-Disparagement.**

While this Agreement is in effect and anytime thereafter, the Parties agree that they shall not disparage the other Party and/or its Affiliates and their respective past or present officers, directors, managers or executives and shall not publish or make any disparaging statement that is reasonably foreseeable to become public with respect to any of them.  The Parties agree that in the event of a breach or threatened breach of this <u>Section 8</u> by the other Party, the non-breaching Party shall be entitled to seek temporary, preliminary and/or final injunctive relief without the necessity of posting any bond or similar security in connection with such action.  The Parties agree that injunctive relief shall be the only remedy of a Party for violation of this <u>Section 8</u> and no Party will be entitled to any other form of damages, including, without limitation, monetary damages.

9.      **Representations, Warranties and Covenants.**

9.1     <u>Supplier Representations</u>.  Supplier represents, warrants, and covenants that: (i) Supplier has all power and authority necessary to enter into this Agreement and to perform its obligations hereunder; (ii) this Agreement has been duly executed and delivered by Supplier and, assuming due authorization, execution and delivery by Fairway, this Agreement constitutes a legal, valid and binding obligation of Supplier enforceable against Supplier in accordance with its terms except as limited by applicable bankruptcy and insolvency laws and general equitable principles, (iii) the execution and delivery of this Agreement and the performance by Supplier of the services contemplated herein will not conflict with or violate applicable Law or any other instrument, contract, agreement, or other commitment or arrangement to which Supplier is a party or by which Supplier is otherwise bound; (iv) Supplier and its employees have all licenses, permits, certifications, and/or other governmental authorizations necessary to manufacture, distribute, package, label, and transport the Covered Products; (v) Covered Products and their packaging shall not be (x) adulterated, misbranded, defaced, altered, repackaged or rebundled within the meaning of the Federal Food, Drug and Cosmetic Act, as amended, or (y) adulterated or misbranded within the meaning of any states' food and drug Laws and regulations; (vi) Supplier and/or its authorized agents abide by good manufacturing and agricultural practices and employ good sanitation practices consistent with standards of the gourmet grocery industry, including, without limitation, the implementation of Hazard Analysis Critical Control Points ("HACCP") plans acceptable to the U.S. Food & Drug Administration; and (vii) Supplier is the lawful owner of all Covered Products, and has the right to sell same and convey good and merchantable title, and all such Covered Products will be conveyed, and are free of any and all claims, liens, security interest and other encumbrances.

9.2     <u>Fairway Representations</u>.  Fairway represents, warrants, and covenants that: (i) Fairway has all power and authority necessary to enter into this Agreement and to perform its obligations hereunder; (ii) this Agreement has been duly executed and delivered by Fairway and, assuming due authorization, execution and delivery by Supplier, this Agreement constitutes a legal, valid and binding obligation of Fairway enforceable against Fairway in accordance with its terms except as limited by applicable bankruptcy and insolvency laws and general equitable principles, and (iii) the execution and delivery of this Agreement and the performance by Fairway of its terms will not conflict with or violate applicable Law or any other instrument, contract,

agreement, or other commitment or arrangement to which Fairway is a party or by which Fairway is otherwise bound.

9.3    <u>Services Provided by Fairway</u>.  Beginning on the Effective Date and continuing for thirty (30) days thereafter unless this Agreement is sooner terminated Fairway shall, subject to any third party restrictions, provide or cause to be provided for the sole benefit of Supplier the services listed on and subject to the terms and conditions of <u>Schedule C</u> (collectively, the "<u>Services</u>") at a reasonable cost plus margin for providing the Services.  Fairway shall perform the Services, if applicable, in a manner reasonably equivalent to the overall standards of quality at which such Services were provided by or on behalf of Fairway immediately prior to the Effective Date but otherwise such Services shall be "as is" and, for the avoidance of doubt, Fairway makes no representations or warranties of any kind, including without limitation, as to sufficiency, accuracy, or timeliness of the Services.  Fairway shall invoice Supplier weekly for the Services.  Supplier shall make payment of amounts set forth in each such invoice via ACH or wire transfer in immediately available funds within five calendar days of issuance and Supplier's receipt of the invoice. <u>Section 2.3</u> of this Agreement shall apply to invoices issued under this <u>Section 9.3</u> *mutatis mutandis*.

