UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                          )        **FOR PUBLICATION**

In re                                                  )

                                                     )        Chapter 11

OLD MARKET GROUP HOLDINGS   )

CORP., *et al*.,                            )        Case No. 20-10161 (PB)

                                                     )

        Debtors.[1]                          )        (Jointly Administered)
------------------------------------------------------------x

## Memorandum Decision and Order on Threshold Legal Issues With Respect to 400 Walnut Avenue LLC'S Cure Claim

**A P P E A R A N C E S :**

WEIL, GOTSHAL & MANGES LLP
*Counsel for the Plan Administrator*
767 Fifth Avenue
New York, New York 10153
<u>By</u>:    Sunny Singh
         Jared R. Friedmann

ANSELL GRIMM & AARON, PC
*Counsel for 400 Walnut Avenue*, LLC
365 Rifle Camp Road
Woodland Park, NJ 07424
<u>By</u>:    Joshua S. Bauchner
         Anthony J. D'Artiglio

WOLLMUTH MAHER & DEUTSCH LLP
*Counsel for VSM NY Holdings LLC, VSM NY*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each of their federal tax identification number, are as follows: Old Market Bakery LLC (4129); Old Market Broadway LLC (8591); Old Market Chelsea LLC (0288); Old Market Construction Group, LLC (2741); Old Market Douglaston LLC (2650); Old Market East 86th Street LLC (3822); Old Market eCommerce LLC (3081); Old Market Georgetowne LLC (9609); Old Market Greenwich Street LLC (6422); Old Market Group Central Services LLC (7843); Old Market Group Plainview LLC (8643); Old Market Hudson Yards LLC (9331); Old Market Kips Bay LLC (0791); Old Market Store LLC (9240); Old Market Pelham LLC (3119); Old Market Pelham Wines & Spirits LLC (3141); Old Market Red Hook LLC (8813); Old Market Stamford LLC (0738); Old Market Stamford Wines & Spirits LLC (3021); Old Market Staten Island LLC (1732); Old Market Uptown LLC (8719); and Old Market Westbury LLC (6240).

1

*Distribution LLC and Village Super Market, Inc.*
500 Fifth Avenue
New York, New York 10110
By:     Paul R. DeFilippo

**<u>Hon. Philip Bentley</u>**
**<u>U.S. Bankruptcy Judge</u>**

### INTRODUCTION

Fairway Group Holdings Corp. and a number of its affiliates (collectively, "Fairway" or the "Debtors") operated a chain of supermarkets in the New York City area. In January 2020, Fairway filed for chapter 11 protection. In the bankruptcy, Fairway sold most of its assets through a series of sales pursuant to Bankruptcy Code § 363 and then confirmed a chapter 11 plan of reorganization in October 2020.[2] The largest of these asset sales, and the one at issue here, was Fairway's sale to Village Supermarkets ("Village") of five stores, a product distribution center located at 400 Walnut Avenue in the Bronx (the "PDC" or "PDC warehouse"), and certain ancillary assets. Fairway's sale of the stores and the PDC warehouse took the form of an assignment to Village of the leases for those properties.

The present dispute concerns Fairway's responsibility, under Bankruptcy Code § 365(b), to cure defaults that existed under its lease for the PDC warehouse — specifically, its failure to make required repairs — at the time it assigned that lease to Village. Before the Court are two threshold legal issues, which the Debtors claim will obviate the need for a trial. The Debtors argue, first, that any repairs they may have been required to make are now the responsibility of Village, the new tenant under the lease. According to the Debtors, the Landlord can compel Village to make

---

[2] Following the asset sales, Fairway Group Holdings Corp. changed its name to Old Market Group Holdings Corp., and its affiliates similarly substituted Old Market for Fairway in their names. For simplicity's sake, the Court refers to the Debtors collectively as Fairway, rather than Old Market. Pursuant to its confirmed plan of reorganization, Fairway is now being managed by a Plan Administrator.

2

all such repairs, and therefore the Landlord has suffered no pecuniary harm and has no cure claim under Bankruptcy Code § 365(b). Second, the Debtors contend that none of their repair obligations ripened into defaults under the lease, and therefore none are defaults requiring cure under Section 365(b), because the Landlord supposedly failed to serve the Debtors with a demand or notice of the need to make these repairs prior to the filing of its cure claim. For these reasons, the Debtors ask this Court to conclude that their cure obligation is zero, regardless of the extent of the repairs required at the PDC warehouse at the time of the sale.