## 10.    Indemnification.

(a)    Supplier agrees to indemnify, defend and hold harmless Fairway from and against any and all losses or liabilities, including, without limitation, reasonable attorney fees and costs, arising out of or relating to claims, demands, actions, or causes of action (collectively, "<u>Claims</u>") that are caused, or alleged to be caused, by, or otherwise arise, or are alleged to arise, from or in connection with (i) Supplier's breach of any of its representations, warranties, covenants, or agreements set forth in this Agreement or (ii) the provision or use of the Services.

(b)    Fairway agrees to indemnify, defend and hold harmless Supplier from and against any and all losses or liabilities, including, without limitation, reasonable attorney fees and costs, arising out of or relating to Claims that are caused, or alleged to be caused, by, or otherwise arise, or are alleged to arise, from Fairway's (i) breach of any of its representations, warranties, covenants, or agreements set forth in this Agreement other than in connection with <u>Section 9.3</u> and (ii) willful misconduct with respect to <u>Section 9.3 subject to Section 10(c) below</u>.

(c)    Notwithstanding anything to the contrary in this Agreement: (i) except for each Party's indemnification obligations in Sections 10(a) and 10(b), in no event shall either Party have any Liability under this Agreement for any consequential, special, incidental, indirect or punitive damages, lost profits or similar items (including, without limitation, loss of revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to a breach or alleged breach of this Agreement) and (ii) Supplier fully and forever releases, waives and discharges Fairway and its Affiliates and its and their directors, officers, employees, agents, successors in interest and insurers from and against any and all Claims or Liability with respect to any breach of, or any matters relating to, <u>Section 9.3</u> or the provision or use of any Services; provided that Fairway will have Liability under this Agreement to the extent exclusively resulting from the willful misconduct of Fairway in the provision of any Services rendered under <u>Section</u>

9.3 of this Agreement up to an amount not to exceed the amount paid under this Agreement by Supplier to Fairway for the provision of such Services.

**11.   Parties Not Agents.**

Nothing contained in this Agreement shall be construed to suggest that the relationship between Fairway and Supplier is a partnership, joint-venture or amalgamation or that the Parties are in any respect agents of the other.  It is the express intent of the Parties that their relationship is that of independent contractors and that neither Party shall have the authority to obligate or create any liability on the behalf of the other Party.  Each Party shall act hereunder as an independent contractor and not as the agent of the other Party in performing its obligations under this Agreement, maintaining control over its employees, its subcontractors and their employees and complying with all withholding of income at source requirements, whether federal, state, local or foreign.  No employee of Supplier providing services hereunder shall be considered an employee of Fairway or any of its Affiliates.  This Agreement shall not confer any rights or remedies upon any Person other than Supplier and Fairway, and their respective successors and permitted assigns.

**12.   Miscellaneous.**

12.1   Governing Law and Venue; Submission to Jurisdiction; Selection of Forum; Waiver of Trial by Jury. This Agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the state of New York without regard to the conflict of laws rules or principles thereof (or any other jurisdiction) to the extent that such laws, rules or principles would direct a matter to another jurisdiction, except as otherwise required under the laws of the state of New York.  Each of the Parties agrees that: (i) it shall bring any Proceeding in connection with, arising out of or otherwise relating to this Agreement, any instrument or other document delivered pursuant to this Agreement or the transactions contemplated by this Agreement exclusively in the Bankruptcy Courts; and (ii) solely in connection with such Proceedings, (A) irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Courts, (B) waives any objection to the laying of venue in any such Proceeding in the Bankruptcy Courts, (C) waives any objection that the Bankruptcy Courts are an inconvenient forum or do not have jurisdiction over any Party, (D) agrees that mailing of process or other papers in connection with any such Proceeding in the manner provided in Section 12.5 or in such other manner as may be permitted by applicable Law shall be valid and sufficient service thereof and (E) it shall not assert as a defense any matter or claim waived by the foregoing clauses (A) through (D) of this Section 12.1 or that any Order issued by the Bankruptcy Courts may not be enforced in or by the Bankruptcy Courts; provided, however, that (x) if the Bankruptcy Cases have not been commenced or (y) upon the closing of the Bankruptcy Cases, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the U.S. District Court for the Southern District of New York sitting in New York County or the Commercial Division of the Courts of the State of New York sitting in the County of New York and any appellate court from any thereof, for the resolution of any such Proceeding. The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Proceeding arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT

WEIL:\97474847\2\44444.0009

IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

12.2    Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other Party; provided that, upon written notice to Fairway, Supplier shall have the right to assign this Agreement to (i) Village or any wholly-owned subsidiary of Village, and/or (ii) Supplier's or Village's lender(s) as a collateral security.