The Court finds the Debtors' threshold arguments to be without merit. Most fundamentally, the contention that Village is liable to the Landlord for repairs required prior to the sale is contrary to a central premise of asset sales under Bankruptcy Code § 363: that the buyer takes the assets free and clear of all pre-sale claims against the Debtors. The free-and-clear provisions contained in the sale order insulate Village from liability for all claims for pre-sale defects, and this protection is not contingent on the Landlord having demanded repairs prior to the filing of its cure claim. Nor does the lack of any prior demand make the required repairs any less a default that must be cured under Section 365. Both the text and the purposes of that section compel the conclusion that the statutory term "default" means any failure to perform under the assumed contract or lease, regardless of the definition of default contained in that contract or lease.

## FACTUAL BACKGROUND

Fairway filed these chapter 11 cases in January 2020, following an unsuccessful attempt to sell its business — 14 grocery stores in the New York City area — outside of bankruptcy. Fairway proceeded to sell most of its assets through a series of sales pursuant to Bankruptcy Code § 363,

3

which the Bankruptcy Court approved. The Court confirmed the Debtors' plan of reorganization in October 2020.[3]

The largest of the Debtors' asset sales was the one relevant to the present dispute: the sale to Village of five of the Debtors' stores, together with the PDC warehouse and ancillary assets such as the right to use the Fairway name. The sale of these stores and the PDC was effectuated by the Debtors' assignment to Village of the leases they held for these properties. The lease for the PDC (the "Lease" [ECF No. 947-5]) has a 25-year term, running from 2013 to 2038. According to the Debtors, the PDC warehouse needed extensive repairs at the time they took occupancy of it in 2013 (Debtors' Br. [ECF No. 1046] ¶ 14); they subsequently invested more than $30 million to improve the property (*id.* ¶ 15); and at the time of the sale, Village knew that further repairs were needed despite these improvements (*id.* ¶ 16).

Most relevant to the threshold issues now before the Court are three documents that governed the Village asset sale: the March 25, 2020 asset purchase agreement (the "Asset Purchase Agreement" or "APA" [ECF No. 449-1]), the April 20, 2020 Bankruptcy Court order approving the Village sale (the "Sale Order" [ECF No. 449]), and the May 6, 2020 agreement by which the Debtors assumed the Lease and assigned it to Village (the "Assumption and Assignment Agreement" or "A&A Agreement" [ECF No. 449-2]).

As is customary for asset sales pursuant to Section 363 of the Bankruptcy Code, the parties agreed that the Bankruptcy Court's order approving the sale would contain standard "free and clear" provisions, shielding Village from all liabilities that arose prior to the sale and related in any way to the acquired assets. The Asset Purchase Agreement provided:

> [A]t the Closing, Buyer will purchase from Sellers, and Sellers will sell, transfer, assign, convey, and deliver to Buyer, all of the Acquired Assets *free*

---

[3] Judge James L. Garrity, Jr., presided over these chapter 11 cases until September 2022, at which time these cases were reassigned to me.

4

> *and clear of Liens or Claims to the maximum extent permitted under applicable bankruptcy law*, except for Permitted Liens.

(Asset Purchase Agreement § 2.1; emphasis added.) The Agreement was conditioned on the Bankruptcy Court's entry of the Sale Order, which the Agreement defined as an order approving the asset sale "free and clear of all Liens and Claims." (*Id.* §§ 1.1, 7.1(c).)

Consistent with this agreement, the Sale Order contained extensive free-and-clear provisions. For example:

> Pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, upon the Closing Date and pursuant to and except as otherwise set forth in the Purchase Agreement, the Acquired Assets shall be transferred to Buyer free and clear of all encumbrances, claims (as defined in section 101(5) of the Bankruptcy Code), . . . whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, . . . with all such Interests or Claims to attach to the cash proceeds of the Sale Transaction in the order of their priority, with the same validity, force, and effect that they now have as against the Acquired Assets, subject to any claims and defenses the Debtors may possess with respect thereto. (Sale Order ¶ 13.)
>
> . . . .
>
> [A]ll persons and entities . . . , including all . . . parties to . . . unexpired leases, . . . hereby are forever barred, estopped, and permanently enjoined from asserting any Interests or Claims relating to the Acquired Assets or the transfer of the Acquired Assets against Buyer . . . . (*Id.* ¶ 15.)
>
> . . . .
>
> [T]he Buyer . . . shall have no liability for any . . . Claim . . . whether known or unknown as of the Closing Date . . . whether fixed or contingent . . . . (*Id.* ¶ 20.)