12.3    Force Majeure.  Supplier shall not be liable or responsible to Fairway, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement, when and to the extent such failure or delay is caused by or results from acts beyond the Supplier's reasonable control, including, without limitation: (i) acts of God, (ii) flood, fire, earthquake, or explosion, (iii) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest, (iv) government order or law, including executive orders. (v) actions, embargoes, or blockades in effect on or after the date of this Agreement, (vi) action by any governmental authority, (vii) national or regional emergency, (viii) epidemic, pandemic, viral or communicable disease outbreak (including COVID-19 (coronavirus)) as determined by the World Health Organization, the federal government of the United States of America, or the State of new York or New Jersey (ix) quarantines, (x) strikes, labor stoppages or slowdowns, or other industrial disturbances, (xi) shortage of adequate power or transportation facilities, (xii) lack of or inability to obtain fuel, power, components, or materials, (xiii) shortage of transportation facilities or transportation carriers, (xiv) disruption of supply chains, or (xv) other similar causes beyond Supplier's control (each, a "Force Majeure Event").  Supplier shall give notice within 5 days of the Force Majeure Event to Fairway, stating the period of time the occurrence is expected to continue and shall use reasonable efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized.  A Force Majeure Event shall not entitle Fairway to terminate this Agreement or to any damages under this Agreement except as expressly set forth herein.

12.4    Severability and Headings.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

12.5    Notice.  All notices, requests, demands and other communications required under this Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) by facsimile transmission with written confirmation of receipt, (iii) on day of transmission if sent by electronic mail ("e-mail") to the e-mail address given below, and written confirmation of receipt is obtained promptly after completion of the transmission, (iv) by

WEIL:\97474847\2\44444.0009

overnight delivery with a reputable national overnight delivery service, or (v) by mail or by certified mail, return receipt requested, and postage prepaid. If any notice is mailed, it shall be deemed given two (2) Business Days after the date such notice is deposited with the United States Postal Service. If notice is given to a Party, it shall be given at the address for such Party set forth below.

|  |  |
|---|---|
| <u>If to Supplier</u>: | VSM NY Distribution LLC<br>c/o Village Super Market, Inc.<br>733 Mountain Avenue<br>Springfield, New Jersey 07081<br>Attention:  John Van Orden<br>Email:  john.vanorden@wakefern.com |
| <u>With a copy (which shall<br>not constitute notice) to</u>: | Wollmuth Maher & Deutsch LLP<br>500 Fifth Avenue<br>New York, New York 10110<br>Attention:  Paul R. DeFilippo, Esq.<br>Email:  PDefilippo@wmd-law.com |
| <u>If to Fairway</u>: | Fairway Group Central Services LLC<br>2284 12th Avenue<br>New York, New York 10027<br>Attention:  Nathalie Augustin<br>Email:  Nathalie.augustin@fairwaymarket.com |
| <u>With a copy (which shall<br>not constitute notice) to</u>: | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Attention: Sunny Singh |

12.6    <u>Entire Agreement</u>.    This Agreement, together with any documents, instruments and certificates explicitly entered referred to herein, the Purchase Agreement, the Related Agreements, and the Confidentiality Agreement constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof. The Schedules to this Agreement are incorporated herein by reference and made a part hereof.

12.7    <u>Amendments and Waiver</u>. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent

WEIL:\97474847\2\44444.0009

default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 12.7 except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

12.8    Counterparts.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

12.9    Mutual Drafting.    The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

[SIGNATURE PAGE FOLLOWS]

12

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

*"Supplier"*

VSM NY DISTRIBUTION LLC

By: Village Super Market, Inc., its sole member

By: _____
Name: _____
Title: _____

*"Fairway"*

FAIRWAY GROUP HOLDINGS CORP.

By: _____
Name: _____
Title: _____

[SIGNATURE PAGE TO SUPPLY AGREEMENT]