The Asset Purchase Agreement and the Sale Order also specifically addressed cure costs for the assigned leases, including the Lease. The APA and the Sale Order provided that, for each assigned lease, Village's responsibility for cure costs would be limited to one month's rent, a sum that Village paid at closing. (*See* APA at 6, defining Cure Costs; *see also* Sale Order ¶ 25.)

5

Consistent with this limitation, the Sale Order specifically shielded Village from any liability to counterparties, including the Landlord, for cure claims or pre-sale defaults of any sort:

> Counterparties to Transferred Contracts . . . . are hereby enjoined from taking any action against . . . the Buyer . . . with respect to any Claim for cure . . . . (Sale Order ¶¶ 27–28; *see also id.* ¶ D (defining "Counterparties" as any counterparties to "Transferred Contracts"); *and see id.* at 1 n.2, Motion to Sell Property Free and Clear of Liens Under Section 363(f) [ECF No. 21] ¶ 18, and Bidding Procedures Order [ECF No. 202] at 2, together defining "Transferred Contracts" to include the assigned leases.)
>
> . . . .
>
> Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all Counterparties are forever barred and permanently enjoined from raising or asserting against . . . the Buyer any defaults . . . existing as of the date of assumption of the Transferred Contracts . . . . (Sale Order ¶ 30.)

Subsequent to entry of the Sale Order, the Debtors and Village executed a separate assumption and assignment agreement for each of the various assigned leases, including the Assumption and Assignment Agreement that governed the Lease.

### PROCEDURAL BACKGROUND

In February 2020, the Debtors filed a notice setting forth the cure costs they proposed to pay for each of the leases they assigned to Village. For the PDC warehouse lease, the Debtors proposed to pay approximately $86,000. The Landlord filed an initial objection on March 4, 2020, followed by an amended objection five days later (the "Cure Objection" [ECF No. 262]), which asserted a claim for approximately $2.01 million in cure costs.[4]

After briefing and discovery had commenced, and the parties had attempted but failed to achieve a mediated resolution of the cure dispute, the Debtors proposed that the Court consider a

---

[4] In July 2020, the Landlord filed a second amended objection, which increased its asserted cure costs to more than $3.8 million. The Court struck that amended objection as untimely, limiting the Landlord's cure claim to the $2.01 million sought in its Cure Objection. (Order Granting Debtors' Motion to Strike the Second Amended Objection [ECF No. 902].) The Cure Objection also demanded payment of approximately $229,000 in past-due rent, but that overdue rent is no longer at issue, because the Debtors subsequently paid it.

6

threshold legal issue that could potentially obviate the need for further discovery and a trial. The Landlord and Village agreed to this approach, and on July 1, 2022, the Court entered a scheduling order providing for the parties, including Village, to brief and the Court to rule on a single threshold issue, defined as the "Damages Issue": whether "the Landlord could demonstrate that it suffered any actual or hypothetical damages . . . entitling it to recover cure costs" as a result of repairs it claims were necessary at the PDC warehouse at the time the Debtors assigned the Lease to Village. (July 1, 2022 Scheduling Order [ECF No. 1247] at 3.)

A subsequent brief filed by the Debtors raised a second threshold argument: that no defaults existed under the Lease, and therefore the Debtors have no defaults under Bankruptcy Code § 365 (and consequently no cure obligations), because the Landlord failed to demand repairs or to provide notice of default at any time prior to the filing of the Cure Objection. (Debtors' Reply Regarding the Threshold Damages Issue [ECF No. 1268] ¶¶ 16–18.)

The parties asked the Court to hear both of these issues on a threshold basis, in advance of further discovery or an evidentiary hearing.[5] In addition, the parties agreed it was appropriate for Village to participate in the argument of these threshold issues as if it were a party, because resolution of these issues may directly affect Village's rights and obligations vis-à-vis the Debtors and the Landlord. Village, in turn, has agreed to be bound by the Court's ruling on these threshold issues.

After the parties briefed the threshold issues, the Court heard argument on these issues on November 9, 2022. The parties presented no evidence at the hearing other than the exhibits

---

[5] The Debtors initially appeared to advance a third threshold argument as well: that the Landlord waived its right to demand cure by failing to demand any repairs of the property prior to filing the Cure Objection. [ECF No. 1268 ¶¶ 19–20.] At the November 9, 2022 hearing on the threshold issues, the Debtors confirmed that, to the extent this waiver argument goes beyond their second threshold argument, concerning lack of notice, they are no longer advancing a waiver argument. (Transcript of November 9, 2022 hearing [ECF No. 1311] at 16, 39–40.)

7

annexed to their motion papers, which included the documents on which the Court has relied in this decision — in particular, the Sale Order, the Asset Purchase Agreement, the Assumption and Assignment Agreement, and the Lease. At the conclusion of the November 9 hearing, the Court reserved decision.

## JURISDICTION

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334(b), as well as the Amended General Order of Reference from the United States District Court for the Southern District of New York, dated January 31, 2012. Under 28 U.S.C. § 157(b)(2)(B), the claim objection is a core proceeding, which the Court may determine by final order.

## DISCUSSION

Section 365 of the Bankruptcy Code permits a debtor that is a lessee under an unexpired lease to assume that lease if the debtor believes, in its reasonable business judgment, that assumption is in the estate's best interest. 11 U.S.C. § 365(a); *see generally Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098–99 (2d Cir. 1993). In most cases, a debtor can assign an assumed lease, as the Debtors have done here. Even a defaulted lease may be assumed and assigned, but in the event of a default, Section 365(b)(1) imposes three conditions to assumption: The debtor must (i) cure all existing defaults, (ii) provide compensation for any actual pecuniary loss resulting from the defaults, and (iii) provide adequate assurance of future performance. *See* 11 U.S.C. § 365(b)(1)(A), (B), & (C).

Despite Section 365's explicit cure requirement, the Debtors contend they are entitled to assume the Lease and assign it to Village without paying any cure costs or making any provision for repairs, regardless of the extent of the repairs that were needed at the time of the sale. They

argue that cure is not required, first, because the Landlord supposedly can compel Village to make any needed repairs and therefore has suffered no actual pecuniary loss, and second, because the Landlord failed to give notice prior to filing the Cure Objection and therefore no default supposedly has occurred under either the Lease or Section 365. The Court concludes that these arguments lack merit for the reasons discussed below.

I. **Village's Responsibility to Make Ongoing Repairs Does Not Relieve the Debtors of Their Cure Obligations**

According to the Debtors, the Asset Purchase Agreement, the Assumption and Assignment Agreement and the Lease require Village, as the new tenant, to undertake any needed repairs, including for conditions that arose prior to the sale. Because the Landlord can compel Village to make these repairs, the Debtors argue, the defective condition of the PDC warehouse has caused and will cause the Landlord no actual pecuniary loss, and the Debtors therefore have no cure obligations.

This argument fails for two independent reasons. First, the Sale Order's "free and clear" provisions expressly shield Village from liability for any claims that existed at the time of the sale, including these repair claims. Thus, the Landlord cannot compel Village to make these repairs; instead, its only recourse is to recover cure costs from the Debtors. Second, even if that were not the case, the Debtors would still be required to cure all defaults that existed at the time of the sale, regardless of any concurrent repair obligations Village might have. A debtor's obligation under Section 365(b) is absolute, not contingent on a showing that its counterparty has suffered actual pecuniary loss.

A. **The Sale Order's "Free and Clear" Provisions Shield Village from Liability for Pre-Sale Conditions, Notwithstanding Any Contrary Provisions of the APA, the A&A Agreement or the Lease.**

The Debtors contend that, by agreeing to take assignment of the PDC warehouse lease on an "as is" basis, knowing the property was in significant need of repair, Village took on an ongoing responsibility as tenant under the Lease to make all needed repairs, including for pre-sale defects.

The Debtors base this argument on two related sets of provisions in the governing documents. First, both the APA and the A&A Agreement provide that Village took assignment of the property "in its 'AS IS, WHERE-IS, WITH ALL FAULTS' condition and without any representation or warranty, orally or in writing, by Sellers." (A&A Agreement ¶ 3; *see also* APA § 4.8.) Second, paragraph 6(a) of the Lease makes the tenant — now Village — responsible for ongoing maintenance and repair:

> *Tenant's Repair Obligation.* . . . Tenant shall, at all times during the term, and at its own costs and expense, put, keep, replace and maintain in thorough repair and in good and substantial order and condition . . . all non-structural portions [and certain structural portions] of the building . . . .

(Lease ¶ 6(a).) According to the Debtors, the combined effect of the "as is" provisions and the Lease's ongoing-repair obligation is to make Village responsible to remedy all defective conditions, regardless of whether they arose before or after the sale.

This conclusion, however, cannot be squared with the "free and clear" provisions of the Asset Purchase Agreement and the Sale Order. As set forth in detail above, those provisions expressly shield Village, as the buyer, from all claims and liabilities that arose prior to the sale and that related in any way to the acquired assets. In addition, the Asset Purchase Agreement and the Sale Order specifically limit Village's liability for cure costs to one month's rent (which it paid to the Debtors at closing), and the Sale Order provides that Village is not liable to the Landlord for any cure claims or defaults that existed at the time of the sale.

In light of these free-and-clear provisions, the "as is" provisions of the APA and the A&A Agreement cannot be read to make Village responsible for defective conditions that arose before

the sale. Instead, these provisions must be given a more limited construction — to bar Village from asserting any claim against the Debtors for pre-sale defects, but not to impose any affirmative repair obligation on Village. In the first place, this narrower construction is the most natural reading of the "as is" provisions. At least as important, this interpretation harmonizes these provisions with the APA's unambiguous free-and-clear provisions, as settled contract interpretation principles require. *See, e.g.*, *Spinelli v. Nat'l Football League*, 903 F.3d 185, 200 (2d Cir. 2018) (court should "strive 'to harmonize all of [a contract's] terms'") (internal citation omitted).

Moreover, any possible doubt as to whether the "as is" provisions should be read this way is overcome by the Sale Order, which expressly states that its provisions take precedence over those of the other sale documents. Paragraph 38 of the Sale Order provides:

> **Conflicts; Precedence.** In the event that there is a direct conflict between the terms of this Sale Order, the Purchase Agreement, or any documents executed in connection therewith, the provisions contained in this Sale Order, the Purchase Agreement, and any documents executed in connection therewith shall govern, *in that order*.

(Sale Order ¶ 38; emphasis added.) The Sale Order itself contains no "as is" provisions. Thus, any conflict between the Sale Order's free-and-clear provisions and the "as is" provisions of the APA and the A&A Agreement must be resolved in favor of the Sale Order's provisions.

Similarly, the provisions of the Lease, including its ongoing-repair provision, are trumped by the Asset Purchase Agreement.[6] This is mandated by the A&A Agreement, which provides the APA's terms take precedence over those of both the A&A Agreement and the Lease:

> The assignment and assumption of *the Lease (and the obligations thereunder)* made hereunder are made in accordance with and subject to all terms and conditions of the [Asset] Purchase Agreement . . . . In the event of a conflict between the terms

---

[6] The Sale Order itself does not directly trump the Lease's provisions, since the Debtors executed the Lease in 2013, long before the Village sale. *See* Sale Order ¶ 38 (addressing conflicts between Sale Order and other "documents executed in connection therewith").

11

and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede, and prevail.

(A&A Agreement ¶ 4; emphasis added.) Thus, any conflict between the Lease's ongoing-repair provision and the free-and-clear provisions of the APA (and by extension, the Sale Order) must be resolved in favor of the latter.

At the November 9 hearing, the Debtors argued, for the first time, that the Landlord's repair claims are not "claims" within the meaning of the Sale Order's free-and-clear provisions — and therefore those provisions do not shield Village from the repair claims — because at the time of the sale such claims had not ripened into defaults under the Lease. (*See* Debtors' Presentation for Hearing on Threshold Issue [ECF No. 1307] at 1.) The Debtors base this argument on paragraph 19(a)(4) of the Lease, which provides that the tenant's failure to perform its obligations under the Lease does not become a "default" or an "Event of Default" (the paragraph uses these terms interchangeably) unless the Landlord provides notice of those breaches and the tenant then fails to cure the breaches within 30 days. (Lease ¶ 19(a)(4).) According to the Debtors, the Landlord did not give notice demanding repairs, and as a result, no default and therefore no "claim" for repairs existed at the time of the sale. (Debtors' Presentation for Hearing on Threshold Issue at 1.)

This argument lacks merit for at least two reasons. In the first place, the Landlord *did* give the Debtors a comprehensive notice demanding repairs: the March 9, 2020 Cure Objection. This notice was given more than 30 days before the Bankruptcy Court entered the April 20, 2020 Sale Order, and the Debtors do not claim to have made any of the demanded repairs. Thus, both of the elements required for an Event of Default to arise under the Lease appear to have been satisfied at the time of the sale.

More to the point, however, whether a default or Event of Default occurred under the Lease has no bearing on whether a "claim" existed within the meaning of the Sale Order's free-and-clear

12

provisions. As noted above, the Sale Order (at ¶ 13) incorporates the Bankruptcy Code's definition of claim: "[any] right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5). As has frequently been observed, this definition is extremely broad. *See Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991) ("Congress intended . . . to adopt the broadest available definition of 'claim.'"); *see also Elliot v. GM LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 156 (2d Cir. 2016), *cert denied*, 137 S. Ct. 1813 (Even a right to payment contingent on future events is a claim under Section 101(5) if it "result[s] from pre-petition conduct fairly giving rise to that contingent claim.") (internal citation omitted).

Here, the Landlord's right to demand repairs would fall within this broad definition even if the Landlord had not given notice of its repair demands by filing the Cure Objection. As Debtors' counsel admitted at the November 9 hearing, the Debtors' repair obligations under the Lease arose whenever repairs were needed, regardless of whether the Landlord gave notice of the defects or demanded that repairs be made. (Transcript of November 9, 2022 hearing [ECF No. 1311] at 80–81, 83.) This conclusion is compelled by paragraph 6(a) of the Lease, which imposes an ongoing repair obligation on the tenant, without any requirement of notice or demand by the Landlord. (Lease [ECF No. 947-5] ¶ 6(a).)

For these reasons, the Court finds that, to the extent repairs were needed at the time of the Village sale, a claim for those repairs existed under the Sale Order's free and clear provisions, and those provisions shield Village from any liability on account of that claim. Thus, contrary to the Debtors' contention, the Landlord's only recourse for any defective conditions that existed at the time of the sale is to recover on its cure claim against the Debtors.

### B. Section § 365 Requires Cure of All Defaults, Regardless of Whether the Counterparty Has Suffered Pecuniary Harm.

13

Even if the Sale Order did not shield Village from liability for pre-sale repair claims — and as a result, the Landlord had potential recourse against Village — the Debtors still would be required to cure all defaults that existed at the time of the sale.

The Debtors contend that Section 365 requires the Landlord to show that it has suffered "pecuniary harm" to be entitled to recover cure costs. (*See* Debtors' Br. [ECF No. 1046] ¶ 2 ("It is a fundamental principle that an entity seeking cure costs must prove that it has been damaged in some way and is therefore entitled to some recovery.")) In fact, both the plain language of Code § 365(b)(1) and the case law compel the opposite conclusion.

Subsection 365(b)(1) expressly provides that, if there has been a default in an executory contract or unexpired lease, the trustee may not assume that contract or lease unless it satisfies three requirements: The debtor must (A) cure the default, (B) compensate, or provide adequate assurance that it will promptly compensate, the counterparty for any actual pecuniary loss caused by the default, and (C) provide adequate assurance of future performance. 11 U.S.C. § 365(b)(1). These are not alternate remedies. Rather, the statute requires that all three be provided, as is clear from the fact that subsections (A), (B) and (C) are connected by the word "and," not "or."

Thus, the requirement that a debtor cure all defaults under a contract or lease that it seeks to assume is not, as the Debtors argue, contingent on the counterparty's proving that it otherwise would suffer pecuniary harm. Rather, the Debtor must always cure each default — and in addition, it must compensate the counterparty for any pecuniary harm remaining after cure. *Accord* 3 Collier on Bankruptcy ¶ 365.06 (under Bankruptcy Code § 365(b), "[f]irst, there must be a cure. This means that the contract or lease must be brought back into compliance with its terms. Second, there must be compensation for pecuniary loss to the other party.").

14

The case law is consistent with this plain-meaning reading of the statute. When debtors seek to assume leases or contracts under which they have failed to make required repairs, courts routinely require the debtor to make those repairs — that is, to cure the defaults — as a condition to assumption. *See, e.g.*, *In re Nw. Territorial Mint LLC*, No. 16-11767 (CMA), 2017 WL 3841750 (Bankr. W.D. Wash. Sept. 1, 2017); *see also Condal Distribs., Inc. v. 2300 Xtra Wholesalers, Inc. (In re 2300 Xtra Wholesalers, Inc.)*, 445 B.R. 113, 121–24 (S.D.N.Y. 2011); *In re Bourbon Saloon, Inc.*, No. 14-398 (NJV), 2015 WL 1245566 (E.D. La. Mar. 18, 2015), *aff'd in part, appeal dismissed in part*, 647 F. App'x 342 (5th Cir. 2016); *In re Prime Motor Inns*, 166 B.R. 993, 994 (Bankr. S.D. Fla. 1994). In none of these cases, or any other case of which the Court is aware, did the court require a showing of pecuniary harm as a prerequisite to requiring cure.

For this reason as well, the Debtors are required to cure all defaults that existed under the Lease at the time of the Village sale.

## II. The Debtors' Unperformed Repair Obligations Are Defaults Requiring Cure, Notwithstanding the Lease's Notice Provisions

In addition to arguing that they are not required to cure any defaults, the Debtors argue that none of the repair obligations they owed at the time of the sale constituted defaults under the Lease and, consequently, none should be considered defaults requiring cure under Bankruptcy Code § 365.

The Debtors base this argument on paragraph 19(a)(4) of the Lease, the same provision on which they rely for their argument (discussed in part I.A, above) that no claim for repairs existed under the Sale Order's free-and-clear provisions. As noted, the Debtors contend that the Landlord did not give notice demanding repairs as required by paragraph 19(a)(4), and that as a result, no default arose under the Lease. Absent a default under the Lease, the Debtors argue, there is no default under Bankruptcy Code § 365.

15

This argument, like the Debtors' argument that no claim for repairs existed under the Sale Order, fails for two independent reasons. First, as discussed in part I.A, the elements required for a default or Event of Default to arise under paragraph 19(a)(4) of the Lease appear to have been satisfied. The Landlord gave the Debtors notice of the required repairs, in the form of their March 9, 2020 Cure Objection, and the Debtors failed to make the demanded repairs within 30 days or at any subsequent time.

Second, even if no default had occurred under the Lease, this still would have no bearing on whether a default exists under Bankruptcy Code § 365. As several courts have held, the text of Section 365(b)(1) compels the conclusion that a default exists under that section whenever the debtor has failed to perform its obligations under its contract or lease, regardless of whether that failure amounted to a default as defined by the contract or lease.

The Ninth Circuit Court of Appeals' recent decision in *Smart Capital. Invs. I, LLC v. Hawkeye Ent., LLC (In re Hawkeye Ent., LLC)*, 49 F.4th 1232 (9th Cir. 2022), is particularly instructive. There, the bankruptcy court had found no defaults existed for Section 365(b) purposes, because the only defaults under the lease the debtor sought to assume were immaterial. The Ninth Circuit rejected this interpretation, holding that default, as used in Section 365(b), refers to all defaults under a contract or lease, not just material defaults. In reasoning directly applicable here, the Court of Appeals held:

> The Bankruptcy Code does not define "default." We interpret an undefined statutory term "in accordance with [its] ordinary meaning." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553, 134 S. Ct. 1749, 188 L. Ed. 2d 816 (2014) (citation omitted). The ordinary meaning of "default" is uncontroversial: it means "[a] failure to perform a task or fulfill an obligation." *American Heritage Dictionary of the English Language* 345 (1976); *see also* Black's Law Dictionary 505 (4th ed. 1968) (defining "default" as the "omission or failure to perform a legal duty").

16

*In re Hawkeye Ent., LLC*, 49 F.4th at 1237–38 (applying definitions in use at the time the Bankruptcy Code was adopted in 1978).

*Metromedia Fiber Network, Inc.*, 335 B.R. 41 (Bankr. S.D.N.Y. 2005), *aff'd sub nom. Abovenet, Inc. v. SBC Telecom, Inc.*, No. 06-CV-8269 (CLB), 2007 WL 636602 (S.D.N.Y. Feb. 26, 2007), is also closely on point. There, as here, the debtor contended that its non-performance did not give rise to a default under the contract it sought to assume — and therefore did not give rise to a default under Section 365 — because its counterparty had not provided written notice and an opportunity to cure, as the contract required. Judge Hardin rejected this argument, holding that "default," as used in Section 365, does not incorporate the definition of default in the contract at issue, but instead must be given its "plain and ordinary meaning" — namely, "the failure to perform or fulfill some obligation or duty imposed by law or contract." *Id.* at 48–50 (citing Black's Law Dictionary 417 (6th ed. 1990); Webster's Collegiate Dictionary 301 (10th ed. 2002)).[7] On appeal, Judge Brieant affirmed, adopting the bankruptcy court's plain-meaning construction of Section 365. *Abovenet, Inc.*, 2007 WL 636602, at *3–5.

Consideration of the purposes of Section 365(b)(1) reinforces the conclusion that the statutory term "default" should be construed to include any failure to perform contractually-required obligations. Section 365 gives debtors broad powers to enforce a defaulted contract or

---

[7] Judge Hardin added that his ruling also rested on the fact that the debtor's counterparty had not asserted a right to cure or a right to damages under subparts (A) and (B) of subsection 365(b)(1), but merely a right to adequate assurance under subpart (C). According to the court, the debtor's argument concerning notice and the opportunity to cure "would carry weight" if cure or damages were sought *and* if, "under state law principles of contract interpretation a counter-party . . . were contractually required to give formal notice of a default and an opportunity to cure as the predicate for the counter-party's right to a cure or to damages for breach . . . ." *Id.* at 49–50. This potential limitation on the *Metromedia* holding has no bearing on the present case, however, because the Lease does not require notice and an opportunity to cure as a predicate for the Landlord's right to demand repairs. Instead, as discussed above, that right arises immediately whenever repairs are needed. Paragraph 19's requirements of notice and an opportunity to cure are relevant only to whether the tenant's non-performance has ripened into an Event of Default, permitting the Landlord to terminate the Lease.

lease, and to assign it to a third party. To reduce the resulting burdens on the debtor's counterparty, subsection 365(b)(1) imposes counterbalancing obligations of cure, compensation and adequate assurance on the debtor. A narrow construction of "default" — permitting a debtor to assume and assign a contract or lease without curing its own breaches, simply because those breaches do not qualify as a default under the contract — would undermine the balance struck by these provisions.

The problem is that contractual definitions of default serve a variety of purposes, not always related to the remedial purposes of subsection 365(b)(1). For example, it is not uncommon for a contract to define default to require notice and an opportunity to cure, and to make a default a prerequisite for a party's right to terminate the contract. *See, e.g.*, *In re Hawkeye Ent., LLC*, 49 F.4th at 1237–38; *see also* Lease [ECF No. 947-5] ¶ 19(a)(4), (b)(1) (upon a default, such as tenant's failure to perform repairs within 30 days after demand, Landlord is entitled to terminate Lease.). With a default definition of this sort, the debtor's counterparty may have no reason to trigger a default by employing the contract's notice-and-opportunity-to-cure procedures, even if the debtor's breaches are substantial, unless it wishes to terminate the contract. To find no default under Section 365 for this reason — because the debtor's counterparty has not followed contractual procedures it was not required to follow and had no reason to follow — would undermine the compensatory purposes of subsection 365(b)(1). It would deprive the counterparty of any remedy for potentially substantial breaches, while giving the debtor a windfall.

That is exactly what would happen in this case were the Court to adopt the Debtors' interpretation of Section 365. The Debtors do not claim the Landlord's failure to demand repairs prior to filing its Cure Objection prejudiced them in any way. Moreover, the Lease did not require the Landlord to give the Debtors notice of the need for repairs, and the Landlord does not appear

18

to have had any reason to do so. Thus, the interpretation advocated by the Debtors would unfairly penalize the Landlord and give the Debtors a windfall.

## CONCLUSION

For the reasons stated above, the Court finds that the threshold issues raised by the Debtors lack merit. The Court will schedule a status conference to address the completion of discovery in this cure dispute.

**IT IS SO ORDERED.**

Dated:  New York, New York
            December 13, 2022

>                                  /s/ Philip Bentley
>                                  **Honorable Philip Bentley**
>                                  **United States Bankruptcy Judge**